# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

SUSIE A. WILSON, individually and in her )
capacity as administratrix of the Estate of )
JERMAINE LAMAR WILSON, deceased, )
and in her capacity as next friend of Z.W., a )
minor, )
                   )
            Plaintiffs, )
                   )
v. )
                   )   Civil Action No. 05-821 (SLR)
STANLEY W. TAYLOR, JR., individually; )
PAUL HOWARD, individually; NOREEN )   JURY TRIAL DEMANDED
RENNARD, individually; THOMAS L. )
CARROLL, individually; BETTY BURRIS, )
individually; DAVID PIERCE, individually; )
MICHAEL RECORDS, individually; )
[OFFICER] <u>DAVID</u> McDONALD, )
individually; and SERGEANT BOOM, )
individually, )
                   )
           Defendants.

## <u>AMENDED[1] COMPLAINT</u>

## <u>INTRODUCTION</u>

1.     Plaintiff Susie A. Wilson brings this action on her own behalf as administratrix of

the estate of Jermaine Lamar Wilson, deceased, and as next friend of Z.W., a minor, seeking

damages in vindication of the violations of the civil and Constitutional rights of Jermaine Lamar

Wilson, her son and Z.W.'s father, together with damages for assault, battery, and wrongful

death.

---

[1] Pursuant to Fed. R. Civ. P. 15(a), plaintiff hereby amends her Complaint as a matter of course, as no responsive pleading has been filed to date. Pursuant to D. Del. L.R. 15.1, this pleading differs from the original in that added material is underlined and deleted material is bracketed.

2.    Jermaine was murdered or otherwise perished due to asphyxia on February 18, 2005 while in the custody of the Delaware Department of Correction[, when he was strangled and/or hung by a ligature, resulting in his asphyxiation and death].

3.    Jermaine's [murder] death occurred on the day he was supposed to have been released from prison, after an alleged violation of probation filed against him by the Department of Corrections was withdrawn, after Jermaine was ordered to be released by the Superior Court of the State of Delaware, and after an individual with the same name as him had entered the Delaware criminal-justice system.

## JURISDICTION AND VENUE

4.    This Court has subject-matter jurisdiction over this claim pursuant to 28 U.S.C. § 1331 (federal-question jurisdiction), 42 U.S.C. §§ 1981 and 1983 (deprivation of equal rights and civil rights), 4 2 U.S.C. § 1985 (conspiracy to violate or interfere with civil rights), 42 U.S.C. § 1986 (failure to prevent violation or interference with civil rights), 42 U.S.C. § 1988 (proceedings in vindication of civil rights), and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

5.    Venue in this District is appropriate pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), in that all defendants reside in this District and a substantial part of the events and omissions giving rise to this claim occurred in this District.

## PARTIES TO THE ACTION

6.    Plaintiff Susie A. Wilson is a resident of the State of Delaware. She is the administratrix of the Estate of Jermaine Lamar Wilson, deceased ("Jermaine"), and, at all times relevant herein, was the natural mother of Jermaine Lamar Wilson.

7.    Plaintiff Susie A. Wilson is the grandmother and next friend of Z.W., the minor son of Jermaine Lamar Wilson, deceased.

8.      At all times relevant herein, defendant Stanley W. Taylor, Jr. ("Taylor") was the Commissioner of the Department of Correction of the State of Delaware. He may be served at the Department of Correction Central Administrative Building, 245 McKee Road, Dover, Kent County, Delaware 19904, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M. Jane Brady] Carl Danberg, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801. Pursuant to 11 *Del. C.* § 6517, at all times relevant herein, Taylor was responsible for the custody, study, training, treatment, correction, and rehabilitation of persons committed to the supervision of the Department of Correction, managing and supervising the Department of Correction, as well as the administration, supervision, operation, management, and control of all correctional institutions within the State of Delaware.

9.      At all times relevant herein, defendant Paul Howard ("Howard") was the Chief of the Bureau of Prisons of the Department of Correction of the State of Delaware.  He may be served at the Department of Correction Central Administrative Building, 245 McKee Road, Dover, Kent County, Delaware 19904, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M. Jane Brady] Carl Danberg, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801.

10.      At all times relevant herein, defendant Noreen Rennard ("Rennard") was the Chief of the Bureau of Community Corrections of the Department of Correction of the State of Delaware.  She may be served at the Department of Correction Central Administrative Building,

245 McKee Road, Dover, Kent County, Delaware 19904, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M. Jane Brady] <u>Carl Danberg</u>, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801

11.    At all times relevant herein, defendant Thomas L. Carroll ("Carroll") was the Warden of the Delaware Correctional Center.  He may be served at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, New Castle County, Delaware 19977, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M. Jane Brady] <u>Carl Danberg</u>, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801.

12.    At all times relevant herein, defendant Betty Burris ("Burris") was the Deputy Warden of the Delaware Correctional Center.  She may be served at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, New Castle County, Delaware 19977, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M. Jane Brady] <u>Carl Danberg</u>, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801.

13.    At all times relevant herein, defendant David Pierce ("Pierce") was the Deputy Warden of the Delaware Correctional Center.  He may be served at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, New Castle County, Delaware 19977, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M. Jane Brady] <u>Carl</u>

Danberg, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801.

14.    At all times relevant herein, defendant Michael Records ("Records") was a Probation and Parole Officer employed by the State of Delaware.  He may be served at the Central Violation of Probation Center, 875 Smyrna Landing Road, Smyrna, New Castle County, Delaware 19977, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M. Jane Brady] Carl Danberg, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801.

15.    At all times relevant herein, [Officer] David McDonald[, whose first name is unknown but whose identity will be determined in discovery,] was a Correctional Officer employed by the State of Delaware assigned to the Delaware Correctional Center.  He may be served at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, New Castle County, Delaware 19977, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M. Jane Brady] Carl Danberg, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801.

16.    At all times relevant herein, Sergeant Boom, whose first name is unknown but whose identity will be determined in discovery, was a Correctional Officer employed by the State of Delaware assigned to the Delaware Correctional Center.  He may be served at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, New Castle County, Delaware 19977, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M.

Jane Brady] <u>Carl Danberg</u>, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801.

## ALLEGATIONS COMMON TO ALL COUNTS

**I.    Irregular Deaths of Delaware Prison Inmates**

**A.    Multiple Unexplained Inmate Deaths Occur in Delaware's Prisons**

17.    Between February 1, 2000 and Jermaine Wilson's death on February 18, 2005, 23 Delaware prison inmates died for unexplained, undisclosed reasons.  Of these, 16 were African-American, six were white, and one was Hispanic.

18.    Edwin Corbin, 43, was an inmate at the Delaware Correctional Center.  He died on April 25, 2000, while in the custody of DOC.  Despite releasing precise causes of death for other inmates, DOC did not do so for Corbin. DOC only stated that the manner of death was "natural".  Corbin was an African-American male.

19.    Inmate Edward Sanders, 45, died on October 3, 2000. According to DOC, he died in the custody of the State of Virginia.  Despite releasing precise causes of death for other inmates, DOC did not do so for Sanders, except to state that he was "transferred to Virginia and died there."  DOC did not disclose Sanders' manner of death.  Sanders was an African-American male.

20.    Edward Coverdale, 42, was an inmate at Sussex Correctional Institution.  He died on November 15, 2000 while in the custody of DOC.  Despite releasing precise causes of death for other inmates, DOC did not do so for Coverdale. DOC only stated that the manner of death was "natural".  Coverdale was a white male.

21.    Henry Jones Smith, 41, was an inmate at Delaware Correctional Center.  He died on January 5, 2001 while in the custody of DOC.  Despite releasing precise causes of death for other inmates, DOC did not do so for Smith. DOC only stated that the manner of death was "natural".  Smith was an African-American male.

22.    Lb L. Lynn [*sic*], 31, was an inmate at Sussex Correctional Institution.  He died on February 11, 2001 while in the custody of DOC.  Despite releasing precise causes of death for other inmates, DOC did not do so for Lynn. DOC only stated that the manner of death was "natural".  Lynn was a white male.

23.    James E. Bervine, 32, was an inmate at the Delaware Correctional Center. He died on May 7, 2001 while in the custody of DOC.  Despite releasing precise causes of death for other inmates, DOC did not do so for Bervine. DOC only stated that the manner of death was "natural".  Bervine was an African-American male.

24.    Karl Brown, 34, was an inmate at the Howard Young Correctional Center. He died on May 12, 2001 while in the custody of DOC.  Despite releasing precise causes of death for other inmates, DOC did not do so for Brown. DOC only stated that the manner of death was "natural".  Brown was an African-American male.

25.    James Brezial, 39, was an inmate at the Delaware Correctional Center. He died on May 15, 2001 while in the custody of DOC.  Despite releasing precise causes of death for other inmates, DOC did not do so for Brezial. DOC only stated that the manner of death was "natural". Brezial was an African-American male.

26.    James Crumpler, 45, was an inmate at the Delaware Correctional Center. He died on May 19, 2001 while in the custody of DOC.  Despite releasing precise causes of death for

other inmates, DOC did not do so for Crumpler. DOC only stated that the manner of death was "natural". Crumpler was an African-American male.

27.     Artie B. Anderson, 44, was an inmate at the Delaware Correctional Center. He died on November 25, 2001 while in the custody of DOC. Despite releasing precise causes of death for other inmates, DOC did not do so for Anderson. DOC only stated that the manner of death was "natural". Anderson was an African-American male.

28.     Robert Sterling, 35, was an inmate at the Howard R. Young Correctional Institution. He died on February 24, 2002 while in the custody of DOC. DOC stated the cause of Sterling's death was "cardiac dysrhythmia during acute psychotic episode following withdrawal from cocaine & heroin", and alleged that the manner of his death was due to an "accident". Sterling was an African-American male.

29.     Christopher O. Blackson, 39, was an inmate at the Delaware Correctional Center. He died on March 27, 2002 while in the custody of DOC. Despite releasing precise causes of death for other inmates, DOC did not do so for Blackson. DOC only stated that the manner of death was "natural". Blackson was an African-American male.

30.     William E. Miller, 41, was an inmate at the Delaware Correctional Center. He died on July 19, 2002 while in the custody of DOC. Despite releasing precise causes of death for other inmates, DOC did not do so for Miller. DOC only stated that the manner of death was "natural". Miller was an African-American male.

31.     Robert Patterson, 52, was an inmate at the Delaware Correctional Center. He died on November 30, 2002 while in the custody of DOC. Despite releasing precise causes of death for other inmates, DOC did not do so for Patterson. DOC only stated that the manner of death was "natural". Patterson was an African-American male.

32.    Bryan Allen Cooper, 34, was an inmate at the Delaware Correctional Center.  He died on February 19, 2003 while in the custody of DOC.  Despite releasing precise causes of death for other inmates, DOC did not do so for Cooper.  DOC only stated that the manner of death was "natural".  Cooper was an African-American male.

33.    Vernell D. Locato, 43, was an inmate at the Delaware Correctional Center.  He died on March 27, 2003 while in the custody of DOC, which claimed, in a press release issued after Locato's death, that "[f]oul play is not suspected" and alleged in the same release that Locato's cause of death was "natural".  Despite releasing precise causes of death for other inmates, the Department of Corrections did not do so for Locato.  Locato was an African-American male.

34.    Henry J. Nabinett, 53, was an inmate at the Howard R. Young Correctional Institution.  He died on June 7, 2003 while in the custody of DOC, which claimed, in a press release dated June 9, 2003, again claimed that "[f]oul play is not suspected", and alleged that Nabinett's cause of death was "natural".  Despite releasing precise causes of death for other inmates, the Department of Corrections did not do so for Nabinett.  Nabinett was a white male.

35.    Larry R. Davis, 25, was an inmate at the Sussex Correctional Institution being held on a life sentence for murder first degree.  Davis died on July 31, 2003 at the University of Maryland Shock Trauma Center in Baltimore, Maryland, while in the custody of DOC.  In a press release dated July 31, 2003, DOC claimed that Davis "collapsed in the gym".  As with previous inmate deaths, DOC claimed that "[f]oul play is not suspected", and later alleged that Davis's cause of death was "natural".  Despite releasing precise causes of death for other inmates, the Department of Corrections did not do so for Davis.  Davis was an African-American male.

36.    James Hodges, 30, was an inmate at the Delaware Correctional Center.  He died on August 27, 2003 while in the custody of DOC.  DOC claimed, in a press release dated August 27, 2003, that Hodges "was found dead in his cell" and that "[h]e was housed in a cell by himself."  As before, DOC claimed in the same press release that "[f]oul play is not suspected."  DOC later alleged that Hodges' cause and manner of death were "undetermined".  However, an autopsy report released by the Office of the Chief Medical Examiner revealed an abrasion with discoloration on the neck, hemorrhage in the strap muscles of the neck, and foam near the nose and mouth and in the lungs, together with blood in the alveolar spaces and congestion in the alveolar capillaries.  Hodges was a white male.

37.    Bernard Coston, 53, was an inmate at the Howard R. Young Correctional Institution being held in default of bail pending trial on charges of criminal trespass and theft under $1,000.00.  He died on September 2, 2003 while in the custody of DOC.  DOC claimed, in a press release dated September 2, 2003, that Coston "died after a lengthy illness".  However, unlike prior inmate deaths due to illness or disease, DOC did not release a cause of death, stating only that his cause of death was "natural".  Coston was an African-American male.

38.    Louis Chance, 37, was an inmate who was serving six months at Level V supervision (i.e., incarceration) for driving under the influence.  He died on September 23, 2003 while in the custody of DOC.  DOC claimed, in a press release dated September 24, 2003, that Chance was incarcerated at Gander Hill Prison; however, in data released to the Wilmington *News-Journal*, DOC claimed that Chance was incarcerated at the Delaware Correctional Center.  As before, DOC alleged that "[f]oul play is not suspected".  However, unlike prior inmate deaths due to natural illness or disease, DOC did not release a cause of death, stating only that the cause of death was "natural".  Chance was a white male.

39.    Robert T. Jackson, 36, was an inmate at the Delaware Correctional Center. He died on November 24, 2003 while in the custody of DOC. However, unlike prior inmate deaths due to natural illness or disease, DOC did release a precise cause of death for Jackson. DOC stated only that the manner of death was "natural". Jackson was a white male.

40.    Robert Saunders, 43, was an inmate at the Howard R. Young Correctional Institution. He died on September 4, 2004 while in the custody of DOC. However, unlike prior inmate deaths due to natural illness or disease, DOC did release a precise cause of death for Saunders. DOC stated only that the manner of death was "natural". Saunders was an African-American male.

41.    Luis Morales, 54, was an inmate at the Delaware Correctional Center. He died on February 7, 2005 while in the custody of DOC. However, unlike prior inmate deaths due to natural illness or disease, DOC did release a precise cause of death for Morales. DOC stated only that the manner of death was "natural". Although DOC has claimed that Morales was a white male, upon information and belief, Morales was actually a Hispanic male.

42.    Deserea B. Bolden, 43, was an inmate at the Delaware Correctional Center. He died on February 17, 2005 while in the custody of DOC. However, unlike prior inmate deaths due to natural illness or disease, DOC did release a precise cause of death for Morales. DOC stated only that the manner of death was "natural". Bolden was an African-American male.

**B.    Inmate Suicides**

43.    Between January 1, 2000 and Jermaine's death on February 18, 2005, seven Delaware prison inmates died of causes alleged by the DOC to be suicide. Of these, two were African-American, four were white, and one was Hispanic.

44.    Paul Whitehurst, 34, was an inmate at the Delaware Correctional Center.  He allegedly committed suicide on April 13, 2001 while in the custody of DOC.  His cause of death was stated by DOC to be "anoxic encephalopathy due to hanging".  Whitehurst was an African-American male.

45.    Harry E. Missimer, 27, was an inmate at the Howard R. Young Correctional Institution. He allegedly committed suicide on April 24, 2001 while in the custody of DOC.  His cause of death was disclosed by DOC to be "hanging", and his manner of death was disclosed as "suicide-hanging".  Missimer was a white male.

46.    Toribo Cejas, 35, was an inmate at the Delaware Correctional Center. He allegedly committed suicide on August 11, 2001 while in the custody of DOC.  His cause of death was disclosed by DOC to be "hanging-external compression of neck by hanging. Generalized visceral congestion. Atherosclerosis of left main artery with stenosis, slight", and his manner of death was alleged to be "suicide-hanging".  Although DOC claimed that Cejas was a white male, upon information and belief, Cejas was in actuality a Hispanic male.

47.    Brett M. Franks, 18, was an inmate at the Sussex Correctional Institution. He allegedly committed suicide on May 22, 2002 while in the custody of DOC.  His cause of death was disclosed by DOC to be "asphyxia due to hanging", and his manner of death was alleged to be "suicide-hanging". Franks was an African-American male.

48.    David B. Bender, 48, was an inmate at the Delaware Correctional Center. He allegedly committed suicide on October 31, 2002 while in the custody of DOC.  His cause of death was disclosed by DOC to be "multiple cerebral infarcts complicating overdose of multiple prescribed medications", and his manner of death was alleged to be "suicide-overdose".  Bender was a white male.

49.    Paul K. Gohagan, 40, was an inmate at the Howard R. Young Correctional Institution. He allegedly committed suicide on June 23, 2003 – his birthday – while in the custody of DOC.  His cause of death was alleged by DOC to be "acute drug intoxication", and his manner of death was alleged to be "suicide-overdose".  Gohagan was a white male.

50.    Christopher Barkes, 37, was an inmate at the Howard R. Young Correctional Institution. He allegedly committed suicide on November 14, 2004 while in the custody of DOC. His cause of death was alleged by DOC to be "asphyxia due to hanging", and his manner of death was alleged to be "suicide-hanging".  Barkes was a white male.

## II.    Jermaine Lamar Wilson's History in Delaware's Corrections System

### A.    Jermaine Is Arrested as a Juvenile, Charged as an Adult in Superior Court, Pleads Guilty, and is Sentenced

51.    On or about December 4, 2002, when he was 17 years of age, Jermaine was arrested, along with several co-conspirators, for the crimes of Robbery First Degree, Aggravated Menacing, and Conspiracy First Degree.  These charges arose out of an incident which occurred on or about December 3, 2002.

52.    On or about January 27, 2003, days after he turned 18, Jermaine was indicted by a Grand Jury sitting in and for New Castle County on one count of Robbery First Degree, two counts of Attempted Robbery First Degree, and three counts of Conspiracy Second Degree.

53.    On or about April 9, 2003, the State of Delaware, acting through Deputy Attorney General Christina M. Showalter, Esquire, filed a Motion in New Castle County Superior Court seeking to transfer Jermaine's custody from the New Castle County Detention Center – a juvenile facility – to the Department of Correction.

54.    The Motion seeking to transfer Jermaine's custody to the Department of Correction was filed pursuant to 11 *Del. C.* § 2103A, which provides as follows:

> When a child has reached his or her 16th birthday and is found to be nonamenable to the rehabilitative processes of the Family Court or is charged with an offense in Superior Court and thereafter makes application for transfer of said charges to Family Court pursuant to § 1011 of Title 10 and is denied or fails to make application pursuant to § 1011 of Title 10 within the required time and is therefore held over for trial in Superior Court, the youth shall be remanded to the Department of Correction if held in default of bail. When a child (youth) has been lawfully administratively remanded or transferred to the Department of Correction ("DOC"), ***DOC shall be exclusively responsible for all aspects of the child's (youth's) care, custody and control, including services associated with those responsibilities upon such remand and transfer.*** The Department of Services for Children, Youth and Their Families ("DSCYF") shall have no authority or jurisdiction of such child (youth).

(emphasis supplied)

55.     On or about March 10, 2003, Jermaine, through counsel, entered into a plea bargain with the State of Delaware in which he pled guilty to one count Robbery First Degree and two counts of Conspiracy Second Degree, in exchange for which the State entered a *nolle prosequi* on the remaining charges.

56.     On or about June 20, 2003, the Honorable Richard R. Cooch of the New Castle County Superior Court ("Superior Court") sentenced Jermaine to, *inter alia*, a minimum mandatory sentence of two years at supervision level V (incarceration), followed by one year at supervision level V, suspended for one year at supervision level IV (work release), suspended after six months for six months at supervision level III, to be held at Level V until Level IV space was available.

### B.     Jermaine Is Transferred From The Plummer Center In Violation of The Superior Court's Sentence

57.     In the aforementioned sentencing order of June 20, 2003, the Superior Court specifically ordered that Jermaine would serve his Level IV sentence at the Plummer Community Correction Center ("Plummer Center") in Wilmington, New Castle County Delaware.

58.     Jermaine served his Level V sentence at the Howard Young Multi-Purpose Criminal Justice Facility ("MPCJF") in Wilmington, New Castle County, Delaware, commonly known as "Gander Hill Prison".

59.     On approximately September 9, 2004, Jermaine was transferred to the John L. Webb Correctional Facility ("WCF") in Wilmington, New Castle County, Delaware.

60.     Jermaine was told by an unknown prison counselor, employed by the State of Delaware and acting within the course and scope of his or her duties, that he was being transferred to WCF because his Level IV time was beginning.

61.     Jermaine was also told by the same unknown counselor that he would be placed in a 90-day "flow down" program upon beginning his Level IV time.

62.     Upon information and belief, "flow down" is a procedure in place at DOC wherein certain inmates on Level IV supervision are placed on progressively less strict supervision, with the ultimate goal being home confinement or partial work release.

63.     However, despite the representation of the State-employed prison counselor to the contrary, approximately two or three days after being transferred to WCF, Jermaine was transferred to the Central Violation of Probation Center ("CVOP") in Smyrna, Kent County, Delaware.

64.     No explanation was given to either Jermaine or his family for his transfer from WCF to CVOP.

65.    At no time did the Superior Court order or authorize Jermaine to be transferred to WCF or CVOP.

66.    DOC did not seek to modify the Superior Court's sentence to permit his transfer to either WCF or CVOP.

67.    After he was transferred to CVOP, the aforementioned counselor who promised Jermaine that he or she would apply for his "flow down" never contacted Jermaine again.

### III.    The Department of Correction Alleges That Jermaine Lamar Wilson Violated His Probation

#### A.    Jermaine Is Assaulted at CVOP by Officer McDonald and Sergeant Boom

68.    On or about January 25, 2005, while housed at CVOP, Jermaine was verbally reprimanded by Corrections Officer McDonald ("McDonald") because he allegedly talked in the hall while returning from dinner.

69.    DOC has classified CVOP as a Level IV supervised-release facility.  In essence, however, CVOP is the functional equivalent of a prison, complete with armed guards, prison uniforms, fences, gates, and controlled access.

70.    Nonetheless, because DOC has classified CVOP as a Level IV facility, it has established rules and regulations which Level IV probationers must follow.

71.    If a Level IV probationer violates one of DOC's rules or regulations, no matter how technical or minor the violation, DOC's policy, practice, and procedure is to allege that the probationer is in violation of probation and seek a ruling as to the same with the Court.

72.    In fact, DOC itself represents to the public that its two Violation of Probation Centers (CVOP and the Sussex Violation of Probation Center)

> house primarily offenders who have violated the terms of their probation. These "rules breakers" have not committed any crimes during their probation in the community. They have committed "technical" violations that could include failing to report to their probation officer, changing residence without notifying their probation officer, failing a drug test or failing to abide by a curfew. The Department of Correction believes such violations warrant brief periods of incarceration.

State of Delaware, *Bureau of Community Correction VOP and Work Release Centers – Department of Correction*, *available at* <http://www.state.de.us/correct/BOCC/BOCC_CCC_cvop.shtml> (last visited October 21, 2005).

73.     Upon information and belief, one of DOC's myriad rules and regulations governing CVOP included a prohibition against talking in the hallways while going to and coming from meals.

74.     After McDonald reprimanded Jermaine for violating the "no-talking" rule, he ordered Jermaine to follow him to a holding cell, whereupon McDonald closed the door violently, causing the door to strike Jermaine on the back.

75.     Jermaine, angry at having been struck by the door for no reason, called McDonald a "sucker".  At that point, McDonald, after looking behind him to determine if anyone was watching, grabbed Jermaine with his left hand by the throat and squeezed, while holding his right hand up in a punching position.

76.     Jermaine told McDonald that if McDonald hit him, he would file charges. McDonald threw Jermaine onto a bench, still gripping Jermaine's throat, and yelled "Listen, you stupid motherf—ker. If you ever call me a sucker again I'll f—k your little black a—s up."

77.     Still gripping Jermaine's throat, McDonald struck Jermaine's head against the wall, cutting the back of his head.

78.    Shortly after being attacked by McDonald, Jermaine observed one Corrections Officer Ayres ("Ayres"), an employee, agent, and/or servant of the State of Delaware, in the vicinity.

79.    Jermaine told Ayres that she must have seen what happened and that he wanted to file a grievance and speak to the supervisor on duty, Lieutenant May, whose first name is unknown.  Ayres did not respond to Jermaine's request.

80.    Jermaine began to strike the door of the holding cell with his foot to attract attention, whereupon Ayres summoned McDonald back to the holding cell.

81.    McDonald returned to the holding cell with one Sergeant Boom (hereinafter "Boom"), an employee, agent, and/or servant of the State of Delaware, who asked Jermaine why he was making noise.

82.    Jermaine responded that he had just been assaulted by McDonald and that he wanted to file a grievance.

83.    McDonald opened the cell door and ordered Jermaine to sit.  Jermaine refused, asking why he had been attacked, and demanded to speak to the lieutenant.

84.    McDonald asked Boom if he was "ready", whereupon McDonald counted to two and sprayed Jermaine in the face with a liquid known as "capstun".

85.    Upon information and belief, "capstun" is a spray employed by law-enforcement officers containing liquid capsaicin pepper oil for the purpose of disabling arrestees.

86.    After being sprayed in the face with "capstun", Jermaine was ordered to sit back down in the holding cell.

**B.    Defendant Records Issues An Administrative Warrant Containing An Incomplete Account of the Incident Involving Jermaine**

87.    In the evening of January 25, 2005 defendant Michael Records issued an Administrative Warrant alleging that Jermaine violated the terms of his Level IV supervision.

88.    An Administrative Warrant is a prerequisite for the Department of Corrections to obtain a hearing before the Superior Court to determine that a probationer is in violation of the terms of his or her supervision or probation.

89.    The Administrative Warrant issued by Probation Officer Records alleged the following:

> On 1/25/05, the offender [Jermaine] was told to stop talking in the hallway by C/O McDonald during evening feeding.  He continued to talk and became disorderly when this was again addressed.  He was ordered to the holding cell, but refused initially to go.  He eventually locked into [*sic*] the holding cell, but then began kicking and banging on the cell door.  He was ordered three times to stop by C/O McDonald, but refused to do so.  He was capstunned at that point to prevent damage to state property.  Previously, offender Wilson incurred program violations for refusing to work on the outside work projects on both 1/3/05, and 1/19/05.

90.    The Administrative Warrant did not mention the involvement of Sergeant Boom in the incident involving Jermaine, nor did it mention that Officer McDonald slammed Jermaine's head against the wall and that Jermaine sustained injuries to his head as a result.

91.    In addition, upon information and belief, defendant Records' representation in the Administrative Warrant that it was necessary to spray Jermaine with "capstun" in order "to prevent damage to state property", was inaccurate and misleading, inasmuch as facilities in CVOP and other Delaware correctional facilities are nearly indestructible and designed to withstand substantial abuse.

92.    Defendant Records placed the representation that Jermaine was sprayed "to prevent damage to state property" in the Administrative Warrant as a pretext for obtaining a violation of probation ("VOP") hearing, as the mere act of talking in the hallway would, upon

information and belief, not have risen to the level of proof necessary to establish probable cause that a violation of probation had occurred, which is a prerequisite for obtaining an Administrative Warrant.

93.    The Administrative Warrant was inaccurate and misleading in other ways as well. For instance, although defendant Records alleged in the Administrative Warrant that Jermaine "incurred program violations" for refusing to work on two occasions in January 2005, he failed to note therein that the reason Jermaine refused to work was because he was not given proper attire to work in the cold weather which beset Delaware that month.  In fact, the average monthly temperature in January 2005 for Wilmington, Delaware, the closest meteorological station to CVOP, was only 31 degrees.

94.    After the Administrative Warrant was issued, by Order of the Honorable Richard R. Cooch of New Castle County Superior Court dated January 26, 2005, Jermaine was ordered held without bail until his violation of probation hearing.

95.    In a video bail hearing held on February 1, 2005 before Commissioner Michael Reynolds of New Castle County Superior Court, Jermaine's commitment in lieu of bail was continued.

96.    At the time of the bail hearing, neither DOC nor the Delaware Department of Justice requested Jermaine's transfer to DCC.  In addition, the Superior Court never authorized Jermaine's transfer from Level IV supervision to Level V confinement.

**C.    Jermaine Is Suddenly Transferred to "The Hole" at the Delaware Correctional Center**

97.    Approximately two to two and one-half hours after being assaulted by McDonald and Boom, as aforesaid, Jermaine was transferred to the Delaware Correctional Center ("DCC"), where he was placed in a solitary-confinement unit commonly known as "The Hole".

98.    Upon information and belief, apart from being used for pretrial detention, placement in "The Hole" is often used by DOC's staff as a form of administrative punishment for DCC inmates who commit rules violations or infractions which do not rise to the level of actual crimes.

99.    According to the State of Delaware, DCC is "a Level 5 (prison) facility for men" and "is the state's largest adult, male correctional facility. DCC houses minimum, medium, and maximum security inmates. DCC is also the primary facility for housing the Kent County pre-trial (detainee) population."  State of Delaware, *Delaware Correctional Center – Department of Correction*, *available at* <http://www.state.de.us/correct/BOP/PrisonDCC.shtml> (last visited October 21, 2005).

100.    Despite the State's representation as set forth above, DCC is in actuality Delaware's only maximum-security prison, housing Delaware's most brutal, violent, and hardened criminals, including convicted rapists and murderers, Delaware's "Death Row", and the state's lethal-injection chamber.

101.    Therefore, DCC was a wholly inappropriate facility in which to place a Level IV probationer such as Jermaine, whose only prior history of violations consisted of hesitance to work during cold weather.

102.    After being placed in "The Hole" at DCC, Jermaine was put on 24-hour lockdown.  He was not permitted to leave his cell for any reason, nor was he permitted to consult with counsel or make telephone calls.

**E.    Jermaine Demands a Contested VOP Hearing**

103.    A VOP hearing in connection with the Administrative Warrant issued by defendant Records was initially scheduled for February 10, 2005 before the Honorable Richard R. Cooch in New Castle County Superior Court.

104.    At the time of his February 10 hearing, Jermaine, through his public defender, Brian Bartley, Esquire, advised the Court that he wished to contest the alleged violation of probation.

105.    The Court immediately continued the violation of probation hearing to February 15, 2005.

106.    Jermaine was returned to DCC after the hearing.

107.    Upon information and belief, Jermaine was advised by unknown employees, agents, and/or servants of the Department of Corrections that he would be held in "the Hole" until February 18, 2005 so that he could complete the balance of his Level IV time.

108.    In fact, upon information and belief, on an unknown date prior to the February 10, 2005 hearing, Jermaine was advised by employees, agents, and/or servants of DOC that his Level IV time would be "up" – that is, completed – on February 18, 2005.

109.    [Upon information and belief, Jermaine M. Wilson was being held at DCC in default of bail at the time Jermaine Lamar Wilson was returned to DCC after his violation of probation hearing.] Deleted.

**F.    The VOP is Withdrawn and Jermaine is Ordered Released**

110.    After Jermaine appeared in Superior Court on February 10, 2005, Probation Officer Records withdrew Jermaine's VOP.

111.    Probation Officer Records neither stated nor disclosed a reason for withdrawing Jermaine's VOP.

112.    In fact, a post-hearing Sentencing Worksheet dated February 10, 2005 appeared in Jermaine's file in Superior Court which reflects that on February 10, 2005, Jermaine was ordered released and that the VOP was withdrawn.  A copy of this Sentencing Worksheet is attached hereto as **Exhibit A** and incorporated herein by reference.

113.    Yet, Jermaine's file also contains a sentencing order dated February 10, 2005 and filed with the Prothonotary on February 14, 2005 which indicates that Jermaine was found not in violation and that the VOP was withdrawn.  A copy of this sentencing order is attached hereto as **Exhibit B** and incorporated herein by reference.

114.    However, the transcript of Jermaine's VOP hearing before Judge Cooch on February 10, 2005 does not reflect that the Court ordered Jermaine released.  A copy of the transcript of the entire February 10, 2005 VOP hearing is attached hereto as **Exhibit C** and incorporated herein by reference.

115.    In addition, a second post-hearing Sentencing Worksheet dated February 10, 2005 appears in Jermaine's Superior Court file which neither lists any disposition for the VOP nor sets forth Jermaine's ultimate disposition.   A copy of this Sentencing Worksheet is attached hereto as **Exhibit D** and incorporated herein by reference.

116.    Even though defendant Records withdrew Jermaine's VOP, he was never returned to CVOP or any other form of Level IV confinement.  Instead, Jermaine was left in "the Hole".

**G.    Jermaine Dies On The Day He Was Told He Would Be Released**

117.    On February 10, 2005, Jermaine wrote a letter to his mother, plaintiff Susie A. Wilson, which read, in pertinent part:

> I went to court today and they said, "Yeah you know" They told me I have to stay at Level 5 though until my Level 3 time starts and that's next week on (Friday 18) Hallaujah!!!   I'm finally coming home mom and to stay.  God is good.  I was praying last

night and I know you was praying for me too and it all worked out.
Can you please be here to pick me up Friday?  Or send somebody
so I can be gone.

118.    Ms. Wilson arrived at DCC on February 18, 2005 at approximately 5:15 p.m. to
pick up Jermaine.

119.    When Ms. Wilson arrived at DCC, she was told that there was no information
available concerning Jermaine's release, and she was instructed to return to DCC at 7:30 p.m.

120.    At approximately 9:00 p.m., Ms. Wilson was again told that no information
regarding Jermaine's release was available and was told to contact DCC the next day.

121.    Ms. Wilson drove home.  At approximately 2:00 a.m. on February 19, 2005, Ms.
Wilson received a telephone call from an individual with the Department of Corrections,
believed to be defendant Pierce, who advised Ms. Wilson that Jermaine had died.

122.    The caller did not ask Ms. Wilson if she had friends or family members nearby
before notifying her of Jermaine's death.

123.    The death certificate prepared by Deputy Chief Medical Examiner Adrienne
Sekula-Perlman, M.D. alleges that Jermaine was found at 10:45 p.m. in DCC.  The death
certificate further concludes that the immediate cause of Jermaine's death was asphyxia due to
hanging, and the manner of death is listed as "suicide".

124.    Jermaine's autopsy report concludes that he died as a result of asphyxia due to
hanging, and notes that a ligature furrow appears on the neck with a band of parchmentized skin
measuring ½" in width depressing the skin to a depth of ¼".  The report further notes an area of
soft tissue swelling measuring 1½"  in greatest dimension with a centrally-placed ¼" superficial
laceration.    Although  the  autopsy  report  is  completely  silent  concerning  Jermaine's
psychological history, the conclusion is nonetheless stated to be asphyxia due to hanging.

125.    Prior to his death, Jermaine had never exhibited suicidal tendencies and had never expressed suicidal ideations and plans.

126.    Jermaine did not commit suicide.

127.    Jermaine [was murdered] died in his prison cell by being strangled with a ligature by persons unknown, but whose identity shall be determined through discovery, or otherwise perished as a result of asphyxia.

## IV.    Jermaine Lamar Wilson's History in Delaware's Corrections System is Confused With Jermaine Lamont Wilson's

128.    On or about November 15, 2004, an individual named Jermaine Lamont Wilson was arrested on charges of Trafficking Cocaine, Possession With Intent to Deliver, Maintaining a Vehicle, Possession Within 1000 Feet of a School, and Possession of Drug Paraphernalia.

129.    Jermaine Lamont Wilson's bail was set by the committing magistrate at $33,500.00 cash, which Jermaine Lamont Wilson posted shortly thereafter.

130.    A preliminary hearing on Jermaine Lamont Wilson's charges was held in the New Castle County Court of Common Pleas on or about November 29, 2004, as a result of which he was bound over for trial in New Castle County Superior Court.

131.    A Grand Jury sitting in and for New Castle County indicted Jermaine Lamont Wilson on the above charges on or about February 7, 2005, after which the charges were assigned Case Number 0411012225 in New Castle County Superior Court.

132.    Jermaine Lamont Wilson was arraigned in New Castle County Superior Court on the aforementioned charges on February 28, 2005.

133.    The charges against Jermaine Lamont Wilson were assigned Criminal Action Number 0411012225 in New Castle County Superior Court.

134.    Jermaine Lamont Wilson had prior involvement with Delaware's criminal justice system.  In fact, upon information and belief, before he was indicted on the aforementioned charges, Jermaine Lamont Wilson was on probation and at least one capias was issued for him. His first arrest was as a juvenile in July 2000.

135.    On or about April 25, 2005, Jermaine Lamont Wilson entered a plea of guilty to Trafficking Cocaine, as a result of which he was sentenced to the Boot Camp Diversion Program.

136.    Jermaine Lamont Wilson's date of birth is August 8, 1983, and he is an African-American male.

137.    Jermaine Lamar Wilson's date of birth was January 15, 1985, and he was an African-American male.

138.    Jermaine Lamont Wilson is not the same person as Jermaine Lamar Wilson.

139.    Jermaine Lamont Wilson was known by an alias of "Jermaine M. Wilson". However, all of the pleadings and other documents in connection with his Superior Court prosecution bore the name of "Jermaine L. Wilson."

140.    On or about May 19, 2005, Robert A. Willoughby, Jr., a probation officer employed by the Department of Corrections, filed a document with New Castle County Superior Court styled "Probation Report – Level III" which, ***for the first time***, referred to Jermaine Lamont Wilson as "Jermaine M. Wilson" – a name by which he had never been referred to throughout the course of his Superior Court prosecution.

141.    Defendant Willoughby's report represented to the Superior Court that Jermaine Lamont Wilson

has a serious criminal history for a man his age.  In Delaware he
has 47 reported arrests that have totaled 75 charges and resulted in

1 Felony and 27 Misdemeanor Convictions to date.  He has a capias history of 31.  Mr. Wilson, per his own admission[,] is a gun enthusiast.  Stating prior to his felony conviction that he used to shoot at multiple ranges. [*sic*]  Mr. Wilson also admits to being a drug dealer, stating that he used the proceeds from his prior drug sales to get where he is today to include purchasing his 2 dump trucks for his trucking business.  Mr. Wilson claims to legally bring in $10,000 to $12,000 per week from the work these 2 trucks perform.  Mr. Wilson also admits to owning and paying cash for a 2005 700 series BMW that is registered to someone else, as he has stated he didn't want his Probation Officer knowing the type of car he had.  This Officer has spoken with several police detectives and by all reports, Mr. Wilson is believed to be operating a very successful illegal drug operation in New Castle County.  Mr. Wilson is a serious drug dealer with an infatuation for [*sic*] guns.  Mr. Wilson was deceitful to this Officer, attempting to make this Officer believe that his .40 caliber Glock that he bought prior to this felony conviction was stolen and that a police report had been taken.  In fact, no police report was ever taken and the gun was not reported stolen. Leaving this officer to believe that he still has access to the gun somewhere. [*sic*]

142.   Despite the fact that Willoughby stated his name to be "Jermaine M. Wilson", a Boot Camp Diversion Order entered by the Superior Court on June 15, 2005 as a consequence of Jermaine Lamont Wilson's aforementioned violation of probation continued to refer to him as "Jermaine L. Wilson".

143.   Upon information and belief, at least two entries pertaining to Jermaine M. Wilson's criminal history appear on Jermaine Lamar Wilson's Superior Court docket sheet:

   a) A capias issued on September 23, 2004 and returned on January 26, 2005 states "Not wanted. L[evel] 4 Supervision.  Report police contact to[…]".

   b) A second capias issued on November 12, 2004 states "FTP [failure to pay]/Criminal Contempt- Court Proceedings".

A copy of said docket sheet is attached hereto as **Exhibit E** and incorporated herein by reference.

144.   The aforementioned docket entries in Jermaine's file are incorrect. Jermaine was incarcerated on September 23, 2004 and November 12, 2004, the two dates for which capiases

were issued.  Therefore, he could not have been wanted on any capias, nor could he have been on Level IV supervision.

145.    Moreover, as recently as October 20, 2005, a document relating to Jermaine's criminal charges appeared in Jermaine Lamont Wilson's Superior Court file: a "Case Report" prepared by Heather Zwickert, a Probation/Parole Officer employed by DOC's Bureau of Pretrial Services, shortly after Jermaine Lamar Wilson's arrest.  Even though this report was dated February 11, 2003, it was marked with Jermaine Lamont Wilson's Superior Court Case Number of "0411012225", indicating a prosecution that commenced in 2004.  A copy of this document is attached hereto as **Exhibit F** and incorporated herein by reference.

146.    Upon information and belief, DOC, through unknown agents, servants, and/or employees, the identities of whom shall be determined in discovery, confused the identities of Jermaine Lamont Wilson and Jermaine Lamar Wilson.

147.    Upon further information and belief, DOC, through unknown agents, servants, and/or employees, the identities of whom shall be determined in discovery, misidentified Jermaine Lamar Wilson as Jermaine Lamont Wilson after the latter's arrest, thereby mistaking Jermaine as a recent dangerous offender and justifying his placement into "the Hole" at DCC.

148.    But for this misidentification, Jermaine would not have been placed into "the Hole".

149.    Upon information and belief, in his VOP report prepared after Jermaine's death, defendant Willoughby intentionally referred to Jermaine Lamont Wilson by his alias of "Jermaine M. Wilson" to conceal and obfuscate the fact that the two Jermaines were confused with each other and that, as a result, Jermaine was placed somewhere he never should have been.

**V.    The Wilmington *News-Journal* Exposes Serious Problems In Delaware's Prison System**

150.    Beginning on September 25, 2005, the Wilmington *News-Journal* began to publish a series of investigative articles as part of a series entitled "Delaware's Deadly Prisons". The articles described the abysmal state of medical care in Delaware's correctional system and also discussed a series of unexplained or suspicious inmate deaths, including Jermaine's.

151.    In an article dated September 28, 2005 entitled "Accountability for Deadly Prisons", the *News-Journal* set forth facts concerning Jermaine's death and reported, *inter alia,* that two individuals named Jermaine Wilson were in the Delaware correctional system at the same time.   The News-Journal further reported that "corrections officials sent the wrong Jermaine Wilson to Smyrna."

152.    The *News-Journal* also reported several egregious cases of inmate neglect, by DOC and its employees, agents, and/or servants, including, but not limited to:

   a)  The death of Anthony Pierce, an inmate at the Sussex Correctional Institution, who was known as "the brother with two heads" because of a massive untreated brain tumor on his head caused by osteosarcoma of the skull that was misdiagnosed by DOC's medical vendor as a cyst or ingrown hair;

   b)  DOC's refusal to send inmates with emergent medical conditions, including heart attacks, to hospitals, instead opting to provide treatment by in-house, contracted medical staff;

   c)  Forcing pretrial detainees in DCC to reside in a unit with no air conditioning while locked in their cells at all times except for meals;

   d)  Failing to provide adequate medical facilities at DCC, requiring ill inmates to sleep on the floor on foam pads;

   e)  Failing to provide adequate healthcare to Kenneth DeRoche, a convicted child rapist who was serving an eight-year term at DCC, for a heart condition, resulting in his release being ordered by Superior Court; and

   f)  Giving medical discharges to inmates with serious health problems rather than providing treatment, placing the burden of their healthcare on the public and on charitable organizations.

153.    Defendant Taylor, interviewed by the News-Journal in connection with the series, claimed that "[t]he inmate population tends to be a population that comes to us with a difficult medical history: substance abuse, tattoos, risky sex. They don't take care of themselves."

## VI.    Defendant Taylor "Responds" to the *News-Journal* Series and DOC Refuses to Release Jermaine Lamar Wilson's Medical Records

154.    In a document entitled "Response to Inmate Health Care Articles" issued on September 30, 2005, intended as a public rebuttal to the *News-Journal* series, defendant Taylor stated:

> Jermaine LeMar [*sic*] Wilson, DOB 1-15-85, was being properly housed at Gander Hill [P]rison.  He was serving a two-hear sentence at Level 5 (prison) for 1st degree robbery beginning on 6-20-03.  With good time credit applied, Jermaine LeMar [*sic*] Wilson's prison time ended on 9-9-04.  J.L. Wilson had a Level 4 (work release) sentence to follow the prison time.  That portion of the sentence began on 9-9-04.  Wilson was transitioned through Level 4 on his way to work release; [*sic*] with stays at the Webb Correctional Facility and Central Violation of Probation Center.  While at CVOP, Wilson exhibited defiant behavior, refused to participate in mandatory community service projects and blatantly failed to comply with orders from security staff.  As a result of this violation, he was sent to Delaware Correctional Center.  Based on his CVOP behavior, he was placed in maximum security.
>
> Jermaine M. Wilson, DOB 8-8-83 – a different inmate – was not incarcerated at either Level 5 (prison) or Level 4 (work release) during the time Jermaine LeMar [*sic*] Wilson was incarcerated at Gander Hill.  Jermaine M. Wilson was on probation at the time, living full time in the community.  His period of probation went from 4-16-03 to 5-10-05.  On 5-11-05, Jermaine M. Wilson was incarcerated at Sussex Violation of Probation Center.  He was released on bail the next day, 5-12-05, to complete his period of probation.
>
> On 7-7-05, Jermaine M. Wilson was incarcerated at Sussex Correctional Institution on trafficking charges. He currently resides at Sussex Boot Camp.

155.    Defendant Taylor's September 30, 2005 public response to the "Delaware's Deadly Prison" series failed to disclose and intentionally withheld significant material facts from the public, including, but not limited to, the following:

a)   That Jermaine Lamont Wilson was indicted under the name of "Jermaine L. Wilson", and was known as such in DELJIS and in the Superior Court docket;

b)   That Jermaine Lamont Wilson's alias was Jermaine M. Wilson;

c)   That Jermaine Lamont Wilson was never referred to by the Department of Corrections or any other entity as "Jermaine M. Wilson" during the course of his Superior Court prosecution until _**after**_ the death of Jermaine Lamar Wilson;

d)   That Jermaine Lamont Wilson had been indicted on multiple serious drug charges on February 7, 2005 in Superior Court and arraigned on the same charges on February 28, 2005;

e)   That documents from Jermaine Lamar Wilson's prosecution appear in Jermaine Lamont Wilson's Superior Court file, and that capiases concerning Jermaine Lamont Wilson appear on Jermaine Lamar Wilson's docket sheet;

f)   That defendant Records withdrew Jermaine Lamar Wilson's violation of probation following the February 10, 2005 hearing;

g)   That Jermaine Lamar Wilson had been advised he would be released from DCC on February 18, 2005;

h)   That plaintiff Susie A. Wilson in fact arrived at DCC in the evening of February 18, 2005 to pick her son up from DCC;

i)   That documents in the Superior Court file indicate that Jermaine Lamar Wilson was ordered to be released on February 10, 2005;

j)   That Jermaine Lamar Wilson was found dead on the day he told his mother he scheduled to be released;

k)   That Jermaine Lamar Wilson was transferred to two facilities in violation of the Superior Court's sentence, namely WCF and CVOP, when he had been ordered to serve the Level IV portion of his sentence at the Plummer Center;

l)   That WCF is a Level IV facility, when in actuality it is a Level V center and is in fact used and advertised as such by DOC;

m) That both Jermaine Lamar Wilson and Jermaine Lamont Wilson were in the Delaware criminal justice system at the same time;

n) That Jermaine Lamar Wilson had never exhibited suicidal tendencies or expressed suicidal ideations and/or plans; and

o) That Jermaine Lamar Wilson did not commit suicide, but, rather, was murdered <u>or otherwise perished.</u>

156.    In    addition,    defendant    Taylor's    September    30,    2005    "response" alleged that the News-Journal articles contained "numerous misstatements, exaggerations, and outright falsehoods".  Defendant Taylor's "response" claimed that

> while [DOC] would welcome the opportunity to refute each and every misstatement in the series, the DOC cannot do so in most cases, because refuting the articles' assertions would require DOC to rely upon and disclose information from inmates' medical files, which are required to be kept confidential by Federal law. If the News[-]Journal can secure a waiver of health information confidentiality from any of the sources for its articles, the DOC can provide a complete response to the allegations reported.

157.    However, defendant Taylor's September 30, 2005 "response" failed to explain why DOC released the precise cause of death for some inmates who died in custody, thereby causing DOC to "rely upon and disclose information from inmates' medical files", but yet did not disclose precise causes of death for other inmates who died in custody.

158.    Also, defendant Taylor's "response" disclosed Jermaine Lamar Wilson's alleged cause and manner of death (asphyxia by hanging) without obtaining a waiver of health information confidentiality from plaintiff Susie A. Wilson – in apparent violation of the same "Federal law" which defendant Taylor claimed justified withholding other inmates' medical information.  Yet, defendant Taylor failed to disclose that fact in his "response".

159.    DOC was also requested, by letter from plantiff's counsel to DOC's Dispensary dated  May  10,  2005  accompanied  by  a  legally  sufficient  HIPAA-compliant  medical

authorization, to produce a copy of Jermaine Lamar Wilson's entire medical file. A copy of the letter is attached hereto as **Exhibit G** and incorporated herein by reference.

160.    To date, neither DOC nor its medical contractor has produced Jermaine Lamar Wilson's medical file, even though it publicly disclosed Jermaine Lamar Wilson's alleged cause and manner of death while at the same time claiming that it was prohibited from releasing medical information regarding other prisoners, in specific violation of Delaware law requiring the disclosure of medical records within 45 days of a request. *See* 10 *Del. C.* § 3926.

## VII.    Jermaine Lamar Wilson Was Deprived of His Constitutional Rights Through Defendants' Actions and Inactions

161.    The physical injury caused to Jermaine by defendants Boom and McDonald, together with Jermaine's [murder and] death, were direct and foreseeable by all defendants.

162.    All defendants acted under color of state law at all times relevant herein and in willful and wanton disregard for the Jermaine's safety and rights, exhibiting gross and reckless negligence which exposed Jermaine to a substantial risk of physical harm and death, all of which shocks one's conscience.

163.    Jermaine was a member of a discrete class of persons subjected to potential harm as a result of the actions of defendants, or each of them, inasmuch as he was an inmate and/or probationer under the supervision of DOC.

164.    The actions and inactions of each defendant are sufficient to shock one's conscience, in that each defendant exercised authority under color of state law to create an opportunity for danger and harm that would not have otherwise existed, thereby establishing violations of his rights guaranteed by the United States and Delaware Constitutions, including, but not limited to:

a) Deprivation of life and liberty without due process of law, pursuant to the Fifth and Fourteenth Amendments;

b) Deprivation of the right to equal protection of law, pursuant to the Fourteenth Amendment;

c) Deprivation of the right to be free from cruel and unusual punishment, pursuant to the Eighth Amendment and imposed on defendants by the Fourteenth Amendment;

d) Deprivation of the right to be free from infliction of cruel punishment, pursuant to Article I, § 11 of the Delaware Constitution;

e) Deprivation of the right to be housed in a jail which pays proper regard to the health of prisoners, in violation of Article I, § 11 of the Delaware Constitution; and

f) Deprivation of his right to life, liberty, and property without judgment by his peers, in violation of Article I, § 7 of the Delaware Constitution;

165.    As a direct and proximate result of the deprivation of his Constitutional rights, as aforesaid, Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death.

166.    As a result of his death, Jermaine was unable to exhaust his administrative remedies against defendants pursuant to 42 U.S.C. § 1997e.

167.    Upon Jermaine's death, all causes of action he had or may have had against any or all defendants survived to plaintiff Susie A. Wilson, as administratrix of his estate, pursuant to 10 *Del. C.* § 3701.

## COUNT I

**CLAIM AGAINST DEFENDANTS TAYLOR, HOWARD, CARROLL, BURRIS, AND PIERCE– VIOLATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW PURSUANT TO 42 U.S.C. §§ 1981 AND 1983 (STATE-CREATED DANGER DOCTRINE)**

168.    Plaintiff repeats Paragraphs 1 through 167 of this Complaint as if the same were more fully set forth at length herein.

34

169.    Defendants Taylor, Howard, Rennard, Carroll, Burris, and Pierce, jointly and severally, acting in their individual capacities and under color of state law, committed the following acts and omissions:

a) Permitted conditions to exist in the Delaware Correctional Center which directly and foreseeably led to Jermaine's assault and [murder] <u>death</u>;

b) Allowed Jermaine Lamont Wilson's identity and criminal history to be confused with Jermaine Lamar Wilson's;

c) Failed to adequately investigate the background and/or history of Jermaine Lamar Wilson before placing him in "the Hole" at the Delaware Correctional Center, a maximum-security Level V facility;

d) Placed Jermaine in a position of danger by moving him from WCF to CVOP without the permission or authority of the Superior Court, and when no legitimate penological interest was served thereby;

e)  Placed Jermaine in a position of danger by moving him from CVOP to DCC without the permission or authority of the Superior Court, and when no legitimate penological interest was served thereby;

f) Placed Jermaine in a maximum-security Level V facility when no legitimate penological interest was served thereby;

g) Permitted an Administrative Warrant to be issued which misrepresented the situation involving Jermaine, Officer McDonald, and Sergeant Boom, and which failed to provide material facts concerning that incident;

h) Failed to provide adequate supervision and oversight for those corrections officers responsible for Jermaine's security;

i) Disobeyed the Superior Court's February 10 order that Jermaine be released;

j) Permitted Officer Willoughby to issue a Violation of Probation report which used the alias of Jermaine Lamont Wilson, "Jermaine M. Wilson", in an attempt to obfuscate the fact that Jermaine's identity was confused with that of Jermaine Lamont Wilson;

k) Failed to establish adequate internal controls and safeguards to prevent individuals with the same name, such as Jermaine Lamont Wilson and Jermaine Lamar Wilson, from being confused with each other;

l) Permitted conditions to exist which led to the death of disproportionately high numbers of African-American inmates, such as Jermaine; and

m) Failed to prevent the deaths of disproportionately high numbers of African-American inmates, such as Jermaine.

170.    The aforementioned acts and omissions of defendants Taylor, Howard, Carroll, Burris, and Pierce created a danger to Jermaine which resulted in the deprivation of his right to equal benefit of laws and proceedings for the security of his person and property as is enjoyed by white citizens, pursuant to 42 U.S.C. § 1981, as well as deprivation of his Constitutional rights under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution as well as Article I, §§ 7 and 11 of the Delaware Constitutions, as aforesaid.

171.    As a direct and proximate result of the deprivation of his Constitutional rights, as aforesaid, Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death, and, as a result, plaintiff hereby makes claim against defendants Taylor, Howard, Carroll, Burris, and Pierce in vindication of the violation of those civil rights, pursuant to 42 U.S.C. § 1988.

## COUNT II

### CLAIM AGAINST DEFENDANTS BOOM AND MCDONALD – VIOLATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW PURSUANT TO 42 U.S.C. §§ 1981 AND 1983 (STATE-CREATED DANGER DOCTRINE)

172.    Plaintiff repeats Paragraphs 1 through 171 of this Complaint as if the same were more fully set forth at length herein.

173.    The violations of Jermaine's Constitutional rights, as aforesaid, were directly and proximately caused by the actions of defendants Boom and McDonald, jointly and severally, acting in their individual capacities and under color of state law, in that they:

a) Maliciously, sadistically, wantonly, and unnecessarily inflicted pain upon Jermaine which was grossly disproportionate to the severity of his offense and was completely without penological justification;

b) Struck, beat, "capstunned", and otherwise subjected Jermaine to bodily harm which was malicious, sadistic, wanton, and unjustified and was carried out with a deliberate indifference to Jermaine's right under the Delaware and United States Constitutions to be free from cruel and unusual punishment.

c) Exercised use of force upon Jermaine that they could not plausibly have thought necessary under the circumstances; and

d) Subjected Jermaine, an African-American inmate, to punishment and/or treatment which would not be inflicted upon similarly-situated white inmates.

174.    The aforementioned acts and omissions of defendants Boom and McDonald created a danger to Jermaine which resulted in the deprivation of his right to equal benefit of laws and proceedings for the security of his person and property as is enjoyed by white citizens, pursuant to 42 U.S.C. § 1981, as well as deprivation of his Constitutional rights under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution as well as Article I, §§ 7 and 11 of the Delaware Constitutions, as aforesaid.

175.    As a direct and proximate result of the deprivation of his Constitutional rights, as aforesaid, Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death. Plaintiff hereby makes claim against defendants Taylor, Howard, Carroll, Burris, and Pierce in vindication of the violation of those civil rights, pursuant to 42 U.S.C. § 1988 and 10 *Del. C.* § 3701.

## COUNT III

**CLAIM AGAINST DEFENDANT RECORDS – VIOLATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW PURSUANT TO 42 U.S.C. §§ 1981 AND 1983 (STATE-CREATED DANGER DOCTRINE)**

176.    Plaintiff repeats Paragraphs 1 through 175 of this Complaint as if the same were more fully set forth at length herein.

177.    The violations of Jermaine's Constitutional rights, as aforesaid, were directly and proximately caused by the actions of defendant Records, acting in his individual capacity and under color of state law, in that he:

a)  Issued or caused to be issued an Administrative Warrant which contained false, inaccurate, and/or misleading information concerning Jermaine's alleged violation of probation, leading to Jermaine's unlawful and unnecessary confinement in "the Hole" at DCC;

b)  Sought or caused to be sought a violation of probation or Jermaine in bad faith and/or without probable cause to do so, leading to Jermaine's unlawful and unnecessary confinement in "the Hole" at DCC;

c)  Withdrew or caused to be withdrawn the aforementioned violation of probation without taking steps to secure Jermaine's release from "the Hole" at DCC; and

d)  Subjected Jermaine, an African-American inmate, to treatment which would not be given to similarly-situated white inmates.

178.    The aforementioned acts and omissions of defendant Records created a danger to Jermaine which resulted in the deprivation of his right to equal benefit of laws and proceedings for the security of his person and property as is enjoyed by white citizens, pursuant to 42 U.S.C. § 1981, as well as deprivation of his Constitutional rights under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution as well as Article I, §§ 7 and 11 of the Delaware Constitutions, as aforesaid.

179.    As a direct and proximate result of the deprivation of his Constitutional rights, as aforesaid, Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death. Plaintiff hereby makes claim against defendants Taylor, Howard, Carroll, Burris, and Pierce in vindication of the violation of those civil rights, pursuant to 42 U.S.C. § 1988 and 10 *Del. C.* § 3701.

## COUNT IV

**CLAIM AGAINST DEFENDANT TAYLOR – VIOLATION OF CIVIL RIGHTS UNDER
COLOR OF STATE LAW PURSUANT TO 42 U.S.C. §§ 1981 AND 1983
(DELIBERATE INDIFFERENCE)**

180.    Plaintiff repeats Paragraphs 1 through 179 of this Complaint as if the same were more fully set forth at length herein.

181.    Defendant Taylor, acting in his individual capacity and under color of state law, was deliberately indifferent to the violations of Jermaine's civil and Constitutional rights, as aforesaid, in that he knew of the following, but failed to take reasonable measures to prevent the same:

a) That the identity and criminal history of Jermaine Lamont Wilson had been confused with that of Jermaine Lamar Wilson;

b) That defendant Records had issued an Administrative Warrant which contained false, inaccurate, and/or misleading information in an attempt to seek a Violation of Probation for Jermaine;

c) That multiple complaints and grievances had been brought by inmates concerning unconstitutional conditions within Delaware's correctional system, yet blamed such violations on extrinsic factors such as "substance abuse, tattoos, risky sex" and alleging that inmates "don't take care of themselves";

d) That conditions existed in the Delaware Correctional Center which directly and foreseeably led to Jermaine's assault and [murder] death;

e) That Jermaine's background and/or history of before were not adequately investigated before he was placed in "the Hole" at the Delaware Correctional Center, a maximum-security Level V facility;

f) That Jermaine was placed in a position of danger by moving him from WCF to CVOP in violation of the Superior Court's sentencing order, and when no legitimate penological interest was served thereby;

g) That Jermaine was placed in a maximum-security Level V facility in violation of the Superior Court's sentencing order, and when no legitimate penological interest was served thereby;

h) That adequate supervision and oversight were not provided for those corrections officers responsible for Jermaine's security;

i) That the Superior Court's February 10 order that Jermaine be discharged was not obeyed;

j) That the Superior Court's sentencing order specifically providing that Jermaine be housed at the Plummer Center was disobeyed;

k) That conditions existed which led to the death of disproportionately high numbers of African-American inmates, such as Jermaine;

l) That disproportionately high numbers of African-American inmates, such as Jermaine, were dying while in the custody of the Department of Corrections;

m) That he engaged in a course of behavior calculated to obfuscate the truth concerning Jermaine's assault[, murder,] and death, as well as the abysmal conditions in Delaware's corrections system; and

n) That a repeated pattern of violations of inmates' civil rights in the Delaware correctional system was occurring, including deprivation of adequate healthcare and abuse and assault of prisoners was occurring, resulting in serious bodily injury, disease, and death.

182.    Jermaine's bodily injury[, murder,] and death was the direct and proximate result of the deliberate indifference of defendant Taylor to the violations of the Constitutional rights of Jermaine and other persons under the supervision of the Delaware correctional system, as aforesaid.

183.    As a direct and proximate result of the deprivation of his Constitutional rights, as aforesaid, Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death. Plaintiff hereby makes claim against defendant Taylor in vindication of the violation of those civil rights, pursuant to 42 U.S.C. § 1988 and 10 *Del. C.* § 3701.

## COUNT V

**VIOLATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW
PURSUANT TO 42 U.S.C. § 1983
(FAILURE TO TRAIN AND MAINTENANCE OF
CUSTOMS, POLICIES, PRACTICES, OR PROCEDURES)**

184.    Plaintiff repeats Paragraphs 1 through 183 of this Complaint as if the same were more fully set forth at length herein.

185.    The bodily injury and death caused to Jermaine was the direct and proximate result of customs, policies, practices, and procedures established by defendants Taylor, Howard, Carroll, Rennard, Burris, and Pierce, jointly and severally, acting in their individual capacity and under color of state law, including, but not limited to, the following:

    a) Failure to adequately train employees, agents, and/or servants of DOC in the proper handling of Level IV probationers who commit minor, technical rules infractions;

    b) Failure to adequately train employees, agents, and/or servants of DOC in conflict resolution and/or management so as not to permit minor, technical rules infractions to rise to the level of a physical altercation;

    c) Failure to maintain adequate internal safeguards and mechanisms to prevent the confusion of inmates with similar names with each other;

    d) Failure to adequately train employees, agents, and/or servants of DOC in the identification and monitoring of inmates so as to prevent confusion of inmates with similar names with each other;

    e) Establishing and maintaining customs, policies, practices, and/or procedures which fail to ensure that Court orders concerning the nature and extent of an inmate's incarceration and/or probation, including whether and when an inmate or probationer is to be released, are obeyed and/or adhered to;

    f) Failure to adequately train employees, agents, and/or servants of DOC to ensure that Court orders concerning the nature and extent of an inmate's incarceration and/or probation, including whether and when an inmate or probationer is to be released, are obeyed and/or adhered to;

    g) Establishing and maintaining customs, policies, practices, and/or procedures which place Level IV probationers in facilities which, although held out to the public and the Courts as probationary or work-release facilities, are in actuality the functional equivalent of Level V prisons;

    h) Establishing and maintaining customs, policies, practices, and/or procedures which place Level IV probationers in Level V custody following technical and/or minor rules infractions;

i)   Establishing and maintaining customs, policies, practices, and/or procedures which place Level IV probationers in Level V custody following technical and/or minor rules infractions without seeking approval of the sentencing Court to do so;

j)   Establishing and maintaining customs, policies, practices, and/or procedures which permit Probation Officers to issue Administrative Warrants which lack full disclosure of the circumstances surrounding alleged violations of probation by Level IV probationers;

k)   Establishing and maintaining customs, policies, practices, and/or procedures which fail to adequately train Probation Officers in the investigation of alleged violations of probation prior to issuing Administrative Warrants;

l)   Establishing and maintaining customs, policies, practices, and/or procedures by which Level IV probationers are moved from one Level IV facility to another in violation of Court orders specifically establishing the facility in which a Level IV sentence is to be completed;

m)   Establishing and maintaining customs, policies, practices, and/or procedures which fail to seek Court approval before moving and/or relocating Level IV probationers when said probationers' sentencing orders specifically set forth the facility in which a Level IV sentence is to be completed;

n)   Establishing customs, policies, practices, and/or procedures which permit Correctional Officers to use dangerous and/or deadly devices such as capstun spray in a facility which is intended to hold Level IV probationers during work release and/or supervised release;

o)   Establishing customs, policies, practices, and/or procedures which fail to adequately carry out DOC's statutory duty pursuant to 11 *Del. C.* § 2103A to "be exclusively responsible for all aspects" of a juvenile offender's "care, custody and control, including services associated with those responsibilities upon such remand and transfer" after said offender's custody is transferred to DOC from the Department of Services for Children, Youth and Their Families;

p)   Establishing customs, policies, practices, and/or procedures which fail to adequately safeguard the life, health, and safety of inmates, resulting in illness, injury, and death;

q)   Establishing customs, policies, practices, and/or procedures which result in cruel and unusual punishment of inmates and probationers, including illness, injury, and death;

r) Failure to adequately train employees, agents, and/or servants of DOC to prevent cruel and unusual punishment of inmates and probationers, including illness, injury, and death;

s) Establishing customs, policies, practices, and/or procedures which fail to ensure that inmates and probationers are screened and/or monitored for suicidal ideations and/or plans;

t) Failure to adequately train employees, agents, and/or servants of DOC to screen inmates and/or probationers for suicidal ideations and/or plans;

u) Establishing customs, policies, practices, and/or procedures which failed to prevent Jermaine Lamar Wilson's death while in the custody of DOC;

v) Establishing policies, policies, practices, and/or procedures which resulted in Jermaine Lamar Wilson's death while in the custody of DOC;

w) Failed to adequately train DOC's employees, agents, and/or servants to prevent Jermaine Lamar Wilson's death while in the custody of DOC.

186.    As a direct and proximate result of the actions and inactions of defendants, as aforesaid, Jermaine was subjected to a deprivation of his rights guaranteed by the United States Constitution, resulting in attendant physical injuries, mental anguish, pain and suffering, and death. Plaintiff hereby makes claim against defendants Taylor, Howard, Carroll, Rennard, Burris, and Pierce, jointly and severally, in vindication of the violation of those civil rights, pursuant to 42 U.S.C. § 1988 and 10 *Del. C.* § 3701.

## COUNT VI

**VIOLATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW
PURSUANT TO 42 U.S.C. § 1985
(CONSPIRACY TO VIOLATE CIVIL RIGHTS)**

187.    Plaintiff repeats Paragraphs 1 through 186 of this Complaint as if the same were more fully set forth at length herein.

188.    The bodily injury caused to Jermaine by defendants Boom and McDonald, jointly and severally, as aforesaid, acting in their individual capacity and under color of state law, was

43

the direct and proximate result of a conspiracy between those two individuals to violate Jermaine's civil rights, which resulted in the deprivation of his right to equal benefit of laws and proceedings for the security of his person and property as is enjoyed by white citizens, pursuant to 42 U.S.C. § 1981, as well as deprivation of his Constitutional rights under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution as well as Article I, §§ 7 and 11 of the Delaware Constitutions, as aforesaid.

189.    As a direct and proximate result of the deprivation of his Constitutional rights, as aforesaid, Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death and, as a result, plaintiff hereby makes claim against defendants Boom and McDonald in vindication of the violation of those civil rights, pursuant to 42 U.S.C. §§ 1985(3) and 1988.

## COUNT VII

**VIOLATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW
PURSUANT TO 42 U.S.C. § 1985
(CONSPIRACY TO VIOLATE CIVIL RIGHTS)**

190.    Plaintiff repeats Paragraphs 1 through 189 of this Complaint as if the same were more fully set forth at length herein.

191.    The bodily injury and death suffered by Jermaine, as aforesaid, was the direct and proximate result of a conspiracy among defendants Taylor, Howard, Carroll, Rennard, Burris, and Pierce, MacDonald, and Boom, or each of them, jointly and severally, acting in their individual capacity and under color of state law, to violate Jermaine's civil rights, which resulted in the deprivation of his right to equal benefit of laws and proceedings for the security of his person and property as is enjoyed by white citizens, pursuant to 42 U.S.C. § 1981, as well as deprivation of his Constitutional rights under the Fifth, Eighth, and Fourteenth Amendments of

the United States Constitution as well as Article I, §§ 7 and 11 of the Delaware Constitutions, as aforesaid.

192.    As a direct and proximate result of the deprivation of his Constitutional rights, as aforesaid, Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death.    Plaintiff hereby makes claim against defendants Taylor, Howard, Carroll, Rennard, Burris, and Pierce in vindication of the violation of those civil rights, pursuant to 42 U.S.C. §§ 1985(3) and 1988.

## COUNT VIII

### VIOLATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW PURSUANT TO 42 U.S.C. § 1986 (FAILURE TO PREVENT CONSPIRACY TO VIOLATE CIVIL RIGHTS)

193.    Plaintiff repeats Paragraphs 1 through 192 of this Complaint as if the same were more fully set forth at length herein.

194.    Defendants Taylor, Howard, Carroll, Burris, and Pierce had actual or constructive knowledge of the conspiracy by defendants Boom and McDonald to violate Jermaine's civil rights, as aforesaid.

195.    Defendants Taylor, Howard, Carroll, Burris, and Pierce had the power and ability to prevent the commission of acts by defendants Boom and McDonald to prevent the violation of Jermaine's civil rights, as aforesaid, but failed to do so.

196.    As a result of the failure to prevent the conspiracy to violate Jermaine's civil rights, as aforesaid, Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death. Plaintiff hereby makes claim against defendants Taylor, Howard, Carroll, Burris, and Pierce in vindication of the violation of those civil rights, pursuant to 42 U.S.C. §§ 1985(3) and 1988.

## COUNT IX

## ASSAULT AND BATTERY

197.    Plaintiff repeats Paragraphs 1 through 196 of this Complaint as if the same were more fully set forth at length herein.

198.    Defendants Boom and McDonald, acting in their individual capacities, committed assault and battery upon Jermaine, in that they intentionally, wantonly, and/or with gross negligence:

        a)   Subjected Jermaine to an imminent fear of physical injury; and

        b)   Struck and beat Jermaine and sprayed him in the eyes with "capstun".

199.    As a direct and proximate result of the acts of defendants Boom and McDonald, as aforesaid, Jermaine sustained injuries including, but not limited to, a laceration of the back of his head and injury to the eyes.  Plaintiff makes claim against defendants Boom and McDonald, jointly and severally, in her capacity as Executrix of the Estate of Jermaine L. Wilson, pursuant to 10 *Del. C.* § 3701.

## COUNT X

## WRONGFUL DEATH

200.    Plaintiff repeats Paragraphs 1 through 199 of this Complaint as if the same were more fully set forth at length herein.

201.    Jermaine's death was caused by the intentional, wanton, and/or grossly negligent acts of defendants Taylor, Howard, Carroll, Burris, and Pierce, in that they knew, or in the exercise of reasonable care, should have known of the violations of Jermaine's Constitutional rights, as aforesaid, but failed to take actions to prevent said violations, which led to Jermaine's [murder] death.

202.    As a result of Jermaine's wrongful death, as aforesaid, plaintiff, in her capacity as Next Friend of Z.W., the surviving child of Jermaine, hereby makes claim against defendants Taylor, Howard, Carroll, Burris, and Pierce for deprivation of expectation of pecuniary benefits to which Z.W. would have resulted from Jermaine's continued life, loss of contributions to Z.W. for support, loss of parental services, and Z.W.'s mental anguish, pursuant to 10 *Del. C.* § 3724(d).

203.    As a further result of Jermaine's wrongful death, as aforesaid, plaintiff, in her individual capacity, hereby makes claim against defendants Taylor, Howard, Carroll, Burris, and Pierce for deprivation of expectation of pecuniary benefits to which she would have resulted from Jermaine's continued life, loss of contributions to her for support, loss of parental services, and reasonable funeral expenses not to exceed $2,000.00, pursuant to 10 *Del. C.* § 3724(d).

## COUNT XI

## PUNITIVE DAMAGES

204.    Plaintiff repeats Paragraphs 1 through 201 of this Complaint as if the same were more fully set forth at length herein.

205.    The actions and conduct of defendants, as aforesaid, were reckless, outrageous, and carried out with reckless disregard for the rights of persons subject to the supervision of the Department of Corrections, including Jermaine, leading to Jermaine's assault and [murder] death.

206.    As a result of the outrageous conduct of defendants, as aforesaid, plaintiff seeks damages in an amount sufficient to punish and make an example of defendants and to deter defendants and others like them from engaging in similar conduct in the future.

**WHEREFORE**, plaintiff demands judgment in her favor for general, special, and punitive damages, together with interest, attorney's fees pursuant to 42 U.S.C. § 1988(b), and the costs of this action.

PERRY & SENSOR

By:   /s/   Michael L. Sensor
              Michael L. Sensor, Esquire
              Delaware Bar ID No.  3541
              Suite 560, First Federal Plaza
              P.O. Box 1568
              Wilmington, DE 19899-1568
              Telephone: (302) 655-4482
              Attorney for Plaintiff

Dated: February 7, 2006