**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SUSIE A. WILSON, individually and in her capacity as administratrix of the Estate of JERMAINE LAMAR WILSON, deceased, and in her capacity as next friend of Z.W., a minor, | ) ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) ) | C. A. No. 05-821-SLR |
| STANLEY W. TAYLOR, JR., individually; PAUL HOWARD, individually; NOREEN RENNARD, individually; THOMAS L. CARROLL, individually; BETTY BURRIS, individually; DAVID PIERCE, individually; MICHAEL RECORDS, individually; and OFFICER McDONALD, individually, | ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

**OPENING BRIEF IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

DEPARTMENT OF JUSTICE
STATE OF DELAWARE

*/s/ Ralph K. Durstein, III*
Ralph K. Durstein, III, ID #912
Erika Y. Tross, ID #4506
Deputy Attorneys General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorneys for Defendants

DATED: JANUARY 18, 2008

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... iii

NATURE AND STAGE OF THE PROCEEDINGS ...................................................1

SUMMARY OF THE ARGUMENT ..........................................................................2

STATEMENT OF FACTS ..........................................................................................4

ARGUMENT ...............................................................................................................9

    I.     ANY CLAIMS ARISING FROM THE JANUARY 25, 2005 INCIDENT ARE BARRED, IN THAT THE INMATE FAILED IN STATE COURT TO OBTAIN A RULING THAT HIS DETENTION OR TRANSFER WAS UNLAWFUL ..............10

    II.    NO CLAIM OF SO-CALLED "STATE-CREATED DANGER" CAN BE ASSERTED AGAINST THE DEFENDANTS BASED ON THE CONTINUED DETENTION AND CONFINEMENT OF JERMAINE, WHERE THERE IS NO EVIDENCE THAT THE DEFENDANTS RECEIVED AN ORDER FROM THE SUPERIOR COURT AUTHORIZING HIS RELEASE ............................................13

    III.   THERE IS NO BASIS FOR THE CLAIM OF DELIBERATE INDIFFERENCE TO THE RISK OF SUICIDE, WHERE THE PLAINTIFF HAS FAILED TO PRODUCE ANY EVIDENCE OF MENTAL HEALTH PROBLEMS, PSYCHIATRIC TREATMENT, OR THREATS OF SUICIDE ON THE PART OF JERMAINE BEFORE HIS DEATH ...............................................................................................14

    IV.   THE PLAINTIFF HAS FAILED TO PRODUCE ANY EVIDENCE FROM WHICH A JURY COULD CONCLUDE THAT THE INMATE WAS MURDERED, AND ANY CLAIM OF RESPONSIBILITY FOR HIS DEATH BASED ON "STATE-CREATED DANGER" OR "DELIBERATE INDIFFERENCE" ON THE PART OF THE DEFENDANTS MUST FAIL.............................................................................18

    V.    SUMMARY JUDGMENT IS APPROPRIATE AS TO COUNT V OF THE AMENDED COMPLAINT BECAUSE THE PLAINTIFF HAS FAILED TO IDENTIFY AN ALTERNATIVE PRACTICE OR TRAINING THAT WOULD NOT HAVE RESULTED IN JERMAINE'S SUICIDE........................................................19

    VI.   THE COURT SHOULD DISMISS COUNT VI OF THE AMENDED COMPLAINT BECAUSE THE PLAINTIFF CANNOT ESTABLISH THE EXISTENCE OF A CONFEDERATION OR THAT OFFICER MCDONALD COMMITTED AN UNLAWFUL ACT IN FURTHERANCE OF A CONSPIRACY ..............................21

VII.    THE DEFENDANTS DID NOT CONSPIRE TO VIOLATE JERMAINE'S CIVIL
        RIGHTS ..................................................................................................................23

VIII.   PLAINTIFF CANNOT ESTABLISH THAT DEFENDANT MCDONALD WAS
        ENGAGED IN A CONSPIRACY TO VIOLATE JERMAINE'S RIGHTS;
        THEREFORE SHE CANNOT ESTABLISH THAT DEFENDANTS TAYLOR,
        HOWARD, CARROLL, BURRIS AND PIERCE FAILED TO PREVENT SUCH A
        CONSPIRACY ..........................................................................................................24

IX.     SUMMARY JUDGMENT IS APPROPRIATE AS TO COUNT IX OF THE
        AMENDED COMPLAINT BECAUSE OFFICER MCDONALD IS IMMUNE
        FROM LIABILITY FOR AN ASSAULT AND BATTERY CLAIM UNDER THE
        STATE TORT CLAIMS ACT AND BECAUSE THERE IS NO MERIT TO
        WILSON'S ALLEGATIONS.........................................................................................25

        A.    The State Tort Claims Act immunizes Officer McDonald from a claim of
              assault and battery against Jermaine ...............................................................25

        B.    Wilson cannot establish that the contact Officer McDonald had with Jermaine
              was harmful or offensive .................................................................................26

X.      THE DEFENDANTS' ACTIONS DID NOT CAUSE JERMAINE TO COMMIT
        SUICIDE.  THEREFORE THERE IS NO BASIS FOR A WRONGFUL DEATH
        CLAIM......................................................................................................................27

XI.     STATE DEFENDANTS ARE IMMUNE FROM LIABILITY IN THEIR
        INDIVIDUAL CAPACITIES PURSUANT TO THE DOCTRINE OF QUALIFIED
        IMMUNITY AS THE FACTS CLEARLY DEMONSTRATE THEY DID NOT
        VIOLATE JERMAINE'S CONSTITUTIONAL RIGHTS.........................................28

XII.    WILSON CANNOT DEMONSTRATE THAT THE DEFENDANTS' CONDUCT
        WAS WILLFUL OR MALICIOUS NOR CAN SHE DEMONSTRATE THAT
        PUNISHING THE DEFENDANTS WILL DETER FUTURE BEHAVIOR;
        THEREFORE THERE IS NO BASIS FOR AN AWARD OF PUNITIVE
        DAMAGES................................................................................................................30

CONCLUSION....................................................................................................................32

## TABLE OF AUTHORITIES

**Case Name**                                                                 **Page**

*AeroGlobal Capital Management, LLC v. Cirrus Industries, Inc.*,
   871 A.2d 428 (Del. 2005) ........................................................................22

*Anderson v. Creighton*, 483 U.S. 635 (1987) .........................................29

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .............................9

*Beers Capitol v. Whetzel*, 256 F.3d 120 (3d Cir. 2001) ...........................21

*Belcher v. Oliver*, 898 F.2d 32 (4th Cir. 1990) ......................................16

*Brzoska v. Olson*, 668 A.2d 1355 (Del. 1995) .........................................26

*Carter v. Exxon Company USA*, 177 F.3d 197 (3d Cir. 1999) ..................9

*City of Canton v. Harris*, 489 U.S. 378 (1989) .......................................20

*Clemente v. Allen*, 120 F.3d 703 (7th Cir. 1997) ....................................12

*Colburn v. Upper Darby Township*, 838 F.2d 663 (3d Cir. 1988) ...........15

*Colburn v. Upper Darby Township*, 946 F.2d 1017 (3d Cir. 1991) .........15

*Edwards v. Balisok*, 520 U.S. 641 (1997) ...............................................11

*Freedman v. City of Allentown*, 853 F.2d 1111 (3d Cir. 1988) ...............14

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................28

*Heck v. Humphrey*, 512 U.S. 477 (1994) ..........................................11, 12

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .............................20

*Leamer v. Fauver*, 288 F.3d 532 (3d Cir. 2002) .....................................11

*McLaughlin v. Copeland,* 455 F. Supp. 749 (D. Del. 1978) ................22, 24

*Memphis Community School Dist. v. Stachura*, 477 U.S. 299 (1986) .......30

*Mitchell v. Dep't of Corrections*, 272 F. Supp. 2d 464 (M.D. Pa. 2003) ......12

*Muhammad v. Close*, 540 U.S. 749 (2004) .............................................11

*Owens v. Ortiz*, 2005 WL 1199066 (D.N.J. May 19, 2005) ....................................................12

*Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989) .............................................................20, 21

*Saucier v. Katz*, 533 U.S. 194 (2001) .....................................................................................29

*Scott v. Harris*, -- U.S. --, 127 S.Ct. 1969 (2007) ...............................................................9, 29

*Smith v. Wade*, 461 U.S. 30 (1983) ........................................................................................30

*Torres v. Fauver*, 292 F.3d 141 (3d Cir. 2002)........................................................................11

*Vick v. Haller*, 512 A.2d 249 (1986)........................................................................................29

*Woloszyn v. County of Lawrence*, 396 F.3d 314 (3d Cir. 2005)..................................15, 20, 21

## <u>Statutes, Rules and Other Authorities</u>

Eighth Amendment of the United States Constitution.................................................................15

Due Process Clause of the Fourteenth Amendment ....................................................................15

42 U.S.C. § 1983........................................................................................................11, 12, 15, 30

10 Del.C. § 3722 .........................................................................................................................27

10 Del.C. § 3724 .........................................................................................................................27

10 Del.C. § 4001 .........................................................................................................................25

F.R.C.P. 26(a)(2)(B) ...................................................................................................................21

F.R.C.P. 37(c)(1)..........................................................................................................................21

F.R.C.P. 56(c) ...............................................................................................................................9

F.R.E. 702 ...................................................................................................................................20

## NATURE AND STAGE OF THE PROCEEDINGS

The plaintiff has brought an action on behalf of the Estate of her deceased son, alleging violations of his Constitutional rights, as well as a wrongful death action on her behalf and that of her son's minor child, seeking damages for a purported "assault" and "battery".[1] These claims are based on the plaintiff's belief that her son "was murdered or otherwise perished due to asphyxia" while an inmate in the custody of the State of Delaware Department of Correction on February 18, 2005.[2]

Named as defendants in the lawsuit were individuals then serving as the Commissioner of Correction, Chief of the Bureau of Prisons, Chief of the Bureau of Community Corrections, the Warden and two Deputy Wardens of the Delaware Correctional Center ("DCC"), and two correctional officers.

The defendants denied having any role or liability in the suicide death of the inmate, and raised various affirmative defenses barring the lawsuit. In the course of discovery, the defendants produced documents as to the inmate's criminal history, pattern of substance abuse, lack of mental health problems, the probation violation arising from the inmate's behavior on January 25, 2005, the housing and monitoring of the inmate at the DCC, the heroic attempts of DCC staff to revive the inmate, the Delaware State Police and DOC investigations of the inmate's death, and the conclusion of the State Medical Examiner that the cause of death was suicide. The plaintiff deposed defendants Taylor, Renard, Carroll, Burris and Pierce. The defendants have deposed the plaintiff. Discovery concluded without the plaintiff offering any support for her claims.

---

[1] Amended Complaint ¶1.
[2] *Id.* ¶2.

## SUMMARY OF THE ARGUMENT

1.      Any claims arising from the violation of probation on January 25, 2005 are barred, in that the inmate was afforded both administrative and judicial remedies to contest his guilt, and his institutional transfer pending a hearing was consistent with the bail conditions imposed by the Superior Court.

2.      The plaintiff has failed to produce any evidence that the Department of Correction received an order from the Superior Court authorizing the release of the inmate on February 18, 2005, and thus no claim of so-called "state-created danger" can be asserted against the defendants based on the continued detention and confinement of the inmate.

3.      The plaintiff has failed to produce any evidence of mental health problems, psychiatric treatment, or threats of suicide on the part of the inmate before his death, and any claim of "deliberate indifference" or failure to train based on the supposed failure to diagnose or protect the inmate from such harm is barred.

4.      The plaintiff has failed to produce any evidence from which a jury could conclude that the inmate was murdered, and any claim of responsibility for his death based on "state-created danger" or "deliberate indifference" on the part of the defendants must fail.

5.      Summary judgment is appropriate as to count V of the Amended Complaint because the plaintiff has failed to identify an alternative practice or training that would not have resulted in the inmate's suicide.

6.      The Court should dismiss Count VI of the Amended Complaint because the plaintiff cannot establish the existence of a confederation or that Officer McDonald committed an unlawful act in furtherance of a conspiracy.

7.      The defendants did not conspire to violate the inmate's civil rights, therefore there

2

is no basis for the plaintiff's conspiracy claim.

8.      The plaintiff cannot establish that Officer McDonald was engaged in a conspiracy to violate the inmate's rights, therefore she cannot establish that defendants Taylor, Howard, Carroll, Burris and Pierce failed to prevent a conspiracy.

9.      Summary Judgment is appropriate as to Count IX of the Amended Complaint because Officer McDonald is immune from liability for an assault and battery claim under the State Tort Claims Act, and because there is no merit to the plaintiff's claim.

10.     The defendants' conduct did not cause Jermaine to commit suicide, therefore there is no basis for a wrongful death claim.

11.     The defendants are immune from liability in their individual capacities pursuant to the doctrine of Qualified Immunity, as the facts clearly demonstrate that they did not violate Jermaine's Constitutional rights.

12.     The plaintiff cannot demonstrate that the defendants' conduct was willful or malicious, nor can she demonstrate that punishing the defendants will deter future behavior, therefore there is no basis for an award of punitive damages.

## STATEMENT OF FACTS

*Jermaine's Conviction and Sentence*

Jermaine Lamar Wilson, DOB 1-15-85, was arrested on December 4, 2002, and charged with an armed robbery committed the day before.  He was detained at the New Castle County Juvenile Detention Center, and indicted on January 27, 2003 on one count of Robbery First Degree, two counts of Attempted Robbery First Degree, and three counts of Conspiracy Second Degree.[3]  On March 10, 2003, Jermaine entered a plea of guilty to one count of Robbery First Degree and two counts of Conspiracy Second Degree.  At the request of the State, Jermaine, who was now over 18 years old and considered an adult, was transferred to the custody of the DOC and assigned to the Howard R. Young Correctional Institution.  On June 20, 2003, he was sentenced by the Honorable Richard R. Cooch to the minimum/mandatory two years incarceration for the robbery, to be followed by one year at Level IV (work release), suspended after six months for six months at Level III supervision.[4]

While Jermaine was in custody, Martha Boston of First Correctional Medical, the medical provider for the DOC at that time, conducted a mental health examination of Jermaine.[5]  The evaluation reflects that Jermaine denied any history of mental health problems, although he did report a pattern of daily substance abuse.[6]

*Jermaine's Violation at CVOP*

In September of 2004, Jermaine was transferred to the Webb Correctional Facility[7], and

---

[3] A-153-54.
[4] A-155-60.
[5] A-150-52.
[6] In her Amended Complaint, at ¶125, the plaintiff alleges that "[p]rior to his death, Jermaine had never exhibited suicidal tendencies and had never expressed suicidal ideations and plans".
[7] A-161-64.

then to the Central Violation of Probation Center ("CVOP")[8], a Level IV facility.[9]  On January 25, 2005, Jermaine violated a CVOP rule by talking in the hall while returning from dinner.[10] Corrections Officer David McDonald gave Jermaine a direct order to cease talking.  Jermaine, however, refused to stop talking.  When he responded in a physically threatening manner and refused to return to his cell, Jermaine was placed in a holding cell, where he began to bang on the door and glass window of the cell with his feet.[11]  Officer McDonald ordered Jermaine to stop kicking the door and windows but Jermaine refused.  At that point, Officer McDonald used a short burst of capstun on Jermaine, who then ceased his kicking.[12]  Officer Michael Records of CVOP issued an administrative warrant for Jermaine's violation of the terms of his Level IV supervision, based on this behavior.[13]  Jermaine was then transferred to DCC.[14]

***Jermaine's Transfer to DCC***

When Jermaine arrived at DCC, he was classified as a detentioner, with an open charge as a result of the administrative warrant, which had triggered a probation violation.[15]  Based on factors such as his pending charge and his behavioral history, DCC assigned Wilson to the

---

[8] A-165-66.

[9] The plaintiff speculates, at ¶128-149 of her Amended Complaint, that her son was confused with another inmate, and that this led to an "improper placement".  This allegation was adamantly denied by the defendants, and there are no facts to support it.

[10] A-178-82.

[11] The Amended Complaint alleges, at ¶68-86 ("Jermaine is Assaulted at CVOP by Officer McDonald and Sergeant Boom [sic]"), a different version of what occurred, but the plaintiff has failed to support these allegations.

[12] A-178-82.

[13] A-183.  The Amended Complaint alleges, at ¶87-96, that the warrant was "incomplete", but the plaintiff has failed to elicit any facts to support this accusation.  The Superior Court record reflects that the decedent was represented by counsel and afforded a full opportunity to contest the violation through a hearing.  See Amended Complaint ¶104.

[14] A-184-85.

[15] Deposition of Deputy Warden David Pierce, at 14-15.

Security Housing Unit ("SHU"), Building #18, "D" Tier, Upper Cell #6.[16]  Tier D is used to isolate problematic detentioner inmates in single cells with no cellmate.[17]  It was not unusual for detentioners to be housed in the SHU.[18,19]

### Jermaine's Hearing on the Administrative Warrant

On January 26, 2005, the Superior Court ordered that Jermaine be held without bail, pending a hearing on the violation.  At a video bail hearing on February 1, 2005, the Court ordered that the commitment in lieu of bail continue.[20]  On February 10, 2005 Jermaine, through his attorney, contested the allegations in the administrative warrant, and a hearing was scheduled for February 15, 2005.[21]  The hearing did not go forward on February 15, 2005.  Although one post-hearing worksheet indicates that the violation was withdrawn, the docket does not reflect an order to that effect, or any order directing that Jermaine be released from detention.  No such order was received by the DOC.

According to a review of records by Noreen Renard, Chief of Community Corrections, Jermaine was scheduled to complete the Level IV portion of his sentence on February 18, 2005.  February 18, however, was not the release date for purposes of his detention on the charge of violating his Level IV conditions.[22]  This release date was to be determined not by DOC, but by

---

[16] A-186.

[17]  Deposition of Warden Thomas Carroll, at 17-18; Deposition of Deputy Warden Elizabeth Burris at 11, 13-14.

[18]  Deposition of Deputy Warden Pierce, at 12-13, 15.

[19]  The plaintiff appears to contest the placement, Amended Complaint ¶97-102, without any factual support.

[20] A-187.

[21]  The plaintiff contends, Amended Complaint ¶110-116, that the violation was withdrawn, and that Judge Cooch ordered that the decedent be released.  However, the factual record lacks any such court order, nor any evidence that such order was issued or received by the Department of Correction prior to Jermaine's death.

[22]  Deposition of Bureau Chief Noreen Renard, at 10-11.

the Court.[23]  After Jermaine's death, Bureau Chief Renard reviewed a Court Order, filed with the Prothonotary on February 14, 2005[24] that indicates that the violation was withdrawn.[25]  However, the plaintiff has failed to present any evidence that this Order was transmitted to the prison or that an order was received by the institutional records unit at DCC before Jermaine's death.

***Jermaine's Suicide***

At dinner on the evening of February 18, 2005, Jermaine told Corrections Officer Michael Newman that he expected to be released.  Officer Newman passed this information on to Sergeant Stephanie Carpenter, who checked the DOC computer to determine Jermaine's status.  Finding nothing, Sgt. Carpenter contacted the records unit to see if any paperwork had been received from the Court.  Jermaine was assured that the officers were checking and looking for an order from the Superior Court authorizing his release.  Shortly after 10:00 p.m., during his last interaction with Jermaine, Officer Newman did not notice anything unusual about Jermaine's behavior in his cell.

Inmates housed in the SHU were checked by officers at irregular intervals, no less than thirty minutes apart.[26]  The security check includes accounting for a living, breathing inmate, and also monitoring inmates as far as mood and tension.  The officer will check the cell as to cleanliness, contraband, and any damage or maintenance issues.[27]  These rounds are documented through a "phone punch" and also in logbooks.  If an inmate is observed attempting to harm himself, an emergency response is initiated.  Inmates can be manipulative, and will fake injuries.

---

[23]  Deposition of Deputy Warden Pierce, at 9.
[24]  A-193-94.
[25]  Deposition of Bureau Chief Renard, at 16-17.
[26]  Deposition of Deputy Warden Pierce, at 9.
[27]  Deposition of Deputy Warden Pierce, at 17-18.

Since it is not possible to determine if a suicide attempt is fake, every case is taken seriously.[28]

Jermaine was discovered hanging from a clothes locker in his room at 10:40 p.m., by Officer Newman.[29]  A Code 4 – an inmate hanging – was then called, and Officer Paul Unsworth and Sgt. Carpenter arrived.  They immediately began efforts to revive Jermaine.[30]  Nurse Tracy Holmes arrived and began performing CPR with Sgt. Carpenter.  At approximately 11:05 p.m. paramedic staff arrived, and took over, attaching a portable defibrillator and a heart monitor. Jermaine was pronounced dead at 11:16 p.m.

An autopsy was performed by Medical Examiner Richard T. Callery on February 19, 2005.[31]  The Medical Examiner concluded that the cause of Jermaine's death was asphyxiation due to hanging.[32]  It appears that Jermaine struck his head on a piece of metal protruding from the locker as he swung from the noose he fashioned from a sheet, causing a gash in his head and a small amount of blood.  There was no evidence of any foul play.[33]

---

[28] Deposition of Deputy Warden Pierce, at 22-23.
[29] A-202-213.
[30] Deposition of Deputy Warden Pierce, at 24.
[31] A-216-19.
[32] A-216-21.
[33] A-222-302.  The Amended Complaint at ¶127 claims that Jermaine was strangled by "persons unknown", and promises "whose identity shall be determined through discovery".  In the alternative, the plaintiff asserts that he "otherwise perished as a result of asphyxia".  There is no evidence of record whatsoever to support the first theory.

## ARGUMENT

Federal Rule 56(c) permits a Court to grant summary judgment, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). To obtain summary judgment the moving party must demonstrate that he has met the standards of Rule 56(c). *Carter v. Exxon Company USA*, 177 F.3d 197, 202 (3d Cir. 1999). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, only disputes that affect the outcome of a lawsuit properly preclude the grant of summary judgment. *Id.*

"At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. In deciding a motion for summary judgment, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 252. Further, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, -- U.S. --, 127 S.Ct. 1769, 1776 (2007).

I.    **ANY CLAIMS ARISING FROM THE JANUARY 25, 2005 INCIDENT ARE BARRED, IN THAT THE INMATE FAILED IN STATE COURT TO OBTAIN A RULING THAT HIS DETENTION OR TRANSFER WAS UNLAWFUL.**

The only version of the altercation that led to Jermaine's transfer, and the resulting administrative warrant alleging a violation of his Level IV conditions, was that of the correctional officers involved. The plaintiff has offered no evidence of record to support her allegations. Moreover, the record is clear as to the adherence by the DOC to established policy and procedure in handling both Jermaine's violation and his transfer to DCC.

The decedent was transferred from the CVOP facility to the SHU at the DCC, based on the incident involving his disorderly and threatening behavior, and due to the risk that he would be disruptive in a general prison population.[34] The administrative warrant indicated that Jermaine had refused to comply with an order regarding his conduct in the hallway, was moved to a holding cell, and continued to be disruptive and defiant.[35] His detention at DCC pending a hearing was reviewed on at least two occasions by the Court.

Jermaine contested the violation, and was represented by counsel in Superior Court on February 10, 2005. A hearing was scheduled for February 15, 2005. At some point, the probation officer apparently sought to withdraw the violation. As Bureau Chief Renard pointed out in her deposition, the withdrawal of a violation of probation is actually a court matter. The officer can make the recommendation, but the officer does not have the authority to withdraw a violation of probation without court approval.[36] After reviewing the transcript of Jermaine's February 10 appearance before Judge Cooch, Bureau Chief Renard could not determine what the

---

[34]  A-178-83; Deposition of Deputy Warden Burris, at 14-15.
[35]  A-183; Deposition of Bureau Chief Renard, at 13, 24, 26.
[36]  Deposition of Bureau Chief Renard, at 14.

intention of the Court may have been in withdrawing Jermaine's violation.[37]

It is clear that the hearing on the merits of the violation, scheduled for February 15, 2005, did not take place. The Court was thus not called upon to hear evidence or to make a determination as to the allegations in the administrative warrant. The Court was only called upon to approve the withdrawal of the violation, and, at some point, the Court did so. Other than that action, the only other judicial involvement was in approving the continued detention of the inmate pending the hearing.

The United States Supreme Court has held that, where a plaintiff asserts Section 1983 liability based on the duration of his sentence, that plaintiff must have first satisfied the favorable termination rule set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994). *See also Muhammad v. Close*, 540 U.S. 749, 755 (2004); *Edwards v. Balisok*, 520 U.S. 641 (1997); *Torres v. Fauver*, 292 F.3d 141 (3d Cir. 2002); *Leamer v. Fauver*, 288 F.3d 532, 542 (3d Cir. 2002). The Court in *Heck* stated:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a §1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus . . . A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under §1983. Thus, when a state prisoner seeks damages in a §1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of the conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

---

[37] Deposition of Bureau Chief Renard, at 15-16.

*Heck*, 512 U.S. 486-487.

The *Heck* favorable termination rule applies to a claim that a sentence was miscalculated. See *Clemente v. Allen*, 120 F.3d 703, 705 (7th Cir. 1997); *Mitchell v. Dep't of Corrections*, 272 F. Supp. 2d 464, 481 (M.D. Pa. 2003); *Owens v. Ortiz*, 2005 WL 1199066, at *3 (D.N.J. May 19, 2005). Thus, a plaintiff may file a claim for damages under §1983 for injuries caused by imprisonment beyond his release date *only* once his confinement has been invalidated by state authorities, the state courts, or by the issuance of a writ of habeas corpus. *Owens*, 2005 WL 1199066, at *3.

The Superior Court in Jermaine's case did not rule on the length or validity of Jermaine's sentence. At most then, based on clerical entries, this Court could find that the pending violation charge was withdrawn. Judge Cooch may have issued an order to that effect, but it is clear that no such order was received by the DOC on February 18, 2005. Thus, even if the plaintiff could show that the sentence was to expire on February 18, 2005, she would have no claim against the defendants. The record is clear that Jermaine was detained in custody, as the correction officers actively searched, in vain, for any authority from the Superior Court for his release. No state court has determined that Jermaine was entitled to release on or before February 18, 2005, or that his detention on that date, until his death, was illegal.

Jermaine was thus afforded due process of law, including representation of counsel, in contesting the violation. He cannot be heard now to complain about the Court's procedure for hearing the violation, where these issues were not raised below, and no finding was made by the Court. Moreover, he cannot be heard to complain about his detention or the merits of the violation, where there was no finding by the Superior Court on that issue.

## II.    NO CLAIM OF SO-CALLED "STATE-CREATED DANGER" CAN BE ASSERTED AGAINST THE DEFENDANTS BASED ON THE CONTINUED DETENTION AND CONFINEMENT OF JERMAINE, WHERE THERE IS NO EVIDENCE THAT THE DEFENDANTS RECEIVED AN ORDER FROM THE SUPERIOR COURT AUTHORIZING HIS RELEASE.

The plaintiff's claim, reviewed in the light most favorable to her accusations, is that her son should have been released on February 18, 2005, because the charge or violation against him had been withdrawn by the DOC, and subsequently approved by Judge Cooch.  Even accepting as true the allegation that such an Order was entered and filed with the Prothonotary on February 14, 2005, there has been no showing that such an Order was ever transmitted to the DOC.  The plaintiff has failed to show that any such order, or any judicial authority for the release of Jermaine, left the Court or the Prothonotary office, either by mail, as a fax transmission, or by way of courier delivery.

The defendants, for their part, have shown conclusively that the transmittal of such an order is the responsibility of the Court, and not of the DOC.  Further, the defendants have explained that any such information regarding an inmate would be received by the records unit at DCC, which would act on it immediately.  While the prison system takes great pains to verify that an inmate is eligible for release, and to confirm that the release has been ordered, the DOC has no interest in keeping any inmate beyond his time of confinement.

The officers on duty on the night of February 18, 2005 were sensitive to Jermaine's concerns about his release.  When Jermaine inquired, the officers on duty repeatedly checked with the records unit, and confirmed that no court order authorizing release had been received.  By the time of Jermaine's inquiry, the Court was closed, and there was no way, other than reviewing the records on hand, to determine if Jermaine was to be released.  The defendants have thus shifted the burden of proof to the plaintiff, to present some credible evidence that an order

directing the release of Jermaine was received by the DCC records unit, on or before February 18, 2005. This the plaintiff has failed to do.

The undisputed testimony is that it is the responsibility of the Court to see that any information regarding an inmate is sent to the facility where the offender is housed.[38] Whether transmitted through the mail, a courier, or by fax, it is the Court that must ensure that orders for release are communicated to the DOC.[39] DCC has a records facility that receives paperwork from the courts, calculates the sentence, and applies "good time".[40] An inmate concerned about his release date can contact the records section. On a day the inmate believes he is to be released, "...the inmate's first contact is his tier officer, his correctional officer, line staff person, who is going to mention it to the sergeant. They will go through whatever they can to find out the answer for the inmate".[41] The officers on duty were sympathetic to Jermaine, and went to considerable lengths on his behalf to check records for authority for his release. It is through no fault of the defendants that Jermaine continued to be held.

III.    **THERE IS NO BASIS FOR THE CLAIM OF DELIBERATE INDIFFERENCE TO THE RISK OF SUICIDE, WHERE THE PLAINTIFF HAS FAILED TO PRODUCE ANY EVIDENCE OF MENTAL HEALTH PROBLEMS, PSYCHIATRIC TREATMENT, OR THREATS OF SUICIDE ON THE PART OF JERMAINE BEFORE HIS DEATH.**

A prison custodian is not the guarantor of an inmate's safety. A court cannot infer from the inmate's act of suicide alone that the prison officials have recklessly disregarded their obligation to take reasonable precautions to protect inmates entrusted to their care. *Freedman v. City of Allentown,* 853 F.2d 1111, 1115 (3d Cir. 1988) (failure of prison officials to recognize

---

[38]  Deposition of Bureau Chief Renard, at 22-23.
[39]  Deposition of Warden Carroll, at 20; Deposition of Deputy Warden Burris, at 33-35.
[40]  Deposition of Deputy Warden Burris, at 30.
[41]  Deposition of Deputy Warden Burris, at 31.

inmate's scars as "suicide hesitation cuts" was at most negligence, insufficient to support §1983 claim).  A plaintiff in a prison suicide case has the burden of establishing three elements:  1) that the detainee had a "particular vulnerability to suicide; 2) that the custodial officers knew or should have known of such "vulnerability"; and 3) that those officers acted with "reckless indifference".  *Colburn v. Upper Darby Township,* 946 F.2d 1017, 1023 (3d Cir. 1991) ("*Colburn II*").

A "particular vulnerability to suicide" bespeaks a serious medical need.  *Id.*  The condition must be one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that a lay person would easily recognize the necessity for medical intervention.  *Woloszyn v. County of Lawrence,* 396 F.3d 314, 320 (3d Cir. 2005).  Neither the Due Process Clause nor the Eighth Amendment imposes liability for a mere negligent failure to protect a detainee from self-inflicted injury.  *Colburn II, supra,* at 1024.  A higher level of culpability, one involving "reckless or deliberate indifference", is required.  *Id.*

The deceased inmate in the *Woloszyn* case had just been arrested on a burglary charge.  He appeared to the arresting officers to be in good spirits, but turned remorseful and distant while being booked.  The inmate admitted to using alcohol, heroin, crack cocaine, and LSD.  He was put on a drug withdrawal watch.  The inmate told a nurse that he was not suicidal, and he had no psychiatric history.  The plaintiff submitted an unsworn declaration from another inmate that Woloszyn had been yelling, screaming, and kicking before hanging himself in his cell.  Based on this record, the District Court found no evidence of "deliberate indifference" and granted summary judgment to the prison officials.  The Third Circuit affirmed.

The *Colburn* cases involved a female taken into police custody for public drunkenness.  *Colburn v. Upper Darby Township,* 838 F.2d 663, 664 (3d Cir. 1988) (*Colburn I*).  Despite being

searched by a prison matron, she shot herself with a concealed handgun some four hours after her arrest.  The Court held that the intoxication, an argument with her boyfriend, and even an attempt to ingest three pills were insufficient to establish a "particular vulnerability to suicide". *Colburn II, supra,* at 1025.  The Court held that the plaintiff had failed to adduce more than a "mere scintilla" of evidence in her favor.  *Id* at 1027.  No fair-minded jury could conclude based on the record that the inmate had a "particular vulnerability" of which the custodian should have been aware.  *Id.*

In *Belcher v. Oliver,* 898 F.2d 32, 35 (4th Cir. 1990), the Fourth Circuit observed that "only an exercise in impermissible judicial hindsight could justify holding these officers responsible for the subsequent suicide."  The decedent in that case was arrested for public intoxication and hazardous driving.  An hour and twenty minutes later, he had hung himself with his belt.  At no time during his detention did the arrestee express any concern about his well-being, nor did he behave in a way that would have indicated to the custodial officers that he presented a suicide risk.  He was in good spirits, singing, clapping his hands, and humming.  The officers had taken action to bring about his release.  The Court held that any failure to afford medical care was inadvertent rather than willful.

In this case, the plaintiff has produced no evidence in support of even the first prong of the *Colburn II* test.  There is no need to inquire into what the defendants knew or should have known.  There is no medical evidence to suggest that Jermaine suffered from a mental heath condition.[42]  His behavior did not suggest any risk or threat of suicide.  The plaintiff has effectively conceded that her son had no known history of mental health problems, and "[p]rior to his death, Jermaine had never exhibited suicidal tendencies and had never expressed suicidal

---

[42] A-150-52.

16

ideations and plans."[43]   There thus can be no claim that the defendants failed to diagnose or recognize a condition or threat that did not exist.

On the night of his death, Jermaine gave no indication that he was vulnerable to suicide. As Deputy Warden Elizabeth Burris described that evening:

> "He, he being Mr. Wilson, gave no indication that he was – had suicidal thoughts.  He had asked about being released.  Staff had checked into it as far as they could on that shift and that they would continue to look into it for him.   And staff had done everything that they should have done during that shift leading up to the suicide."[44]

It is undisputed that the decedent was regularly monitored on the night of his death.  He was discovered hanging in his cell approximately half an hour after Officer Newman had last made his rounds.  There has been no expert opinion offered by the plaintiff that the decedent should have been afforded closer attention, particularly in the absence of any erratic behavior or threat of suicide.  The plaintiff has not retained a psychiatric expert to offer criticism of the screening of the decedent, nor of the policies and procedures of the DOC with regard to inmate mental health and suicide risk.  There has been no showing that there was anything about the decedent or his situation that would raise a "red flag" as to his mental health.  Quite to the contrary, by all accounts, Jermaine was looking forward to being released from prison after serving a long sentence.  There is nothing in the record to suggest a risk of suicide. It is simply not possible to be indifferent to a risk that does not exist.

The policy at the DCC for responding to threats of suicide, as described by Deputy Warden Burris, was strict, timely, and thorough:

> "If an inmate verbalizes or displays behavior that appears to be suicide in any way whatsoever, security responds.    Mental

---

[43]   Amended Complaint, ¶125; Deposition of Susie Wilson, at 8-9, 21-22, 69, 70.
[44]   Deposition of Deputy Warden Burris, at 20.

health/medical are notified to intervene immediately."[45]

This approach was taken, regardless of the reason, and despite the fact that inmates may pretend or feign suicide, thus abusing the process.[46] The procedure calls for the inmate to be removed from his cell and taken to the infirmary, where he would then be placed on a suicide watch.

Far from being indifferent to Jermaine's concerns, the staff at DCC attempted to ascertain when he would be released, and whether a court order had been received. He was reassured that he would be leaving, as soon as authority was received from the Court. He exhibited no objective signs of vulnerability to suicide. The plaintiff has fallen far short of the evidence offered in the cited cases, and the defendants are entitled to summary judgment.

IV.    **THE PLAINTIFF HAS FAILED TO PRODUCE ANY EVIDENCE FROM WHICH A JURY COULD CONCLUDE THAT THE INMATE WAS MURDERED, AND ANY CLAIM OF RESPONSIBILITY FOR HIS DEATH BASED ON "STATE-CREATED DANGER" OR "DELIBERATE INDIFFERENCE" ON THE PART OF THE DEFENDANTS MUST FAIL.**

In her Amended Complaint, the plaintiff backs off of the previous allegation of "murder", but still alleges that her son "died in his prison cell by being strangled with a ligature by persons unknown, but whose identity shall be determined through discovery…"[47] This assertion, which continues to suggest homicide, is weakened somewhat by the addition, in the same paragraph of the Amended Complaint, of the words "or otherwise perished as a result of asphyxia".

In point of fact, the plaintiff has failed utterly to identify the "persons unknown" who strangled her son, or their motive for doing so. She has failed to elicit any evidence that would suggest how the assailants entered a locked cell. She provides no factual support for her

---

[45] Deposition of Deputy Warden Burris, at 49.
[46] Deposition of Deputy Warden Burris, at 50, 53.
[47] Amended Complaint ¶127.

speculation that Jermaine may have "frustrated some people" who then "beat him".[48]  At no point does she even name who "some people" may have been – other inmates, or the officers who tried to help Jermaine by checking on the release papers, or those who tried desperately to revive him.  The claim is nothing more than irrational suspicion from a grieving mother.

The plaintiff's other theory, as expressed in her deposition testimony, involves her reluctant acceptance of the idea that her son may have attempted or simulated suicide, in order to get attention.[49]  As set forth above, in Argument III, to the extent that Jermaine may have intended to simulate suicide in order to gain attention, there is no basis from which a jury could find that such an act was reasonably foreseeable, let alone that the defendants had a legal duty to intervene.  It would require creative psychiatric expert testimony indeed to support the claim that the defendants should have foreseen that an inmate pending release, with no adverse mental health history, and no objective indications of any psychiatric problems, who was communicating normally and constructively with staff, would commit or attempt suicide.  In the absence of any such support, such a claim is worse than speculative.

## V.    SUMMARY JUDGMENT IS APPROPRIATE AS TO COUNT V OF THE AMENDED COMPLAINT BECAUSE THE PLAINTIFF HAS FAILED TO IDENTIFY AN ALTERNATIVE PRACTICE OR TRAINING THAT WOULD NOT HAVE RESULTED IN JERMAINE'S SUICIDE.

The plaintiff contends that Jermaine's injuries and death were the result of "customs, policies, practices, and procedures established by defendants Taylor, Howard, Carroll, Rennard, Burris, and Pierce, …."[50]  Plaintiff, however, has failed to set forth an alternative custom, policy, practice or procedure that would not have resulted in Jermaine's suicide, nor has she linked the

---

[48]  Deposition of Susie Wilson, at 72.
[49]  Deposition of Susie Wilson, at 71.
[50]  Amended Complaint ¶ 185.

defendants to improper policies that existed at the time of Jermaine's death.  Thus plaintiff cannot support her claim.

In *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989), the Third Circuit set forth the elements a plaintiff must establish to prove a claim of failure to train.  The Court held that for liability to attach to a government policymaker, a plaintiff must first identify specific training or policies which defendants failed to employ, that could reasonably be expected to prevent the harm that allegedly occurred.  *Sample*, 885 F.2d at 1118.  Once the plaintiff identifies the specific policies, she must then demonstrate that:  1) the existing custom and practice without the [plaintiff-identified] specific alternative practice created an unreasonable risk of harm; 2) the policymaker was aware of the unreasonable risk; 3) the policymaker was indifferent to the unreasonable risk, and 4) constitutionally significant harm resulted from the deficient policy or practice.  *Id.* (*citing City of Canton v. Harris*, 489 U.S. 378 (1989)).

The plaintiff has failed to identify, in either the Amended Complaint or discovery, "[other] specific training not provided that could reasonably be expected to prevent the [harm] that occurred."  *Woloszyn,* 396 F.3d at 325.  Therefore Wilson cannot meet her burden under the Third Circuit test.

Moreover, the Third Circuit test involves penalogical issues regarding the propriety of existing or alternative training and/or policies, as well as the obviousness of the risk of any given policy or practice to the policymakers, that require the opinion of an expert to establish.  *See* FED. R. EVID. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148-49 (1999).  Plaintiff did not identify any expert witnesses on her behalf.  Therefore she cannot address any of the issues required to establish liability for a failure to train claim, either on summary judgment or at trial.[51]

---

[51]    According to the Scheduling Order, plaintiff's deadline to provide expert discovery was

In addition to being unable to satisfy the legal test, plaintiff's case is void of any factual evidence linking the defendants to the training and policies that did exist at the time of Jermaine's death. Moreover, there is no evidence that the defendants were on notice of other training which would have avoided Jermaine's suicide, or any evidence suggesting that, in implementing policies or procedures, the defendants exhibited a "deliberate indifference" to whether Jermaine was in danger of committing suicide. *Woloszyn*, 396 F.3d at 325.

Finally, the plaintiff cannot show that the defendants failed to respond "in the face of an awareness of a pattern of … injuries" similar to those which Jermaine suffered. *Beers Capitol v. Whetzel*, 256 F.3d 120, 134 (3d Cir. 2001) (citing *Sample*, 885 F.2d at 1118). There is no evidence in this case of a "pattern" of suicides by inmates *with no prior history of suicide attempts or mental illness*. Therefore Wilson cannot establish that the defendants should have been aware of deficiencies in policies prior to Jermaine's suicide.

Given the record of this case, plaintiff's failure to establish the necessary elements for a failure to train claim, and plaintiff's failure to offer any expert testimony that would establish such elements, this claim should be dismissed.

## VI. THE COURT SHOULD DISMISS COUNT VI OF THE AMENDED COMPLAINT BECAUSE THE PLAINTIFF CANNOT ESTABLISH THE EXISTENCE OF A CONFEDERATION OR THAT OFFICER MCDONALD COMMITTED AN UNLAWFUL ACT IN FURTHERANCE OF A CONSPIRACY.

Wilson alleges that Officer McDonald conspired with a "Sergeant Boom" to "violate Jermaine's civil rights, which resulted in the deprivation of his right to equal benefit of laws and

---

approximately July 31, 2007. (D.I. 53). Plaintiff never named an expert, nor did she provide any expert discovery as required by F.R.C.P 26 (a)(2)(B). Plaintiff's failure to provide expert discovery bars her use of such information at trial or in a motion. F.R.C.P. 37(c)(1).

proceedings for the security of his person and property as is enjoyed by white citizens, ...."[52] Thus Wilson claims Officer McDonald conspired with "Sergeant Boom" to violate Jermaine's civil rights.

To prove a claim of civil conspiracy a plaintiff must show:  (1) a confederation or combination of two or more persons; (2) some unlawful act done in furtherance of the conspiracy; and (3) actual damage.  *McLaughlin v. Copeland*, 455 F. Supp. 749, 752 (D. Del. 1978); *See also*, *AeroGlobal Capital Management, LLC v. Cirrus Industries, Inc.*, 871 A.2d 428, 437 n.8 (Del. 2005).  "The gravaman of an action in civil conspiracy is not the conspiracy itself but the underlying wrong which would be actionable absent the conspiracy."  *McLaughlin*, 455 F. Supp. at 752.

Wilson cannot establish that there was a confederation of two or more persons.  Wilson dismissed Sergeant "Boom" as a defendant on February 27, 2006.[53]  Further Wilson has failed to offer another individual with whom Officer McDonald acted in concert with in capstunning Jermaine.  Therefore there is nothing in the record to establish the existence of a confederation between Officer McDonald and any other individual.

Wilson also cannot prove that Officer McDonald committed an unlawful act.  The unrebutted facts show that on January 25, 2005, Jermaine violated a CVOP rule by talking in the hallway.[54]  Officer McDonald verbally reprimanded Jermaine and told him to stop talking. Jermaine, however, continued to talk in violation of Officer McDonald's direct order.[55]  At this point Officer McDonald ordered Jermaine into a holding cell.  Once inside the holding cell

---

[52] Amended Complaint ¶ 188.
[53] D.I. 28.
[54] A-178-82.
[55] *Id.*

Jermaine began banging and kicking on the glass windows to the cell.[56]  Fearing that Jermaine would break the glass, Officer McDonald went to Jermaine's cell and requested that he stop banging on the glass.  When Jermaine again refused to obey the direct order, Officer McDonald capstunned Jermaine to prevent him from breaking the glass.[57]  Jermaine then stopped kicking the glass and no further force was needed or used.[58]

The facts do not indicate that Officer McDonald committed an unlawful act or conspired with anyone else to commit an unlawful act against Jermaine.  Rather, Officer McDonald used the minimum amount of reasonable force necessary to maintain discipline and restore order to an unruly inmate.

Finally, the plaintiff has failed to offer any evidence that the policies and procedures used to restrain and capstun Jermaine were any different than the policies and procedures used to retrain and capstun white inmates.  Thus there is no basis for the plaintiff's claims of conspiracy or violation of Jermaine's right to equal protection.

## VII.    THE DEFENDANTS DID NOT CONSPIRE TO VIOLATE JERMAINE'S CIVIL RIGHTS.

The plaintiff asserts that the defendants engaged in a conspiracy to violate Jermaine's rights which resulted in his death.  She also contends that this conspiracy resulted in "the deprivation of [Jermaine's] right to equal benefit of laws and proceedings for the security of his person and property as is enjoyed by white citizens, …."[59]

As previously stated, to prove a claim of civil conspiracy Wilson must establish:  (1) a

---

[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] Amended Complaint ¶ 191.

confederation or combination of two or more persons; (2) some unlawful act done in furtherance of the conspiracy; and (3) actual damage. *McLaughlin*, 455 F. Supp. at 752.

There is nothing in the record to support a claim of conspiracy. The plaintiff cannot show that the defendants acted in concert prior to or after Jermaine's death to violate his rights. Further there is no proof that Jermaine's rights were actually violated. The record shows that Jermaine was capstunned in accordance with procedure and that he was properly transferred to DCC following the capstun. Finally, the plaintiff has not offered a scintilla of evidence to support her bald assertion that Jermaine was treated any differently than white inmates.

No reasonable jury could find that the defendants conspired to violate Jermaine's constitutional rights or violated his right to equal protection. Therefore there is no basis for this claim and judgment should be granted in favor of the defendants as a matter of law.

## VIII. PLAINTIFF CANNOT ESTABLISH THAT DEFENDANT MCDONALD WAS ENGAGED IN A CONSPIRACY TO VIOLATE JERMAINE'S RIGHTS; THEREFORE SHE CANNOT ESTABLISH THAT DEFENDANTS TAYLOR, HOWARD, CARROLL, BURRIS AND PIERCE FAILED TO PREVENT SUCH A CONSPIRACY.

Wilson asserts in Count VIII of her Amended Complaint that defendants Taylor, Howard, Carroll, Burris and Pierce had: 1) knowledge of a conspiracy between McDonald and "Boom" to violate Jermaine's rights, and 2) the power and ability to prevent the commission of acts by McDonald and "Boom".[60] Wilson further contends that defendants Taylor, Howard, Carroll, Burris and Pierce failed to prevent this conspiracy and, as a result, "Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death."[61]

As previously set forth, the facts fail to show the existence of a conspiracy to violate

---

[60] Amended Complaint ¶ 194-95.
[61] *Id.* at ¶ 196.

Jermaine's rights between Officer McDonald and "Boom" or any other individual.  Given that there was no conspiracy between McDonald and another individual, there was no conspiracy for defendants Taylor, Howard, Carroll, Burris and Pierce to prevent, and the plaintiff cannot establish the elements of the claim.


IX.    **SUMMARY JUDGMENT IS APPROPRIATE AS TO COUNT IX OF THE AMENDED COMPLAINT BECAUSE OFFICER MCDONALD IS IMMUNE FROM LIABILITY FOR AN ASSAULT AND BATTERY CLAIM UNDER THE STATE TORT CLAIMS ACT AND BECAUSE THERE IS NO MERIT TO WILSON'S ALLEGATIONS.**

Wilson claims that Officer McDonald "committed assault and battery upon Jermaine, in that [he] intentionally, wantonly, and/or with gross negligence:  a) subjected Jermaine to an imminent fear of physical injury; and b) struck and beat Jermaine and sprayed him in the eyes with 'capstun'."[62]  Given that Officer McDonald is immune from plaintiff's tort claim, and given that the facts fail to support a claim of assault and battery, this claim should be dismissed.

A.    **The State Tort Claims Act immunizes Officer McDonald from a claim of assault and battery against Jermaine.**

The State Tort Claims Act immunizes state defendants from liability for actions that (1) "arose out of and in connection with the performance of an official duty ... involving the exercise of discretion;" (2) "[were] done in good faith and in the belief that the public interest would best be served thereby;" and (3) "[were] done without gross or wanton negligence."  10 *Del. C.* § 4001.  In an action against a state defendant, the plaintiff "shall have the burden of proving the absence of 1 or more of the elements of immunity…."  *Id.*

In this case Officer McDonald capstunned Jermaine in good faith in order to maintain discipline and restore order in accordance with CVOP policies and procedures.  The facts

---

[62] *Id.* at ¶ 198.

indicate that Jermaine was kicking the glass doors and windows to the holding cell.[63]   If Jermaine broke the glass, he was potentially a harm to himself and others.  Therefore it was in the public interest, and Jermaine's best interest, to capstun Jermaine to prevent him from kicking the glass and injuring himself or someone else.  Finally the record shows that Officer McDonald performed his job without gross or wanton negligence.  Officer McDonald capstunned Jermaine with a short burst of capstun.[64]   Jermaine responded and refrained from kicking the glass.[65]   Officer McDonald did not use any other force after the capstun.[66]   Therefore he performed his job in accordance with policy and procedure without gross or wanton negligence.

Given the facts of this case Wilson cannot prove the absence of one of the elements for immunity and Officer McDonald is entitled to protection from liability for Wilson's tort claim.

### B.    Wilson cannot establish that the contact Officer McDonald had with Jermaine was harmful or offensive.

Under Delaware law, "[T]he tort of battery is the intentional, unpermitted contact upon the person of another which is harmful or offensive."  *Brzoska v. Olson*, 668 A.2d 1355, 1360 (Del. 1995).  In this case the force Officer McDonald used on Jermaine – the capstun – was done in accordance with CVOP's policies and procedures.  Plaintiff's discovery efforts have yielded no evidence to the contrary.  She has not disclosed any expert opinion.  Therefore there is nothing to show that the contact was unpermitted.  Moreover, Officer McDonald used the minimum amount of reasonable force necessary to maintain discipline and restore order.  Thus the contact was not harmful or offensive.

In light of the facts of this case, Officer McDonald did not commit the tort of assault and

---

[63] A-178-82.
[64] *Id.*
[65] *Id.*
[66] *Id.*

battery upon Jermaine and Officer McDonald is entitled to judgment on this claim as a matter of law.

## X.    THE DEFENDANTS' ACTIONS DID NOT CAUSE JERMAINE TO COMMIT SUICIDE.  THEREFORE THERE IS NO BASIS FOR A WRONGFUL DEATH CLAIM.

Count X of the Amended Complaint asserts that, "Jermaine's death was caused by the intentional, wanton, and/or grossly negligent acts of defendants Taylor, Howard, Carroll, Burris, and Pierce, in that they knew, or …, should have known of the violation of Jermaine's Constitutional rights, …, but failed to take actions to prevent" the violation of his rights.[67]

Delaware law permits a parent or child to bring an action for the recovery of the wrongful death of a deceased person.  10 *Del. C.* § 3724.  Such an action may be maintained against a defendant "whose wrongful act causes the death of" the decedent.  10 *Del. C.* § 3722.  Thus, to maintain a claim of wrongful death a plaintiff must establish that the conduct of the defendant caused the death of the decedent.

The record in this case is clear – Jermaine committed suicide.[68]  The suicide, however, could not have been predicted or prevented, as Jermaine had no prior history of suicide attempts, mental illness or mental defect.[69]  Further, Jermaine never told corrections officers, medical staff or any of the defendants that he was suicidal or wanted to harm himself.[70]  Rather, he gave every indication that he looked forward to his release from prison in the near future.  Given that

---

[67] Amended Complaint ¶ 201.

[68] A-221-302.

[69] A-150-52, 161-62, 184-85.  The plaintiff herself concedes as much in ¶125 of the Amended Complaint:  "Prior to his death, Jermaine had never exhibited suicidal tendencies and had never expressed suicidal ideations and plans".  *See also* Plaintiff's Responses to Defendants' Requests for Admission at Responses 1, 2, and 3.

[70] Plaintiff's Responses to Defendants' Requests for Admission at Response 8.

Jermaine had no prior history that would indicate that he was suicidal, and given that he never informed anyone that he wanted to harm himself and never exhibited such behavior, the defendants could not have anticipated that he would commit suicide and could not have prevented his death.

Further, the record is devoid of any evidence that the defendants encouraged Jermaine to commit suicide or made efforts to prevent Jermaine's release from incarceration. Quite to the contrary, the record reflects that efforts were made to determine if and when Jermaine would be released, by checking for an order from the Superior Court. The officers who had contact with Jermaine took steps to reassure him that such efforts were underway, and that he would be notified upon the receipt of such authority from the Court. Therefore, there is no proof that the defendants' conduct was the proximate cause of Jermaine's suicide.

In light of the record in this case, no reasonable jury could find that the defendants caused Jermaine to commit suicide. Therefore, Wilson cannot maintain a wrongful death claim and the Court should grant the defendants judgment as a matter of law.

## XI. STATE DEFENDANTS ARE IMMUNE FROM LIABILITY IN THEIR INDIVIDUAL CAPACITIES PURSUANT TO THE DOCTRINE OF QUALIFIED IMMUNITY AS THE FACTS CLEARLY DEMONSTRATE THEY DID NOT VIOLATE JERMAINE'S CONSTITUTIONAL RIGHTS.

The defendants are protected from liability for the plaintiff's claims in their individual capacities by the doctrine of qualified immunity. The doctrine of qualified immunity holds that government officials performing discretionary functions are immune from liability for damages, provided that their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is clearly established when, "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*

*v. Creighton*, 483 U.S. 635, 640 (1987). Furthermore, state officials are entitled to qualified immunity where they acted in good faith, without gross or wanton negligence, in the performance of discretionary duties. *Vick v. Haller*, 512 A.2d 249 (1986) (*aff'd in part and rev'd in part on procedural grounds*).

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001). Thus a determination by the district court of whether qualified immunity applies should be made at the earliest possible stage "so that the costs and expenses of trial are avoided where the defense is dispositive." *Id.* at 200-01.

In deciding a question of qualified immunity a district court is required to consider an initial inquiry: "Taken in the light most favorable to the party asserting the injury do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. "If and only if, the court finds a violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established … in light of the specific context of the case.'" *Scott*, 127 S.Ct. at 1774. In other words, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Creighton*, 483 U.S. at 640.

In this case, the only evidence of record shows that each of the defendants performed their jobs in good faith, and without gross or wanton negligence. Defendant McDonald used the minimum amount of reasonable force necessary to maintain discipline and to restrain Jermaine. Defendant Records properly violated Jermaine and transferred him to DCC in accordance with DOC policy. Further, defendants Taylor, Howard, Carroll, Renard, Burris, and Pierce did not cause Jermaine's suicide, nor were they aware of facts or information from which they could have prevented Jermaine's suicide. Therefore it is clear that the defendants performed their jobs in accordance with DOC's policies and procedures and are entitled to qualified immunity as to

all claims against them in their individual capacities.

XII.    **WILSON CANNOT DEMONSTRATE THAT THE DEFENDANTS' CONDUCT WAS WILLFUL OR MALICIOUS NOR CAN SHE DEMONSTRATE THAT PUNISHING THE DEFENDANTS WILL DETER FUTURE BEHAVIOR; THEREFORE THERE IS NO BASIS FOR AN AWARD OF PUNITIVE DAMAGES.**

In the final count of her Amended Complaint, Wilson claims that she is entitled to punitive damages as a result of the defendants' "outrageous conduct".[71]

The United States Supreme Court holds that the purpose of awarding punitive damages is to punish a defendant "for his willful or malicious conduct and to deter others from similar behavior." *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 306 n. 9 (1986). The Court further holds that a court may award punitive damages under a section 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

In this case there is nothing in the record to indicate that the defendants' conduct was willful or malicious. As previously stated, defendant McDonald used the minimum amount of reasonable force necessary to maintain discipline and restore order to Jermaine. His use of capstun was necessary to control a violent inmate and was in accordance with CVOP's policies and procedures. Moreover, nothing about the remaining defendants' conduct can be shown to be willful or malicious. All of the defendants acted in accordance with DOC's policies and procedures. None of the defendants were aware of facts or information from which they could have prevented Jermaine's suicide. Moreover none of the defendants actually caused Jermaine's

---

[71]Amended Complaint ¶¶ 205-06.

suicide.  Thus punitive damages are not appropriate to punish their conduct.

Finally, nothing in the record indicates that awarding punitive damages will deter future conduct.  The facts show that no one could have predicted Jermaine's suicide.  Even his mother admits that he was never suicidal and never had a history of mental illness that would lead her to believe he would commit suicide.[72]  Given that Jermaine's suicide could not have been predicted or prevented, an award of punitive damages is inappropriate as the defendants' conduct is not deserving of punishment and it will have no effect on the future conduct of DOC officials.

---

[72] Plaintiff's Responses to Defendants' Requests for Admission at Responses 6 and 7.

## CONCLUSION

The plaintiff has brought a lawsuit unsupported by any facts in the record. It is apparent that the motivation for the suit was her understandable grief as a mother, and her anger misdirected at the defendants, rather than any viable cause of action. It is unfortunate that the Amended Complaint is couched as a broad political attack on the Department of Correction[73], rather than pleading valid claims that can be substantiated by facts in the record. Lurid accusations of murder find no factual support from any source. The defendants are accused of disregard of mental health issues, when there is no history of problems and no behavior to suggest that the decedent was a suicide risk. Nor is there any evidence at all to suggest that the defendants disregarded the decedent's safety, or could have prevented his suicide. The only evidence is that the officers on duty attempted to help him gain release, and those present after his suicide engaged in heroic efforts to revive the decedent. Allegations are made concerning the contested violation of Level IV conditions, when the record clearly reflects that the decedent was afforded full due process from the Court. Finally, the plaintiff's frustration as to the decedent's release date is a quarrel perhaps with the Prothonotary, or with the Superior Court, regarding transmittal of an order to release the decedent, and not with the defendants, who lacked the authority to release him. This is a lawsuit totally devoid of any jury issues supported by facts, and richly deserving of judgment in favor of each defendant, as to all counts and claims.

---

[73] The Amended Complaint contains an account of supposedly "unexplained inmate deaths", at ¶17-42, and inmate suicides, at ¶43-50, which are irrelevant to the claims asserted by the plaintiff. Further spurious material is found at ¶150-160, a lengthy account of newspaper articles concerning other inmates, and the response of the Department of Correction thereto.

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SUSIE A. WILSON, individually and in her capacity as administratrix of the Estate of JERMAINE LAMAR WILSON, deceased, and in her capacity as next friend of Z.W., a minor, | ) ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) ) | C. A. No. 05-821-SLR |
| STANLEY W. TAYLOR, JR., individually; PAUL HOWARD, individually; NOREEN RENNARD, individually; THOMAS L. CARROLL, individually; BETTY BURRIS, individually; DAVID PIERCE, individually; MICHAEL RECORDS, individually; and OFFICER McDONALD, individually, | ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on January 18, 2008, the *Opening Brief in Support of Defendants' Motion for Summary Judgment* was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the following: Michael L. Sensor, Esq.

DEPARTMENT OF JUSTICE
STATE OF DELAWARE

*/s/ Ralph K. Durstein, III*
Ralph K. Durstein, III, #912
Erika Y. Tross, #4506
Deputy Attorneys General
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801
(302) 577-8400
Attorneys for Defendants