## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

SUSIE A. WILSON, individually and in her
capacity as administratrix of the Estate of
JERMAINE LAMAR WILSON, deceased,
and in her capacity as next friend of Z.W., a
minor,

      Plaintiffs,

v.

STANLEY W. TAYLOR, JR., individually;
PAUL HOWARD, individually; NOREEN
RENNARD, individually;  THOMAS L.
CARROLL, individually; BETTY BURRIS,
individually; DAVID PIERCE, individually;
MICHAEL RECORDS, individually;
[OFFICER] <u>DAVID</u> McDONALD,
individually; and SERGEANT BOOM,
individually,

     Defendants.

Civil Action No. 05-821 (SLR)

JURY TRIAL DEMANDED

## <u>AMENDED[1] COMPLAINT</u>

### <u>INTRODUCTION</u>

1.  Plaintiff Susie A. Wilson brings this action on her own behalf as administratrix of

the estate of Jermaine Lamar Wilson, deceased, and as next friend of Z.W., a minor, seeking

damages in vindication of the violations of the civil and Constitutional rights of Jermaine Lamar

Wilson, her son and Z.W.'s father, together with damages for assault, battery, and wrongful

death.

---

[1] Pursuant to Fed. R. Civ. P. 15(a), plaintiff hereby amends her Complaint as a matter of course,
as no responsive pleading has been filed to date. Pursuant to D. Del. L.R. 15.1, this pleading
differs from the original in that added material is underlined and deleted material is bracketed.

2.      Jermaine was murdered or otherwise perished due to asphyxia on February 18, 2005 while in the custody of the Delaware Department of Correction[, when he was strangled and/or hung by a ligature, resulting in his asphyxiation and death].

3.      Jermaine's [murder] death occurred on the day he was supposed to have been released from prison, after an alleged violation of probation filed against him by the Department of Corrections was withdrawn, after Jermaine was ordered to be released by the Superior Court of the State of Delaware, and after an individual with the same name as him had entered the Delaware criminal-justice system.

## JURISDICTION AND VENUE

4.      This Court has subject-matter jurisdiction over this claim pursuant to 28 U.S.C. § 1331 (federal-question jurisdiction), 42 U.S.C. §§ 1981 and 1983 (deprivation of equal rights and civil rights), 4 2 U.S.C. § 1985 (conspiracy to violate or interfere with civil rights), 42 U.S.C. § 1986 (failure to prevent violation or interference with civil rights), 42 U.S.C. § 1988 (proceedings in vindication of civil rights), and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

5.      Venue in this District is appropriate pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), in that all defendants reside in this District and a substantial part of the events and omissions giving rise to this claim occurred in this District.

## PARTIES TO THE ACTION

6.      Plaintiff Susie A. Wilson is a resident of the State of Delaware. She is the administratrix of the Estate of Jermaine Lamar Wilson, deceased ("Jermaine"), and, at all times relevant herein, was the natural mother of Jermaine Lamar Wilson.

7.      Plaintiff Susie A. Wilson is the grandmother and next friend of Z.W., the minor son of Jermaine Lamar Wilson, deceased.

2

8.    At all times relevant herein, defendant Stanley W. Taylor, Jr. ("Taylor") was the Commissioner of the Department of Correction of the State of Delaware. He may be served at the Department of Correction Central Administrative Building, 245 McKee Road, Dover, Kent County, Delaware 19904, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M. Jane Brady] <u>Carl Danberg</u>, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801. Pursuant to 11 *Del. C.* § 6517, at all times relevant herein, Taylor was responsible for the custody, study, training, treatment, correction, and rehabilitation of persons committed to the supervision of the Department of Correction, managing and supervising the Department of Correction, as well as the administration, supervision, operation, management, and control of all correctional institutions within the State of Delaware.

9.    At all times relevant herein, defendant Paul Howard ("Howard") was the Chief of the Bureau of Prisons of the Department of Correction of the State of Delaware. He may be served at the Department of Correction Central Administrative Building, 245 McKee Road, Dover, Kent County, Delaware 19904, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M. Jane Brady] <u>Carl Danberg</u>, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801.

10.    At all times relevant herein, defendant Noreen Rennard ("Rennard") was the Chief of the Bureau of Community Corrections of the Department of Correction of the State of Delaware. She may be served at the Department of Correction Central Administrative Building,

3

245 McKee Road, Dover, Kent County, Delaware 19904, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M. Jane Brady] Carl Danberg, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801

11.    At all times relevant herein, defendant Thomas L. Carroll ("Carroll") was the Warden of the Delaware Correctional Center. He may be served at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, New Castle County, Delaware 19977, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M. Jane Brady] Carl Danberg, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801.

12.    At all times relevant herein, defendant Betty Burris ("Burris") was the Deputy Warden of the Delaware Correctional Center.  She may be served at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, New Castle County, Delaware 19977, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M. Jane Brady] Carl Danberg, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801.

13.    At all times relevant herein, defendant David Pierce ("Pierce") was the Deputy Warden of the Delaware Correctional Center. He may be served at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, New Castle County, Delaware 19977, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M. Jane Brady] Carl

4

Danberg, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801.

14.    At all times relevant herein, defendant Michael Records ("Records") was a Probation and Parole Officer employed by the State of Delaware. He may be served at the Central Violation of Probation Center, 875 Smyrna Landing Road, Smyrna, New Castle County, Delaware 19977, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M. Jane Brady] Carl Danberg, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801.

15.    At all times relevant herein, [Officer] David McDonald[, whose first name is unknown but whose identity will be determined in discovery,] was a Correctional Officer employed by the State of Delaware assigned to the Delaware Correctional Center. He may be served at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, New Castle County, Delaware 19977, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M. Jane Brady] Carl Danberg, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801.

16.    At all times relevant herein, Sergeant Boom, whose first name is unknown but whose identity will be determined in discovery, was a Correctional Officer employed by the State of Delaware assigned to the Delaware Correctional Center. He may be served at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, New Castle County, Delaware 19977, with additional service made pursuant to 10 *Del. C.* § 3103(c) upon the Honorable [M.

Jane Brady] Carl Danberg, Attorney General of the State of Delaware, or the Honorable Malcolm S. Cobin, State Solicitor, at the Delaware Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, New Castle County, Delaware 19801.

## ALLEGATIONS COMMON TO ALL COUNTS

I.     **Irregular Deaths of Delaware Prison Inmates**

    A.     **Multiple Unexplained Inmate Deaths Occur in Delaware's Prisons**

17.     Between February 1, 2000 and Jermaine Wilson's death on February 18, 2005, 23 Delaware prison inmates died of unexplained, undisclosed reasons.  Of these, 16 were African-American, six were white, and one was Hispanic.

18.     Edwin Corbin, 43, was an inmate at the Delaware Correctional Center.  He died on April 25, 2000, while in the custody of DOC.  Despite releasing precise causes of death for other inmates, DOC did not do so for Corbin. DOC only stated that the manner of death was "natural".  Corbin was an African-American male.

19.     Inmate Edward Sanders, 45, died on October 3, 2000. According to DOC, he died in the custody of the State of Virginia.  Despite releasing precise causes of death for other inmates, DOC did not do for Sanders, except to state that he was "transferred to Virginia and died there." DOC did not disclose Sanders' manner of death.  Sanders was an African-American male.

20.     Edward Coverdale, 42, was an inmate at Sussex Correctional Institution.  He died on November 15, 2000 while in the custody of DOC.  Despite releasing precise causes of death for other inmates, DOC did not do so for Coverdale. DOC only stated that the manner of death was "natural".  Coverdale was a white male.

6

21.    Henry Jones Smith, 41, was an inmate at Delaware Correctional Center. He died on January 5, 2001 while in the custody of DOC. Despite releasing precise causes of death for other inmates, DOC did not do so for Smith. DOC only stated that the manner of death was "natural". Smith was an African-American male.

22.    Lb L. Lynn [sic], 31, was an inmate at Sussex Correctional Institution. He died on February 11, 2001 while in the custody of DOC. Despite releasing precise causes of death for other inmates, DOC did not do so for Lynn. DOC only stated that the manner of death was "natural". Lynn was a white male.

23.    James E. Bervine, 32, was an inmate at the Delaware Correctional Center. He died on May 7, 2001 while in the custody of DOC. Despite releasing precise causes of death for other inmates, DOC did not do so for Bervine. DOC only stated that the manner of death was "natural". Bervine was an African-American male.

24.    Karl Brown, 34, was an inmate at the Howard Young Correctional Center. He died on May 12, 2001 while in the custody of DOC. Despite releasing precise causes of death for other inmates, DOC did not do so for Brown. DOC only stated that the manner of death was "natural". Brown was an African-American male.

25.    James Brezial, 39, was an inmate at the Delaware Correctional Center. He died on May 15, 2001 while in the custody of DOC. Despite releasing precise causes of death for other inmates, DOC did not do so for Brezial. DOC only stated that the manner of death was "natural". Brezial was an African-American male.

26.    James Crumpler, 45, was an inmate at the Delaware Correctional Center. He died on May 19, 2001 while in the custody of DOC. Despite releasing precise causes of death for

other inmates, DOC did not do so for Crumpler. DOC only stated that the manner of death was "natural". Crumpler was an African-American male.

27.     Artie B. Anderson, 44, was an inmate at the Delaware Correctional Center. He died on November 25, 2001 while in the custody of DOC. Despite releasing precise causes of death for other inmates, DOC did not do so for Anderson. DOC only stated that the manner of death was "natural". Anderson was an African-American male.

28.     Robert Sterling, 35, was an inmate at the Howard R. Young Correctional Institution. He died on February 24, 2002 while in the custody of DOC. DOC stated the cause of Sterling's death was "cardiac dysrhythmia during acute psychotic episode following withdrawal from cocaine & heroin", and alleged that the manner of his death was due to an "accident". Sterling was an African-American male.

29.     Christopher O. Blackson, 39, was an inmate at the Delaware Correctional Center. He died on March 27, 2002 while in the custody of DOC. Despite releasing precise causes of death for other inmates, DOC did not do so for Blackson. DOC only stated that the manner of death was "natural". Blackson was an African-American male.

30.     William E. Miller, 41, was an inmate at the Delaware Correctional Center. He died on July 19, 2002 while in the custody of DOC. Despite releasing precise causes of death for other inmates, DOC did not do so for Miller. DOC only stated that the manner of death was "natural". Miller was an African-American male.

31.     Robert Patterson, 52, was an inmate at the Delaware Correctional Center. He died on November 30, 2002 while in the custody of DOC. Despite releasing precise causes of death for other inmates, DOC did not do so for Patterson. DOC only stated that the manner of death was "natural". Patterson was an African-American male.

8

32.    Bryan Allen Cooper, 34, was an inmate at the Delaware Correctional Center. He died on February 19, 2003 while in the custody of DOC. Despite releasing precise causes of death for other inmates, DOC did not do so for Cooper. DOC only stated that the manner of death was "natural". Cooper was an African-American male.

33.    Vernell D. Locato, 43, was an inmate at the Delaware Correctional Center. He died on March 27, 2003 while in the custody of DOC, which claimed, in a press release issued after Locato's death, that "[f]oul play is not suspected" and alleged in the same release that Locato's cause of death was "natural". Despite releasing precise causes of death for other inmates, the Department of Corrections did not do so for Locato. Locato was an African-American male.

34.    Henry J. Nabinett, 53, was an inmate at the Howard R. Young Correctional Institution. He died on June 7, 2003 while in the custody of DOC, which claimed, in a press release dated June 9, 2003, again claimed that "[f]oul play is not suspected", and alleged that Nabinett's cause of death was "natural". Despite releasing precise causes of death for other inmates, the Department of Corrections did not do so for Nabinett. Nabinett was a white male.

35.    Larry R. Davis, 25, was an inmate at the Sussex Correctional Institution being held on a life sentence for murder first degree. Davis died on July 31, 2003 at the University of Maryland Shock Trauma Center in Baltimore, Maryland, while in the custody of DOC. In a press release dated July 31, 2003, DOC claimed that Davis "collapsed in the gym". As with previous inmate deaths, DOC claimed that "[f]oul play is not suspected", and later alleged that Davis's cause of death was "natural". Despite releasing precise causes of death for other inmates, the Department of Corrections did not do so for Davis. Davis was an African-American male.

9

36.     James Hodges, 30, was an inmate at the Delaware Correctional Center. He died on August 27, 2003 while in the custody of DOC. DOC claimed, in a press release dated August 27, 2003, that Hodges "was found dead in his cell" and that "[h]e was housed in a cell by himself." As before, DOC claimed in the same press release that "[f]oul play is not suspected." DOC later alleged that Hodges' cause and manner of death were "undetermined". However, an autopsy report released by the Office of the Chief Medical Examiner revealed an abrasion with discoloration on the neck, hemorrhage in the strap muscles of the neck, and foam near the nose and mouth and in the lungs, together with blood in the alveolar spaces and congestion in the alveolar capillaries. Hodges was a white male.

37.     Bernard Coston, 53, was an inmate at the Howard R. Young Correctional Institution being held in default of bail pending trial on charges of criminal trespass and theft under $1,000.00. He died on September 2, 2003 while in the custody of DOC. DOC claimed, in a press release dated September 2, 2003, that Coston "died after a lengthy illness". However, unlike prior inmate deaths due to illness or disease, DOC did not release a cause of death, stating only that his cause of death was "natural". Coston was an African-American male.

38.     Louis Chance, 37, was an inmate who was serving six months at Level V supervision (i.e., incarceration) for driving under the influence. He died on September 23, 2003 while in the custody of DOC. DOC claimed, in a press release dated September 24, 2003, that Chance was incarcerated at Gander Hill Prison; however, in data released to the Wilmington News-Journal, DOC claimed that Chance was incarcerated at the Delaware Correctional Center. As before, DOC alleged that "[f]oul play is not suspected". However, unlike prior inmate deaths due to natural illness or disease, DOC did not release a cause of death, stating only that the cause of death was "natural". Chance was a white male.

10

**A000010**

39.     Robert T. Jackson, 36, was an inmate at the Delaware Correctional Center. He died on November 24, 2003 while in the custody of DOC. However, unlike prior inmate deaths due to natural illness or disease, DOC did release a precise cause of death for Jackson. DOC stated only that the manner of death was "natural". Jackson was a white male.

40.     Robert Saunders, 43, was an inmate at the Howard R. Young Correctional Institution. He died on September 4, 2004 while in the custody of DOC. However, unlike prior inmate deaths due to natural illness or disease, DOC did release a precise cause of death for Saunders. DOC stated only that the manner of death was "natural". Saunders was an African-American male.

41.     Luis Morales, 54, was an inmate at the Delaware Correctional Center. He died on February 7, 2005 while in the custody of DOC. However, unlike prior inmate deaths due to natural illness or disease, DOC did release a precise cause of death for Morales. DOC stated only that the manner of death was "natural". Although DOC has claimed that Morales was a white male, upon information and belief, Morales was actually a Hispanic male.

42.     Deserea B. Bolden, 43, was an inmate at the Delaware Correctional Center. He died on February 17, 2005 while in the custody of DOC. However, unlike prior inmate deaths due to natural illness or disease, DOC did release a precise cause of death for Morales. DOC stated only that the manner of death was "natural". Bolden was an African-American male.

**B.     Inmate Suicides**

43.     Between January 1, 2000 and Jermaine's death on February 18, 2005, seven Delaware prison inmates died of causes alleged by the DOC to be suicide. Of these, two were African-American, four were white, and one was Hispanic.

11

**A000011**

44.     Paul Whitehurst, 34, was an inmate at the Delaware Correctional Center. He allegedly committed suicide on April 13, 2001 while in the custody of DOC. His cause of death was stated by DOC to be "anoxic encephalopathy due to hanging". Whitehurst was an African-American male.

45.     Harry E. Missimer, 27, was an inmate at the Howard R. Young Correctional Institution. He allegedly committed suicide on April 24, 2001 while in the custody of DOC. His cause of death was disclosed by DOC to be "hanging", and his manner of death was disclosed as "suicide-hanging". Missimer was a white male.

46.     Toribo Cejas, 35, was an inmate at the Delaware Correctional Center. He allegedly committed suicide on August 11, 2001 while in the custody of DOC. His cause of death was disclosed by DOC to be "hanging-external compression of neck by hanging. Generalized visceral congestion. Atherosclerosis of left main artery with stenosis, slight", and his manner of death was alleged to be "suicide-hanging". Although DOC claimed that Cejas was a white male, upon information and belief, Cejas was in actuality a Hispanic male.

47.     Brett M. Franks, 18, was an inmate at the Sussex Correctional Institution. He allegedly committed suicide on May 22, 2002 while in the custody of DOC. His cause of death was disclosed by DOC to be "asphyxia due to hanging", and his manner of death was alleged to be "suicide-hanging". Franks was an African-American male.

48.     David B. Bender, 48, was an inmate at the Delaware Correctional Center. He allegedly committed suicide on October 31, 2002 while in the custody of DOC. His cause of death was disclosed by DOC to be "multiple cerebral infarcts complicating overdose of multiple prescribed medications", and his manner of death was alleged to be "suicide-overdose". Bender was a white male.

12

A000012

49.    Paul K. Gohagan, 40, was an inmate at the Howard R. Young Correctional Institution. He allegedly committed suicide on June 23, 2003 – his birthday – while in the custody of DOC. His cause of death was alleged by DOC to be "acute drug intoxication", and his manner of death was alleged to be "suicide-overdose". Gohagan was a white male.

50.    Christopher Barkes, 37, was an inmate at the Howard R. Young Correctional Institution. He allegedly committed suicide on November 14, 2004 while in the custody of DOC. His cause of death was alleged by DOC to be "asphyxia due to hanging", and his manner of death was alleged to be "suicide-hanging". Barkes was a white male.

## II.    Jermaine Lamar Wilson's History in Delaware's Corrections System

### A.    Jermaine Is Arrested as a Juvenile, Charged as an Adult in Superior Court, Pleads Guilty, and is Sentenced

51.    On or about December 4, 2002, when he was 17 years of age, Jermaine was arrested, along with several co-conspirators, for the crimes of Robbery First Degree, Aggravated Menacing, and Conspiracy First Degree. These charges arose out of an incident which occurred on or about December 3, 2002.

52.    On or about January 27, 2003, days after he turned 18, Jermaine was indicted by a Grand Jury sitting in and for New Castle County on one count of Robbery First Degree, two counts of Attempted Robbery First Degree, and three counts of Conspiracy Second Degree.

53.    On or about April 9, 2003, the State of Delaware, acting through Deputy Attorney General Christina M. Showalter, Esquire, filed a Motion in New Castle County Superior Court seeking to transfer Jermaine's custody from the New Castle County Detention Center – a juvenile facility – to the Department of Correction.

54.    The Motion seeking to transfer Jermaine's custody to the Department of Correction was filed pursuant to 11 *Del. C.* § 2103A, which provides as follows:

13

**A000013**

> When a child has reached his or her 16th birthday and is found to be nonamenable to the rehabilitative processes of the Family Court or is charged with an offense in Superior Court and thereafter makes application for transfer of said charges to Family Court pursuant to § 1011 of Title 10 and is denied or fails to make application pursuant to § 1011 of Title 10 within the required time and is therefore held over for trial in Superior Court, the youth shall be remanded to the Department of Correction if held in default of bail. When a child (youth) has been lawfully administratively remanded or transferred to the Department of Correction ("DOC"), ***DOC shall be exclusively responsible for all aspects of the child's (youth's) care, custody and control, including services associated with those responsibilities upon such remand and transfer.*** The Department of Services for Children, Youth and Their Families ("DSCYF") shall have no authority or jurisdiction of such child (youth).

(emphasis supplied)

55.     On or about March 10, 2003, Jermaine, through counsel, entered into a plea bargain with the State of Delaware in which he pled guilty to one count Robbery First Degree and two counts of Conspiracy Second Degree, in exchange for which the State entered a *nolle prosequi* on the remaining charges.

56.     On or about June 20, 2003, the Honorable Richard R. Cooch of the New Castle County Superior Court ("Superior Court") sentenced Jermaine to, *inter alia*, a minimum mandatory sentence of two years at supervision level V (incarceration), followed by one year at supervision level V, suspended for one year at supervision level IV (work release), suspended after six months for six months at supervision level III, to be held at Level V until Level IV space was available.

**B.      Jermaine Is Transferred From The Plummer Center In Violation of The Superior Court's Sentence**

14

**A000014**

57.    In the aforementioned sentencing order of June 20, 2003, the Superior Court specifically ordered that Jermaine would serve his Level IV sentence at the Plummer Community Correction Center ("Plummer Center") in Wilmington, New Castle County Delaware.

58.    Jermaine served his Level V sentence at the Howard Young Multi-Purpose Criminal Justice Facility ("MPCJF") in Wilmington, New Castle County, Delaware, commonly known as "Gander Hill Prison".

59.    On approximately September 9, 2004, Jermaine was transferred to the John L. Webb Correctional Facility ("WCF") in Wilmington, New Castle County, Delaware.

60.    Jermaine was told by an unknown prison counselor, employed by the State of Delaware and acting within the course and scope of his or her duties, that he was being transferred to WCF because his Level IV time was beginning.

61.    Jermaine was also told by the same unknown counselor that he would be placed in a 90-day "flow down" program upon beginning his Level IV time.

62.    Upon information and belief, "flow down" is a procedure in place at DOC wherein certain inmates on Level IV supervision are placed on progressively less strict supervision, with the ultimate goal being home confinement or partial work release.

63.    However, despite the representation of the State-employed prison counselor to the contrary, approximately two or three days after being transferred to WCF, Jermaine was transferred to the Central Violation of Probation Center ("CVOP") in Smyrna, Kent County, Delaware.

64.    No explanation was given to either Jermaine or his family for his transfer from WCF to CVOP.

15

65. At no time did the Superior Court order or authorize Jermaine to be transferred to WCF or CVOP.

66. DOC did not seek to modify the Superior Court's sentence to permit his transfer to either WCF or CVOP.

67. After he was transferred to CVOP, the aforementioned counselor who promised Jermaine that he or she would apply for his "flow down" never contacted Jermaine again.

## III. The Department of Correction Alleges That Jermaine Lamar Wilson Violated His Probation

### A. Jermaine Is Assaulted at CVOP by Officer McDonald and Sergeant Boom

68. On or about January 25, 2005, while housed at CVOP, Jermaine was verbally reprimanded by Corrections Officer McDonald ("McDonald") because he allegedly talked in the hall while returning from dinner.

69. DOC has classified CVOP as a Level IV supervised-release facility. In essence, however, CVOP is the functional equivalent of a prison, complete with armed guards, prison uniforms, fences, gates, and controlled access.

70. Nonetheless, because DOC has classified CVOP as a Level IV facility, it has established rules and regulations which Level IV probationers must follow.

71. If a Level IV probationer violates one of DOC's rules or regulations, no matter how technical or minor the violation, DOC's policy, practice, and procedure is to allege that the probationer is in violation of probation and seek a ruling as to the same with the Court.

72. In fact, DOC itself represents to the public that its two Violation of Probation Centers (CVOP and the Sussex Violation of Probation Center)

16

**A000016**

house primarily offenders who have violated the terms of their probation. These "rules breakers" have not committed any crimes during their probation in the community. They have committed "technical" violations that could include failing to report to their probation officer, changing residence without notifying their probation officer, failing a drug test or failing to abide by a curfew. The Department of Correction believes such violations warrant brief periods of incarceration.

State of Delaware, *Bureau of Community Correction VOP and Work Release Centers – Department of Correction, available at* <http://www.state.de.us/correct/BOCC/BOCC_CCC_cvop.shtml> (last visited October 21, 2005).

73.     Upon information and belief, one of DOC's myriad rules and regulations governing CVOP included a prohibition against talking in the hallways while going to and coming from meals.

74.     After McDonald reprimanded Jermaine for violating the "no-talking" rule, he ordered Jermaine to follow him to a holding cell, whereupon McDonald closed the door violently, causing the door to strike Jermaine on the back.

75.     Jermaine, angry at having been struck by the door for no reason, called McDonald a "sucker". At that point, McDonald, after looking behind him to determine if anyone was watching, grabbed Jermaine with his left hand by the throat and squeezed, while holding his right hand up in a punching position.

76.     Jermaine told McDonald that if McDonald hit him, he would file charges. McDonald threw Jermaine onto a bench, still gripping Jermaine's throat, and yelled "Listen, you stupid motherf—ker. If you ever call me a sucker again I'll f—k your little black a—s up."

77.     Still gripping Jermaine's throat, McDonald struck Jermaine's head against the wall, cutting the back of his head.

17

78.    Shortly after being attacked by McDonald, Jermaine observed one Corrections Officer Ayres ("Ayres"), an employee, agent, and/or servant of the State of Delaware, in the vicinity.

79.    Jermaine told Ayres that she must have seen what happened and that he wanted to file a grievance and speak to the supervisor on duty, Lieutenant May, whose first name is unknown. Ayres did not respond to Jermaine's request.

80.    Jermaine began to strike the door of the holding cell with his foot to attract attention, whereupon Ayres summoned McDonald back to the holding cell.

81.    McDonald returned to the holding cell with one Sergeant Boom (hereinafter "Boom"), an employee, agent, and/or servant of the State of Delaware, who asked Jermaine why he was making noise.

82.    Jermaine responded that he had just been assaulted by McDonald and that he wanted to file a grievance.

83.    McDonald opened the cell door and ordered Jermaine to sit. Jermaine refused, asking why he had been attacked, and demanded to speak to the lieutenant.

84.    McDonald asked Boom if he was "ready", whereupon McDonald counted to two and sprayed Jermaine in the face with a liquid known as "capstun".

85.    Upon information and belief, "capstun" is a spray employed by law-enforcement officers containing liquid capsaicin pepper oil for the purpose of disabling arrestees.

86.    After being sprayed in the face with "capstun", Jermaine was ordered to sit back down in the holding cell.

**B.    Defendant Records Issues An Administrative Warrant Containing An Incomplete Account of the Incident Involving Jermaine**

18

**A000018**

87.    In the evening of January 25, 2005 defendant Michael Records issued an Administrative Warrant alleging that Jermaine violated the terms of his Level IV supervision.

88.    An Administrative Warrant is a prerequisite for the Department of Corrections to obtain a hearing before the Superior Court to determine that a probationer is in violation of the terms of his or her supervision or probation.

89.    The Administrative Warrant issued by Probation Officer Records alleged the following:

> On 1/25/05, the offender [Jermaine] was told to stop talking in the hallway by C/O McDonald during evening feeding. He continued to talk and became disorderly when this was again addressed. He was ordered to the holding cell, but refused initially to go. He eventually locked into [*sic*] the holding cell, but then began kicking and banging on the cell door. He was ordered three times to stop by C/O McDonald, but refused to do so. He was capstunned at that point to prevent damage to state property. Previously, offender Wilson incurred program violations for refusing to work on the outside work projects on both 1/3/05, and 1/19/05.

90.    The Administrative Warrant did not mention the involvement of Sergeant Boom in the incident involving Jermaine, nor did it mention that Officer McDonald slammed Jermaine's head against the wall and that Jermaine sustained injuries to his head as a result.

91.    In addition, upon information and belief, defendant Records' representation in the Administrative Warrant that it was necessary to spray Jermaine with "capstun" in order "to prevent damage to state property", was inaccurate and misleading, inasmuch as facilities in CVOP and other Delaware correctional facilities are nearly indestructible and designed to withstand substantial abuse.

92.    Defendant Records placed the representation that Jermaine was sprayed "to prevent damage to state property" in the Administrative Warrant as a pretext for obtaining a violation of probation ("VOP") hearing, as the mere act of talking in the hallway would, upon

19

information and belief, not have risen to the level of proof necessary to establish probable cause that a violation of probation had occurred, which is a prerequisite for obtaining an Administrative Warrant.

93.    The Administrative Warrant was inaccurate and misleading in other ways as well. For instance, although defendant Records alleged in the Administrative Warrant that Jermaine "incurred program violations" for refusing to work on two occasions in January 2005, he failed to note therein that the reason Jermaine refused to work was because he was not given proper attire to work in the cold weather which beset Delaware that month. In fact, the average monthly temperature in January 2005 for Wilmington, Delaware, the closest meteorological station to CVOP, was only 31 degrees.

94.    After the Administrative Warrant was issued, by Order of the Honorable Richard R. Cooch of New Castle County Superior Court dated January 26, 2005, Jermaine was ordered held without bail until his violation of probation hearing.

95.    In a video bail hearing held on February 1, 2005 before Commissioner Michael Reynolds of New Castle County Superior Court, Jermaine's commitment in lieu of bail was continued.

96.    At the time of the bail hearing, neither DOC nor the Delaware Department of Justice requested Jermaine's transfer to DCC. In addition, the Superior Court never authorized Jermaine's transfer from Level IV supervision to Level V confinement.

**C.    Jermaine Is Suddenly Transferred to "The Hole" at the Delaware Correctional Center**

97.    Approximately two to two and one-half hours after being assaulted by McDonald and Boom, as aforesaid, Jermaine was transferred to the Delaware Correctional Center ("DCC"), where he was placed in a solitary-confinement unit commonly known as "The Hole".

20

**A000020**

98.    Upon information and belief, apart from being used for pretrial detention, placement in "The Hole" is often used by DOC's staff as a form of administrative punishment for DCC inmates who commit rules violations or infractions which do not rise to the level of actual crimes.

99.    According to the State of Delaware, DCC is "a Level 5 (prison) facility for men" and "is the state's largest adult, male correctional facility. DCC houses minimum, medium, and maximum security inmates. DCC is also the primary facility for housing the Kent County pre-trial (detainee) population." State of Delaware, *Delaware Correctional Center – Department of Correction, available at* <http://www.state.de.us/correct/BOP/PrisonDCC.shtml> (last visited October 21, 2005).

100.    Despite the State's representation as set forth above, DCC is in actuality Delaware's only maximum-security prison, housing Delaware's most brutal, violent, and hardened criminals, including convicted rapists and murderers, Delaware's "Death Row", and the state's lethal-injection chamber.

101.    Therefore, DCC was a wholly inappropriate facility in which to place a Level IV probationer such as Jermaine, whose only prior history of violations consisted of hesitance to work during cold weather.

102.    After being placed in "The Hole" at DCC, Jermaine was put on 24-hour lockdown. He was not permitted to leave his cell for any reason, nor was he permitted to consult with counsel or make telephone calls.

**E.    Jermaine Demands a Contested VOP Hearing**

21

**A000021**

103.    A VOP hearing in connection with the Administrative Warrant issued by defendant Records was initially scheduled for February 10, 2005 before the Honorable Richard R. Cooch in New Castle County Superior Court.

104.    At the time of his February 10 hearing, Jermaine, through his public defender, Brian Bartley, Esquire, advised the Court that he wished to contest the alleged violation of probation.

105.    The Court immediately continued the violation of probation hearing to February 15, 2005.

106.    Jermaine was returned to DCC after the hearing.

107.    Upon information and belief, Jermaine was advised by unknown employees, agents, and/or servants of the Department of Corrections that he would be held in "the Hole" until February 18, 2005 so that he could complete the balance of his Level IV time.

108.    In fact, upon information and belief, on an unknown date prior to the February 10, 2005 hearing, Jermaine was advised by employees, agents, and/or servants of DOC that his Level IV time would be "up" – that is, completed – on February 18, 2005.

109.    [Upon information and belief, Jermaine M. Wilson was being held at DCC in default of bail at the time Jermaine Lamar Wilson was returned to DCC after his violation of probation hearing.] Deleted.

**F.    The VOP is Withdrawn and Jermaine is Ordered Released**

110.    After Jermaine appeared in Superior Court on February 10, 2005, Probation Officer Records withdrew Jermaine's VOP.

111.    Probation Officer Records neither stated nor disclosed a reason for withdrawing Jermaine's VOP.

22

112.    In fact, a post-hearing Sentencing Worksheet dated February 10, 2005 appeared in Jermaine's file in Superior Court which reflects that on February 10, 2005, Jermaine was ordered released and that the VOP was withdrawn.  A copy of this Sentencing Worksheet is attached hereto as **Exhibit A** and incorporated herein by reference.

113.    Yet, Jermaine's file also contains a sentencing order dated February 10, 2005 and filed with the Prothonotary on February 14, 2005 which indicates that Jermaine was found not in violation and that the VOP was withdrawn.  A copy of this sentencing order is attached hereto as **Exhibit B** and incorporated herein by reference.

114.    However, the transcript of Jermaine's VOP hearing before Judge Cooch on February 10, 2005 does not reflect that the Court ordered Jermaine released.  A copy of the transcript of the entire February 10, 2005 VOP hearing is attached hereto as **Exhibit C** and incorporated herein by reference.

115.    In addition, a second post-hearing Sentencing Worksheet dated February 10, 2005 appears in Jermaine's Superior Court file which neither lists any disposition for the VOP nor sets forth Jermaine's ultimate disposition.  A copy of this Sentencing Worksheet is attached hereto as **Exhibit D** and incorporated herein by reference.

116.    Even though defendant Records withdrew Jermaine's VOP, he was never returned to CVOP or any other form of Level IV confinement.  Instead, Jermaine was left in "the Hole".

**G.    Jermaine Dies On The Day He Was Told He Would Be Released**

117.    On February 10, 2005, Jermaine wrote a letter to his mother, plaintiff Susie A. Wilson, which read, in pertinent part:

> I went to court today and they said, "Yeah you know" They told me I have to stay at Level 5 though until my Level 3 time starts and that's next week on (Friday 18) Hallaujah!!!  I'm finally coming home mom and to stay.  God is good.  I was praying last

> night and I know you was praying for me too and it all worked out.
> Can you please be here to pick me up Friday? Or send somebody
> so I can be gone.

118.    Ms. Wilson arrived at DCC on February 18, 2005 at approximately 5:15 p.m. to pick up Jermaine.

119.    When Ms. Wilson arrived at DCC, she was told that there was no information available concerning Jermaine's release, and she was instructed to return to DCC at 7:30 p.m.

120.    At approximately 9:00 p.m., Ms. Wilson was again told that no information regarding Jermaine's release was available and was told to contact DCC the next day.

121.    Ms. Wilson drove home.  At approximately 2:00 a.m. on February 19, 2005, Ms. Wilson received a telephone call from an individual with the Department of Corrections, believed to be defendant Pierce, who advised Ms. Wilson that Jermaine had died.

122.    The caller did not ask Ms. Wilson if she had friends or family members nearby before notifying her of Jermaine's death.

123.    The death certificate prepared by Deputy Chief Medical Examiner Adrienne Sekula-Perlman, M.D. alleges that Jermaine was found at 10:45 p.m. in DCC.  The death certificate further concludes that the immediate cause of Jermaine's death was asphyxia due to hanging, and the manner of death is listed as "suicide".

124.    Jermaine's autopsy report concludes that he died as a result of asphyxia due to hanging, and notes that a ligature furrow appears on the neck with a band of parchmentized skin measuring ½" in width depressing the skin to a depth of ¼". The report further notes an area of soft tissue swelling measuring 1½" in greatest dimension with a centrally-placed ¼" superficial laceration.    Although the autopsy report is completely silent concerning Jermaine's psychological history, the conclusion is nonetheless stated to be asphyxia due to hanging.

24

**A000024**

125.   Prior to his death, Jermaine had never exhibited suicidal tendencies and had never expressed suicidal ideations and plans.

126.   Jermaine did not commit suicide.

127.   Jermaine [was murdered] died in his prison cell by being strangled with a ligature by persons unknown, but whose identity shall be determined through discovery, or otherwise perished as a result of asphyxia.

IV.   **Jermaine Lamar Wilson's History in Delaware's Corrections System is Confused With Jermaine Lamont Wilson's**

128.   On or about November 15, 2004, an individual named Jermaine Lamont Wilson was arrested on charges of Trafficking Cocaine, Possession With Intent to Deliver, Maintaining a Vehicle, Possession Within 1000 Feet of a School, and Possession of Drug Paraphernalia.

129.   Jermaine Lamont Wilson's bail was set by the committing magistrate at $33,500.00 cash, which Jermaine Lamont Wilson posted shortly thereafter.

130.   A preliminary hearing on Jermaine Lamont Wilson's charges was held in the New Castle County Court of Common Pleas on or about November 29, 2004, as a result of which he was bound over for trial in New Castle County Superior Court.

131.   A Grand Jury sitting in and for New Castle County indicted Jermaine Lamont Wilson on the above charges on or about February 7, 2005, after which the charges were assigned Case Number 0411012225 in New Castle County Superior Court.

132.   Jermaine Lamont Wilson was arraigned in New Castle County Superior Court on the aforementioned charges on February 28, 2005.

133.   The charges against Jermaine Lamont Wilson were assigned Criminal Action Number 0411012225 in New Castle County Superior Court.

25

134.   Jermaine Lamont Wilson had prior involvement with Delaware's criminal justice system.  In fact, upon information and belief, before he was indicted on the aforementioned charges, Jermaine Lamont Wilson was on probation and at least one capias was issued for him.  His first arrest was as a juvenile in July 2000.

135.   On or about April 25, 2005, Jermaine Lamont Wilson entered a plea of guilty to Trafficking Cocaine, as a result of which he was sentenced to the Boot Camp Diversion Program.

136.   Jermaine Lamont Wilson's date of birth is August 8, 1983, and he is an African-American male.

137.   Jermaine Lamar Wilson's date of birth was January 15, 1985, and he was an African-American male.

138.   Jermaine Lamont Wilson is not the same person as Jermaine Lamar Wilson.

139.   Jermaine Lamont Wilson was known by an alias of "Jermaine M. Wilson".  However, all of the pleadings and other documents in connection with his Superior Court prosecution bore the name of "Jermaine L. Wilson."

140.   On or about May 19, 2005, Robert A. Willoughby, Jr., a probation officer employed by the Department of Corrections, filed a document with New Castle County Superior Court styled "Probation Report – Level III" which, *__for the first time__*, referred to Jermaine Lamont Wilson as "Jermaine M. Wilson" – a name by which he had never been referred to throughout the course of his Superior Court prosecution.

141.   Defendant Willoughby's report represented to the Superior Court that Jermaine Lamont Wilson

> has a serious criminal history for a man his age.  In Delaware he
> has 47 reported arrests that have totaled 75 charges and resulted in

26

**A000026**

1 Felony and 27 Misdemeanor Convictions to date. He has a capias history of 31. Mr. Wilson, per his own admission[,] is a gun enthusiast. Stating prior to his felony conviction that he used to shoot at multiple ranges. [*sic*] Mr. Wilson also admits to being a drug dealer, stating that he used the proceeds from his prior drug sales to get where he is today to include purchasing his 2 dump trucks for his trucking business. Mr. Wilson claims to legally bring in $10,000 to $12,000 per week from the work these 2 trucks perform. Mr. Wilson also admits to owning and paying cash for a 2005 700 series BMW that is registered to someone else, as he has stated he didn't want his Probation Officer knowing the type of car he had. This Officer has spoken with several police detectives and by all reports, Mr. Wilson is believed to be operating a very successful illegal drug operation in New Castle County. Mr. Wilson is a serious drug dealer with an infatuation for [*sic*] guns. Mr. Wilson was deceitful to this Officer, attempting to make this Officer believe that his .40 caliber Glock that he bought prior to this felony conviction was stolen and that a police report had been taken. In fact, no police report was ever taken and the gun was not reported stolen. Leaving this officer to believe that he still has access to the gun somewhere. [*sic*]

142.    Despite the fact that Willoughby stated his name to be "Jermaine M. Wilson", a Boot Camp Diversion Order entered by the Superior Court on June 15, 2005 as a consequence of Jermaine Lamont Wilson's aforementioned violation of probation continued to refer to him as "Jermaine L. Wilson".

143.    Upon information and belief, at least two entries pertaining to Jermaine M. Wilson's criminal history appear on Jermaine Lamar Wilson's Superior Court docket sheet:

    a)  A capias issued on September 23, 2004 and returned on January 26, 2005 states "Not wanted. L[evel] 4 Supervision. Report police contact to[…]".

    b)  A second capias issued on November 12, 2004 states "FTP [failure to pay]/Criminal Contempt- Court Proceedings".

A copy of said docket sheet is attached hereto as **Exhibit E** and incorporated herein by reference.

144.    The aforementioned docket entries in Jermaine's file are incorrect. Jermaine was incarcerated on September 23, 2004 and November 12, 2004, the two dates for which capiases

27

were issued. Therefore, he could not have been wanted on any capias, nor could he have been on Level IV supervision.

145.    Moreover, as recently as October 20, 2005, a document relating to Jermaine's criminal charges appeared in Jermaine Lamont Wilson's Superior Court file: a "Case Report" prepared by Heather Zwickert, a Probation/Parole Officer employed by DOC's Bureau of Pretrial Services, shortly after Jermaine Lamar Wilson's arrest. Even though this report was dated February 11, 2003, it was marked with Jermaine Lamont Wilson's Superior Court Case Number of "0411012225", indicating a prosecution that commenced in 2004. A copy of this document is attached hereto as **Exhibit F** and incorporated herein by reference.

146.    Upon information and belief, DOC, through unknown agents, servants, and/or employees, the identities of whom shall be determined in discovery, confused the identities of Jermaine Lamont Wilson and Jermaine Lamar Wilson.

147.    Upon further information and belief, DOC, through unknown agents, servants, and/or employees, the identities of whom shall be determined in discovery, misidentified Jermaine Lamar Wilson as Jermaine Lamont Wilson after the latter's arrest, thereby mistaking Jermaine as a recent dangerous offender and justifying his placement into "the Hole" at DCC.

148.    But for this misidentification, Jermaine would not have been placed into "the Hole".

149.    Upon information and belief, in his VOP report prepared after Jermaine's death, defendant Willoughby intentionally referred to Jermaine Lamont Wilson by his alias of "Jermaine M. Wilson" to conceal and obfuscate the fact that the two Jermaines were confused with each other and that, as a result, Jermaine was placed somewhere he never should have been.

**V.    The Wilmington *News-Journal* Exposes Serious Problems In Delaware's Prison System**

28

**A000028**

150.  Beginning on September 25, 2005, the Wilmington *News-Journal* began to publish a series of investigative articles as part of a series entitled "Delaware's Deadly Prisons". The articles described the abysmal state of medical care in Delaware's correctional system and also discussed a series of unexplained or suspicious inmate deaths, including Jermaine's.

151.  In an article dated September 28, 2005 entitled "Accountability for Deadly Prisons", the *News-Journal* set forth facts concerning Jermaine's death and reported, *inter alia,* that two individuals named Jermaine Wilson were in the Delaware correctional system at the same time.  The News-Journal further reported that "corrections officials sent the wrong Jermaine Wilson to Smyrna."

152.  The *News-Journal* also reported several egregious cases of inmate neglect, by DOC and its employees, agents, and/or servants, including, but not limited to:

    a)  The death of Anthony Pierce, an inmate at the Sussex Correctional Institution, who was known as "the brother with two heads" because of a massive untreated brain tumor on his head caused by osteosarcoma of the skull that was misdiagnosed by DOC's medical vendor as a cyst or ingrown hair;

    b)  DOC's refusal to send inmates with emergent medical conditions, including heart attacks, to hospitals, instead opting to provide treatment by in-house, contracted medical staff;

    c)  Forcing pretrial detainees in DCC to reside in a unit with no air conditioning while locked in their cells at all times except for meals;

    d)  Failing to provide adequate medical facilities at DCC, requiring ill inmates to sleep on the floor on foam pads;

    e)  Failing to provide adequate healthcare to Kenneth DeRoche, a convicted child rapist who was serving an eight-year term at DCC, for a heart condition, resulting in his release being ordered by Superior Court; and

    f)  Giving medical discharges to inmates with serious health problems rather than providing treatment, placing the burden of their healthcare on the public and on charitable organizations.

29

**A000029**

153.    Defendant Taylor, interviewed by the News-Journal in connection with the series, claimed that "[t]he inmate population tends to be a population that comes to us with a difficult medical history: substance abuse, tattoos, risky sex. They don't take care of themselves."

**VI.    Defendant Taylor "Responds" to the *News-Journal* Series and DOC Refuses to Release Jermaine Lamar Wilson's Medical Records**

154.    In a document entitled "Response to Inmate Health Care Articles" issued on September 30, 2005, intended as a public rebuttal to the *News-Journal* series, defendant Taylor stated:

> Jermaine LeMar [*sic*] Wilson, DOB 1-15-85, was being properly housed at Gander Hill [P]rison. He was serving a two-hear sentence at Level 5 (prison) for 1st degree robbery beginning on 6-20-03. With good time credit applied, Jermaine LeMar [*sic*] Wilson's prison time ended on 9-9-04. J.L. Wilson had a Level 4 (work release) sentence to follow the prison time. That portion of the sentence began on 9-9-04. Wilson was transitioned through Level 4 on his way to work release; [*sic*] with stays at the Webb Correctional Facility and Central Violation of Probation Center. While at CVOP, Wilson exhibited defiant behavior, refused to participate in mandatory community service projects and blatantly failed to comply with orders from security staff. As a result of this violation, he was sent to Delaware Correctional Center. Based on his CVOP behavior, he was placed in maximum security.

> Jermaine M. Wilson, DOB 8-8-83 – a different inmate – was not incarcerated at either Level 5 (prison) or Level 4 (work release) during the time Jermaine LeMar [*sic*] Wilson was incarcerated at Gander Hill. Jermaine M. Wilson was on probation at the time, living full time in the community. His period of probation went from 4-16-03 to 5-10-05. On 5-11-05, Jermaine M. Wilson was incarcerated at Sussex Violation of Probation Center. He was released on bail the next day, 5-12-05, to complete his period of probation.

> On 7-7-05, Jermaine M. Wilson was incarcerated at Sussex Correctional Institution on trafficking charges. He currently resides at Sussex Boot Camp.

30

155.    Defendant Taylor's September 30, 2005 public response to the "Delaware's Deadly Prison" series failed to disclose and intentionally withheld significant material facts from the public, including, but not limited to, the following:

a)  That Jermaine Lamont Wilson was indicted under the name of "Jermaine L. Wilson", and was known as such in DELJIS and in the Superior Court docket;

b)  That Jermaine Lamont Wilson's alias was Jermaine M. Wilson;

c)  That Jermaine Lamont Wilson was never referred to by the Department of Corrections or any other entity as "Jermaine M. Wilson" during the course of his Superior Court prosecution until *after* the death of Jermaine Lamar Wilson;

d)  That Jermaine Lamont Wilson had been indicted on multiple serious drug charges on February 7, 2005 in Superior Court and arraigned on the same charges on February 28, 2005;

e)  That documents from Jermaine Lamar Wilson's prosecution appear in Jermaine Lamont Wilson's Superior Court file, and that capiases concerning Jermaine Lamont Wilson appear on Jermaine Lamar Wilson's docket sheet;

f)  That defendant Records withdrew Jermaine Lamar Wilson's violation of probation following the February 10, 2005 hearing;

g)  That Jermaine Lamar Wilson had been advised he would be released from DCC on February 18, 2005;

h)  That plaintiff Susie A. Wilson in fact arrived at DCC in the evening of February 18, 2005 to pick her son up from DCC;

i)  That documents in the Superior Court file indicate that Jermaine Lamar Wilson was ordered to be released on February 10, 2005;

j)  That Jermaine Lamar Wilson was found dead on the day he told his mother he scheduled to be released;

k)  That Jermaine Lamar Wilson was transferred to two facilities in violation of the Superior Court's sentence, namely WCF and CVOP, when he had been ordered to serve the Level IV portion of his sentence at the Plummer Center;

l)  That WCF is a Level IV facility, when in actuality it is a Level V center and is in fact used and advertised as such by DOC;

31

m) That both Jermaine Lamar Wilson and Jermaine Lamont Wilson were in the Delaware criminal justice system at the same time;

n) That Jermaine Lamar Wilson had never exhibited suicidal tendencies or expressed suicidal ideations and/or plans; and

o) That Jermaine Lamar Wilson did not commit suicide, but, rather, was murdered <u>or otherwise perished.</u>

156.   In addition, defendant Taylor's September 30, 2005 "response" alleged that the News-Journal articles contained "numerous misstatements, exaggerations, and outright falsehoods". Defendant Taylor's "response" claimed that

> while [DOC] would welcome the opportunity to refute each and every misstatement in the series, the DOC cannot do so in most cases, because refuting the articles' assertions would require DOC to rely upon and disclose information from inmates' medical files, which are required to be kept confidential by Federal law. If the News[-]Journal can secure a waiver of health information confidentiality from any of the sources for its articles, the DOC can provide a complete response to the allegations reported.

157.   However, defendant Taylor's September 30, 2005 "response" failed to explain why DOC released the precise cause of death for some inmates who died in custody, thereby causing DOC to "rely upon and disclose information from inmates' medical files", but yet did not disclose precise causes of death for other inmates who died in custody.

158.   Also, defendant Taylor's "response" disclosed Jermaine Lamar Wilson's alleged cause and manner of death (asphyxia by hanging) without obtaining a waiver of health information confidentiality from plaintiff Susie A. Wilson – in apparent violation of the same "Federal law" which defendant Taylor claimed justified withholding other inmates' medical information. Yet, defendant Taylor failed to disclose that fact in his "response".

159.   DOC was also requested, by letter from plaintiff's counsel to DOC's Dispensary dated May 10, 2005 accompanied by a legally sufficient HIPAA-compliant medical

32

**A000032**

authorization, to produce a copy of Jermaine Lamar Wilson's entire medical file. A copy of the letter is attached hereto as **Exhibit G** and incorporated herein by reference.

160.    To date, neither DOC nor its medical contractor has produced Jermaine Lamar Wilson's medical file, even though it publicly disclosed Jermaine Lamar Wilson's alleged cause and manner of death while at the same time claiming that it was prohibited from releasing medical information regarding other prisoners, in specific violation of Delaware law requiring the disclosure of medical records within 45 days of a request. *See* 10 *Del. C.* § 3926.

**VII.    Jermaine Lamar Wilson Was Deprived of His Constitutional Rights Through Defendants' Actions and Inactions**

161.    The physical injury caused to Jermaine by defendants Boom and McDonald, together with Jermaine's [murder and] death, were direct and foreseeable by all defendants.

162.    All defendants acted under color of state law at all times relevant herein and in willful and wanton disregard for the Jermaine's safety and rights, exhibiting gross and reckless negligence which exposed Jermaine to a substantial risk of physical harm and death, all of which shocks one's conscience.

163.    Jermaine was a member of a discrete class of persons subjected to potential harm as a result of the actions of defendants, or each of them, inasmuch as he was an inmate and/or probationer under the supervision of DOC.

164.    The actions and inactions of each defendant are sufficient to shock one's conscience, in that each defendant exercised authority under color of state law to create an opportunity for danger and harm that would not have otherwise existed, thereby establishing violations of his rights guaranteed by the United States and Delaware Constitutions, including, but not limited to:

33

a) Deprivation of life and liberty without due process of law, pursuant to the Fifth and Fourteenth Amendments;

b) Deprivation of the right to equal protection of law, pursuant to the Fourteenth Amendment;

c) Deprivation of the right to be free from cruel and unusual punishment, pursuant to the Eighth Amendment and imposed on defendants by the Fourteenth Amendment;

d) Deprivation of the right to be free from infliction of cruel punishment, pursuant to Article I, § 11 of the Delaware Constitution;

e) Deprivation of the right to be housed in a jail which pays proper regard to the health of prisoners, in violation of Article I, § 11 of the Delaware Constitution; and

f) Deprivation of his right to life, liberty, and property without judgment by his peers, in violation of Article I, § 7 of the Delaware Constitution;

165.    As a direct and proximate result of the deprivation of his Constitutional rights, as aforesaid, Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death.

166.    As a result of his death, Jermaine was unable to exhaust his administrative remedies against defendants pursuant to 42 U.S.C. § 1997e.

167.    Upon Jermaine's death, all causes of action he had or may have had against any or all defendants survived to plaintiff Susie A. Wilson, as administratrix of his estate, pursuant to 10 *Del. C.* § 3701.

## COUNT I

**CLAIM AGAINST DEFENDANTS TAYLOR, HOWARD, CARROLL, BURRIS, AND PIERCE– VIOLATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW PURSUANT TO 42 U.S.C. §§ 1981 AND 1983 (STATE-CREATED DANGER DOCTRINE)**

168.    Plaintiff repeats Paragraphs 1 through 167 of this Complaint as if the same were more fully set forth at length herein.

34

**A000034**

169.    Defendants Taylor, Howard, Rennard, Carroll, Burris, and Pierce, jointly and severally, acting in their individual capacities and under color of state law, committed the following acts and omissions:

a)  Permitted conditions to exist in the Delaware Correctional Center which directly and foreseeably led to Jermaine's assault and [murder] death;

b)  Allowed Jermaine Lamont Wilson's identity and criminal history to be confused with Jermaine Lamar Wilson's;

c)  Failed to adequately investigate the background and/or history of Jermaine Lamar Wilson before placing him in "the Hole" at the Delaware Correctional Center, a maximum-security Level V facility;

d)  Placed Jermaine in a position of danger by moving him from WCF to CVOP without the permission or authority of the Superior Court, and when no legitimate penological interest was served thereby;

e)  Placed Jermaine in a position of danger by moving him from CVOP to DCC without the permission or authority of the Superior Court, and when no legitimate penological interest was served thereby;

f)  Placed Jermaine in a maximum-security Level V facility when no legitimate penological interest was served thereby;

g)  Permitted an Administrative Warrant to be issued which misrepresented the situation involving Jermaine, Officer McDonald, and Sergeant Boom, and which failed to provide material facts concerning that incident;

h)  Failed to provide adequate supervision and oversight for those corrections officers responsible for Jermaine's security;

i)  Disobeyed the Superior Court's February 10 order that Jermaine be released;

j)  Permitted Officer Willoughby to issue a Violation of Probation report which used the alias of Jermaine Lamont Wilson, "Jermaine M. Wilson", in an attempt to obfuscate the fact that Jermaine's identity was confused with that of Jermaine Lamont Wilson;

k)  Failed to establish adequate internal controls and safeguards to prevent individuals with the same name, such as Jermaine Lamont Wilson and Jermaine Lamar Wilson, from being confused with each other;

35

**A000035**

l) Permitted conditions to exist which led to the death of disproportionately high numbers of African-American inmates, such as Jermaine; and

m) Failed to prevent the deaths of disproportionately high numbers of African-American inmates, such as Jermaine.

170.    The aforementioned acts and omissions of defendants Taylor, Howard, Carroll, Burris, and Pierce created a danger to Jermaine which resulted in the deprivation of his right to equal benefit of laws and proceedings for the security of his person and property as is enjoyed by white citizens, pursuant to 42 U.S.C. § 1981, as well as deprivation of his Constitutional rights under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution as well as Article I, §§ 7 and 11 of the Delaware Constitutions, as aforesaid.

171.    As a direct and proximate result of the deprivation of his Constitutional rights, as aforesaid, Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death, and, as a result, plaintiff hereby makes claim against defendants Taylor, Howard, Carroll, Burris, and Pierce in vindication of the violation of those civil rights, pursuant to 42 U.S.C. § 1988.

## COUNT II

**CLAIM AGAINST DEFENDANTS BOOM AND MCDONALD – VIOLATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW PURSUANT TO 42 U.S.C. §§ 1981 AND 1983 (STATE-CREATED DANGER DOCTRINE)**

172.    Plaintiff repeats Paragraphs 1 through 171 of this Complaint as if the same were more fully set forth at length herein.

173.    The violations of Jermaine's Constitutional rights, as aforesaid, were directly and proximately caused by the actions of defendants Boom and McDonald, jointly and severally, acting in their individual capacities and under color of state law, in that they:

36

a) Maliciously, sadistically, wantonly, and unnecessarily inflicted pain upon Jermaine which was grossly disproportionate to the severity of his offense and was completely without penological justification;

b) Struck, beat, "capstunned", and otherwise subjected Jermaine to bodily harm which was malicious, sadistic, wanton, and unjustified and was carried out with a deliberate indifference to Jermaine's right under the Delaware and United States Constitutions to be free from cruel and unusual punishment.

c) Exercised use of force upon Jermaine that they could not plausibly have thought necessary under the circumstances; and

d) Subjected Jermaine, an African-American inmate, to punishment and/or treatment which would not be inflicted upon similarly-situated white inmates.

174.    The aforementioned acts and omissions of defendants Boom and McDonald created a danger to Jermaine which resulted in the deprivation of his right to equal benefit of laws and proceedings for the security of his person and property as is enjoyed by white citizens, pursuant to 42 U.S.C. § 1981, as well as deprivation of his Constitutional rights under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution as well as Article I, §§ 7 and 11 of the Delaware Constitutions, as aforesaid.

175.    As a direct and proximate result of the deprivation of his Constitutional rights, as aforesaid, Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death. Plaintiff hereby makes claim against defendants Taylor, Howard, Carroll, Burris, and Pierce in vindication of the violation of those civil rights, pursuant to 42 U.S.C. § 1988 and 10 *Del. C.* § 3701.

## COUNT III

### CLAIM AGAINST DEFENDANT RECORDS – VIOLATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW PURSUANT TO 42 U.S.C. §§ 1981 AND 1983 (STATE-CREATED DANGER DOCTRINE)

37

176.    Plaintiff repeats Paragraphs 1 through 175 of this Complaint as if the same were more fully set forth at length herein.

177.    The violations of Jermaine's Constitutional rights, as aforesaid, were directly and proximately caused by the actions of defendant Records, acting in his individual capacity and under color of state law, in that he:

      a) Issued or caused to be issued an Administrative Warrant which contained false, inaccurate, and/or misleading information concerning Jermaine's alleged violation of probation, leading to Jermaine's unlawful and unnecessary confinement in "the Hole" at DCC;

      b) Sought or caused to be sought a violation of probation or Jermaine in bad faith and/or without probable cause to do so, leading to Jermaine's unlawful and unnecessary confinement in "the Hole" at DCC;

      c) Withdrew or caused to be withdrawn the aforementioned violation of probation without taking steps to secure Jermaine's release from "the Hole" at DCC; and

      d) Subjected Jermaine, an African-American inmate, to treatment which would not be given to similarly-situated white inmates.

178.    The aforementioned acts and omissions of defendant Records created a danger to Jermaine which resulted in the deprivation of his right to equal benefit of laws and proceedings for the security of his person and property as is enjoyed by white citizens, pursuant to 42 U.S.C. § 1981, as well as deprivation of his Constitutional rights under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution as well as Article I, §§ 7 and 11 of the Delaware Constitutions, as aforesaid.

179.    As a direct and proximate result of the deprivation of his Constitutional rights, as aforesaid, Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death. Plaintiff hereby makes claim against defendants Taylor, Howard, Carroll, Burris, and Pierce in vindication of the violation of those civil rights, pursuant to 42 U.S.C. § 1988 and 10 *Del. C.* § 3701.

38

## COUNT IV

**CLAIM AGAINST DEFENDANT TAYLOR – VIOLATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW PURSUANT TO 42 U.S.C. §§ 1981 AND 1983 (DELIBERATE INDIFFERENCE)**

180.    Plaintiff repeats Paragraphs 1 through 179 of this Complaint as if the same were more fully set forth at length herein.

181.    Defendant Taylor, acting in his individual capacity and under color of state law, was deliberately indifferent to the violations of Jermaine's civil and Constitutional rights, as aforesaid, in that he knew of the following, but failed to take reasonable measures to prevent the same:

a)  That the identity and criminal history of Jermaine Lamont Wilson had been confused with that of Jermaine Lamar Wilson;

b)  That defendant Records had issued an Administrative Warrant which contained false, inaccurate, and/or misleading information in an attempt to seek a Violation of Probation for Jermaine;

c)  That multiple complaints and grievances had been brought by inmates concerning unconstitutional conditions within Delaware's correctional system, yet blamed such violations on extrinsic factors such as "substance abuse, tattoos, risky sex" and alleging that inmates "don't take care of themselves";

d)  That conditions existed in the Delaware Correctional Center which directly and foreseeably led to Jermaine's assault and [murder] death;

e)  That Jermaine's background and/or history of before were not adequately investigated before he was placed in "the Hole" at the Delaware Correctional Center, a maximum-security Level V facility;

f)  That Jermaine was placed in a position of danger by moving him from WCF to CVOP in violation of the Superior Court's sentencing order, and when no legitimate penological interest was served thereby;

g)  That Jermaine was placed in a maximum-security Level V facility in violation of the Superior Court's sentencing order, and when no legitimate penological interest was served thereby;

39

h) That adequate supervision and oversight were not provided for those corrections officers responsible for Jermaine's security;

i) That the Superior Court's February 10 order that Jermaine be discharged was not obeyed;

j) That the Superior Court's sentencing order specifically providing that Jermaine be housed at the Plummer Center was disobeyed;

k) That conditions existed which led to the death of disproportionately high numbers of African-American inmates, such as Jermaine;

l) That disproportionately high numbers of African-American inmates, such as Jermaine, were dying while in the custody of the Department of Corrections;

m) That he engaged in a course of behavior calculated to obfuscate the truth concerning Jermaine's assault[, murder,] and death, as well as the abysmal conditions in Delaware's corrections system; and

n) That a repeated pattern of violations of inmates' civil rights in the Delaware correctional system was occurring, including deprivation of adequate healthcare and abuse and assault of prisoners was occurring, resulting in serious bodily injury, disease, and death.

182.    Jermaine's bodily injury[, murder,] and death was the direct and proximate result of the deliberate indifference of defendant Taylor to the violations of the Constitutional rights of Jermaine and other persons under the supervision of the Delaware correctional system, as aforesaid.

183.    As a direct and proximate result of the deprivation of his Constitutional rights, as aforesaid, Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death. Plaintiff hereby makes claim against defendant Taylor in vindication of the violation of those civil rights, pursuant to 42 U.S.C. § 1988 and 10 *Del. C.* § 3701.

<u>COUNT V</u>

**VIOLATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW<br>PURSUANT TO 42 U.S.C. § 1983<br>(FAILURE TO TRAIN AND MAINTENANCE OF<br><u>CUSTOMS, POLICIES, PRACTICES, OR PROCEDURES)</u>**

40

184. Plaintiff repeats Paragraphs 1 through 183 of this Complaint as if the same were more fully set forth at length herein.

185. The bodily injury and death caused to Jermaine was the direct and proximate result of customs, policies, practices, and procedures established by defendants Taylor, Howard, Carroll, Rennard, Burris, and Pierce, jointly and severally, acting in their individual capacity and under color of state law, including, but not limited to, the following:

a) Failure to adequately train employees, agents, and/or servants of DOC in the proper handling of Level IV probationers who commit minor, technical rules infractions;

b) Failure to adequately train employees, agents, and/or servants of DOC in conflict resolution and/or management so as not to permit minor, technical rules infractions to rise to the level of a physical altercation;

c) Failure to maintain adequate internal safeguards and mechanisms to prevent the confusion of inmates with similar names with each other;

d) Failure to adequately train employees, agents, and/or servants of DOC in the identification and monitoring of inmates so as to prevent confusion of inmates with similar names with each other;

e) Establishing and maintaining customs, policies, practices, and/or procedures which fail to ensure that Court orders concerning the nature and extent of an inmate's incarceration and/or probation, including whether and when an inmate or probationer is to be released, are obeyed and/or adhered to;

f) Failure to adequately train employees, agents, and/or servants of DOC to ensure that Court orders concerning the nature and extent of an inmate's incarceration and/or probation, including whether and when an inmate or probationer is to be released, are obeyed and/or adhered to;

g) Establishing and maintaining customs, policies, practices, and/or procedures which place Level IV probationers in facilities which, although held out to the public and the Courts as probationary or work-release facilities, are in actuality the functional equivalent of Level V prisons;

h) Establishing and maintaining customs, policies, practices, and/or procedures which place Level IV probationers in Level V custody following technical and/or minor rules infractions;

41

**A000041**

i) Establishing and maintaining customs, policies, practices, and/or procedures which place Level IV probationers in Level V custody following technical and/or minor rules infractions without seeking approval of the sentencing Court to do so;

j) Establishing and maintaining customs, policies, practices, and/or procedures which permit Probation Officers to issue Administrative Warrants which lack full disclosure of the circumstances surrounding alleged violations of probation by Level IV probationers;

k) Establishing and maintaining customs, policies, practices, and/or procedures which fail to adequately train Probation Officers in the investigation of alleged violations of probation prior to issuing Administrative Warrants;

l) Establishing and maintaining customs, policies, practices, and/or procedures by which Level IV probationers are moved from one Level IV facility to another in violation of Court orders specifically establishing the facility in which a Level IV sentence is to be completed;

m) Establishing and maintaining customs, policies, practices, and/or procedures which fail to seek Court approval before moving and/or relocating Level IV probationers when said probationers' sentencing orders specifically set forth the facility in which a Level IV sentence is to be completed;

n) Establishing customs, policies, practices, and/or procedures which permit Correctional Officers to use dangerous and/or deadly devices such as capstun spray in a facility which is intended to hold Level IV probationers during work release and/or supervised release;

o) Establishing customs, policies, practices, and/or procedures which fail to adequately carry out DOC's statutory duty pursuant to 11 *Del. C.* § 2103A to "be exclusively responsible for all aspects" of a juvenile offender's "care, custody and control, including services associated with those responsibilities upon such remand and transfer" after said offender's custody is transferred to DOC from the Department of Services for Children, Youth and Their Families;

p) Establishing customs, policies, practices, and/or procedures which fail to adequately safeguard the life, health, and safety of inmates, resulting in illness, injury, and death;

q) Establishing customs, policies, practices, and/or procedures which result in cruel and unusual punishment of inmates and probationers, including illness, injury, and death;

42

**A000042**

r) Failure to adequately train employees, agents, and/or servants of DOC to prevent cruel and unusual punishment of inmates and probationers, including illness, injury, and death;

s) Establishing customs, policies, practices, and/or procedures which fail to ensure that inmates and probationers are screened and/or monitored for suicidal ideations and/or plans;

t) Failure to adequately train employees, agents, and/or servants of DOC to screen inmates and/or probationers for suicidal ideations and/or plans;

u) Establishing customs, policies, practices, and/or procedures which failed to prevent Jermaine Lamar Wilson's death while in the custody of DOC;

v) Establishing policies, policies, practices, and/or procedures which resulted in Jermaine Lamar Wilson's death while in the custody of DOC;

w) Failed to adequately train DOC's employees, agents, and/or servants to prevent Jermaine Lamar Wilson's death while in the custody of DOC.

186.    As a direct and proximate result of the actions and inactions of defendants, as aforesaid, Jermaine was subjected to a deprivation of his rights guaranteed by the United States Constitution, resulting in attendant physical injuries, mental anguish, pain and suffering, and death. Plaintiff hereby makes claim against defendants Taylor, Howard, Carroll, Rennard, Burris, and Pierce, jointly and severally, in vindication of the violation of those civil rights, pursuant to 42 U.S.C. § 1988 and 10 *Del. C.* § 3701.

## COUNT VI

### VIOLATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW PURSUANT TO 42 U.S.C. § 1985 (CONSPIRACY TO VIOLATE CIVIL RIGHTS)

187.    Plaintiff repeats Paragraphs 1 through 186 of this Complaint as if the same were more fully set forth at length herein.

188.    The bodily injury caused to Jermaine by defendants Boom and McDonald, jointly and severally, as aforesaid, acting in their individual capacity and under color of state law, was

43

the direct and proximate result of a conspiracy between those two individuals to violate Jermaine's civil rights, which resulted in the deprivation of his right to equal benefit of laws and proceedings for the security of his person and property as is enjoyed by white citizens, pursuant to 42 U.S.C. § 1981, as well as deprivation of his Constitutional rights under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution as well as Article I, §§ 7 and 11 of the Delaware Constitutions, as aforesaid.

189.    As a direct and proximate result of the deprivation of his Constitutional rights, as aforesaid, Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death and, as a result, plaintiff hereby makes claim against defendants Boom and McDonald in vindication of the violation of those civil rights, pursuant to 42 U.S.C. §§ 1985(3) and 1988.

## COUNT VII

### VIOLATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW
### PURSUANT TO 42 U.S.C. § 1985
### (CONSPIRACY TO VIOLATE CIVIL RIGHTS)

190.    Plaintiff repeats Paragraphs 1 through 189 of this Complaint as if the same were more fully set forth at length herein.

191.    The bodily injury and death suffered by Jermaine, as aforesaid, was the direct and proximate result of a conspiracy among defendants Taylor, Howard, Carroll, Rennard, Burris, and Pierce, MacDonald, and Boom, or each of them, jointly and severally, acting in their individual capacity and under color of state law, to violate Jermaine's civil rights, which resulted in the deprivation of his right to equal benefit of laws and proceedings for the security of his person and property as is enjoyed by white citizens, pursuant to 42 U.S.C. § 1981, as well as deprivation of his Constitutional rights under the Fifth, Eighth, and Fourteenth Amendments of

44

the United States Constitution as well as Article I, §§ 7 and 11 of the Delaware Constitutions, as aforesaid.

192.    As a direct and proximate result of the deprivation of his Constitutional rights, as aforesaid, Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death.  Plaintiff hereby makes claim against defendants Taylor, Howard, Carroll, Rennard, Burris, and Pierce in vindication of the violation of those civil rights, pursuant to 42 U.S.C. §§ 1985(3) and 1988.

## COUNT VIII

### VIOLATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW PURSUANT TO 42 U.S.C. § 1986 (FAILURE TO PREVENT CONSPIRACY TO VIOLATE CIVIL RIGHTS)

193.    Plaintiff repeats Paragraphs 1 through 192 of this Complaint as if the same were more fully set forth at length herein.

194.    Defendants Taylor, Howard, Carroll, Burris, and Pierce had actual or constructive knowledge of the conspiracy by defendants Boom and McDonald to violate Jermaine's civil rights, as aforesaid.

195.    Defendants Taylor, Howard, Carroll, Burris, and Pierce had the power and ability to prevent the commission of acts by defendants Boom and McDonald to prevent the violation of Jermaine's civil rights, as aforesaid, but failed to do so.

196.    As a result of the failure to prevent the conspiracy to violate Jermaine's civil rights, as aforesaid, Jermaine suffered attendant physical injuries, mental anguish, pain and suffering, and death. Plaintiff hereby makes claim against defendants Taylor, Howard, Carroll, Burris, and Pierce in vindication of the violation of those civil rights, pursuant to 42 U.S.C. §§ 1985(3) and 1988.

45

**A000045**

## COUNT IX

## ASSAULT AND BATTERY

197.    Plaintiff repeats Paragraphs 1 through 196 of this Complaint as if the same were more fully set forth at length herein.

198.    Defendants Boom and McDonald, acting in their individual capacities, committed assault and battery upon Jermaine, in that they intentionally, wantonly, and/or with gross negligence:

        a)  Subjected Jermaine to an imminent fear of physical injury; and

        b)  Struck and beat Jermaine and sprayed him in the eyes with "capstun".

199.    As a direct and proximate result of the acts of defendants Boom and McDonald, as aforesaid, Jermaine sustained injuries including, but not limited to, a laceration of the back of his head and injury to the eyes.  Plaintiff makes claim against defendants Boom and McDonald, jointly and severally, in her capacity as Executrix of the Estate of Jermaine L. Wilson, pursuant to 10 *Del. C.* § 3701.

## COUNT X

## WRONGFUL DEATH

200.    Plaintiff repeats Paragraphs 1 through 199 of this Complaint as if the same were more fully set forth at length herein.

201.    Jermaine's death was caused by the intentional, wanton, and/or grossly negligent acts of defendants Taylor, Howard, Carroll, Burris, and Pierce, in that they knew, or in the exercise of reasonable care, should have known of the violations of Jermaine's Constitutional rights, as aforesaid, but failed to take actions to prevent said violations, which led to Jermaine's [murder] death.

46

**A000046**

202.    As a result of Jermaine's wrongful death, as aforesaid, plaintiff, in her capacity as Next Friend of Z.W., the surviving child of Jermaine, hereby makes claim against defendants Taylor, Howard, Carroll, Burris, and Pierce for deprivation of expectation of pecuniary benefits to which Z.W. would have resulted from Jermaine's continued life, loss of contributions to Z.W. for support, loss of parental services, and Z.W.'s mental anguish, pursuant to 10 *Del. C.* § 3724(d).

203.    As a further result of Jermaine's wrongful death, as aforesaid, plaintiff, in her individual capacity, hereby makes claim against defendants Taylor, Howard, Carroll, Burris, and Pierce for deprivation of expectation of pecuniary benefits to which she would have resulted from Jermaine's continued life, loss of contributions to her for support, loss of parental services, and reasonable funeral expenses not to exceed $2,000.00, pursuant to 10 *Del. C.* § 3724(d).

## COUNT XI

### PUNITIVE DAMAGES

204.    Plaintiff repeats Paragraphs 1 through 201 of this Complaint as if the same were more fully set forth at length herein.

205.    The actions and conduct of defendants, as aforesaid, were reckless, outrageous, and carried out with reckless disregard for the rights of persons subject to the supervision of the Department of Corrections, including Jermaine, leading to Jermaine's assault and [murder] death.

206.    As a result of the outrageous conduct of defendants, as aforesaid, plaintiff seeks damages in an amount sufficient to punish and make an example of defendants and to deter defendants and others like them from engaging in similar conduct in the future.

47

**A000047**

WHEREFORE, plaintiff demands judgment in her favor for general, special, and punitive damages, together with interest, attorney's fees pursuant to 42 U.S.C. § 1988(b), and the costs of this action.

PERRY & SENSOR

By: __/s/  Michael L. Sensor__
       Michael L. Sensor, Esquire
       Delaware Bar ID No. 3541
       Suite 560, First Federal Plaza
       P.O. Box 1568
       Wilmington, DE 19899-1568
       Telephone: (302) 655-4482
       Attorney for Plaintiff

Dated: February 7, 2006

48

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SUSIE A. WILSON, individually and in her )
capacity as administratrix of the Estate of )
JERMAINE LAMAR WILSON, deceased, )
and in her capacity as next friend of Z.W., a )
minor, )
                                     )
        Plaintiffs, )
                                       )
    v. )      C. A. No. 05-821-SLR
                                         )
STANLEY W. TAYLOR, JR., individually; )      JURY TRIAL DEMANDED
PAUL HOWARD, individually; NOREEN )
RENNARD, individually; THOMAS L. )
CARROLL, individually; BETTY BURRIS, )
individually; DAVID PIERCE, individually; )
MICHAEL RECORDS, individually; )
OFFICER McDONALD, individually; and )
SERGEANT BOOM, individually, )
                                       )
        Defendants. )

## ANSWER TO AMENDED COMPLAINT

Defendants, by and through undersigned counsel, hereby answer the amended

complaint as follows:

1.      Denied.

2.      Denied.

3.      Denied.

4.      Denied.

5.      Denied.

6.      After reasonable investigation, Answering Defendants are without sufficient

knowledge or information to form a belief as to the truth of allegations in this

paragraph.

7.      After reasonable investigation, Answering Defendants are without sufficient

knowledge or information to form a belief as to the truth of allegations in this

paragraph.

8. thru 14. Answering Defendants admit the allegations of paragraphs 8 through 14.

15.      After reasonable investigation, Answering Defendants are without

sufficient knowledge or information to form a belief as to the truth of allegations in

this paragraph.

16.      After reasonable investigation, Answering Defendants are without

sufficient knowledge or information to form a belief as to the truth of allegations in

this paragraph.

17.      After reasonable investigation, Answering Defendants are without

sufficient knowledge or information to form a belief as to the truth of allegations in

this paragraph.

18. thru 68. After reasonable investigation, Answering Defendants are without

sufficient knowledge or information to form a belief as to the truth of allegations in

paragraphs 18 through 68.

69.      Denied.

70.      Denied.

71.      Denied.

72.      Admitted.

73.      After reasonable investigation, Answering Defendants are without

sufficient knowledge or information to form a belief as to the truth of allegations in

2

**A000050**

this paragraph.

74.    Denied.

75.    Denied.

76.    Denied.

77.    Denied.

78.    Denied.

79.    Denied.

80.    Denied.

81.    Denied.

82.    Denied.

83.    After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

84.    Denied.

85.    After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

86.    Denied.

87.    After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

88.    Denied.

89.    After reasonable investigation, Answering Defendants are without

**A000051**

sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

90.    Denied.

91.    Denied.

92.    Denied.

93.    Denied.

94.    After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

95.    After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

96.    After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

97.    Denied.

98.    Denied.

99.    Admitted.

100.    Denied.

101.    Denied.

102.    Denied.

103.    After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in

4

**A000052**

this paragraph.

104.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

105.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

106.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

107.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

108.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

109.     It appears Plaintiff has deleted this paragraph to the extent that it is not, after reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

110.     Denied.

111.     Denied.

112.     After reasonable investigation, Answering Defendants are without

5

**A000053**

sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

113.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

114.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

115.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

116.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

117.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

118.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

119.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

6

**A000054**

120.    After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

121.    After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

122.    After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

123.    After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

124.    After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

125.    After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

126.    Denied.

127.    Denied.

128.    After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

7

**A000055**

129.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

130.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

131.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

132.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

133.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

134.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

135.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

136.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in

8

this paragraph.

137.     Admitted.

138.     Admitted.

139.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

140.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

141.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

142.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

143.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

144.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in this paragraph.

145.     After reasonable investigation, Answering Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations in

9

**A000057**

this paragraph.

146.     Denied.

147.     Denied.

148.     Denied.

149.     Denied.

150.     Admitted that the Wilmington News-Journal published a series of news articles concerning inmate medical care and treatment. Otherwise denied.

151.     Admitted that the Wilmington News-Journal published a series of news articles concerning inmate medical care and treatment. Otherwise denied.

152.     Admitted that the Wilmington News-Journal published a series of news articles concerning inmate medical care and treatment. Otherwise denied.

153.     Admitted that the Wilmington News-Journal published a series of news articles concerning inmate medical care and treatment. Otherwise denied.

154.     Admitted that the Wilmington News-Journal published a series of news articles concerning inmate medical care and treatment.

155.     Denied.

156.     Admitted that the Wilmington News-Journal published a series of news articles concerning inmate medical care and treatment.

157.     Denied.

158.     Denied.

159.     Denied.

160.     Denied.

161.     Denied.

10

162.     Denied.

163.     Denied.

164.     Denied.

165.     Denied.

166.     Denied.

167.     Denied.

## COUNT I

168.     Defendants repeat the answers to paragraphs 1 through 167 of this answer as if fully set forth herein.

169 a) thru m) Denied.

170.     Denied.

171.     Denied.

## COUNT II

172.     Defendants repeat the answers to paragraphs 1 through 171 of this answer as if fully set forth herein.

173 a) thru d). Denied.

174.     Denied.

175.     Denied.

## COUNT III

176.     Defendant Records repeats the answers to paragraphs 1 through 175 of this answer as if fully set forth herein.

177.     Denied.

178.     Denied.

179.    Denied.

## COUNT IV

180.    Defendant Taylor repeats the answers to paragraphs 1 through 179 of this answer as if fully set forth herein.

181.    Denied.

182.    Denied.

183.    Denied.

## COUNT V

184.    Defendants repeat the answers to paragraphs 1 through 183 of this answer as if fully set forth herein.

185.    Denied.

186.    Denied.

## COUNT VI

187.    Defendants repeat the answers to paragraphs 1 through 186 of this answer as if fully set forth herein.

188.    Denied.

189.    Denied.

## COUNT VII

190.    Defendants repeat the answers to paragraphs 1 through 189 of this answer as if fully set forth herein.

191.    Denied.

192.    Denied.

## COUNT VIII

12

193.    Defendants repeat the answers to paragraphs 1 through 192 of this answer as if fully set forth herein.

194.    Denied.

195.    Denied.

196.    Denied.

## COUNT IX

197.    Defendants repeat the answers to paragraphs 1 through 196 of this answer as if fully set forth herein.

198.    Denied.

199.    Denied.

## COUNT X

200.    Defendants repeat the answers to paragraphs 1 through 199 of this answer as if fully set forth herein.

201.    Denied.

202.    Denied.

203.    Denied.

## COUNT XI

204.    Defendants repeat the answers to paragraphs 1 through 203 of this answer as if fully set forth herein.

205.    Denied.

206.    Denied.

## RELIEF

1.    It is specifically denied that Plaintiff is entitled to compensatory damages

13

**A000061**

or punitive damages.

2.       It is specifically denied that Plaintiff is entitled to any other relief.

## AFFIRMATIVE DEFENSE

3.       Plaintiff's Complaint fails to state a claim upon which relief may be granted.

4.       Decedent failed to exhaust his administrative remedies.

5.       Defendants are immune from liability under the Eleventh Amendment.

6.       Defendants are entitled to qualified immunity.

7.       As to any claims under state law, Defendants are entitled to immunity under the State Torts Claims Act, 10 *Del. C.* § 4001 *et seq.*

8.       As to claims under state law, Defendants are entitled to sovereign immunity in official capacity.

9.       Defendants cannot be held liable in the absence of personal involvement for the alleged constitutional deprivations.

10.      To the extent that Plaintiff seeks to hold Defendants liable based on supervisory responsibilities, the doctrine of *respondeat superior* or vicarious liability is not a basis for liability in an action under 42 *U.S.C.* § 1983.

11.      Defendants, in their official capacities, are not liable for alleged violations of decedent's constitutional rights as they are not "persons" within the meaning of 42 *U.S.C.* § 1983.

12.      Decedent was contributorily negligent.

13.      Decedent assumed the risk.

14.      This action is barred by the applicable statute of limitations.

14

15.    Any injury sustained by decedent resulted from a superseding cause.

16.    Plaintiff's Complaint, to the extent that it seeks punitive damages, fails to state a cause of action supporting the punitive damages claim.

Wherefore, the Defendants demand that judgment be entered in their favor as to all claims and against the plaintiff as to all claims, and attorney's fees and costs be awarded to defendants.

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

/s/ Ophelia M. Waters
Ophelia M. Waters, ID# 3879
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
302-577-8400
ophelia.waters@state.de.us

Attorney for State Defendants

Dated:    February 7, 2006

15

A000063

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2006, I electronically filed *Answer to Amended Complaint* with the Clerk of Court using CM/ECF which will send notification of such filing to the following: Michael L. Sensor, Esquire.

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

/s/ Ophelia M. Waters
Ophelia M. Waters, I.D. #3879
Deputy Attorney General
820 North French Street, 6th Floor
Wilmington, Delaware 19801
(302)577-8400
ophelia.waters@state.de.us

16

**A000064**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SUSIE A. WILSON, individually and in her )
capacity as administratrix of the Estate of )
JERMAINE LAMAR WILSON, deceased, )
and in her capacity as next friend of Z.W., a )
minor, )
                           )
          Plaintiffs, )
                           )
v. )   Civil Action No. 05-821 (SLR)
                           )
STANLEY W. TAYLOR, JR., individually; )
PAUL HOWARD, individually; NOREEN )   JURY TRIAL DEMANDED
RENNARD, individually;  THOMAS L. )
CARROLL, individually; BETTY BURRIS, )
individually; DAVID PIERCE, individually; )
MICHAEL RECORDS, individually; DAVID )
McDONALD, individually; and SERGEANT )
BOOM, individually, )
                           )
         Defendants. )

**NOTICE OF VOLUNTARY DISMISSAL OF DEFENDANT SERGEANT BOOM**
**PURSUANT TO FED. R. CIV. P. 41(a)(1)(i)**

    **NOW COMES** plaintiff, by and through counsel, and, pursuant to FED. R. CIV. P.

41(a)(1)(i), dismisses defendant Sergeant Boom from the above-captioned action without

prejudice.

                               PERRY & SENSOR


                        By:  _/s/   Michael L. Sensor_
                              Michael L. Sensor, Esquire
                              Delaware Bar ID No.  3541
                              Suite 560, First Federal Plaza
                              P.O. Box 1568
                              Wilmington, DE 19899-1568
                              Telephone: (302) 655-4482
                              Attorney for Plaintiff

Dated: February 27, 2006

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 27, 2006, he electronically filed the following document with the Clerk of Court using CM/ECF which will send notification of such filing to the following persons, counsel of record for all parties:

**DOCUMENT:**

Notice of Voluntary Dismissal of Defendant Sergeant Boom Pursuant to FED. R. CIV. P. 41(a)(1)(i)

**RECIPIENT:**

Ophelia M. Waters, Esquire
Deputy Attorney General
820 N. French Street
Wilmington, DE 19801

PERRY & SENSOR

By: /s/   Michael L. Sensor
      Michael L. Sensor, Esquire
      Delaware Bar ID No. 3541
      Suite 560, First Federal Plaza
      P.O. Box 1568
      Wilmington, DE 19899-1568
      Telephone: (302) 655-4482
      Attorney for Plaintiff

Dated: February 27, 2006

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SUSIE A. WILSON, individually and in her capacity as administratrix of the Estate of JERMAINE LAMAR WILSON, deceased, and in her capacity as next friend of Z.W., a minor,<br><br>Plaintiff,<br><br>v.<br><br>STANLEY W. TAYLOR, JR., individually; PAUL HOWARD, individually; NOREEN RENNARD, individually; THOMAS L. CARROLL, individually; BETTY BURRIS, individually; DAVID PIERCE, individually; MICHAEL RECORDS, individually; DAVID McDONALD, individually; and SERGEANT BOOM, individually,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 05-821 SLR |

## PLAINTIFF'S RESPONSES TO DEFENDANTS' REQUESTS FOR ADMISSION

1.      At the time of his intake assessment at Howard Young on April 16, 2003, Jermaine denied any suicidal thoughts, ideations, or plans.

**RESPONSE:**

Plaintiff admits that the documents produced to date in discovery reflect that Jermaine, when asked, did not articulate any suicidal thoughts, ideations, or plans. Plaintiff also admits that the Posthumous Case Review performed on February 28, 2005 by Jeremy D. McEntire, MSCC on behalf of First Correctional Medical indicates that "it does not appear that there were any indications or warning signs that he was at risk for or planned to harm himself." Plaintiff is unaware of any further communications which Jermaine may have had with the intake counselor(s) or other DOC or medical personnel; moreover, defendants have refused to produce

the post-mortem evaluation conducted by the Medical Society of Delaware, which may or may not contain additional information concerning Jermaine's articulation of suicidal thoughts, ideations, or plans. Therefore, plaintiff lacks information sufficient to enable her to admit or deny this Request beyond the face of the documents produced to date.

2.     At the time of his intake assessment at Howard Young on April 16, 2003, Jermaine denied any previous suicide attempts.

**RESPONSE:**

Plaintiff admits that the documents produced to date in discovery reflect that Jermaine, when asked, did not articulate previous suicide attempts. Plaintiff further admits that the Posthumous Case Review performed on February 28, 2005 by Jeremy D. McEntire, MSCC on behalf of First Correctional Medical indicates that "it does not appear that there were any indications or warning signs that he was at risk for or planned to harm himself." Plaintiff is unaware of any further communications which Jermaine may have had with the intake counselor(s) or other DOC or medical personnel; moreover, defendants have refused to produce the post-mortem evaluation conducted by the Medical Society of Delaware, which may or may not contain additional information concerning Jermaine's articulation of previous suicide attempts. Therefore, plaintiff lacks information sufficient to enable her to admit or deny this Request beyond the face of the documents produced to date.

3.     At the time of his transfer from CVOP to DCC on January 25, 2005, Jermaine denied any previous suicide attempts.

**RESPONSE:**

Plaintiff admits that the documents produced in discovery to date reflect that Jermaine, when asked, denied previous suicide attempts, and that the Posthumous Case Review performed on February 28, 2005 by Jeremy D. McEntire, MSCC on behalf of First Correctional Medical indicates that "it does not appear that there were any indications or warning signs that he was at risk for or planned to harm himself." Plaintiff is unaware of any further communications which Jermaine may have had with the intake counselor(s) or other DOC or medical personnel; moreover, defendants have refused to produce the post-mortem evaluation conducted by the Medical Society of Delaware, which may or may not contain additional information concerning Jermaine's articulation of previous suicide attempts. Therefore, plaintiff lacks information sufficient to enable her to admit or deny this Request beyond the face of the documents produced to date.

4.     Plaintiff Susie Wilson last visited with Jermaine on or about January 15, 2005.

**RESPONSE:**

Admitted.

5.     At Plaintiff Susie Wilson's last visit with Jermaine, Jermaine did not state that he was going to commit suicide.

**RESPONSE:**

Admitted.

6.     Plaintiff does not know of any occasion prior to February 18, 2005 on which Jermaine attempted to commit suicide.

**RESPONSE:**

    Admitted.


    7.    Plaintiff did not tell the Defendants that Jermaine had any suicidal thoughts, ideations, or plans.

**RESPONSE:**

    Admitted.


    8.    Plaintiff did not tell any employee of the DOC that Jermaine had any suicidal thoughts, ideations, or plans.

**RESPONSE:**

    Admitted.


    9.    The autopsy protocol for Jermaine states that the final diagnoses [sic] of Jermaine's death was asphyxia due to hanging.

**RESPONSE:**

    Admitted.


    10.    Jermaine's Certificate of Death states that the immediate cause of death was asphyxia due to hanging.

**RESPONSE:**

    Admitted.

PERRY & SENSOR

By:   /s/ Michael L. Sensor
       Michael L. Sensor, Esquire
       Delaware Bar ID No.  3541
       One Customs House, Suite 560
       P.O. Box 1568
       Wilmington, DE 19899-1568
       Telephone: (302) 655-4482
       Attorney for Plaintiff

Dated: November 5, 2007

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

SUSIE A. WILSON, individually and in her            )
capacity as administratrix of the Estate of          )
JERMAINE LAMAR WILSON, deceased,                     )
and in her capacity as next friend of Z.W., a        )
minor,                                               )
                                                     )
        Plaintiffs,                                )
                                                     )
        v.                                         )    C. A. No. 05-821-SLR
                                                     )
STANLEY W. TAYLOR, JR., individually;                )    JURY TRIAL DEMANDED
PAUL HOWARD, individually; NOREEN                     )
RENNARD, individually; THOMAS L.                      )
CARROLL, individually; BETTY BURRIS,                  )
individually; DAVID PIERCE, individually;            )
MICHAEL RECORDS, individually; and                   )
OFFICER McDONALD, individually;                      )
                                                     )
        Defendants.                               )

## NOTICE OF SERVICE OF PLAINTIFF'S RESPONSES TO DEFENDANT'S DISCOVERY REQUESTS

The undersigned hereby certifies that on November 5, 2007, he caused to be served two true and correct copies of the following to the following persons, counsel of record for defendants, by means of electronic mail and first class U.S. Mail, postage pre-paid:

**DOCUMENT:**

Plaintiff's Responses to Defendant's Requests for Admission

**RECIPIENTS:**

Ralph K. Durstein, III, Esquire
Erica Y. Tross, Esquire
Department of Justice
820 N. French Street
Wilmington, DE 19801

**A000072**

PERRY & SENSOR

By: /s/    Michael L. Sensor
     Michael L. Sensor, Esquire
     Delaware Bar ID No. 3541
     One Customs House, Suite 560
     P.O. Box 1568
     Wilmington, DE 19899-1568
     Telephone: (302) 655-4482
     Attorney for Plaintiff

Dated: November 5, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SUSIE A. WILSON, individually       :
and in her capacity as              :
administratrix of the Estate        :
of JERMAINE LAMAR WILSON,           :
deceased, and in her capacity       :
as next friend of Z.W., a           : C.A. NO.
minor,                              : 05-821-SLR
            Plaintiff               :
                                    :
       -v-                          :
                                    :
STANLEY W. TAYLOR, JR.,             :
individually; PAUL HOWARD,          :
individually; NOREEN RENNARD,       :
individually; THOMAS L.             :
CARROLL, individually; BETTY        :
BURRIS, individually; DAVID         :
PIERCE, individually; MICHAEL       :
RECORDS, individually; and          :
OFFICER McDONALD, individually,     :
            Defendants              :

         Deposition of SUSIE A. WILSON, taken before
Elaine Gallagher Parrish, RPR, CRR, at 820 North French
Street, 6th Floor, Wilmington, Delaware on May 24, 2007,
commencing approximately at 3:00 p.m.

APPEARANCES:

        MICHAEL L. SENSOR, ESQ.
        Perry & Sensor
             One Custom House, Suite 560
             P.O. Box 1568
             Wilmington, Delaware 19899-1568
             for the Plaintiff,

                WILCOX & FETZER
     1330 King Street — Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com

APPEARANCES:(Ctd.)
ERIKA Y. TROSS, ESQ.
RALPH K. DURSTEIN, III, ESQ.
Deputy Attorney General
State of Delaware Department of Justice
820 North French Street
Wilmington, Delaware 19801
for the Defendant.

---

SUSIE A. WILSON,
having been first duly sworn according to law, was examined and testified as follows:

---

BY MS. TROSS:
Q. Miss Wilson, my name is Erika Tross. This is my colleague, Dirk Durstein. We represent the Defendants in this case. As Mr. Sensor, your attorney, probably already explained to you, this is a deposition. It's part of the discovery process. I am going to ask a series of questions and your answers are being given under oath subject to the laws relating to perjury. So you must give accurate, honest answers to my questions. Mr. Sensor can object to a question I ask, but you must answer unless he directs you not to respond.
The Court Reporter will be taking down all of my questions and all of your answers. Therefore, we

have to speak one at a time because the Court Reporter can't transcribe if we are both talking over one another. Also, all of your responses must be verbal. The Court Reporter cannot take down a nod of the head or saying uh-huh. So please just say yes or no if the question requires a yes or no answer.
I will assume that if you answer a question you have understood the question. So if you don't understand the question, please ask me for clarification before you answer.
Other things, you are allowed to take breaks. And given what we're going to be talking about today, if at any time you need a break, just feel free to ask for one. I'm more than willing to give you as many breaks as you think you need. And I'll also give you time at the end to add anything that you think I should know that we haven't covered.
And, finally, I do need to know are you taking any medication or drugs which would cloud your judgment or prevent you from understanding questions and giving true answers?
A. No.
Q. What is your full name?
A. Susie Ann Wilson.

Q. And your address?
A. 1-A Clinton Court, New Castle, Delaware, 19720.
Q. Have you ever used any other names or aliases?
A. Yes.
Q. And what other names?
A. Susie Garden.
Q. Was that like a maiden name?
A. G-a-r-d-e-n. Yes.
Q. Did you bring anything with you to this deposition?
A. No.
Q. Okay. Did you review anything in preparation for the deposition?
A. Can you clarify?
Q. Such as documents or pleadings or papers?
A. Yes.
Q. What did you review?
A. Just some papers in my lawyer's office that we went over. That's about it. Just some review.
Q. Was it papers that were filed in the case?
A. Yes.
Q. Did you speak with anyone in preparation for your deposition?
A. Yes.

MR. SENSOR: Other than me, I assume?
BY MS. TROSS:
Q. Yes. Other than your attorney.
A. No.
Q. Have you ever been deposed before?
A. Yes.
Q. When were you deposed?
A. In -- it was some time in the 80s. I was in a car accident.
Q. Okay. Have you ever testified in court before?
A. Yes.
Q. Was it also related to that case in the 80s?
A. No.
Q. When did you testify in court?
A. In 2000.
Q. What was that related to?
A. A case, one of my family was involved in a case and I was just testifying as a family member.
Q. Okay. What is your date of birth?
A. January 11th, 1963.
Q. And where were you born?
A. Wilmington, Delaware.
Q. Did you grow up in Wilmington as well?
A. Yes.

Wilson v. Taylor, et al.
SUSIE A. WILSON

---

6

1  Q. How long have you lived at your current
2  residence?
3  A. Oh, almost two years.
4  Q. Where did you live —
5  A. One year, 11 months.
6  Q. Where did you live prior to then?
7  A. 22-B Geneva Court in Newark, Delaware, 19720 —
8  19702.
9  Q. Do you currently live with someone or do you
10 live by yourself?
11 A. I live by myself.
12 Q. Miss Wilson, what is your highest level of
13 education?
14 A. Associate's Degree.
15 Q. And where did you get your degree for your
16 Associate's?
17 A. Delaware Tech, Wilmington campus.
18 Q. Are you currently married?
19 A. No.
20 Q. Do you have any children besides Jermaine
21 Wilson?
22 A. Yes.
23 Q. How many other children do you have?
24 A. I have one son.

---

7

1  Q. And what's his name?
2  A. Jabar Wilson. J-a-b-a-r.
3  Q. And how old is Jabar?
4  A. Jabar is 26.
5  Q. Was he Jermaine's older brother?
6  A. Yes.
7  Q. Now, I'm just going to ask you a few background
8  questions about Jermaine, just so I can get an idea of
9  what he was like. What date was he born?
10 A. January 15th, 1985.
11 Q. And can you describe for me his personality as a
12 child? What was he like when he was eight or ten
13 years old?
14 A. Jermaine was quiet, reserved. He was always
15 under me. Everybody called him a mama's boy. He liked
16 to play, just like normal little kids, liked to play and
17 jump and eat junk and things like that. Just a normal
18 little boy.
19 Q. Okay. So he liked to joke around a lot, that
20 sort of thing?
21 A. He was kind of quiet, but he liked to play.
22 Q. Okay. What was your relationship like with
23 Jermaine when he was young?
24 A. We were very close, very close. I breastfed

---

8

1  Jermaine for 13 months, so I was — he was always with
2  me and I always had my children with me, whenever. If
3  they couldn't go, I stay home. So I was real close to
4  him. We talked and everything, open relationship.
5  Q. As he became a teenager and got older, what was
6  he like?
7  A. Still quiet and reserved and always up under me,
8  always.
9  Q. So even as he became like 16 and 17 he was still
10 really close to you?
11 A. Uh-huh. Yes.
12    MR. SENSOR: Yes? Make sure you say yes or
13 no.
14    THE WITNESS: Yes. Yes. I'm sorry. That
15 was in the rules with me.
16 BY MS. TROSS:
17 Q. Did Jermaine have any type of psychiatric
18 treatment or counseling when he was a child?
19 A. No, never.
20 Q. What about when he became a teenager?
21 A. No, never.
22 Q. Did a teacher or a guidance counselor ever
23 recommend that you get him psychiatric treatment or
24 counseling?

---

9

1  A. No.
2  Q. Did Jermaine, to your knowledge, ever use drugs
3  when he was a child or a teenager?
4  A. Not when he was a child, but as a teenager I
5  believe he experimented with marijuana.
6  Q. Okay. Did he ever use alcohol when he was a
7  child or a teenager?
8  A. I believe when he was a teenager on one occasion
9  that I know of personally.
10 Q. Did you ever hear from others, family members or
11 friends, that he was using drugs or alcohol?
12 A. No.
13 Q. Now I am going to get into a little bit about
14 Jermaine and his criminal history and then also the day
15 of his death. So, like I said, if you need to take a
16 break, just let me know. Okay?
17    When was Jermaine first arrested?
18 A. He had to be 15 years old.
19 Q. Okay. So about 2000?
20 A. Yes.
21 Q. Do you remember what he was first arrested for?
22 A. I need to clarify that that's the first contact
23 he had with the criminal justice system as a juvenile.
24 Q. Okay. Do you remember what it was for?

---

3 (Pages 6 to 9)

Wilson v. Taylor, et al.
SUSIE A. WILSON

10

1   A.   Yes. It happened in school. Something happened
2   between him and the teacher.
3   Q.   Okay. Do you know the exact details of what
4   happened?
5   A.   Vaguely.
6   Q.   What do you remember?
7   A.   I remember that there was some kind of food
8   container on the floor and he was told to pick it up and
9   something happened to the -- that he said it wasn't his,
10  he didn't do it, and from what I was told was that he
11  was grabbed by the -- by the shirt and he was pulled
12  hard enough where his necklace came off of his neck, and
13  he then hit the teacher in the face and that's what I
14  was told happened.
15  Q.   Okay. And who told you that?
16  A.   It was the school and it was written in a
17  letter.
18  Q.   How many times prior to his most recent
19  incarceration in December of 2002 had he been arrested,
20  so between the first time and this most recent, how many
21  times had he been arrested in between?
22  A.   I'm not sure. I believe it may have been three
23  -- two or three. I'm not positive, though.
24  Q.   Is there something that would remind you, a

11

1   document?
2   A.   It may help because I'm not positive of the
3   dates.
4   Q.   But you believe it was about two or three times?
5   A.   Yeah, it was like -- like if he did -- violated,
6   like didn't come in his curfew or something like that,
7   where they picked him up. So it wasn't like a crime
8   each time. It was like something that was left over
9   from before.
10  Q.   So you said like a violation of curfew, do you
11  remember any other incidents he was arrested for?
12  A.   I think it was -- I don't want to assume. It
13  was, I believe it was an assault.
14  Q.   Do you know the details of the assault?
15  A.   I'm sorry.
16  Q.   Take your time.
17  A.   I'm trying to recall.
18  Q.   Take your time.
19  A.   I believe it was involving two older gentlemen.
20  Q.   Do you know what happened?
21  A.   I believe he hit them, both of them, I believe.
22  Q.   And do you know why he hit them?
23  A.   He was supposed to be dating some girl and she
24  said that they tried to proposition her.

12

1   Q.   Okay. So he was defending the girl?
2   A.   Yes.
3   Q.   To your knowledge did Jermaine ever receive
4   psychiatric treatment or counseling when he was within
5   the juvenile system?
6   A.   Not to my knowledge.
7   Q.   Not to your knowledge. Did someone within the
8   juvenile system ever speak with you about his need for
9   counseling or psychiatric treatment?
10  A.   I believe he did have some. He went to a boot
11  camp and I believe he had some anger management --
12  Q.   Okay.
13  A.   -- course, through that.
14  Q.   Did anyone ever contact you about getting him
15  further treatment or counseling?
16  A.   No, but I tried to get him some on my own.
17  Q.   Okay.
18  A.   I can't think of the name of the -- I can't
19  recall the name of the agency but they work with teens.
20  I can't think of the name of it at this time.
21  Q.   Do you remember when that was that you tried to
22  get him some?
23  A.   I believe he was 16.
24  Q.   And why did you take the steps to try to get him

13

1   counseling?
2   A.   I felt as though he was -- he was having a
3   problem because his -- well, my ex -- well, he was my
4   father-in-law then and my sister both were diagnosed
5   with cancer and he was having a hard time with that.
6   Q.   Okay.
7   A.   And his father -- my father-in-law, which is his
8   grandfather, eventually passed away and then he started
9   having a lot of problems after that.
10  Q.   What type of problems?
11  A.   A little more withdrawn.
12  Q.   Okay. Anything else?
13  A.   No, not that I can think of.
14  Q.   Okay. When Jermaine was arrested the last time
15  on December 4th, 2002 do you know what he was arrested
16  for?
17  A.   Yes. Attempted robbery.
18  Q.   Okay.
19  A.   And the weapons charge.
20  Q.   Did he have a trial?
21  A.   No.
22  Q.   Did he plead guilty?
23  A.   Yes.
24  Q.   After he pled guilty do you remember what

4 (Pages 10 to 13)

Wilson v. Taylor, et al.
SUSIE A. WILSON

## 14

1  sentence he received?
2       A. I'm not clear on that. I would have to -- have
3  to read it because I can't remember the whole --
4  remember it, you know, word for word.
5       Q. Were you at the sentencing hearing?
6       A. I believe I was.
7       Q. Okay.
8       A. I believe I was. I was just about -- just about
9  everything, I didn't miss too many of anything, so I
10  believe I was there.
11          MR. SENSOR: Are you all right?
12          THE WITNESS: Yeah. I'm just trying to
13  breathe. It's kind of hard.
14  BY MS. TROSS:
15       Q. Okay. What institution did Jermaine first go to
16  after he was sentenced? Which prison facility?
17       A. Gander Hill.
18       Q. Okay. Do you know how long he was at Gander
19  Hill?
20       A. No.
21       Q. Where did he go after he left Gander Hill?
22       A. To the Webb Correctional Center.
23       Q. Do you know how long he was at the Webb
24  Correctional facility?

## 15

1       A. For two days.
2       Q. Do you know why he was sent to Webb after Gander
3  Hill?
4       A. He was supposed to be sent to the Plummers
5  Center. I don't know why he was sent there.
6       Q. Do you want to take a break?
7       A. Yes.
8       Q. Okay. That's fine. Do you want to go get some
9  air?
10          MR. DURSTEIN: Come this way is the best.
11          MS. TROSS: Take as long as you need.
12          (Recess taken.)
13          MS. TROSS: Okay. Just let me know when
14  you're ready to start again.
15          THE WITNESS: Okay.
16  BY MS. TROSS:
17       Q. Okay. We're back on the record. Okay. So
18  before we had our break we were talking about Jermaine's
19  transfer from Howard Young to Webb Correctional, and I
20  believe you have said he was at Webb Correctional for
21  two days, is that correct?
22       A. Yes.
23       Q. Okay. After he left Webb Correctional, where
24  did he go?

## 16

1       A. To the CO -- CVOP, the Central Violation Or
2  Probation Center down in Smyrna.
3       Q. Okay. And when did you first find out that
4  Jermaine had been transferred to CVOP?
5       A. He called me.
6       Q. Do you remember what day he called you?
7       A. I believe he went there on a Tuesday, to Webb on
8  a Tuesday, and was transferred to CVOP on a Thursday.
9       Q. Do you recall the dates?
10       A. I don't recall the dates.
11       Q. And he was transferred on Thursday you said,
12  correct?
13       A. I believe it was a Thursday, to my recollection.
14       Q. When did he call you?
15       A. I believe he called me that Thursday night, if
16  not that Friday morning.
17       Q. Okay.
18       A. Because I was supposed to see him that weekend
19  at CVO -- at the Webb Center.
20       Q. So did you go visit him at the CVOP instead?
21       A. I don't recall.
22       Q. Okay. Do you know why he was sent to CVOP?
23       A. They didn't give me any reason.
24       Q. Did he know a reason?

## 17

1       A. No.
2       Q. Okay. Did you speak with anyone about why he
3  had been transferred?
4       A. No.
5       Q. Okay. How long was Jermaine housed at CVOP?
6       A. I believe he was there since September of -- I
7  don't remember the year. I can't recall the year.
8       Q. So September, do you know the end month when he
9  left CVOP?
10       A. January.
11       Q. Okay.
12       A. 25th.
13       Q. Okay. Did you ever visit Jermaine while he was
14  housed at CVOP?
15       A. Every weekend.
16       Q. Every weekend?
17       A. That -- if nobody else had already made an
18  appointment. I was usually first.
19       Q. Who else went to visit him that you know of?
20       A. His brother, his best friend, at CVOP and --
21       Q. Who was -- I'm sorry, go ahead.
22       A. And his aunt and cousin and his son.
23       Q. Who was his best friend?
24       A. Howard Powell.

5 (Pages 14 to 17)

Wilson v. Taylor, et al.
SUSIE A. WILSON

18

1      Q.  When Jermaine left CVOP where was he transferred
2  to?
3      A.  He didn't actually leave there.  He was put in
4  the hole at the Department of Corrections at the Smyrna
5  prison.
6      Q.  Are you referring to Delaware Correctional
7  Center?
8      A.  Yes.
9      Q.  Okay.
10     A.  Yes.
11     Q.  Okay.  So after he left CVOP he was transferred
12  to Delaware Correctional Center?
13     A.  I can't say he was transferred.  That's where
14  they took him for the 24 hours that he was supposed
15  to serve in the hole.
16     Q.  Okay.
17     A.  I don't know where, if they had him on CVOP or
18  there.  I don't know that information.
19     Q.  To your knowledge what was -- what reason -- for
20  what reason was Jermaine transferred from CVOP to the
21  Delaware Correctional Center?
22     A.  Originally?  They said it was a violation of --
23  an administrative warrant for a violation of probation
24  that he was going to be -- he was trying -- going to

19

1  endanger a State or damage State property.
2      Q.  And who told you that that was the reason?
3      A.  I read it in the -- in the documents.
4      Q.  So no one ever told you that was the reason?
5      A.  No.
6      Q.  Okay.
7      A.  I was called to have my -- they called me to
8  cancel my appointment that I had after that date, I
9  think, I believe it was January 30th but I'm not
10  positive.
11     Q.  Okay.
12     A.  And I was told that his visit was cancelled but
13  they wouldn't tell me why.
14     Q.  Did you ask why, why the visit had been
15  cancelled?
16     A.  Yeah, but they didn't give me any information,
17  that his visit was taken away.
18     Q.  Okay.  When they called to cancel the visit did
19  they tell you he had been sent to the Delaware
20  Correctional Center?
21     A.  No.
22     Q.  What did they tell you when they called to
23  cancel the visit?
24     A.  That his visit was cancelled.  I need to go back

20

1  for just a minute.
2      Q.  Okay.
3      A.  Because when Jermaine called me on January 24th
4  he said he was filing a grievance and that they probably
5  were going to take away his visits and his phone calls
6  for two weeks.
7      Q.  Okay.
8      A.  So when they called me and told me that his
9  visit was cancelled, he had already let me know that
10  that probably would happen.
11     Q.  So you thought that was the reason?
12     A.  Yes.
13     Q.  So when they called you, you thought he was
14  still at the CVOP?
15     A.  Yes.
16     Q.  Okay.
17     A.  Yes.
18     Q.  Did you ask if he was still there?
19     A.  No.  I had no reason to believe he wouldn't be
20  there.
21     Q.  Okay.  When did you first learn that Jermaine
22  was at Delaware Correctional Center?
23     A.  On February 14th.
24     Q.  Okay.  And how did you learn that he was there

21

1  on that date?
2      A.  I received a letter from him and it had a
3  different address on the envelope.
4      Q.  Okay.  So Mrs. Wilson, when was the last time
5  you saw Jermaine alive?
6      A.  I believe the last visit I had I believe, to my
7  best recollection, was -- it was, I believe it was his
8  birthday, if that was a Saturday or Sunday, but I can't
9  recall because of the time that lapsed.
10     Q.  So that would have been about January 15th?
11     A.  That would have -- that was his birthday.  It
12  was around that time, I remember, you know, cooking his
13  favorite things and bringing it to him.
14     Q.  Okay.  What did he tell you at that time, the
15  last time that you saw him?
16     A.  He was always glad to see me.  We just laughed
17  and talked about -- about everything, just like we did
18  on, you know, when he was home and we were on the phone.
19     Q.  So it was a good visit?
20     A.  Yeah, always.
21     Q.  And how was his state of mind?
22     A.  He was fine.  He was just like usual.  His usual
23  self.
24     Q.  Which is?

6 (Pages 18 to 21)

Wilson v. Taylor, et al.
SUSIE A. WILSON

22

1    A.  Happy go lucky, laughing, smiling, just asking
2    about the family and everything.
3    Q.  Did he discuss when he was going to be released?
4    A.  Not at that time, no.
5    Q.  When did he discuss it?
6    A.  In the letter.
7    Q.  That you received --
8    A.  Well, on the phone -- sorry, on the phone
9    before, and then in the -- in the letter and he told me
10   that they said that he would be coming home.
11   Q.  Okay.  This is the letter that he sent you?
12   A.  Yes.
13   Q.  And what date was the letter, do you remember?
14   A.  I believe it was the -- it was -- I got two
15   letters, so I need to clarify.  One he wrote on the
16   10th, I received on the 14th.
17   Q.  Okay.
18   A.  Then one he wrote on the 14th.  I got it either
19   the 17th or the 18th, I can't remember, recall, but it
20   was two letters.
21   Q.  Okay.  When you last saw Jermaine at your last
22   visit what did he say he was going to do after he was
23   released?
24   A.  We always talked about him coming home, working

23

1    at the bakery with his best friend's family, they own a
2    bakery, and finding a job, you know, during the week
3    because the bakery job is only on the weekends.
4    Q.  What bakery is that?
5    A.  It's called, oh, goodness, I'm sorry, I can't
6    recall at this time.  If I think about it I'll let you
7    know.
8    Q.  Okay.  And what had he planned on doing during
9    the week?
10   A.  Looking for a job, and also he was going to --
11   his son was going to come live with him and they were
12   both going to live with me.
13   Q.  To your knowledge on what day was Jermaine to be
14   released from the Delaware Correctional Center?
15   A.  He told me he was going to be released on the
16   18th.
17   Q.  Of which month?
18   A.  Of February, 2005.
19   Q.  And you said he told you that?
20   A.  Yes.
21   Q.  And how did he tell you that?
22   A.  In the letter that I received from him.
23   Q.  Prior to the 18th of February did you ever
24   contact anyone at the Delaware Correctional Center to

24

1    verify that that was the day he was going to be
2    released?
3    A.  Once he sent me the letter, yes, I called but I
4    couldn't get any -- any information.  It was President's
5    Day weekend, so they were telling me that anybody that I
6    needed to speak to I would have to wait and talk to them
7    on Tuesday.
8    Q.  Do you remember who you spoke with?
9    A.  I don't remember.
10   Q.  But you called Delaware Correctional Center?
11   A.  I called, like, the records and any -- anyone
12   that I could get through to, I tried to get some
13   answers.
14   Q.  So did you ever verify with anyone that February
15   18th, 2005 was the day that Jermaine was going to be
16   released?
17   A.  No.  I went to pick him up.  They said they
18   didn't have any release papers for him.
19   Q.  So did you go to Delaware Correctional Center on
20   February 18th?
21   A.  I did.
22   Q.  What time did you go?
23   A.  About 5:30 in the evening.
24   Q.  And what happened when you arrived?

25

1    A.  I asked -- I told them I was there to pick up my
2    son, Jermaine Wilson.
3    Q.  Who did you speak with?
4    A.  I don't recall.  It was an older Caucasian
5    gentleman.  I don't recall.  I didn't know at that
6    time that I needed, you know, anybody's name, so I
7    didn't . . .
8    Q.  But you spoke with someone in the front area?
9    A.  Yes.
10   Q.  Okay.  And you said it was an older gentleman?
11   A.  Yes.
12   Q.  Do you remember --
13   A.  Caucasian, tall.
14   Q.  And do you recall what he told you?
15   A.  He told me that I was in the wrong place.
16   Q.  Do you know what he meant by that?
17   A.  He said they didn't have him there.  They didn't
18   have a Jermaine Wilson there.  And they didn't have any
19   release papers for Jermaine.  That's my best
20   recollection.  There were no release papers for him.
21   Q.  So did he tell you that Jermaine wasn't there or
22   that there weren't any release papers for him?
23   A.  He told me both.  He told me to come -- go have
24   some dinner and to come back in two hours and then they

7  (Pages 22 to 25)

Wilson v. Taylor, et al.
SUSIE A. WILSON

26

1  would check.
2    Q. Okay. Did you come back after two hours?
3    A. I did. I came back about 7:30. And --
4    Q. Did you do anything before you came back?
5    A. I went to my aunt's house who lives about, maybe
6  15, 20 minutes from the prison.
7    Q. And what's your aunt's name?
8    A. Rosalee Wayman.
9    Q. Did you call anyone in that two-hour period to
10  find out if Jermaine was going to be released that day?
11    A. No, I didn't.
12    Q. Did you ever go back to Delaware Correctional
13  Center to try to pick up your son after the two hours?
14    A. Yes. Yes.
15    Q. And what happened when you went back?
16    A. The same gentleman was there, and I told him I
17  was back to pick up my son. He said that he didn't have
18  any release papers for him. Something to the fact that
19  the paperwork was slow and they may not have received it
20  yet. He said what is his birth date. And I recall that
21  because he was eating something, so he took the paper
22  towel that was on his desk and wrote Jermaine's birth
23  date on it, and when he put it in Jermaine's picture
24  popped up on the screen. I said, that's my son. He

27

1  said is that with bail, ma'am? And I didn't know what
2  that meant. I didn't know what he was talking about. I
3  said he finished his time. And he said well, we don't
4  have any -- he's not -- he's not being released today.
5    Q. At that point did he know that Jermaine was at
6  the Delaware Correctional Center?
7    A. Yes.
8    Q. But he said he wasn't being released that day?
9    A. Yes. And I said, are you sure. And we were
10  having a conversation back and forth. He was, like,
11  well, maybe we don't have the paperwork yet. I can wait
12  until the person comes out with the inmates that are
13  being released and maybe they can tell me something.
14    Q. Did you wait for that person?
15    A. I did. I waited on the outside for, like, 30
16  minutes before they let me inside the door.
17    Q. Okay. Did you speak with anyone?
18    A. When the lady came out with the inmates, I asked
19  her about him but she wouldn't give me any information,
20  and at that time the phone was ringing. Something was
21  going on but I don't know what was happening. Something
22  was going on. They were changing like the people that
23  were in the -- where I was talking to the older, the
24  gentleman, they were changing, and the lady was talking

28

1  on the phone to somebody. So he wasn't -- she said that
2  he wasn't -- she didn't have anybody else coming out.
3  So I sat there for another half hour, just waiting
4  to see if something, you know, something different would
5  happen.
6    Q. And did you speak with anyone after the half an
7  hour?
8    A. No. There was nobody there to speak to.
9    Q. Do you know the name of the lady who you were
10  speaking with?
11    A. No. But she was -- she came -- actually came
12  out with the inmates that were being released that
13  evening.
14    Q. Do you remember what she looked like?
15    A. African-American, she looked like she might have
16  been anywhere from maybe 30 to 35. She was carrying one
17  of the clear, like, pocketbooks, whatever they carry so
18  that they can have their belongings with them.
19    Q. So after the 30 minutes, after the 30 minutes
20  when you finished speaking with her, what did you do
21  next?
22    A. I left. My sister was parked outside. She had
23  been parked out front the whole time that, you know, she
24  was waiting for me. And when I came out she wasn't out

29

1  front. And when I -- when she -- you know, I looked up
2  and saw where her car was, she said they told her that
3  she had to move. When I told you that they were doing
4  something, changing, I don't know what they were doing,
5  but it was just a lot of commotion going on, and she
6  asked me where was my -- where was Jermaine. I said
7  they didn't release him. They didn't give him to me.
8  And then I just -- I was just in a daze from there
9  because I didn't know what was going on.
10    Q. Okay. Are you okay. Do you want to take a
11  break?
12    A. I'm okay.
13    Q. Did you contact anyone after you left the second
14  time about your son's release?
15    A. Before I left that -- after we left out that
16  parking lot we went back around the CVOP to see if it
17  was anything there. It was just dark. Nobody was
18  there, no cars, nothing.
19    Q. Did you go inside?
20    A. No. It was all dark. You couldn't get in. The
21  doors were locked. Because I had been in there several
22  times so I know where you go in.
23    Q. So you tried to go to CVOP but the doors were
24  locked?

8 (Pages 26 to 29)

Case 1:05-cv-00821-SLR    Document 61-2    Filed 02/12/2008    Page 82 of 94

Wilson v. Taylor, et al.
SUSIE A. WILSON

30

1    A.  It was just dark.
2    Q.  What did you do after that?
3    A.  I went home.
4    Q.  Did you call anyone once you went home?
5    A.  I went home.  I called Brian Bartley who is
6    Jermaine's Public Defender.
7    Q.  Were you able to reach Mr. Bartley?
8    A.  No, it was like 10 o'clock at night.
9    Q.  Did you leave a message on his machine?
10   A.  Yes.
11   Q.  What did you say in the message?
12   A.  I said Brian, I need you to call me.  I said
13   hello, this is Susie Wilson.  I said Brian, I need you
14   to call me.  I need to find out what's going on with
15   Jermaine.  He wrote me a letter.  He told me he was
16   supposed to be released and I went to pick him up and
17   they said they didn't have release papers for me.  Can
18   you please call me and let me know what's going on.
19   Q.  Did you call anyone else?
20   A.  No.
21   Q.  So at this point what did you think was the
22   reason your son was not getting released?
23   A.  I had no idea.  I didn't know what was going on.
24   I was -- I just didn't know what was going on at all.

31

1    Q.  Okay.  Mrs. Wilson, when did you first hear that
2    your son had died?
3    A.  About five minutes to two that morning on the
4    19th.
5    Q.  The morning of the 19th?
6    A.  Yeah.  It was two -- it was 1:55.
7    Q.  You received a phone call?
8    A.  Yes.
9    Q.  Do you remember who called you?
10   A.  Deputy Warden Pierce.
11   Q.  And what did Deputy Warden Pierce say to you?
12   A.  He said may I speak to Susie Wilson.  I said
13   this is Susie Wilson.  He said Miss Wilson, I have some
14   bad news.  And I said, I'm home by myself, do I need to
15   get somebody?  He said that would be a good idea.
16   Jermaine is no longer with us.  He said, I found
17   Jermaine dead in his cell a little after 12.  He
18   appeared to have hung himself.  And I said, what do I
19   need to do?  I said, where is he now?  And I just -- I
20   was still holding a letter that -- the last letter
21   Jermaine had written to me.  I was holding it.  I had it
22   when I went down to the prison and I was sleep with it
23   on my chest.  So I grabbed a pen and I just start
24   writing in the information that he gave me.  And then I

32

1    hung up and I just started calling my family.
2    Q.  Do you want to take a break?  Let's take a break
3    for a couple minutes, okay?
4        (Recess taken)
5    BY MS. TROSS:
6    Q.  Back on the record.  Miss Wilson, before we took
7    a break you had just finished telling me what Deputy
8    Warden Pierce had called you and told you about
9    Jermaine's death.  Did you ask him any questions at that
10   time regarding what happened?
11   A.  I believe I did.  It was -- I was -- I was just
12   in shock, like.  I mean, I didn't expect anybody to call
13   me on the phone to tell me something like that.
14   Q.  What would you rather that they had done?
15   A.  Well, somebody come to my house and tell me, not
16   tell me on the phone.
17   Q.  So if someone had come to your house and told
18   you, you believe that would have made the situation
19   better?
20   A.  Yes.
21   Q.  After Deputy Warden Pierce called you, who was
22   the first person you spoke with after you learned of
23   your son's death?
24   A.  My sister that lives, like, I don't -- like a

33

1    block or so from me, in my development.
2    Q.  And what's your sister's name?
3    A.  Bobbie Garden, B-o-b-b-i-e.
4    Q.  And what did you do after you learned what
5    happened to your son?
6    A.  I got up, I got up and I remember getting
7    dressed.  I mean I had just came in like 10 o'clock.  I
8    can't remember what I did.  The next thing I knew I was
9    fully dressed with coat on.  Where I was going I have no
10   idea.
11   Q.  Did you end up going anywhere?
12   A.  No.  Nowhere.
13   Q.  Okay.  Did you contact anyone at the Department
14   of Correction to find out details about what happened to
15   Jermaine?
16   A.  No, but Jermaine's aunt did --
17   Q.  Who is Jermaine's aunt?
18   A.  -- as soon as she got there.  It was like --
19   Laretta Wilson, L-a-r-e-t-t-a.
20   Q.  Did you ask her to call someone?
21   A.  Yes.  I -- the family wanted to know and I
22   wanted to -- I had told them that they said I couldn't
23   get Jermaine's body until Tuesday because it was
24   President's Day.  We needed to let Jabar know that

9 (Pages 30 to 33)

Wilson v. Taylor, et al.
SUSIE A. WILSON

34

1  Jermaine had passed away. Jabar was in Texas in the —
2  Army being on training, so we had to get the Red Cross
3  to contact the Army to let them know that he had — that
4  it was true that he had passed away. But they wouldn't
5  give — they wouldn't release the information to the Red
6  Cross.
7     Q. Who wouldn't release the information?
8     A. The Department of Corrections.
9     Q. And how do you know that they wouldn't release
10 the information?
11    A. Because we tried to get it, we tried to get the
12 — them to call and give the information to the Red
13 Cross. The Red Cross said they needed the information
14 to be able to pay for him to come home.
15    Q. Who did you ask about releasing the information?
16    A. Whoever was taking Deputy Warden's Pierce place
17 at that time, but then he left the prison or whatever at
18 that time. It was — it was a holiday. It was
19 President's Day that weekend.
20    Q. So what day was this that you were calling
21 trying to get this information released?
22    A. On Saturday. This happened maybe two, three
23 o'clock in the morning, from that whole time we were
24 trying to get Jabar to be released from the military so

35

1  he could come home.
2     Q. And so on Saturday was it you who was contacting
3  people at the Department of Correction?
4     A. No, I was no good. I couldn't do anything. I
5  was just in a daze. I — I couldn't do anything.
6     Q. So was this your aunt who was trying to
7  contact —
8     A. This was Jermaine's aunt.
9        MR. SENSOR: Make sure you let Miss Tross
10 ask the question.
11       THE WITNESS: I'm sorry. I'm sorry.
12       MR. SENSOR: That's all right.
13 BY MS. TROSS:
14    Q. So this was Laretta Wilson?
15    A. Yes.
16    Q. And she spoke with whoever was taking Deputy
17 Warden Pierce's place?
18    A. Yes.
19    Q. Did she speak with anyone else?
20    A. I believe the Coroner's Office, the Medical
21 Examiner's Office.
22    Q. Why did she call the Medical Examiner?
23    A. Because that's who Deputy Warden Pierce told me
24 I needed to contact to get Jermaine's body on Tuesday.

36

1     Q. Was this when he first called you that he told
2  you that?
3     A. Yes. I started asking a lot of questions. I
4  don't remember what they were, but I was writing, I was
5  just writing.
6     Q. Do you have the notes that you were still
7  writing?
8        MR. SENSOR: Is that it?
9        THE WITNESS: This looks like what Laretta
10 was writing, but I had stuff — this is the back. I had
11 some things on the front, some numbers. This may be it.
12 I don't — I was a mess. So I really. . .
13       MS. TROSS: Mike, can we have a copy?
14       MR. SENSOR: Sure.
15       MS. TROSS: We can have these documents?
16       MR. SENSOR: Sure.
17       MR. DURSTEIN: Off the record.
18       (Discussion held off the record).
19 BY MS. TROSS:
20    Q. So Miss Wilson called the Coroner, Medical
21 Examiner, did she call anyone else?
22    A. The Red Cross. They contacted — the Red Cross
23 contacted the military. After some hours we kept trying
24 to get them to release the information, the Army said

37

1  we're going to let him go because we can't do anything
2  with him. He hasn't eaten since — because we called
3  like that morning, like 2:30 in the morning.
4     Q. Called who?
5     A. Called the Army — I mean called the Red Cross
6  and they contacted the Army, but, you know, that's the
7  only way we could contact, you know, get contact to
8  them.
9     Q. At this point were you or your family members
10 calling anyone to find out the details about what
11 happened to Jermaine?
12    A. Yes.
13    Q. Who were you calling?
14    A. Representative Hazel Plant, Representative
15 Charles Oberly. Herman Holloway.
16    Q. Who is Herman Holloway?
17    A. He's a community activist, like he's prominent
18 like helping people in community with different type of
19 issues that happened.
20    Q. When did you call Representative Plant?
21    A. Everything was done on that Saturday.
22    Q. And why did you call Representative Plant on
23 Saturday?
24    A. To let her know that Jermaine had died in the

10  (Pages 34 to 37)

Wilson v. Taylor, et al.
SUSIE A. WILSON

38

1  prison.
2  Q. Did she know Jermaine?
3  A. No. She -- no. It was just that she's a
4  Representative for my mom and my sister's district, and
5  we felt as though we needed them to help us get some
6  information of what happened to him.
7  Q. So you were calling Representative Plant to ask
8  her to help you get information?
9  A. Yes.
10  Q. Why did you call Representative Oberly?
11  A. He's my Representative for my district.
12  Q. Okay. And why were you calling him?
13  A. To let him know that I needed -- I needed his
14  help to find out what happened to my son and see if he
15  could help me.
16  Q. And why did you call Herman Holloway?
17  A. Just because he's the church that my, Jermaine's
18  other side of the family goes to, he goes to that
19  church and so they're his family, the family, they know
20  him and deal with him and know how he helps in the
21  Southbridge community in the New Castle area.
22  Q. So what were you hoping that he could do for
23  you?
24  A. Help me find out what happened to my son.

39

1  Q. Did you call Representative Plant after you
2  called someone from the Department of Correction?
3  A. Yes.
4  Q. And who did you call from the Department of
5  Correction before speaking with Representative Plant?
6  A. I don't know who I spoke with but it was whoever
7  was covering for Deputy Warden Pierce at that time.
8  Q. Okay. Now, help me understand. I'm trying to
9  understand. I'm sorry. Do you need a minute?
10  A. No. I just need to -- I'm focusing on what
11  you're saying.
12  Q. I'm trying to understand why you felt the need
13  to call them. What happened that you felt you needed to
14  call them, Representative Plant, Representative Oberly
15  and Herman Holloway?
16  A. The first thing was that my son was dead and
17  they called me and told me on the phone, and that he was
18  at the Department of Corrections and not at the CVOP
19  originally, and that I wanted to know what was going on,
20  and the fact that we couldn't get the Red -- couldn't
21  get the prison to give the Red Cross notification that
22  Jermaine had died, and that we couldn't get his body
23  until Tuesday. Those were the issues.
24  Q. Okay. Did any of your issues get resolved?

40

1  A. We got his body.
2  Q. When did you get his body?
3  A. I believe we got it Saturday.
4  Q. Did you get answers to your questions regarding
5  what happened with Jermaine?
6  A. No.
7  Q. Would you mark these as Defendant's Exhibit 1?
8  (Wilson Deposition Exhibit No. D-1 was
9  marked for identification.)
10  BY MS. TROSS:
11  Q. Miss Wilson, I am handing you a document Bates
12  stamped D00399. Just take a moment to review the
13  document and let me know when you have finished
14  reviewing it.
15  A. I'm finished.
16  Q. Okay. Miss Wilson, do you recognize this
17  document?
18  A. Yes.
19  Q. Did you draft this letter?
20  A. Along with my family, yes.
21  Q. Who helped you to draft the letter?
22  A. My family, Representative Plant, Herman
23  Holloway, Jr. -- I believe Dwight Davis was there. He's
24  also a person in the community. He's like a community

41

1  activist.
2  Q. Did anyone else help you draft the letter?
3  A. I don't recall at this time anybody else.
4  Q. Okay. Who did you send the letter to?
5  A. Commissioner Stan Taylor.
6  Q. And why did you draft the letter?
7  A. Can you clarify what you mean?
8  Q. When you wrote the letter what was your purpose
9  in writing the letter?
10  A. To find out information.
11  Q. Okay.
12  A. To try to get information of what happened to
13  Jermaine.
14  Q. Okay. Did you ever get answers to the questions
15  in your letter?
16  A. No.
17  Q. Do you know if Commissioner Taylor ever received
18  your letter?
19  A. Yes.
20  Q. But you believe you never got answers to the
21  letter?
22  A. I never got answers to the letter.
23  Q. Were you ever made aware that Commissioner
24  Taylor had given the State Representatives verbal

11 (Pages 38 to 41)

Case 1:05-cv-00821-SLR    Document 61-2    Filed 02/12/2008    Page 85 of 94
Wilson v. Taylor, et al.
SUSIE A. WILSON

42

1  answers to your questions?
2  A. No.
3  Q. Did Representative Plant or Representative
4  Oberly ever tell you that Commissioner Taylor had
5  responded to your questions?
6  A. No.
7  Q. If we could get you -- if we could get you
8  formal answers to your questions, is that something that
9  you would like to receive?
10  A. Yes.
11  Q. Okay.
12  MR. SENSOR: Off the record.
13  (Discussion held off the record).
14  BY MS. TROSS:
15  Q. So back on the record. So you would like to
16  receive answers to your questions?
17  A. Yes.
18  Q. Okay. Just a few more things about the letter.
19  You state towards the end of the letter, we hope that
20  you would be able to assist us in our quest for
21  resolution of the matter in a timely fashion. When
22  you're saying we and us and our, who are you referring
23  to?
24  A. My family and the Representatives and the

43

1  community activists that were helping us out.
2  Q. At the bottom of your letter there is two sets
3  of initials; who does SAW stand for?
4  A. That's Susie Ann Wilson.
5  Q. And the SES?
6  A. That's Sharon Elaine -- Sharon E. Stokes. I'm
7  not positive what the middle initial stands for.
8  Q. Who is Miss Stokes?
9  A. She's our church secretary and Jermaine's
10  Godmother.
11  Q. And she also helped in drafting the letter?
12  A. She typed the letter.
13  Q. Did she participate at all in the substance of
14  the letter?
15  A. No, she did not.
16  Q. Okay. Miss Wilson, what were your initial
17  thoughts and feelings in the days and weeks after you
18  learned of your son's death?
19  A. I was -- I was -- I couldn't think about
20  anything but what happened to Jermaine. That's the only
21  question that I had was what happened to Jermaine, and
22  why is he not here now.
23  Q. Did anyone ever make you aware of the efforts
24  taken by the officers at the Delaware Correctional

44

1  Center to help your son after -- after they found him in
2  his cell?
3  A. No.
4  Q. Did anyone ever tell you what happened?
5  A. Not until I received I believe it was January
6  when -- of 2007, January, I don't remember, recall if it
7  was the beginning or the end of the month, that a report
8  was given like showing -- giving the information of what
9  happened that night.
10  MR. SENSOR: I just want to clarify your
11  question. Does your question deal with what she
12  discovered before this litigation was instituted, right?
13  MS. TROSS: Yes.
14  MR. SENSOR: Okay. Did you understand
15  that?
16  THE WITNESS: No. I didn't have any...
17  MS. TROSS: I'm sorry?
18  THE WITNESS: No. I didn't know anything.
19  BY MS. TROSS:
20  Q. Okay. So since this litigation has begun have
21  you now learned more about what happened to your son?
22  A. Yes.
23  Q. And I wanted to know, if you were given
24  the opportunity to speak with the officers who tried to

45

1  help your son on the day of his death, would you want to
2  speak with them?
3  A. I can't answer right now.
4  Q. Okay. Well, I would say to you if you -- if
5  there is any time where you would want to speak with
6  them, talk to Mr. Sensor and he will let us know and
7  we'll try to arrange that meeting for you. Okay?
8  A. Yes.
9  MR. DURSTEIN: We can probably go off the
10  record.
11  (Discussion held off the record).
12  BY MS. TROSS:
13  Q. Back on the record. Okay. Miss Wilson, now I
14  want to ask you some questions regarding the complaint,
15  so I am going to give you a copy of the amended
16  complaint to review. I have one for you, too.
17  Have you seen this document before?
18  A. Yes. I believe I have, yes.
19  Q. And is this the amended complaint that was filed
20  in this litigation?
21  A. Yes,
22  Q. Could you turn with me to page two and paragraph
23  two of the complaint? In the complaint you state that
24  Jermaine was murdered. Now what makes you think that

12 (Pages 42 to 45)

**A000085**

Wilson v. Taylor, et al.
SUSIE A. WILSON

46

1  your son was murdered?
2      A.  I believe he was murdered because all the blood
3  that was on his clothes and the gash that was in the
4  back of his head.
5      Q.  Did anyone tell you that Jermaine was murdered?
6      A.  No.
7          MR. SENSOR:  No?
8          THE WITNESS:  No.
9          MR. SENSOR:  Just speak up a little bit.
10 I'm sorry.
11         THE WITNESS:  No.  Sorry.
12 BY MS. TROSS:
13     Q.  Did anyone tell you that they believed that the
14 gash in the back of Jermaine's head was caused by him
15 hitting his head on the locker in his cell?
16     A.  I read that in the newspaper.
17     Q.  Okay.  And do you believe that's true?
18     A.  I don't know.  I don't know what I believe right
19 at this moment.  It's just . . .
20     Q.  Is it still your belief today that Jermaine was
21 murdered?
22     A.  I believe he was murdered.
23     Q.  And who do you think murdered him?
24     A.  Either another inmate or guard or some guards.

47

1      Q.  And why do you think that he was murdered?
2      A.  I believe he wanted to get out and I believe he
3  was -- I believe he wanted to get out and he kept asking
4  them when was he getting out.
5      Q.  So --
6      A.  And he may have just got fed up and was doing
7  anything trying to get some answers to when he was going
8  to get out.
9      Q.  Do you believe that it is possible that Jermaine
10 committed suicide?
11     A.  No.
12     Q.  Do you --
13     A.  He didn't have any reason to.
14     Q.  Do you believe it was possible that he was
15 attempting suicide to get attention from the guards?
16     A.  He may have been.
17         MR. SENSOR:  Do you need a break, Susie?
18 Are you okay?
19         MS. TROSS:  We can take a couple minutes if
20 you want to.
21         THE WITNESS:  I'm okay.  I just want to get
22 through it.
23 BY MS. TROSS:
24     Q.  Okay.  Let's go back to the complaint, okay?  On

48

1  page two, paragraph three, you state that Jermaine's
2  death occurred on the day he was supposed to have been
3  released from prison after he was ordered to be released
4  by the Superior Court in the State of Delaware.  How do
5  you know the Superior Court ordered him to be released
6  on February 18th?
7      A.  I saw -- are you -- I need to clarify.  Are you
8  referring to before any information with the -- before
9  the lawsuit was filed?
10     Q.  I am asking what was your basis for stating in
11 the complaint at the time it was written that the
12 Superior Court had ordered him to be released on
13 February 18th?
14     A.  I believed he was to be released on February
15 10th from the document from Judge Cooch saying that the
16 administrative warrant was unfounded at that court
17 hearing on February 10th.
18     Q.  Okay.  The document that you're referring to, do
19 you know if that document was ever given to anyone at
20 the Department of Correction?
21     A.  I believe it was.
22     Q.  And what makes you believe that?
23     A.  It went through their Prothonotary's Office, to
24 the Prothonotary's Office at the courthouse.

49

1      Q.  At the Superior Court?
2      A.  Yes.
3      Q.  How do you know it went from the Superior Court
4  to the Department of Correction?
5      A.  As far as I know they were the ones that
6  transferred him to the court and back to the
7  correctional facility.
8      Q.  So do you know if that document was given to
9  someone from the Department of Correction?
10     A.  I'm not sure how they handle their paperwork
11 when they bring an inmate to court.
12     Q.  Okay.
13         MR. SENSOR:  Off the record.
14         (Discussion held off the record).
15 BY MS. TROSS:
16     Q.  We're back on the record.  So, Miss Wilson, do
17 you know for certain whether anyone at the Department of
18 Correction received the document that you're referring
19 to?
20     A.  I believe they did.
21     Q.  And what makes you think that?
22     A.  Because they brought him to the courthouse and
23 they transferred him -- they were there with him in the
24 courtroom and transferred him back to the prison.

13 (Pages 46 to 49)

Wilson v. Taylor, et al.
SUSIE A. WILSON

50

1    Q.  So do you know if that document was given to the
2    people who were transferring him?
3    A.  I'm not sure.  I don't know.
4    Q.  Okay.  Were you at the court on February 10th?
5    A.  No.
6    Q.  Did you receive notice of any hearing for
7    February 10?
8    A.  No.
9    Q.  Okay.  Let's go back to the complaint, page
10   three and paragraph eight.  Okay.  In paragraph eight
11   you state that Stanley W. Taylor, Jr. was responsible
12   for the custody, study, training, treatment, correction
13   and rehabilitation of persons committed to the
14   Department of Correction.
15       How do you know Mr. Taylor was responsible
16   for those things?
17   A.  He's the Commissioner.
18   Q.  So did you read a document that states that he's
19   responsible for those things?
20   A.  Well, he's in charge of the prison.
21   Q.  So this is what you believe that he's in charge
22   of?
23   A.  Yes.
24   Q.  But you didn't see that written anywhere?

51

1    A.  No.
2    Q.  Okay.  Why did you sue Mr. Taylor?
3    A.  Because he's the Commissioner of the prison, so
4    it's under his jurisdiction, under his administration.
5    Q.  Do you believe he had any personal involvement
6    in your son's death?
7    A.  No.
8    Q.  The next paragraph, paragraph nine, you talk
9    about Paul Howard who is also a defendant.  And why did
10   you file the lawsuit against Mr. Howard?
11       MR. SENSOR:  I just want to interpose a
12   standing objection to the extent this is asking her to
13   discuss communications with my office about legal
14   strategy, but subject to that objection you can answer.
15       THE WITNESS:  I believe the same as for --
16   that he -- the prison is under his administration.
17   BY MS. TROSS:
18   Q.  Do you think he had any personal involvement in
19   your son's death?
20   A.  No.
21   Q.  In paragraph ten you discuss Noreen Rennard; why
22   did you file the lawsuit against Miss Rennard?
23   A.  Same, again, they are under her, the prison is
24   under her administration.

52

1    Q.  Okay.  Do you think she had any personal
2    involvement in your son's death?
3    A.  No.
4    Q.  And the next paragraph, paragraph 11, you name
5    Warden Thomas Carroll; why did you file the lawsuit
6    against Warden Carroll?
7    A.  Because he's responsible for what goes on in the
8    prison, with the staff.
9    Q.  With the who?
10   A.  Staff.  I'm sorry.
11   Q.  Okay.  That's okay.  Do you think he had
12   personal involvement in your son's death?
13   A.  No.
14   Q.  Okay.  And next in paragraph 12 you discuss
15   Deputy Warden Betty Burris; why did you name Deputy
16   Burris as a defendant?
17   A.  The staff is also -- at the prison is under her
18   administration.
19   Q.  And do you think she had personal involvement in
20   Jermaine's death?
21   A.  No.
22   Q.  And in paragraph 13 you named Deputy Warden
23   David Pierce; why did you file the lawsuit against
24   Deputy Warden Pierce?

53

1    A.  He was in charge of the staff at that time.
2    Q.  Do you think he had personal involvement in your
3    son's death?
4    A.  No.
5    Q.  Do you believe there was any way he could have
6    prevented your son's death?
7    A.  Yes.
8    Q.  How so?
9    A.  By making sure that the prison was staffed
10   properly, that the staff was -- that they had -- they
11   were not overworked or overburdened, like doing two or
12   three shifts at a time.
13   Q.  When you say that he could have made sure that
14   the prison was staffed properly, what about it was
15   staffed improperly?  What was wrong with the way it was
16   staffed?
17   A.  I believe that the prison was understaffed at
18   that time.
19   Q.  And if they had the staff you believe they
20   should have had, what difference would it have made, do
21   you think?
22   A.  I believe that my son would have gotten the
23   answers that he was looking for.
24   Q.  Okay.  In paragraph 14 you name Officer Michael

14  (Pages 50 to 53)

Wilson v. Taylor, et al.
SUSIE A. WILSON

54

1   Records, why did you file the lawsuit against Officer
2   Records?
3      A.  He was supposed to be the parole officer at that
4   time.  I have never heard of him before this incident
5   with Jermaine, with the administrative warrant that was
6   filed against him.
7      Q.  Did you believe he was your son's parole
8   officer?
9      A.  No.
10     Q.  Do you think he had any personal involvement in
11  your son's death?
12     A.  Not personal, no.
13     Q.  Okay.  Then how do you think he was involved in
14  your son's death?
15        MR. SENSOR:  I just want to make an
16  objection.  The -- strike that.  I'm sorry.  I spoke out
17  of turn.  Go ahead.  Withdraw it.  You can answer.
18        THE WITNESS:  I believe that when they
19  withdrew the administrative warrant that I believe that
20  it should have been followed through that he be released
21  at that time since the warrant was unfounded and not
22  continue to keep him in the hole in Smyrna Prison.
23     BY MS. TROSS:
24     Q.  Okay.  And, finally, you in paragraph 15 you

55

1   discuss Officer David McDonald.  Why did you file the
2   lawsuit against Officer McDonald?
3      A.  I believe he was one of the ones that originally
4   the day that Jermaine was put into the hole on January
5   25th that he beat my son.
6      Q.  Okay.  And did someone tell you that he beat
7   your son?
8      A.  I read it.
9      Q.  Do you remember where you read it?
10     A.  The first time I read it was a letter that
11  Jermaine wrote, wrote to Judge Cooch, that's the first
12  time I read it.
13     Q.  Did you ever hear Officer McDonald's version of
14  what happened?
15     A.  Just in -- yes, just in the report but not
16  face-to-face, just a letter.
17     Q.  So you have seen Officer McDonald's report?
18     A.  Yes.
19     Q.  Do you believe that Officer McDonald's report is
20  accurate?
21     A.  No.
22     Q.  Could you mark that as Exhibit 2?
23        (Wilson Deposition Exhibit No. D-2 was
24  marked for identification.)

56

1   BY MS. TROSS:
2      Q.  Miss Wilson, this is Officer McDonald's report
3   that I believe you were referring to.  Could you take a
4   moment just to review it?  Just let me know when you're
5   finished.
6      A.  I'm finished.
7      Q.  Miss Wilson, what in Officer McDonald's report
8   do you think is inaccurate?
9      A.  I don't believe that Jermaine cursed at him
10  because of the past behaviors that he has had when he
11  was incarcerated, that he was what they call a model
12  prisoner.  And that the other -- it contradicts some of
13  the other reports from the other guards that were there
14  at that same time saying that Jermaine didn't want to go
15  in and refused to go in, and Jermaine -- the letter that
16  Jermaine wrote describing that he assaulted him in some
17  kind of way when he went inside.
18     Q.  Can you mark that, please?
19        (Wilson Deposition Exhibit No. D-3 was
20  marked for identification.)
21  BY MS. TROSS:
22     Q.  Miss Wilson, the Court Reporter just handed you
23  Defendant's Exhibit 3.  Take a moment to review it.  Do
24  you want a break for a moment?

57

1      A.  I'm finished.
2      Q.  Miss Wilson, I wanted to -- oh, I'm sorry, do
3   you recognize the document?
4      A.  Yes.
5      Q.  Is this a letter that Jermaine wrote to you?
6      A.  Yes.
7      Q.  And what's the date at the top of the letter?
8      A.  February 10th, 2005.
9      Q.  Did you receive this letter?
10     A.  Yes.
11     Q.  When did you receive it?
12     A.  On February 14th.
13     Q.  Okay.  Let's turn to the second page of the
14  letter.  Okay.  Jermaine says in the letter, I almost
15  forgot to tell you, I got kicked out of CVOP.  That's
16  why I'm in Smyrna Prison.  I'll tell you why later.
17  Just make sure I have a ride, please.
18        Is that correct?  Is that what the letter
19  states?
20     A.  Yes.
21     Q.  Okay.  Does Jermaine ever state in his letter
22  why he was kicked out?
23     A.  No.
24     Q.  Does he ever state that he was wrongly kicked

15  (Pages 54 to 57)

Wilson v. Taylor, et al.
SUSIE A. WILSON

---

58

1  out?
2      A.  No.
3      Q.  Does he ever mention in the letter that one of
4  the officers hit him?
5      A.  No.
6      Q.  Does he ever state in the letter that he was
7  injured at CVOP?
8      A.  No.
9      Q.  Okay.  We can put the letter aside for now.
10  Okay?  Back on the complaint, on pages 18 through 19,
11  let's go there for a minute.  Starting at the bottom of
12  18 and then into page 19, it talks about Officer Records
13  and his administrative warrant, correct?
14      A.  Yes.
15      Q.  Have you seen the administrative warrant Officer
16  Records made?
17      A.  Yes.
18      Q.  Do you believe that the administrative warrant
19  was accurate?
20      A.  No.
21      Q.  I think this is 4.
22          (Wilson Deposition Exhibit No. D-4 was
23  marked for identification.)
24  BY MS. TROSS:

---

59

1      Q.  Miss Wilson, the Court Reporter just handed you
2  Defendant's Exhibit 4.  Take a moment to review and let
3  me know when you're finished.
4      A.  I'm finished.
5      Q.  Okay.  What about Officer Records' warrant do
6  you believe is inaccurate?
7      A.  That Jermaine refused to go in, and that the
8  whole thing was unfounded, especially that he was trying
9  to, I'm sorry, I don't have my glasses on, and the
10  reason why he was kicking the door and banging the cell
11  that they said he was trying to destroy State property.
12  I believe that is incorrect.
13      Q.  Okay.  Do you believe that Jermaine was talking
14  in the hallway and was told to stop talking?
15      A.  I don't know.
16      Q.  Okay.
17      A.  I don't know.
18      Q.  But you stated that you don't believe that when
19  he was told to go in that he refused to go in?
20      A.  Yes.
21      Q.  And what is your belief based on?
22      A.  It's based on the fact that Jermaine called me
23  on January 24th and told me that he had asked for
24  thermal underwear because it was so cold outside and

---

60

1  they had him working on the outside, and he said that he
2  needed the underwear to be able to work, so he refused
3  to work without the underwear.
4      Q.  Okay.  But why do you think that it's inaccurate
5  that when he was told to lock into the holding cell that
6  he didn't refuse to lock in?
7      A.  Because I don't believe that he was trying to
8  cause any problem at that time.
9      Q.  Okay.
10      A.  With his time being, you know, almost over.
11      Q.  Okay.  You also state that you believe it's
12  inaccurate that — that he, that they needed to cap stun
13  him to prevent damage to State property.
14      Why do you believe that's inaccurate?
15      A.  I believe it's inaccurate because, number one,
16  is because the whole administrative warrant was
17  unfounded when Jermaine went to court.  The second
18  reason is how Jermaine described in the letter what
19  happened to him on that day, on January 25th.
20      Q.  What letter are you referring to?
21      A.  Jermaine wrote a four-page letter to Judge Cooch
22  the day that he was at the court.
23      Q.  So based on Jermaine's letter you believe that
24  the administrative warrant is inaccurate?

---

61

1      A.  Based on Jermaine's letter and the fact that
2  Judge Cooch said that it was unfounded and that it was
3  withdrawn by Mike Records.
4      Q.  How do you know Officer Records withdrew the
5  warrant?
6      A.  I saw the paperwork.
7      Q.  Were you aware that Officer Records was not at
8  the hearing?
9      A.  Yes.
10      Q.  But you still believe that he withdrew the
11  warrant?
12      A.  Whoever was representing him at that time stood
13  in place for him, withdrew the warrant.
14      Q.  And what makes you believe that they withdrew
15  the warrant?
16      MR. SENSOR:  Asked and answered.  You can
17  answer.
18      THE WITNESS:  I believe it was not true
19  what they said he did.
20      MS. TROSS:  Okay.
21      MR. SENSOR:  Off the record.
22      (Discussion held off the record).
23  BY MS. TROSS:
24      Q.  Okay.  Let's return to the complaint for a

---

16  (Pages 58 to 61)

Wilcox and Fetzer, Ltd.    Registered Professional Reporters        302-655-0477

Wilson v. Taylor, et al.
SUSIE A. WILSON

62

1  moment. We're back on the record. Let's return to the
2  complaint. On page 19, paragraph 91, you state that
3  Officer Records' representation in the administrative
4  warrant that it was necessary to spray Jermaine with cap
5  stun in order to prevent damage to state property was
6  inaccurate and misleading in as much as facilities in
7  CVOP are nearly indestructible and designed to withstand
8  substantial abuse.
9        Have you seen the holding cell where
10 Jermaine was housed in CVOP?
11   A.  No.
12   Q.  Were you aware that the holding cell at CVOP
13 where Jermaine was housed is made of glass?
14   A.  No.
15   Q.  Knowing that it is made of glass, do you
16 understand why the officers feared that his kicking it
17 would cause him to break the glass?
18       MR. SENSOR:  Objection as to form. You can
19 answer.
20       THE WITNESS:  No.
21 BY MS. TROSS:
22   Q.  Do you think kicking glass would cause it to
23 break?
24   A.  Yes, I do.

63

1    Q.  Okay. Let's turn to page 20 of the complaint,
2  paragraph 93. You state that Jermaine refused to work
3  because he was not given the proper attire. How do you
4  know that Jermaine was not given the proper attire?
5    A.  Because I communicated with my son and he told
6  me.
7    Q.  When did he tell you?
8    A.  The first time, the first -- the first time he
9  got the -- the first program violation was it was so
10 cold outside and he didn't have something, either a long
11 johns or gloves, I can not recall at this time, whatever
12 it was he was freezing outside. So he came and got,
13 went and got, told them he was getting on the bus
14 because he was about to freeze. He was really cold. It
15 was bitter cold during these -- the days that he was out
16 there in January.
17   Q.  Do you know if Jermaine filed a grievance
18 regarding that incident?
19   A.  The second one, the one for the long johns for
20 this time on the 25th, yes. I believe he filed it
21 either because I talked to him the January 24th, around
22 8, 8:30 p.m. so I don't know if he filed it that night
23 or the -- I believe he filed it on the 25th.
24   Q.  Did he tell you that he had filed a grievance?

64

1    A.  He told me he was filing a grievance.
2    Q.  Did Jermaine tell you whether any of the other
3  inmates refused to work?
4    A.  No. He didn't discuss anyone else.
5    Q.  Do you know if any of the other inmates refused
6  to work?
7    A.  No, I don't.
8    Q.  Because of improper attire?
9    A.  No, I don't.
10   Q.  Okay. On page 20, I believe same page we were
11 on, paragraph 97, you state Jermaine was transferred to
12 Delaware Correctional Center to a solitary confinement
13 unit commonly known as the hole. How do you know
14 Jermaine was transferred to the hole?
15   A.  I was told afterwards.
16   Q.  Who told you?
17   A.  I saw it in the letter that Jermaine wrote and
18 the administrative warrant.
19   Q.  Are you referring to Officer Records'
20 administrative warrant?
21   A.  Yes.
22   Q.  Were you aware that the area where Jermaine was
23 housed is classified as pre-trial detention?
24   A.  Are you referring to the CVOP?

65

1    Q.  I'm sorry. I'm referring to when he was at
2  Delaware Correctional Center, were you aware that the
3  cell in which he was in was in an area classified as
4  pre-trial detention?
5    A.  No.
6    Q.  Okay. In the next page of the complaint,
7  paragraph 102, you state Jermaine was put on 24-hour
8  lockdown, was not permitted to leave his cell for any
9  reason, nor was he permitted to consult with counsel or
10 make telephone calls.
11       How do you know he was not allowed to leave
12 his cell?
13   A.  From what I know about the hole I believe they
14 are not permitted to leave.
15   Q.  Did anyone tell you that?
16   A.  I don't recall.
17   Q.  Okay. How do you know that he was not allowed
18 to make telephone calls?
19   A.  Because Jermaine would call me.
20   Q.  Did he call you when he was at Delaware
21 Correctional Center?
22   A.  No.
23       MR. SENSOR:  Off the record.
24       (Discussion held off the record.)

17 (Pages 62 to 65)

Wilson v. Taylor, et al.
SUSIE A. WILSON

66

1   BY MS. TROSS:
2      Q.  We're back on the record. Before I continue
3   with the questioning I just wanted to get the envelopes,
4   the copies of the envelopes that you gave me marked.
5   Could you mark that, I think it's defense exhibit 5.
6          (Wilson Deposition Exhibit No. D-5 was
7   marked for identification.)
8   BY MS. TROSS:
9      Q.  Could you hand that to Miss Wilson. Miss
10  Wilson, could you please just explain to us what defense
11  exhibit 5 is?
12     A.  When Deputy Warden Pierce called me and gave me
13  information about my son, I took down what the questions
14  -- the answers to the questions that I asked him.
15     Q.  Okay. And those questions and answers are
16  indicated on that copy of the envelope?
17     A.  Yes.
18     Q.  Okay. Could you mark this as Exhibit 6?
19         (Wilson Deposition Exhibit No. D-6 was
20  marked for identification.)
21  BY MS. TROSS:
22     Q.  Miss Wilson, the Court Reporter is handing you
23  Defendant's Exhibit 6. Could you identify for us what
24  Exhibit 6 is?

67

1      A.  This is a letter from Jermaine.
2      Q.  Okay. Does it have a date on it?
3      A.  Yes.
4      Q.  What's the date?
5      A.  It's postmarked - I don't have my glasses on,
6   sorry - for the 14th. This is the first letter that I
7   received from Jermaine.
8      Q.  Okay. The first letter you received while he
9   was at the Delaware Correctional Center?
10     A.  Yes.
11     Q.  Okay. Could you mark that as 7?
12         (Wilson Deposition Exhibit No. D-7 was
13  marked for identification.)
14  BY MS. TROSS:
15     Q.  And could you please explain for the record what
16  Defendant's Exhibit 7 is?
17     A.  This is the back of the envelope of the letter
18  that I received from Jermaine on February 14th and this
19  is some numbers that his Aunt Laretta wrote on the back
20  of the letter.
21     Q.  So his Aunt Laretta wrote on that letter?
22     A.  Yes, on the back of the letter.
23     Q.  Okay. So going back to when Jermaine was housed
24  at DCC, I believe you stated earlier that he did not

68

1   call you while he was at DCC; is that correct?
2      A.  Yes.
3      Q.  Did Jermaine contact you in any way while he was
4   at DCC?
5      A.  No.
6      Q.  Did you receive letters from him while he was at
7   DCC?
8      A.  On February -- on February 14th, yes.
9      Q.  Okay.
10     A.  I did.
11     Q.  Did you receive any other letters from him?
12     A.  I received another one on, it was either the
13  17th or the 18th.
14     Q.  Okay. Did you visit with Jermaine at any time
15  while he was housed at DCC?
16     A.  No.
17     Q.  Okay. Going back to the complaint on page 24,
18  paragraph 118, you state that you arrived at DCC on
19  February 18th, 2005 at approximately 5:15 to pick up
20  Jermaine. Why did you come to DCC at that time?
21     A.  Because I had received a letter from him, that's
22  how I found out he was there. I didn't know where he
23  was before.
24     Q.  Were you told to come pick him up at that time

69

1   at 5:15?
2      A.  No. That's the time that I got down there.
3      Q.  Okay. On page 25, paragraph 125, you state that
4   Jermaine had never exhibited suicidal tendencies and had
5   never expressed suicidal ideations and plans. How do
6   you know Jermaine never exhibited suicidal tendencies or
7   expressed suicidal ideations and plans?
8      A.  I communicated with my son all the time, on the
9   phone, cards, letters, visits.
10     Q.  So you don't believe that he exhibited any
11  suicidal tendencies?
12     A.  No.
13     Q.  So do you believe there was any way that the
14  employees and officers at the Delaware Correctional
15  Center could have known that he was suicidal?
16         MR. SENSOR: I am going to object to the
17  form. You can answer it.
18         THE WITNESS: I believe that they could
19  have answered his question, I believe he wanted to know
20  when he was coming out, and taking him from the
21  environment at CVOP and then taking him over to the
22  environment at the Delaware Correctional Center where he
23  was isolated, where he was by himself, I believe that he
24  should have had some con — there should have been made

18  (Pages 66 to 69)

**A000091**

Wilson v. Taylor, et al.
SUSIE A. WILSON

70

1    available some contact with a counselor or something for
2    him there.
3    BY MS. TROSS:
4        Q.   In your opinion is there anything about Jermaine
5    that would have made the officers aware that he was
6    suicidal?
7            MR. SENSOR:   Objection as to form.   You may
8    answer it.
9            THE WITNESS:   I believe Jermaine kept
10   asking when am I going home, somebody tell me something,
11   tell me why I'm here, I don't want to be here, I know my
12   son and I know he was asking questions.
13   BY MS. TROSS:
14       Q.   Knowing your son, do you believe that he ever
15   told the guards that he was going to commit suicide?
16       A.   No.
17       Q.   Okay.   On page 25, again, and paragraph 126, you
18   state that Jermaine did not commit suicide.   So how do
19   you believe that Jermaine died?
20       A.   I have two ways that I think Jermaine may have
21   died.
22       Q.   Okay.
23       A.   And one is that he was trying to get answers to
24   when am I going home, you know, why can't I call my

71

1    mother or why can't I call my family, why can't I have
2    visits, I believe he was asking a lot of questions.   I
3    believe that he may have been trying -- if Jermaine, if
4    I wanted to believe that he committed suicide, that he
5    was trying to get attention for somebody to say tell me
6    something.
7        Q.   Okay.
8        A.   That's the only way that I would ever believe
9    that he would want to -- would even attempt to try to do
10   something like that because that's not my son.
11       Q.   And if that's the case, do you think that the
12   officers could have prevented him from committing
13   suicide?
14       A.   Yes.
15       Q.   How so?
16       A.   By not having him there in the first place when
17   he was supposed to be home ten days before he was
18   supposed to be released, eight days before, on the 10th,
19   that he would have been home.   He would have been able
20   to contact his family as he usually did by writing, by
21   visits, and by telephone calls.
22       Q.   You stated that there was a second option, what
23   was the second option for how your son died?
24       A.   I was saying that he had asked -- was asking a

72

1    lot of questions, and he may have frustrated them by
2    continuously asking questions about somebody tell me why
3    I'm still here, you know, why I can't make, you know,
4    have any communication with my family, why my visits are
5    cut off, all of that, when I was supposed to -- he was
6    only supposed to be there for one day, one night.
7        Q.   And what do you think that the frustration led
8    to?
9        A.   That he just kept asking the same question, when
10   is somebody going to tell me something, just
11   continuously asking the same questions over and over,
12   just somebody give me some dates, some, you know, tell
13   me something, I don't believe that he got any answers.
14       Q.   Okay.   So if he didn't commit suicide what do
15   you think happened?
16       A.   I believe he may have frustrated some people.
17       Q.   And then they did what?
18       A.   Beat him.
19       Q.   Okay.   Miss Wilson, what injuries do you believe
20   you suffered as a result of the defendant's conduct?
21       A.   I have anxiety, depression, post-traumatic
22   stress disorder, I go in and out and I have, like my
23   social, I don't do anything -- like I go to work, I used
24   to go to church a lot, and I hardly go at all, I hardly

73

1    do anything any more.   I go to work.   I come home, go to
2    sleep.   I can't pay my bills because I don't remember
3    that I'm supposed to pay my bills.
4        Q.   Have you seen a doctor for the anxiety?
5        A.   I'm on medication.
6        Q.   What kind of medication?
7        A.   Paxil.
8        Q.   Have you seen a doctor for your depression?
9        A.   Well, I just see my family doctor.   I can't talk
10   about it.   I -- I try to go like to some grief groups
11   but I can't do it.   I can't . . .
12           MR. SENSOR:   Are you all right?   Do you
13   need a break?
14           THE WITNESS:   No.   I want to get through
15   it.   I just want to get through it.
16   BY MS. TROSS:
17       Q.   Okay.   We're almost done, okay?   Were you
18   prescribed any medication for the depression?
19       A.   Yes.
20       Q.   What medication?
21       A.   I take Paxil, 40 milligrams.
22       Q.   Okay.   Were you prescribed any other medication
23   besides the Paxil?
24       A.   Yes.   In the beginning I was given -- on Xanax,

19  (Pages 70 to 73)

Wilson v. Taylor, et al.
SUSIE A. WILSON

74

1　the same, on the 8 -- 19th when I was called.
2　　Q.　What's the Xanax for?
3　　A.　Because I couldn't stop shaking.
4　　Q.　Do you still take the Xanax?
5　　A.　As needed.
6　　Q.　Were you prescribed any other medication?
7　　A.　I was taking Effexor and the Paxil together.
8　　Q.　What does Effexor do?
9　　A.　Only thing I know is that it helped -- it was
10　supposed to calm -- the Paxil worked on one -- the one
11　side of my brain, the Effexor was supposed to help both
12　because I was starting to have crying spells again where
13　I just couldn't stop crying, it was uncontrollable and
14　so it was hard for me to work like that.
15　　Q.　Speaking of work, where do you work?
16　　A.　I work for the Ministry of Caring.
17　　Q.　What is the Ministry of Caring?
18　　A.　It's an organization that helps the poor and
19　disenfranchised.　They have a lot of shelters, feeding
20　centers and homes for people with AIDS and things like
21　that.
22　　Q.　What do you do for them?
23　　A.　I'm a case worker at the job placement center.
24　I teach life skills classes and I help people to find

75

1　jobs and just to become self sufficient.
2　　Q.　How long have you been working there?
3　　A.　Seven years.
4　　Q.　How much do you make there?　Are you paid by the
5　hour or are you paid annually?
6　　A.　I'm paid by the hour.
7　　Q.　And how much do you make per hour?
8　　A.　I believe I make 12, 12.26 or something like
9　that.
10　　Q.　Okay.
11　　A.　I believe that's what it is.
12　　Q.　Miss Wilson, if the Defendants could have done
13　anything differently, what would you have liked them to
14　have done differently?
15　　A.　The first thing is to have released my son at
16　the time that he was supposed to be released.　Also,
17　that when he was supposed to serve one night in the hole
18　to serve that one night.
19　　Q.　Is that --
20　　A.　When he was asking the question since he was
21　there, that he would get some answers, that I was
22　notified that they had moved him so that I could still
23　have contact with my son.　I continuously called and
24　made appointments like I usually would, and I was told

76

1　that there weren't any appointments.　I wasn't told that
2　he wasn't there, ever.
3　　Q.　Who were you referring to when you say you
4　called?
5　　A.　I called CVOP and make appointments as usual.　I
6　never stopped making my appointments.　At one time he
7　told me I was calling the wrong day.　I was like this is
8　not the wrong day.　I was never told he wasn't there.
9　　Q.　Is there anything else you felt that they could
10　have done differently?
11　　A.　After his death the way they contacted me, and
12　to give information to the Red Cross for my son to come
13　home, my older son, his brother.
14　　Q.　Is there anything else?
15　　A.　To answer my questions that I asked.
16　　Q.　Anything else?
17　　A.　An apology.
18　　Q.　What would you like them to apologize for?
19　　A.　Not taking care of my son.
20　　Q.　Miss Wilson, I don't know if it helps but --
21　let's take a moment.
22　　　　(Recess taken.)
23　BY MS. TROSS:
24　　Q.　Miss Wilson, I don't know if it helps in any

77

1　way, but I'm really sorry for your son's death.　And we
2　will do our best to get you answers to those questions
3　that you had, okay?
4　　A.　Thank you.
5　　Q.　Okay.　And what I would offer to you -- off the
6　record.
7　　　　(Discussion held off the record).
8　BY MS. TROSS:
9　　Q.　So I have two more questions I want to ask you
10　back on the record and then we'll be done.　Okay.　At
11　this time would you like to change your answer to any
12　question that I asked you?
13　　A.　No.
14　　Q.　Okay.　You also are permitted to make a
15　statement at this time in response to the case.　You
16　can't ask me any factual or legal questions because I'm
17　not a party, but if there is anything else you think I
18　should know to understand what happened you can say that
19　now.
20　　A.　I think that it's important for recordkeeping
21　for whatever happens in the court that is followed, that
22　order or whatever is followed with that inmate, whatever
23　is supposed to happen with that inmate, that they are
24　housed where they're supposed to be housed for an amount

20　(Pages 74 to 77)

Wilson v. Taylor, et al.
SUSIE A. WILSON

|  | 78 |
|---|---|
| 1 | of time that they're supposed to serve there and not any |
| 2 | additional time, that I think that puts them -- I think |
| 3 | it puts the inmate in danger when any inmate, not just |
| 4 | my son, anyone that's serving more time than they're |
| 5 | supposed to or not coming out at all, like my son should |
| 6 | have been home. I can't get over it. |
| 7 | MS. TROSS: Okay. We're done now. Thank |
| 8 | you Miss Wilson. |
| 9 | MR. SENSOR: We'll read and sign. Thank |
| 10 | you. |
| 11 | (Whereupon the Deposition concluded at |
| 12 | approximately 5:00 p.m.) |
| 13 | |
| 14 | INDEX |
| 15 | DEPONENT: SUSIE A. WILSON          PAGE |
| 16 | Examination by Ms. Tross          2 |
| 17 | EXHIBITS |
| 18 | SUSIE A. WILSON DEPOSITION EXHIBITS          MARKED |
| 19 | 1 Letter to Stan Taylor          40<br>2 Officer McDonald's report          55 |
| 20 | 3 2/10/05 letter from Jermaine Wilson          56<br>4 Administrative Warrant          58 |
| 21 | 5 Envelope with questions and answers          66<br>6 2/14/05 letter from Jermaine Wilson          66 |
| 22 | 7 Envelope with Aunt Laretta's notes          67 |
| 23 | ERRATA SHEET/DEPONENT'S SIGNATURE          PAGE 79<br>CERTIFICATE OF REPORTER          PAGE 80 |
| 24 | |

|  | 80 |
|---|---|
| 1 | State of Delaware)<br>                       ) |
| 2 | New Castle County) |
| 3 | CERTIFICATE OF REPORTER |
| 4 | I, Elaine G. Parrish, Registered |
| 5 | Professional Reporter and Notary Public, do hereby<br>certify that there came before me on the 24th of May,<br>2007, the deponent herein, SUSIE A. WILSON, who was duly |
| 6 | sworn by me and thereafter examined by counsel for the<br>respective parties; that the questions asked of said |
| 7 | deponent and the answers given were taken down by me in<br>stenotype notes and thereafter transcribed into |
| 8 | typewriting under my direction. |
| 9 | I further certify that the foregoing is a<br>true and correct transcript of the testimony given at |
| 10 | said examination of said witness. |
| 11 | I further certify that I am not counsel,<br>attorney, or relative of either party, or otherwise |
| 12 | interested in the event of this suit. |
| 13 | |
| 14 | Elaine G. Parrish |
| 15 | Certification No. 170-RPR |
| 16 | (Expires January 31, 2009) |
| 17 | DATED: May 30, 2007 |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | 79 |
|---|---|
| 1 | REPLACE THIS PAGE<br>WITH THE ERRATA SHEET |
| 2 | AFTER IT HAS BEEN<br>COMPLETED AND SIGNED |
| 3 | BY THE DEPONENT. |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

21 (Pages 78 to 80)