Stanley W. Taylor

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SUSIE A. WILSON, individually      :
and in her capacity as
administratrix of the Estate       :
of JERMAINE LAMAR WILSON,

                                   :

                Plaintiff,

                                   :

        vs.                            Civil Action No.
                                   :     05-821 SLR
STANLEY W. TAYLOR, JR.,
individually; PAUL HOWARD,         :
individually; NOREEN RENARD,
individually; THOMAS L. CARROLL,  :
individually; BETTY BURRIS,
individually; DAVID PIERCE,        :
individually; MICHAEL RECORDS,
individually; DAVID McDONALD,      :
individually; and SERGEANT
BOOM, individually,                :

                Defendants.     :
                                 - - -
            Deposition of STANLEY W. TAYLOR, JR.,

taken pursuant to notice in the offices of the

Delaware Department of Justice, Civil Division, Sixth

Floor, Carvel State Office Building, 820 North French

Street, Wilmington, Delaware, on Wednesday, January

24, 2007, at 1:50 p.m., before Lorraine B. Marino,

Registered Diplomate Reporter and Notary Public.

CORBETT & WILCOX
230 North Market Street
Wilmington, Delaware 19801
(302) 571-0510
Corbett & Wilcox is not affiliated with
Wilcox & Fetzer, Court Reporters

A000095

Stanley W. Taylor

2 (Pages 2 to 5)

Page 2

```
1   APPEARANCES:
2         MICHAEL L. SENSOR, ESQ.
          Perry & Sensor
3         One Customs House Square - Suite 560
          Wilmington, DE  19801
4          for Plaintiff
5         RALPH K. DURSTEIN, ESQ.
          ERICA Y. TROSS, ESQ.
6         Deputy Attorneys General
          Delaware Department of Justice
7         820 North French Street - Sixth Floor
          Wilmington, DE  19801
8          for Defendants
9            - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
1         STANLEY W. TAYLOR, JR., having been
2   first duly sworn, was examined and testified as
3   follows:
4   BY MR. SENSOR:
5       Q.    All right, Commissioner.  Good
6   afternoon.
7       A.    Good afternoon.
8       Q.    My name is Michael Sensor.  I
9   represent Susie Wilson in her own capacity and in her
10  capacity as administrator of the estate of her
11  deceased son, Jermaine Wilson.  And as you know, we
12  are here today to take your deposition.
13        I know you have given depositions in
14  the past.  I will try to give you some ground rules
15  and be fairly straightforward about it.  I am going to
16  ask you some questions about this incident and some
17  other questions generally regarding the Deparment of
18  Correction.  If you don't understand my question or
19  you are not clear, just ask me to repeat it or clarify
20  it.  Lawyers sometimes ask horrible questions, and I
21  will try to clarify it.
22        If you don't know or you don't
23  remember the answer to a question, just signify that,
24  and that's a perfectly valid answer.
```

Page 4

```
1         Of course, let's try not to talk over
2   each other so the court reporter can get everything
3   down.
4         And if you should need to take a
5   break, that is absolutely fine.  I hopefully won't
6   have you here long enough that we will need to take a
7   break.  Fair enough?
8       A.    Fair enough, yes, sir.
9       Q.    All right.  Sir, what documents have
10  you reviewed in preparation for your deposition today?
11      A.    I have read the original complaint and
12  our responses to the complaint.
13      Q.    All right.  Did you read the amended
14  complaint, too?
15      A.    Yes.
16      Q.    What other documents have you
17  reviewed?
18      A.    I read a summary of the response -- I
19  read a summary of the work -- a work product that I
20  had my records staff do back when this article first
21  came out, and I think that's it.
22      Q.    Did you review any of the documents
23  that your attorneys produced in response to my
24  discovery requests?
```

Page 5

```
1       A.    No.
2       Q.    Okay.  I have got a number of
3   documents here I will be reviewing with you, so if you
4   haven't seen them, you haven't seen them.  That's
5   fine.
6       A.    Right.
7       Q.    Sir, I know you have been deposed in
8   the past.  In connection with this matter -- and I
9   mean the death of Jermaine Wilson -- have you given
10  any other depositions?
11      A.    No, I haven't.
12      Q.    Have you been interviewed by anybody,
13  other than by your attorneys, concerning the matters
14  surrounding Mr. Wilson's death?
15      A.    No.
16      Q.    Did you give any statements to
17  anybody, including the United States Department of
18  Justice, relating to Jermaine Wilson's death?
19      A.    No.
20      Q.    Was Jermaine Wilson's death discussed
21  in any way during the United States Department of
22  Justice investigation into the Deparment of
23  Correction?
24      A.    No, not that I am aware of.
```

Stanley W. Taylor

Page 6

1    Q.    All right. Fair enough. And I
2  understand you weren't involved in every single moment
3  of that investigation.
4    A.    Right. There may have been
5  discussions with attorneys or what have you, but, no,
6  not that I was present at.
7    Q.    Okay. Could just give me a very brief
8  background of your history within the Department of
9  Correction?
10    A.    I just completed 30 years. I started
11  as a correction officer 1976; after about two and a
12  half years promoted to a counselor position, worked
13  there a couple of years; from there went to training
14  academy, eventually director of the training academy;
15  back to institution work as a security superintendent;
16  around '91, '92 became warden, '93 or so bureau chief.
17  Have been Commissioner of Correction since 1995.
18    Q.    Sure. And I understand that is a
19  cabinet-level position where you report directly to
20  the Governor.
21    A.    That's correct.
22    Q.    Okay.
23    A.    Nominated by the Governor, confirmed
24  by the Senate.

Page 7

1    Q.    Certainly. And I understand you are
2  about to enjoy your retirement.
3    A.    Three days.
4    Q.    Congratulations.
5    A.    Thank you. Looking forward to it.
6    Q.    Good. Underneath you, sir, would be
7  several bureau chiefs; correct?
8    A.    Correct.
9    Q.    And what chiefs are those?
10    A.    Chief of the Bureau of Prisons, and
11  that person is in charge of the Level V facilities.
12  The respective wardens report directly to that chief.
13  Chief of Community Corrections, who would be in charge
14  of Level IV facilities, work release and violation of
15  probation centers, and all of probation and parole.
16  And then a chief in charge of administrative services
17  that deals with purchasing, payroll, maintenance,
18  medical health care, food service, substance abuse
19  treatment, management information systems, I believe
20  captures most of it.
21    Q.    Is there a deputy commissioner who is
22  under you or do you go right to the bureau chiefs?
23    A.    I go right to the bureau chiefs.
24  There is a deputy principal assistant position, but

Page 8

1  that's been vacant for two years.
2    Q.    Okay. So I guess it is a fair
3  statement that was vacant as of February 2005?
4    A.    Yes.
5    Q.    Sir, and I am going to confine the
6  next couple of questions to the timeframe of February
7  2005. Did you go to any conferences outside the
8  Deparment of Correction concerning correctional
9  maintenance, correctional operations, anything like
10  that?
11    A.    I believe I would have attended
12  American Correctional Association meeting and my
13  Directors -- Association of State Correctional
14  Administrators meeting.
15    Q.    Is that something you would do on a
16  yearly basis?
17    A.    Try to. They are typically once a
18  year, and I probably get to every other one, but I
19  think in 2005 I was there. I would frankly have to
20  check to be sure, but --
21    Q.    Sure. What is the general agenda at
22  those sorts of meetings?
23    A.    It varies.
24    Q.    Okay.

Page 9

1    A.    It varies. It is typically things
2  that are hot, if you will, out there, but it varies
3  year to year. It is funded by the National Institute
4  of Corrections, but they can vary. They are typically
5  institutional management kinds of things.
6    Q.    Right. Now, when you say
7  institutional management, do any of the items that are
8  discussed at those seminars involve recordkeeping,
9  internal recordkeeping?
10    A.    Not that I recall.
11    Q.    Okay. Do any of those seminars
12  involve communication of information between different
13  facilities in the same system regarding inmates and
14  their whereabouts?
15    A.    No, not typically.
16    Q.    All right. Sir, are you aware of --
17  at the time of the incident involving Mr. Wilson, are
18  you aware of what the procedures were that were in
19  place at DOC for determining when an inmate's release
20  date was?
21    A.    Yes.
22    Q.    And what were those?
23    A.    The respective institutions would
24  receive all the sentencing data from the respective

Stanley W. Taylor

4 (Pages 10 to 13)

Page 10

1 courts, take that data, compile it into a unified
2 format and translate that into a -- calculate that
3 into a release date.
4     Q.     Was that information kept in paper
5 form or on computers or both, or how was it done?
6     A.     It is a function of both. Sometimes
7 information is received in an automated fashion.
8 Sometimes it is received mailed from the court.
9 Sometimes it is transported from the court by
10 correctional staff who may be at court. Sometimes it
11 is delivered by fax. Sometimes there is literally
12 conversation between records staff and prothonotaries
13 in the respective courts. So it can be in any number
14 of ways.
15     Q.     Right. At the time of this incident
16 did DOC keep actual physical paper files on each
17 inmate or probationer within its custody?
18     A.     Typically the information, the
19 sentencing information is going to be in the
20 respective institution that holds the offender. Some
21 of that information is also going to be in the
22 statewide computers, the DELJIS system. It is a
23 combination, again, of that information and some paper
24 information that comes from the court.

Page 11

1     Q.     Okay. So when we talk about the
2 records, you know, the DOC records, that is really a
3 combination of a physical paper file plus whatever is
4 on file from DELJIS and the other systems; fair
5 enough?
6     A.     Yes.
7     Q.     Are there any procedures or policies
8 in place as of February 2005 to audit those records to
9 determine whether they had correct information?
10     A.     From time to time the chief of
11 management services will send some of the more
12 experienced records staff out to the respective
13 facilities and do records checks, if you will, sample
14 checks to check on quality of work.
15     Q.     About how many times a year was that
16 done in February 2005?
17     A.     I couldn't tell you.
18     Q.     Who was the chief of management
19 services at that time?
20     A.     Joyce Talley.
21     Q.     Ms. Talley?
22     A.     Right.
23     Q.     Is this something that an outside
24 agency would be hired to do or was it done internally?

Page 12

1     A.     Done internally.
2     Q.     What, generally speaking, was done for
3 each audit?
4     A.     They would take a sample of records
5 and look at the supporting documentation, compare that
6 to what they calculated the release date to be and see
7 if it was accurately done and just do that on a number
8 of cases. If they would find errors or typical
9 mistakes, they would review that with the respective
10 records staff at the respective facility.
11     Q.     Okay. Sir, in the time since you have
12 been Commissioner of Corrections, do you know how many
13 inmates have committed suicide in Delaware
14 correctional facilities?
15     A.     Since the time I have been
16 commissioner?
17     Q.     Yes, sir.
18     A.     No. I can say on average it is about
19 two per year. I can say going back to 2000, we have
20 had -- calendar year 2000, we have had as few as zero
21 and as high as three in any given year. So that the
22 average is about two.
23     Q.     And those are inmate suicides, not
24 deaths?

Page 13

1     A.     Inmate suicides.
2     Q.     Okay. Are you aware, sir, of any
3 incident that has happened during your tenure as
4 Commissioner of Corrections where somebody had not
5 intended to commit suicide but was pretending to do so
6 and died as a result?
7     A.     I can't sit here and say that I know
8 that has occurred, but from time to time that is
9 speculated that that may have happened. There have
10 been times where partial strangulation can be
11 associated with sexual gratification as well. So that
12 has come up from time to time. But when somebody is
13 dead, frankly, you don't know what the motivation was.
14     Q.     Sure. I want to read you some names
15 and maybe you can, if you know, tell me what you know
16 about the inmate's cause of death. Do you remember
17 the death of somebody named -- excuse me. I am trying
18 to find the right page -- Edwin Corbin, who died on
19 April 25, 2000?
20     MR. DURSTEIN: Mike, before the
21 commissioner proceeds, let me just note an objection
22 here. I am not sure it would cause me to instruct him
23 not to answer this question. When we get into the
24 specifics of past inmate incidents that may impact on

A000098

Stanley W. Taylor

Page 14

1  medical conditions or medical records, we have a HIPAA
2  concern, and I think you understand that. I don't
3  think this question implicated that, but I would be
4  inclined to instruct the commissioner not to respond
5  in such a way as would disclose the contents of
6  private medical information for inmates, including
7  deceased inmates.
8  BY MR. SENSOR:
9      Q.    Right, right. And let me just
10  slightly rephrase that by saying what I am looking for
11  is cause of death, which is something that would be
12  released by the medical examiner, as opposed to the
13  specifics that led to it, cause of death being
14  asphyxia, what have you. Fair enough?
15     A.    Yes.
16     Q.    Okay. And again, tell me if you know.
17  If you don't know, then that is fine.
18          I have an individual named Edwin
19  Corbin, who died on April 25 of 2000. Do you have any
20  knowledge of the cause of death?
21     A.    No.
22     Q.    Okay. There was a gentleman named
23  Edward Sanders, who died on October 3, 2000, while in
24  the custody of the State of Virginia. He was

Page 15

1  transferred there. He was apparently a Delaware
2  inmate. Do you have any knowledge of why he died?
3      A.    No.
4      Q.    Okay. A gentleman named Edward
5  Coverdale, who died November 15 of 2000, at the Sussex
6  Correctional Institution. Same question.
7      A.    No. Let me -- maybe it would save you
8  some time. When we have a death, our procedure is to
9  find out what happened. The body is turned over to
10  the medical examiner. There is a review done there.
11  Our medical staff meet with -- there is a
12  mortality/morbidity review, and the causes of death
13  are looked at, and the treatment protocol is reviewed.
14          My job, the way I see it, is to ensure
15  that those kinds of processes are in place and taking
16  place. I do not focus on the person's name and the
17  respective cause of death. So if that would save you
18  the time relative to these questions.
19     Q.    Okay. Well, I guess what you are
20  telling me then is that you don't have knowledge of
21  specific inmate names and specific causes of death.
22  Fair enough?
23     A.    Correct.
24     Q.    You know the numbers but not the

Page 16

1  names?
2      A.    Correct; and generally, generally, the
3  causes.
4      Q.    Okay.
5      A.    I would not associate the cause with
6  the name.
7      Q.    Okay.
8      A.    For example, I mean --
9      Q.    Sure.
10     A.    -- typically, we will -- the leading
11  cause is typically a heart issue. Then there is
12  cancer. Then there are respiratory kinds of issues.
13  Then there are deaths associated with HIV, that sort
14  of thing. It is typically in that kind of descending
15  order. Very much what you would expect to see in
16  community statistics.
17     Q.    Sure. Well, let me -- are you aware
18  of any inmate other than Mr. Wilson who allegedly
19  committed suicide and died on the day of his release
20  or the day of his scheduled release?
21     A.    Any other inmate that committed
22  suicide or died on the day of his release. Is that
23  the question?
24     Q.    That was a poorly phrased question.

Page 17

1  The allegation here in this case is that Mr. Wilson
2  perished on the day he was scheduled to be released
3  and his body was apparently found hanging in the cell.
4  My question to you is, sir, are you aware personally
5  of any other inmate other than Mr. Wilson who died
6  under similar circumstances?
7      A.    On the day of his release.
8      Q.    Or the day he was scheduled to be
9  released.
10     A.    Scheduled to be released. No.
11     Q.    All right. Fair enough. Turning to
12  the facts of this incident itself, what is your
13  understanding of why Mr. Wilson died?
14     A.    That he hanged himself.
15     Q.    And do you know why he hung himself?
16     A.    No.
17     Q.    Are you aware that Mr. Wilson had been
18  asking other people, for instance, other correction
19  officers, to find out when he was scheduled to be
20  released?
21     A.    Yes.
22     Q.    Ms. Renard testified a few moments ago
23  that her understanding was that Mr. Wilson was
24  scheduled to be released February 18, which was the

Stanley W. Taylor

6 (Pages 18 to 21)

Page 18

1   day of his death. Was that your understanding as
2   well?
3        A.    Yes.
4        Q.    Are you aware that Mr. Wilson was
5   taken to court on February 10 on a violation of
6   probation and that probation was withdrawn, the VOP
7   was withdrawn?
8        A.    Yes.
9        Q.    Do you have any knowledge of why that
10  was withdrawn?
11       A.    No.
12       Q.    In connection with any investigations
13  into this matter, was that question ever asked?
14       A.    No.
15       Q.    Why is that?
16       A.    It is not out of the ordinary.
17       Q.    It is not out of the ordinary for
18  somebody to go in and for the probation to be
19  withdrawn that day?
20       A.    Correct.
21       Q.    Okay. Is that something that is done
22  by the court or is that done by the probation and
23  parole officer?
24       A.    The official action is always done by

Page 19

1   the court. A probation officer may recommend that
2   course of action. The court may decide that course of
3   action. But the court has to officially withdraw.
4        Q.    Do you have any knowledge of whether
5   or not that course was recommended to the court in
6   this case?
7        A.    I do not.
8        Q.    Have you discussed the facts of this
9   matter with Officer Records, who issued the initial
10  violation of probation?
11       A.    No, I haven't.
12       Q.    Who have you discussed the facts of
13  this with other than your attorneys?
14       A.    I have simply read the report from
15  internal affairs when it was done, so it has been a
16  while.
17       Q.    Okay. That was done by Ron Drake --
18       A.    Correct.
19       Q.    -- the institutional investigator?
20       A.    Correct.
21       Q.    Okay. So you did read that report?
22       A.    I read that report, and I recall a
23  verbal briefing contemporaneous with that.
24       Q.    Are you aware, sir, during your tenure

Page 20

1   as Commissioner of Corrections of any incidents where
2   inmates were having difficulty finding information
3   regarding their precise release date?
4        A.    Yes.
5        Q.    And are you aware of how many times
6   that has come to your attention during your tenure as
7   Commissioner of Corrections?
8        A.    To my personal attention? A few. And
9   let me give you an example of why I am saying yes, it
10  is an issue.
11            There is a fair amount of sentencing
12  in Delaware that includes suspensions of portions of
13  sentences contingent upon successful completion of
14  certain programming --
15       Q.    Right.
16       A.    -- which leaves things relative, if
17  you will, and that can be very confusing to offenders.
18  And so there is a fair amount of communication: "I
19  just completed this program or I am about to complete
20  this program. When will that -- how will that affect
21  my release date?"
22            And there is a process that typically
23  they flow down from an institutional level to a work
24  release, and those things can be contingent upon

Page 21

1   completion of, say, a substance abuse treatment
2   program. That adds a lot of confusion to the system.
3   It results in offenders writing letters to typically
4   classification staff, records staff. And sometimes I
5   am copied on those kinds of requests, so I can tell
6   from that activity that there is a fair amount of
7   confusion around that at times.
8        Q.    Sure. There is no doubt in your mind
9   that Mr. Wilson was supposed to be released on
10  February 18, 2005?
11       A.    I am relying on the work done by the
12  records staff that I asked to look at that, and that's
13  what they reported to me, that his release date should
14  have been the 18th.
15       Q.    And when we mean release, what I mean
16  by release, I am basically saying release to the
17  street.
18       A.    I believe he had other sentencing
19  levels to follow.
20       Q.    I believe Level III?
21       A.    I believe Level III.
22       Q.    Okay. So according to the records you
23  reviewed, as of February 18, he was to be released
24  from DCC, where he was being held on violation of

Stanley W. Taylor

Page 22

1  Level IV, down to Level III?
2      A.    I didn't review the records. I am
3  reviewing the report that the records staff gave me.
4  It was a brief summary, but their assessment was that
5  a full review, including records that were in the
6  court's possession at that time, would have made that
7  indication. That same report indicated to me that our
8  Deparment of Correction did not have that release in
9  our possession.
10     Q.    I see.
11     A.    And that led to the institution's not
12  having that information, and hence the response back
13  to Mr. Wilson that there doesn't seem to be that
14  release in his file.
15     Q.    I see. Okay.
16     A.    Typically --
17     Q.    I am sorry. Go ahead.
18     A.    Typically, what that occurs, when the
19  offender is asking about that, staff will call the
20  booking/receiving. If it is during business hours,
21  they will try to go right back to the court to clarify
22  the matter. If it is after court hours, they will
23  look at what file and paperwork and electronic file
24  information may be available and try to make an

Page 23

1  assessment. If it is not real clear, they will wait
2  till the next business day and approach the court for
3  classification. That is typically what happens.
4      Q.    Okay. You indicated there is a report
5  that was prepared by the records people. I want to
6  show you a document that was produced in discovery.
7  Just take a quick look at that, if you would, please.
8  (Pause) Is that the document you are referring to,
9  sir?
10     A.    The front page is -- it was more than
11  this. There were more documents than this. It
12  included the newspaper article. It included some
13  comments relative to the newspaper article. I believe
14  that was all.
15     Q.    Okay. And then there was apparently
16  an executive summary, if you will, regarding
17  Mr. Wilson's history in the system and his release
18  date?
19     A.    Yes.
20            MR. SENSOR: Okay. Can we mark that,
21  please?
22            (Taylor Deposition Exhibit No. 1 was
23  marked for identification.)
24

Page 24

1  BY MR. SENSOR:
2      Q.    Sir, do you have any personal
3  knowledge of when Mr. Wilson first began making
4  inquiry into his release date?
5      A.    No, I don't.
6      Q.    Do you have any knowledge from the
7  documents you have reviewed as to when he began
8  inquiring into his release date?
9      A.    Just the information that was in the
10  report by Ron Drake, which I believe indicated that
11  night. Whether there is anything before that, I am
12  not -- I don't recall.
13     Q.    Okay. Is the records department
14  generally open or available at least on a 24-hour
15  basis?
16     A.    The records staff are primarily the
17  traditional 8:00 to 5:00, though the records office is
18  open to watch commanders on a 24-hour basis. They
19  have somewhat limited ability to go beyond what is
20  immediately in front of them in the paperwork.
21     Q.    Right. So if a watch commander has a
22  need to look up information, say, at midnight, there
23  is at least some ability to do that?
24     A.    Correct.

Page 25

1      Q.    Okay. Would that involve going into
2  the computer system or would they have to look in the
3  physical file?
4      A.    They would attempt to do both.
5      Q.    All right. What is the procedure at
6  DOC or what was the procedure at DOC in effect at the
7  time of this incident when an inmate claimed a release
8  date but there is no supporting paperwork from the
9  court? What was done?
10     A.    I think I answered that before. But
11  typically, they would wait for the next court day. I
12  mean, if it is a weekday and it is 4:00 to 12:00 shift
13  or midnight shift, they are going to wait until 8:00
14  a.m., 9:00 a.m. the next day, when the court is going
15  to be in session, and typically a records staff will
16  contact a prothonotary of the respective court and try
17  to sort that out.
18            If it is a Friday night, then it is
19  going to wait until Monday morning.
20     Q.    Certainly.
21     A.    But that is typically the next
22  business day. The records staff would pick up the
23  information referred to them by the security staff or
24  whoever got the information from the inmate and carry

Stanley W. Taylor

8  (Pages 26 to 29)

Page 26

1   it forward from there.
2      Q.    Commissioner, in your experience
3   during your time as Commissioner of Corrections, is an
4   eight-day delay in getting information unusual,
5   release information?
6      A.    Can you be more specific?
7      Q.    Sure.  In this case it appears that
8   Mr. Wilson went to court on February 10, and the VOP
9   was withdrawn and apparently he was ordered released.
10  February 18 came about, and Mr. Wilson passed away,
11  which is the day he was supposed to be released.  My
12  question is:  In your experience as Commissioner of
13  Corrections, is an eight-day gap between the day a
14  court order is entered and the day information gets to
15  DOC unusual?
16     A.    I am aware that there are delays.
17  Sometimes the delays exceed that.  But how frequent
18  that occurs, I couldn't respond to you.  But there are
19  delays, and sometimes those delays are significant.
20     Q.    Who would have better knowledge of you
21  than the frequency of those delays?
22     A.    The records staff that deal with that
23  on a regular basis.
24     Q.    And the records staff, is that under

Page 27

1   Ms. Talley as chief of management services?
2      A.    Correct.
3      Q.    Okay.  Thank you.  Now, at some point
4   after Mr. Wilson passed away, were you contacted by
5   Representatives Oberle and Plant concerning this
6   incident?
7      A.    I recall being stopped at Legislative
8   Hall by Representative Oberle.  I don't recall being
9   asked about it by Representative Plant.
10     Q.    Do you recall receiving a letter about
11  this?
12     A.    Yes.  What I remember more is the
13  conversation with Bill Oberle.
14     Q.    What was the conversation?  What was
15  the nature of the conversation?
16     A.    He approached me in Legislative Hall
17  and asked about the case, what I thought about the
18  case, and I basically relayed to him what I had been
19  briefed on from my recollection of the report from Ron
20  Drake and Ron Drake's verbal report to me.
21        And I recall Representative Oberle
22  making some remarks concerning remarks that he had
23  heard, and I don't know whether he heard them directly
24  or indirectly from -- I don't know whether it was the

Page 28

1   ambulance driver or somebody that had seen the body
2   along the way and thought that the injuries, in his
3   view, were inconsistent with suicide.  And so he
4   expressed that to me, and I said there has been
5   nothing that I have seen in the reports up to that
6   point that indicated anything like that.
7      Q.    Right.
8      A.    But that was a very brief conversation
9   in Legislative Hall somewhere, sometime after the
10  incident, but I couldn't tell you specifically what
11  day that was.
12     Q.    Okay.  I just want to hand you a
13  letter that came to you or at least was dated
14  March 11, 2005, from those representatives.  Tell me
15  if you recall receiving that.
16     A.    Yes.
17     Q.    And do you also recall receiving the
18  second page to that letter, which is a number of
19  questions that was provided by Ms. Wilson and her
20  family regarding the incident?
21     A.    Yes.
22     Q.    Did you ever make contact with
23  Ms. Wilson or either of the representatives to address
24  those questions?

Page 29

1      A.    I believe a follow-up response was
2   prepared and sent back to the respective
3   representatives --
4      Q.    I want to hand you a letter --
5      A.    -- probably --
6      Q.    I am sorry.
7      A.    Excuse me.  Probably through the chief
8   of prisons.
9      Q.    Right.  That was my next question.  I
10  have a letter here dated March 15 of '05 from Chief
11  Howard to Reverend Johnson, which appears to respond
12  to that letter.  Do you recall seeing that letter?
13     A.    Yes.
14     Q.    Is that the response that you were
15  referring to, sir?
16     A.    No.  This is saying that the response
17  is being prepared.
18     Q.    Okay.
19     A.    Right.
20     Q.    Was a formal document or some letter
21  ever prepared which specifically responded to the 19
22  questions set forth in Ms. Wilson's letter of March 8?
23     A.    I believe so.
24        MR. SENSOR:  Please mark this.

Stanley W. Taylor

Page 30

1          (Taylor Deposition Exhibit Nos. 2 and
2    3 were marked for identification.)
3    BY MR. SENSOR:
4          Q.    Commissioner, is it your testimony
5    that Chief Howard would have prepared that formal
6    response?
7          A.    Not likely.
8          Q.    Do you know who would have?
9          A.    It would have probably been the
10   institution working with Ron Drake, people closest to
11   the information.
12         Q.    The institutional investigator?
13         A.    Yes.
14         Q.    Okay.  Do you know when that document
15   was prepared?
16         A.    I believe it was timely.
17         Q.    I mean roughly, do you know when?
18   March, April, May 2005?
19         A.    I would believe we would have returned
20   that -- this, the letter of request is dated March 11.
21   I believe we would have gotten that back within the
22   month, within March.  But I --
23         Q.    Sure.
24         A.    I don't recall specifically, no.

Page 31

1          Q.    Certainly.  Do you recall reviewing
2    that document before it was sent out?
3          A.    Yes.
4          Q.    Do you know who would have custody of
5    that document at the present time?
6          A.    No.
7          Q.    Okay.  Now, sir, at some point after
8    this incident occurred there were a number of articles
9    in the Wilmington News-Journal about some issues in
10   the prisons; correct?
11         A.    Yes.
12         Q.    Do you recall issuing a press release
13   essentially responding to those articles?
14         A.    Yes.
15         Q.    And included in that press release was
16   a response specifically to the article concerning
17   Mr. Wilson's death; right?
18         A.    Yes.
19         Q.    In that press release was it ever
20   disclosed that Mr. Wilson was scheduled to be released
21   on the day that he died?
22         A.    I don't recall.  But if you have it
23   here --
24         Q.    Yes, I do.  Just take a look at this.

Page 32

1    The specific part that deals with Mr. Wilson is on the
2    next to last page.
3          A.    (Pause) It does not.
4          MR. SENSOR:  Can we mark that, please?
5          (Taylor Deposition Exhibit No. 4 was
6    marked for identification.)
7    BY MR. SENSOR:
8          Q.    Sir, are you aware from your review of
9    the documents involving this matter whether or not
10   Mr. Wilson had ever exhibited suicidal tendencies or
11   thoughts or exhibited such before he died?
12         A.    Can you restate the question, please?
13         Q.    Sure.  That was terrible.  Are you
14   aware, sir, personally or based upon your review of
15   the information available to you whether Mr. Wilson
16   had exhibited any suicidal tendencies before he died?
17         A.    Not that I am aware of.
18         Q.    Okay.  Was that fact disclosed in the
19   press release we have just discussed?
20         A.    I don't believe so.
21         Q.    Okay.  Sir, in your time at the
22   Department of Correction as its commissioner, have you
23   ever experienced or become aware of a situation where
24   an inmate committed suicide without ever having

Page 33

1    exhibited suicidal ideations in the past?
2          A.    I don't specifically recall a case.
3          Q.    All right.  Sir, are you aware that
4    Mr. Wilson's mother was telephoned I believe by Chief
5    Howard to advise her of Mr. Wilson's death?
6          A.    No, I don't believe it was Chief
7    Howard.  I believe -- and I am going on my memory of
8    the report.  But I believe it was somebody at the
9    institution that actually made the phone call.  Chief
10   Howard would be central office, and I don't believe he
11   made the phone call.
12         Q.    Could it have been Mr. Pierce?
13         A.    I think so.
14         Q.    Okay.  What is the Deparment of
15   Correction's standard procedure to advise family
16   members of death?
17         A.    We are always in the position of
18   trying to get the information out to make the public
19   aware that we have had an incident in a timely
20   fashion.  We always try to notify family first.  So
21   our procedure is have somebody try to reach the family
22   as quickly as possible.  That's the procedure.  Make
23   contact.  They would start with the person of record
24   that is identified as the person the inmates indicate

Stanley W. Taylor

10 (Pages 34 to 37)

Page 34

1 to have information like that given to.
2         But there is no -- if you are asking
3 me about methodologies or ways of communicating that,
4 I mean, they try to do that as appropriately as they
5 possibly can. But the issue is mainly to make that
6 contact as quickly as possible.
7     Q.    Okay. Sir --
8     A.    And we hold up our press releases
9 until --
10    Q.    Sure.
11    A.    As long as possible, reasonably
12 possible, until that notice is accomplished.
13    Q.    Sure. And speaking of press releases,
14 turning back to Taylor 2, who prepared that press
15 release? Was that done by Ms. Welch? The one that
16 says, "Response to Inmate Health Care." Maybe I have
17 the wrong number.
18    A.    It is Taylor 4.
19    Q.    I apologize.
20    A.    This would have been some work by my
21 staff, some work by me, a review by lawyers. It would
22 have been the work of a number of hands.
23    Q.    Okay. Sir, are you aware that
24 Mr. Wilson's sentence from the Superior Court ordered

Page 35

1 that he serve Level IV at Plummer Center?
2     A.    No.
3     Q.    If that was in the order --
4     A.    I am aware that is reported. I was
5 not aware.
6     Q.    What is the Deparment of Correction's
7 procedure with regard to transferring inmates from one
8 Level IV facility to another when the court order
9 specifies that it be served at a certain center?
10    A.    We transfer within SENTAC levels. So
11 if someone is sentenced to work release, Plummer
12 Center is a work release facility. They can be moved
13 to any other Level IV facility as well. And again,
14 oftentimes that is occurring based on program
15 availability and that sort of thing. But we have
16 authority to move within SENTAC levels.
17    Q.    Is that done without seeking
18 permission from the court?
19    A.    Yes.
20    Q.    So if the court specifically orders,
21 say, Level IV at Plummer Center, is there a procedure
22 in place to ask the court to modify the order so that
23 Level IV can be served at any facility?
24    A.    No.

Page 36

1         MR. SENSOR: I think I am almost done
2 here, sir. Just give me one moment, please.
3         Commissioner, I have no further
4 questions. I thank you for your time and I wish you a
5 pleasant retirement.
6         THE WITNESS: Thank you, sir.
7         MR. DURSTEIN: Reserve reading and
8 signing.
9         - - -
10 (Deposition concluded at 2:30 p.m.)
11         - - -
12         INDEX
13 TAYLOR DEPOSITION EXHIBITS        Marked
14   1 Jermaine Wilson history, with
      attachments------------------------- 23
15
16   2 Letter dated 3/11/05, from
      Representatives Oberle and Plant to
      Commissioner Taylor------------------ 30
17
18   3 Letter dated 3/15/05, from Chief Howard
      to Reverend Johnson------------------- 30
19   4 Document entitled "Response to Inmate
      Health Care Articles," dated 9/30/05--- 32
20
21         - - -
22 (Exhibits attached to original transcript and copies.)
23
24

Page 37

1         CERTIFICATE
2         I, LORRAINE B. MARINO, Registered
3 Diplomate Reporter and Notary Public, do hereby
4 certify that the witness, STANLEY W. TAYLOR, JR.,
5 after being duly sworn by me, was examined by counsel
6 for the respective parties and the questions of said
7 witness and his answers were taken down by me in
8 stenotype notes and thereafter transcribed into
9 typewriting at my direction.
10        I certify that the foregoing is a true
11 and correct transcript of the testimony given at said
12 examination of said witness.
13        I further certify that the deposition
14 was made available to the witness for reading and
15 signing.
16        I further certify that I am not
17 counsel, attorney, or relative of either party, or
18 otherwise interested in the event of this suit.
19
20
21
22 Registered Diplomate Reporter and Notary Public
   Certificate No. 181PS/Exp.: Permanent
23
   Date: 2/2/07
24

Noreen Renard

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SUSIE A. WILSON, individually  :
and in her capacity as
administratrix of the Estate   :
of JERMAINE LAMAR WILSON,

                               :

            Plaintiff,

                               :

        vs.                        Civil Action No.
                               :      05-821 SLR
STANLEY W. TAYLOR, JR.,
individually; PAUL HOWARD,     :
individually; NOREEN RENARD,
individually; THOMAS L. CARROLL,:
individually; BETTY BURRIS,
individually; DAVID PIERCE,    :
individually; MICHAEL RECORDS,
individually; DAVID McDONALD,  :
individually; and SERGEANT
BOOM, individually,            :

            Defendants.    :
                    -  -  -
            Deposition of NOREEN RENARD, taken

pursuant to notice in the offices of the Delaware

Department of Justice, Civil Division, Sixth Floor,

Carvel State Office Building, 820 North French Street,

Wilmington, Delaware, on Wednesday, January 24, 2007,

at 1:09 p.m., before Lorraine B. Marino, Registered

Diplomate Reporter and Notary Public.


                CORBETT & WILCOX
                230 North Market Street
                Wilmington, Delaware 19801
                    (302) 571-0510
        Corbett & Wilcox is not affiliated with
            Wilcox & Fetzer, Court Reporters

www.corbettreporting.com

**A000105**

Noreen Renard

2  (Pages 2 to 5)

| Page 2 | Page 4 |
|---|---|

**Page 2**

1      NOREEN RENARD, having been first duly
2  sworn, was examined and testified as follows:
3  BY MR. SENSOR:
4      Q.    Good afternoon.
5      A.    Good afternoon.
6      Q.    My name is Michael Sensor, and I
7  represent Susie Wilson in her own capacity and as
8  administrator of the estate of Jermaine Wilson, who is
9  deceased.  And this is the time that we have set for
10  your deposition.
11          Have you ever been deposed in the
12  past?
13      A.    Yes, I have.
14      Q.    Okay.  At the risk of being
15  repetitive, I just want to go over some basic ground
16  rules.  I am going to ask you a series of questions.
17  I am going to try not to be repetitive and I will be
18  respectful of your time so we can get you out of here
19  in a relatively short period of time.
20          If there is anything you don't
21  understand about my question, please tell me.  It is
22  not unusual for lawyers to ask questions that make no
23  sense at first because we are usually thinking 17
24  steps ahead.  If you don't understand it, just tell

**Page 3**

1  me.
2          I would ask that you answer the
3  questions to the best of your knowledge and belief.  I
4  would ask you not to guess.  If you don't know, you
5  don't remember, just tell me that, and that's a
6  perfectly valid answer.
7          If you need to take a break at any
8  time -- hopefully we will not go so long that you will
9  need one, but if you do, just say so, and that's no
10  problem.
11          It is important all your answers be
12  verbal.  Let's try not to talk over each other so the
13  court reporter can take it all down.  And I think if
14  we follow those rules, we will be out of here fairly
15  quickly.  Fair enough?
16      A.    Yes.
17      Q.    Okay.  First of all, how many times
18  have you been deposed in the past?
19      A.    Approximately five or six times.
20      Q.    And were those in connection with
21  actions against either the State of Delaware, the
22  Department of Correction or yourself?
23      A.    They usually involved employee issues.
24      Q.    I see.  Have you ever been deposed in

**Page 4**

1  connection with an issue involving an inmate or
2  probationer?
3      A.    Yes.
4      Q.    How many times?
5      A.    I would say twice.
6      Q.    Do you remember what those cases were?
7      A.    No, I don't.
8      Q.    Approximately how long ago was it; do
9  you recall?
10      A.    Probably six to eight years ago.
11      Q.    Okay.  Did you review any documents
12  before your deposition today?
13      A.    Yes, I did.
14      Q.    And what did you review?
15      A.    I reviewed the complaint.
16      Q.    Any other documents?
17      A.    Just the documents related to the
18  complaint that were attached to the complaint.
19      Q.    Okay.  Other than discussions with
20  your attorneys, which I don't want you to tell me
21  about, have you had any discussions involving the
22  allegations in the complaint with anybody?
23      A.    Yes.
24      Q.    And who?

**Page 5**

1      A.    Initially, discussions with scheduling
2  with the commissioner and with Paul Howard --
3      Q.    All right.
4      A.    -- about scheduling.
5      Q.    Chief of the Prisons Bureau?
6      A.    Yes.
7      Q.    Did you bring any documents with you
8  today in connection with this matter?
9      A.    No, I did not.
10      Q.    At some point were you asked to review
11  documents in the possession of the Bureau of Community
12  Correction in response to discovery requests which
13  were submitted by the plaintiff?
14      A.    I am not sure I understand.
15      Q.    Okay.  At some point were you asked by
16  your attorneys to review any documents that you or
17  your office might have concerning Jermaine Wilson?
18      A.    Just the documents that were attached
19  and part of the complaint.
20      Q.    Okay.  So you provided no documents to
21  your attorneys in connection with responding to any
22  requests?
23      A.    No.
24      Q.    Okay, fair enough.  I just want to ask

Noreen Renard

Page 6

1  you some very basic background questions. What is
2  your educational history?
3      A.    I have a master's in education and
4  counseling.
5      Q.    And where was that from?
6      A.    From Trenton State College.
7      Q.    You have a bachelor's degree, I
8  assume?
9      A.    Yes, I do.
10     Q.    And where was that from?
11     A.    From the University of Maine.
12     Q.    What is your employment history?
13     A.    I became employed with the Deparment
14 of Correction in 1978 as a probation/parole officer,
15 was a probation/parole officer for eight years,
16 promoted to a supervisor, supervisor of
17 probation/parole for four years, promoted to a
18 warden's position and was in that position for three
19 years, and then became bureau chief of community
20 corrections in 1993.
21     Q.    Did I hear you say at one point you
22 were in the position of a warden?
23     A.    Yes.
24     Q.    And what facility was that?

Page 7

1      A.    The Pretrial Annex.
2      Q.    Which facility is that at?
3      A.    That facility is now called the Webb
4  facility.
5      Q.    Okay. I understand. And when were
6  you the warden of the Pretrial Annex?
7      A.    From approximately 1990 to 1993.
8      Q.    In the hierarchy of the Deparment of
9  Correction, who is your immediate superior?
10     A.    The commissioner of corrections.
11     Q.    Mr. Taylor?
12     A.    Yes.
13     Q.    And who reports to you?
14     A.    My direct reports include my deputy as
15 well as the director of probation and parole and the
16 wardens of the work release and violations centers and
17 a few administrative support-type positions.
18     Q.    And those centers, the wardens
19 reporting to you would include CVOP, SVOP, Plummer?
20     A.    Yes.
21     Q.    And Webb?
22     A.    No.
23     Q.    No. What sort of facility is Webb
24 now?

Page 8

1      A.    Webb is a Level V minimum security
2  facility.
3      Q.    Okay. Other than CVOP, SVOP and
4  Plummer, do any other wardens report to you?
5      A.    I have three wardens that report to
6  me.
7      Q.    Okay. Who is the deputy director
8  under you?
9      A.    The deputy director would be — deputy
10 bureau chief would be Joe Paesani.
11     Q.    How do you spell that?
12     A.    P-A-E-S-A-N-I.
13     Q.    And who is the director of probation
14 and parole?
15     A.    Alan Grinstead.
16     Q.    I guess the easiest way to start is to
17 ask you if you are familiar with the facts surrounding
18 the death of Jermaine Wilson.
19     A.    I am familiar with the facts as they
20 were included in the complaint that was filed.
21     Q.    Other than the complaint, do you have
22 any independent knowledge of the facts surrounding
23 Mr. Wilson's death?
24     A.    I am not sure how to answer that.

Page 9

1      Q.    Okay. Well, other than what you read
2  in the complaint, were you aware that Jermaine Wilson
3  passed away in the DCC in February 2005?
4      A.    Yes.
5      Q.    How did you become aware of that?
6      A.    There was discussion within the office
7  that there had been a death at the Delaware
8  Correctional Center, and I believe we also had a
9  newspaper article that day or the day after.
10     Q.    Okay. Was there a report made to you
11 or was this just more office talk?
12     A.    It was office talk at that time, yes.
13     Q.    At some point did you receive formal
14 written or oral reports concerning Mr. Wilson's death?
15     A.    No, I did not.
16     Q.    At any point did you become aware that
17 Mr. Wilson was being held in DCC after a violation of
18 probation at CVOP?
19     A.    Yes, I became aware of that.
20     Q.    And when was that?
21     A.    Probably the day or the day after his
22 death.
23     Q.    And how did you become aware of that?
24     A.    I am not sure who told me that, but I

A000107

Noreen Renard

4 (Pages 10 to 13)

Page 10

1 was told that he had been at CVOP prior to being at
2 DCC.
3     Q.    What is your understanding of why he
4 was in CVOP?
5     A.    From my understanding, he had
6 previously been sentenced to a period of
7 incarceration, and in the process of moving through
8 the various sentencing levels, he had moved to the
9 level which would place him in the Central Violation
10 Center.
11     Q.    And do you know what Mr. Wilson's
12 release date from CVOP was to be?
13     A.    At that time?
14     Q.    Yes.
15     A.    No.
16     Q.    Did you subsequently come to an
17 understanding of what that date was?
18     A.    After, yes, after his death.
19     Q.    And what date was that to be?
20     A.    The date of?
21     Q.    Let me ask that again. After his
22 death what understanding did you come to as to
23 Mr. Wilson's release date?
24     A.    His release date from his Level IV

Page 11

1 sentence was February 18, I believe. But I would have
2 to check the documents that we have on release
3 information.
4     Q.    Sure. February 18, 2005?
5     A.    Right.
6     Q.    Are you aware that's also the day that
7 he died?
8     A.    Yes.
9     Q.    All right. How did you become aware
10 that his release date was February 18, 2005?
11     A.    Again, after his death, in the
12 discussions about his death, there was discussion of
13 the sentence and the fact that he had been at CVOP and
14 was at DCC.
15     Q.    Now, when you say that your
16 understanding is the date of his release was to be
17 February 18 of '05, does that also mean that was the
18 date he was to be released from DCC for his violation?
19     A.    My understanding was that was the
20 release date from the Level IV portion of his
21 sentence.
22     Q.    Okay. At some point either before or
23 after Mr. Wilson's death did you read or review the
24 incident report for the event which led to his

Page 12

1 violation of probation?
2     A.    Yes.
3     Q.    Okay. I would just like to put a
4 document in front of you. If you could take a moment
5 to review that.
6     MR. SENSOR: Erica, I will try to get
7 you a copy.
8     (There was a pause.)
9 BY MR. SENSOR:
10     Q.    Have you had an opportunity to review
11 that document?
12     A.    Yes, I have.
13     Q.    Have you reviewed it before today?
14     A.    Yes.
15     Q.    When was the last time you believe you
16 reviewed it?
17     A.    Probably yesterday.
18     MR. SENSOR: Okay. Could we mark
19 that, please, Renard 1.
20     (Renard Deposition Exhibit No. 1 was
21 marked for identification.)
22 BY MR. SENSOR:
23     Q.    Ma'am, what is your understanding of
24 why Mr. Wilson was -- why an administrative warrant

Page 13

1 was filed alleging a violation of probation?
2     A.    My understanding was that on the day
3 that he was moved to DCC, he had been involved in an
4 incident of talking within the hallways, not complying
5 with orders to stop that behavior, was moved to the
6 holding cell, and continued to be disruptive and
7 defiant.
8     Q.    And as a result I believe it was
9 Officer Records filed an administrative warrant?
10     A.    Yes.
11     Q.    Have you discussed the facts of this
12 matter with Officer Records at any time --
13     A.    No.
14     Q.    -- either before or after the
15 complaint was filed?
16     A.    Not that I recall.
17     Q.    Okay. Are you aware that Mr. Wilson
18 was taken to Superior Court on February 10 for that
19 violation?
20     A.    Yes.
21     Q.    And are you aware that the violation
22 was withdrawn?
23     A.    Yes.
24     Q.    Do you have any knowledge of why that

Noreen Renard

Page 14

1  violation was withdrawn?
2      A.    I don't know specifically why that was
3  withdrawn.
4      Q.    Do you have a general idea of why it
5  was withdrawn? Let me rephrase that. I am not trying
6  to be difficult. Your attorneys in response to my
7  interrogatories have stated that nobody knows why the
8  violation was withdrawn. That's basically a summary
9  of what the answer was. And what I am trying to
10  understand is if you have any knowledge whatsoever of
11  why Officer Records or somebody within the Bureau of
12  Community Correction would have withdrawn this
13  violation of probation.
14      A.    I do not know specifically why it was
15  withdrawn.
16      Q.    Okay. Generally speaking, what
17  reasons would there be for a probation and parole
18  officer to withdraw a violation of probation?
19      A.    First, I think it is important to
20  understand that any withdrawal of a violation of
21  probation, the withdrawal is actually a court matter.
22  The officer can make a recommendation, but the officer
23  does not have the authority to withdraw a violation of
24  probation without court approval.

Page 15

1      Q.    Sure. So if you have a situation
2  where, for instance, a violation of probation is filed
3  and for whatever reason the officer, the
4  probation/parole officer decides that perhaps it is
5  something that shouldn't be followed through, is it
6  your testimony that the officer would have to go to
7  the court and request that the court withdraw it?
8      A.    The officer would have to request
9  court approval on any withdrawal.
10      Q.    Okay. Is there any procedure in place
11  where court approval for a withdrawal was not sought
12  or is it always done by the court?
13      A.    I frankly don't know all the specifics
14  of how that process works.
15      Q.    You indicated a moment ago that you in
16  connection with your preparation today reviewed the
17  documents which were provided with the complaint and
18  some other documents. Did you see the transcript of
19  the violation of probation hearing before Judge Cooch?
20      A.    Yes, I did.
21      Q.    Was there anything in that transcript
22  which indicated that the court was going to withdraw
23  the violation?
24      A.    I could not tell from that transcript

Page 16

1  what the intention was.
2      Q.    The intention of the court or the
3  officer?
4      A.    Either one.
5      Q.    Have you spoken to the officer who was
6  present in the courtroom that day either before or
7  after this suit was filed concerning what may have
8  happened that day?
9      A.    No, I have not.
10      Q.    Do you know what officer was present
11  that day? I don't believe it was Mr. Records.
12      A.    Her first name is Doreen.
13      Q.    Okay. Fair enough. But is it clear
14  to you that that violation was withdrawn on
15  February 10 one way or the other?
16      A.    Yes. I saw documentation after the
17  fact that there had been a withdrawal.
18      Q.    If I may, I just want to hand you what
19  has already been marked as Burris 6. Just take a
20  moment to review that, if you would. Have you seen
21  that before?
22      A.    Yes, I have.
23      Q.    And does that confirm the withdrawal
24  of the violation of probation?

Page 17

1      A.    Yes, it does.
2      Q.    And I also want to hand you what was
3  already marked as Burris 5. If you could just take a
4  look at that. I am sorry to toss it to you. Have you
5  seen that before?
6      A.    Yes.
7      Q.    And does that document indicate that
8  Mr. Wilson was to be released?
9      A.    Yes.
10      Q.    Now, did you ever see that document
11  before you reviewed materials in connection with your
12  deposition?
13      A.    I don't believe I did.
14      Q.    All right. Have you seen documents
15  like what we just showed you as Burris 5 and 6 in the
16  past in similar formats?
17      A.    Yes.
18      Q.    Are those what are generally sent to
19  the Deparment of Correction to indicate that an
20  inmate -- either a violation has been withdrawn or
21  that an inmate is to be released?
22      A.    Yes.
23      Q.    All right. I noted in the transcript
24  which was provided, filed with the complaint, that

Noreen Renard

6 (Pages 18 to 21)

Page 18

1  apparently Mr. Wilson indicated through counsel he
2  wanted a contested hearing.
3      A.    Yes.
4      Q.    Have you ever in your experience as
5  director of the Bureau of Community Correction
6  experienced a situation where a probationer requested
7  a contested hearing only to have it withdrawn that
8  day?
9      A.    Yes, that does happen.
10     Q.    Okay. In the past what reasons have
11 there been for such a withdrawal on the day of a
12 contested hearing, if you can recall?
13     A.    That is such a broad question, because
14 there could be so many reasons that I couldn't even
15 begin to list all of those reasons.
16     Q.    Sure. Well, it appears that no
17 hearing was actually held that day, on the day
18 Mr. Wilson requested a contested hearing. So I guess
19 phrased a little differently, have you ever
20 experienced a situation where an inmate demands a
21 contested hearing, no hearing is actually held that
22 day, and then the same day the violation is withdrawn?
23     A.    I am not close enough to what happens
24 on the day-to day with the scheduling of hearings to

Page 19

1  know what the usual format of that is.
2      Q.    Sure. I understand. I also want to
3  show you a document which was produced by your
4  attorneys that was Bates-marked 281 through 293. And
5  I suspect this duplicates in part what we already
6  showed you. Just take a moment to review that, if you
7  would.
8      A.    (Pause) This document here, Form
9  905 --
10     Q.    Yes.
11     A.    -- I have not seen that before.
12     Q.    Okay.
13     A.    (Pause) I have not seen the next
14 document.
15     Q.    And just to stop you, what is the
16 Bates -- the number on the lower right-hand corner of
17 that document, ma'am?
18     A.    D00287.
19     Q.    Thank you.
20     A.    And I don't remember seeing this one,
21 D00288. (Pause) Okay.
22         MR. SENSOR: Would you mark that,
23 please.
24         (Renard Deposition Exhibit No. 2 was

Page 20

1  marked for identification.)
2  BY MR. SENSOR:
3      Q.    Ma'am, with the exception of the pages
4  that you haven't seen before, can you identify those
5  documents for me?
6      A.    Okay. The first document is a cover
7  sheet for a violation report for Level IV, followed by
8  the Exhibit B, history, service request, Exhibit A,
9  and the central violation orientation signature page,
10 program violation, another program violation, arrest/
11 incident form, and another arrest/incident form, and
12 another arrest/incident form. They are all a
13 continuation.
14     Q.    Are all those documents related to --
15 well, with the exception of the ones you haven't seen
16 before, related to the altercation with Jermaine
17 Wilson that led to his violation?
18     A.    Yes.
19     Q.    Who was responsible, if anybody, for
20 reviewing such documents after they have been produced
21 or prepared by the probation and parole officer? Let
22 me rephrase that.
23         Is there an administrative or
24 supervisory okay on those forms?

Page 21

1      A.    Yes.
2      Q.    And who would do those?
3      A.    Okay. The violation report would be
4  approved by a probation supervisor, and the incident
5  reports would generally be approved by a shift
6  commander, shift supervisor.
7      Q.    And do you have any role in reviewing
8  or okaying those reports at any time?
9      A.    Not directly, no.
10     Q.    Indirectly do you have any reason at
11 any point to review those?
12     A.    They would come to my attention if
13 they were directed to me by the warden or if there was
14 some other unusual circumstance that would require me
15 to be notified to review the forms.
16     Q.    Did such a circumstance exist in
17 connection with Jermaine Wilson's incident that
18 required you to review them?
19     A.    After his death and it was reported
20 that he was at the Central Violation Center and DCC, I
21 reviewed the reports at my request.
22     Q.    Did you see or notice anything out of
23 the ordinary in those reports?
24     A.    No.

Noreen Renard

Page 22

1       Q.      Did you in the course of your
2    preparation for this deposition have an opportunity to
3    review the narrative letter that Mr. Wilson wrote to
4    Judge Cooch setting forth his side of the story?
5       A.      I did not see that letter until the
6    package was received, the complaint.
7       Q.      Sure. But you did have a chance to
8    review that at some point?
9       A.      As part of the complaint, yes.
10      Q.      Is it a fair statement that there is a
11   dispute between the now late Mr. Wilson and Officer
12   Records as to what exactly happened that day?
13      A.      I would have to look at his letter
14   again.
15      Q.      Okay. After an inmate is -- after a
16   violation of probation is withdrawn by the court, how
17   does the Bureau of Community Correction know to
18   release an inmate? Or release a probationer? I guess
19   he is not technically an inmate.
20      A.      Okay. If the individual was being
21   housed within a community corrections facility, there
22   is a process -- and again, I don't know how mail and
23   how forms are directed through the court back to the
24   institutions precisely. But that information would be

Page 23

1    sent back to the facility where the offender is being
2    held. And upon receiving the official court order,
3    court document, then the person would be processed for
4    release.
5       Q.      Okay. If the inmate such as
6    Mr. Wilson in this case is being held at Level V --
7       A.      Right.
8       Q.      -- on a violation, does your bureau
9    get involved in that in any way?
10      A.      Usually not.
11      Q.      Are there exceptions to that rule?
12      A.      Occasionally, a form or a document
13   could be sent to the wrong institution, and then we
14   will forward that information to wherever the offender
15   would be held.
16      Q.      Do you have any knowledge of whether
17   the court order withdrawing the probation was sent to
18   CVOP in this case?
19      A.      I don't know.
20      Q.      Do you have any knowledge of where it
21   was sent at all?
22      A.      No.
23      Q.      Okay. Fair enough. Now, it is my
24   understanding that Mr. Wilson was violated because he

Page 24

1    apparently violated several rules of the CVOP. Is
2    that correct?
3       A.      Yes.
4       Q.      And which rules are those?
5       A.      He was failing to obey direct
6    orders/commands and being disruptive in the facility,
7    was refusing to stop speaking when directed to do so.
8       Q.      If my review of the documents is
9    correct, the initial violation was essentially because
10   he was talking in the hall I guess on the way back
11   from chow?
12      A.      Yes.
13      Q.      What level of security exists at CVOP?
14   In other words, is it a facility where persons are in
15   shackles and manacles all the time or do they have
16   some freedom to move about?
17      A.      They have a limited freedom to move
18   about. It is a highly structured facility where
19   offenders are given very specific directions as to
20   their comings and goings, their activities, their
21   schedule for the day.
22      Q.      And is it correct that nobody can
23   enter or exit the facility without going through a
24   security clearance?

Page 25

1       A.      They cannot enter or exit without
2    going through a security door, yes.
3       Q.      Right. Is the front security
4    screening any different than, say, at DCC or another
5    Level V facility?
6       A.      Yes.
7       Q.      And in what way?
8       A.      It is not as intensive as far as
9    individuals coming and going out of the facility may
10   not be thoroughly strip-searched each and every time
11   they enter or leave the facility, depending on how
12   they entered or left the facility.
13      Q.      Right. Now, internally what sort of
14   housing are probationers set up in? In other words,
15   are they in individual cells or are they in --
16      A.      Oh, in this particular facility it is
17   a dormitory-type setting, approximately 24 beds to 30
18   beds in each dormitory.
19      Q.      Thank you. You just answered my next
20   question. And how many dormitories are there in total
21   in the entire facility?
22      A.      There are ten dormitory structures.
23      Q.      So the total population in CVOP is
24   probably around 250, plus or minus?

Noreen Renard

8 (Pages 26 to 29)

Page 26

1    A.    It was 232 today.
2    Q.    Okay. If an inmate -- I say inmate.
3 I really mean probationer. They are not inmates, so
4 forgive me.
5        But if a resident of CVOP happens to
6 run afoul of one of the rules of CVOP, what discretion
7 does the Bureau of Community Correction have to
8 violate or not violate?
9    A.    It is discretionary as far as if there
10 are technical noncriminal violations, those technical,
11 noncriminal violations of rules can be
12 administratively handled within the institution or
13 they can be referred to the court if it is deemed that
14 they are significant or repetitive enough to warrant
15 court attention.
16    Q.    What was it about what Mr. Wilson
17 allegedly did on the day of I guess it was January 25
18 that led to the issuance of an administrative warrant
19 versus handling it internally?
20    A.    The refusal to cooperate with commands
21 and directions, and once being directed to move to the
22 holding area, not being cooperative while within the
23 holding area, continuing to be defiant and to act out
24 while in the holding area.

Page 27

1    Q.    One of the warrants executed by or the
2 warrant executed by Officer Records indicates that
3 Mr. Wilson was cap-stunned to avoid damage to state
4 property. Do you recall seeing that?
5    A.    Yes.
6    Q.    And what state property is it that was
7 in danger of being damaged?
8    A.    The door, in particular the glass, as
9 well as the bench facility that is within there, and
10 just generally the holding cell area.
11    Q.    What sort of substance covers the
12 door? Is it plexiglass? Is it regular glass? What
13 is it?
14    A.    It is a metal door with security glass
15 within the window.
16    Q.    Is there any indication that
17 Mr. Wilson actually broke that glass that you know of,
18 to the extent you know?
19    A.    To the extent I know, the glass was
20 not broken.
21    Q.    The bench that is inside the cell,
22 what sort of bench is that? What is it made of?
23    A.    It is a composite-type material. I
24 don't know specifically.

Page 28

1    Q.    Sure. Is it bolted to the wall or
2 otherwise fastened or secured?
3    A.    To the floor, yes.
4    Q.    Do you know of any incidents where an
5 inmate has damaged such a bench by kicking it or
6 otherwise acting out inside a holding cell?
7    A.    Not specifically.
8    Q.    There is also some indication in the
9 documents that Mr. Wilson had incurred previous
10 program violations.
11    A.    Yes.
12    Q.    And what is your knowledge of what
13 those violations were, if any?
14    A.    He had refused on two occasions to
15 participate in the work crew activity.
16    Q.    Were those prior program violations
17 reflected in the document that I believe we marked as
18 Renard 2? It is right there.
19    A.    (Pause) Yes. It indicates that he
20 refused to participate in outside work projects.
21    Q.    And what work projects were those that
22 he refused to participate in?
23    A.    I don't know which specific projects.
24    Q.    Can I just see that for a second,

Page 29

1 please? Okay. I am looking at under Renard 2 the
2 documents which are Bates-marked 287 and 288. I
3 realize those are the forms that you indicated you
4 hadn't seen before.
5    A.    Right.
6    Q.    But generally, are those forms that
7 are used to indicate a program violation?
8    A.    Yes.
9    Q.    All right. What does the first
10 document indicate that the program violation was?
11    A.    He failed to -- he refused an order.
12 He refused -- let's see. It is listed under "Other."
13 From what I can read here, it sounds like he refused
14 to pick up trash. The writing is not very clear.
15    Q.    Sure. And how about the other one.
16 Are you able to tell what that was?
17    A.    He refused to work.
18    Q.    Does it say why he refused to work?
19    A.    It says because he wasn't issued a
20 pair of long-johns bottoms or some type of clothing.
21    Q.    And what was the date of that second
22 program violation, if you can tell from that document?
23    A.    January 19.
24    Q.    The transcript from the actual

Noreen Renard

Page 30

1  violation hearing indicates that Mr. Wilson had been
2  seen by something called the NIT board for his first
3  write-up. What is the NIT board?
4      A.    I think that might be an error in the
5  initials. I think it is -- usually it is the MDT. It
6  is the Multidisciplinary Team. But some institutions
7  use different initials and have different local names.
8      Q.    Is that essentially an internal
9  disciplinary committee that decides what is going to
10  happen to somebody who commits a program violation?
11      A.    Yes.
12      Q.    It was also alleged by Officer Records
13  that one of the other reasons Mr. Wilson was
14  cap-stunned was to prevent damage to himself or staff.
15  Now, do you recall that allegation?
16      A.    Repeat that again, please.
17      Q.    Sure. I am going back to the
18  initial -- to the incident that led to the VOP. There
19  was an allegation in the administrative warrant that
20  one of the reasons Mr. Wilson was cap-stunned was to
21  prevent damage to state property, which we have
22  discussed, damage to himself, or damage to staff. Do
23  you recall that?
24      A.    Yes.

Page 31

1      Q.    From your review of those documents,
2  is there any indication that Mr. Wilson was in danger
3  of harming himself?
4      A.    Whenever anyone is banging in a
5  holding cell, there is a possibility.
6      Q.    How about damaging or injuring staff?
7      A.    If staff are interacting, there is the
8  possibility.
9      Q.    Okay. Short of administering cap-stun
10  to an inmate in Mr. Wilson's position, did your bureau
11  have any other policies or procedures in force or
12  effect at the time of that incident to subdue an
13  inmate in that condition?
14      A.    We follow department training on the
15  use of force and the continuum of use of force.
16      Q.    And what is the department procedure
17  on use of force?
18      A.    I can't tell you all the specifics of
19  it except that it is essentially use of force is
20  necessary -- whatever appropriate use of force is
21  necessary to control the individual from harming
22  someone else, themselves, or property.
23      Q.    Finally, are you aware of any other
24  incident that has occurred during your time in the

Page 32

1  Department of Correction where an inmate was found
2  dead on the day he was supposed to be released?
3      A.    Do I know? No, not specifically.
4      MR. SENSOR: Okay. Thank you. Those
5  are my questions. Thank you for your time.
6      MR. DURSTEIN: Reserve reading and
7  signing.
8              ---
9      (Deposition concluded at 1:48 p.m.)
10              ---
11              INDEX
12  RENARD DEPOSITION EXHIBITS              Marked
13   1  Arrest/incident report, dated 1/25/05---   12
14   2  CVOP violation report, dated 2/9/05-----   19
15              ---
16  (Exhibits attached to original transcript and copies.)

Page 33

1              CERTIFICATE
2      I, LORRAINE B. MARINO, Registered
3  Diplomate Reporter and Notary Public, do hereby
4  certify that the witness, NOREEN RENARD, after being
5  duly sworn by me, was examined by counsel for the
6  respective parties and the questions of said witness
7  and her answers were taken down by me in stenotype
8  notes and thereafter transcribed into typewriting at
9  my direction.
10      I certify that the foregoing is a true
11  and correct transcript of the testimony given at said
12  examination of said witness.
13      I further certify that the deposition
14  was made available to the witness for reading and
15  signing.
16      I further certify that I am not
17  counsel, attorney, or relative of either party, or
18  otherwise interested in the event of this suit.
19
20
21
22  Registered Diplomate Reporter and Notary Public
     Certificate No. 181PS/Exp.: Permanent
23
24  Date: 2/2/07

Warden Thomas Carroll

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SUSIE A. WILSON, individually :
and in her capacity as        :
administratrix of the Estate  :
of JERMAINE LAMAR WILSON,     :
deceased, and in her capacity :
as next friend of Z.W., a     :
minor,                        :
                              :  Civil Action
        Plaintiffs,           :  No. 05-821 SLR
                              :
            vs.               :
                              :
STANLEY W. TAYLOR, JR.,       :
individually; PAUL HOWARD,    :
individually; NOREEN RENNARD, :
individually; THOMAS L.       :
CARROLL, individually; BETTY  :
BURRIS, individually; DAVID   :
PIERCE, individually; MICHAEL :
RECORDS, individually; DAVID  :
McDONALD, individually; and   :
SERGEANT BOOM, individually,  :
                              :
        Defendants.           :
                   -   -   -

            Deposition of THOMAS CARROLL, taken
pursuant to notice before Gail Inghram Verbano, CLR,
CSR, RMR, in the law offices of  Delaware Department
of Justice, 820 North French Street, 6th Floor,
Wilmington, Delaware 19801, on Thursday, March 1,
2007, beginning at approximately 11:48 a.m.


                   -   -   -


            CORBETT & WILCOX
230 N. Market Street - Wilmington, Delaware 19801
            (302) 571-0510


        Corbett & Wilcox is not affiliated with
            Wilcox & Fetzer, Court Reporters

www.corbettreporting.com

Warden Thomas Carroll

2 (Pages 2 to 5)

Page 2

1  APPEARANCES:
2        MICHAEL L. SENSOR, ESQ.
         PERRY & SENSOR
3        Suite 560, One Customs House
         Wilmington, Delaware 19899
4        Attorney for Plaintiffs
5     RALPH K. DURSTEIN, ESQ.
      STATE OF DELAWARE
6     DEPARTMENT OF JUSTICE
      Carvel State Office Building
7     6th Floor, 820 North French Street
      Wilmington, Delaware 19801
8        Attorney for Defendants
9  ALSO PRESENT:
10       Jennifer Mitchell
11
12
13
14        THOMAS CARROLL, having first been
15  duly sworn according to law, was examined and
16  testified as follows:
17          - - -
18          EXAMINATION
19  BY MR. SENSOR:
20     Q  Warden Carroll, my name is Michael
21  Sensor. I represent the Estate of Jermaine Wilson in
22  connection with a claim that's been brought against
23  several defendants, and this is the time that we've
24  set for your deposition.

Page 3

1          Have you ever given deposition
2  testimony before?
3     A  No.
4     Q  Okay. Mr. Durstein may have given you
5  some ground rules. I'll try to be very brief and
6  succinct.
7          I'm going to ask you a series of
8  questions regarding not only this incident but also
9  some policies and procedures which may have been in
10  effect at DCC at the time of this incident.
11          I'd like to ask you to answer the
12  questions to the best of your knowledge and belief.
13  If you don't know the answer or you don't remember
14  it, just tell me that; that's a perfectly valid
15  answer. If you don't understand one of my
16  questions -- which can happen; sometimes lawyers ask
17  crazy questions -- just tell me you didn't understand
18  and I'll try to rephrase it.
19          And I'd also ask that we not talk
20  over each other, because the court reporter can only
21  take down one person at a time. So far that hasn't
22  been an issue here.
23          If you don't tell me you don't
24  remember or don't know or don't understand, I'll

Page 4

1  proceed from that assumption. Fair enough?
2     A  Fair enough.
3     Q  Okay. I understand, sir, you're
4  currently the warden at the Delaware Correctional
5  Center?
6     A  Yes.
7     Q  Could you give me a brief outline of your
8  educational background.
9     A  Yes. I have a bachelor's degree from the
10  University of Delaware in 1977. I have a master's
11  degree from the University of Delaware in 1984. And
12  I've received other trainings, both in-state and
13  through the National Institute of Corrections.
14     Q  Has all of your outside training been
15  with the National Institute of Corrections, or have
16  other facilities provided it?
17     A  I've gone to a program through Duke
18  University. I've gone through some programs through
19  State personnel, which is now Office of Management
20  and Budget. But they've been primarily pretty much
21  through NIC.
22     Q  All right. How many of those I'll call
23  continuing education classes would you estimate
24  you've taken through your career with DOC?

Page 5

1     A  Six, seven, eight, something like that.
2     Q  And give me an outline of your background
3  with DOC, if you would.
4     A  Okay. I came to the Department of
5  Correction in April of 1980. During my time with the
6  department, I have been a correctional counselor; I
7  have been an inmate classification officer; I have
8  been a training administrator; and I've been the
9  warden of three separate institutions.
10     Q  What institutions have you been the
11  warden of?
12     A  Morris Correctional Institution in Dover,
13  which is now called Morris Community Correctional
14  Center; Webb Correctional Facility in Wilmington; and
15  the Delaware Correctional Center.
16     Q  Okay. And what year did you become
17  warden of the Delaware Correctional Center?
18     A  2001.
19     Q  Can you tell me -- and I realize this may
20  be a lengthy question to answer, as I found with the
21  prior deponent. But can you give me a thumbnail
22  sketch of your responsibilities as warden in
23  February 2005.
24     A  As the warden of the institution, I have

A000115

Warden Thomas Carroll

3 (Pages 6 to 9)

**Page 6**

1  overall administrative responsibility for the
2  Delaware Correctional Center.
3      Q   So every -- basically every department or
4  subunit within the prison ultimately reports to you?
5      A   Those subunits that are part of the
6  Bureau of Prisons report to me. The way the
7  Department of Correction is organized, there are some
8  other subunits that report to folks outside of my
9  immediate chain of command and outside of my
10  institution.
11          But every part of the Bureau --
12  just about every part of the Bureau of Prisons on my
13  property, within my fence -- let me say that --
14  reports to me, yes.
15      Q   Okay. In February 2005, which units
16  within DCC were not part of the Bureau of Prisons?
17      A   Food service. Education is part of the
18  Bureau of Prisons but does not report to me. Medical
19  is contracted; and medical, their direct report is
20  the Bureau of Management Services.
21          Maintenance is the Bureau of
22  Management Services.
23          Those are pretty much -- the best I
24  can recall -- trying to go through the compound --

**Page 7**

1  best I can recall, from the fence in, for me.
2          We have a concrete plant on the
3  site that reports -- that's in the Bureau of Prisons
4  but reports to the deputy bureau chief.
5          We have our court and
6  transportation and emergency response team that is a
7  subunit of the Bureau of Prisons and reports to the
8  bureau chief, does not report directly to me. But
9  they are on the campus, for lack of a better term, of
10  my institution.
11      Q   Sure. So issues regarding inmate
12  classification, would anybody in charge of inmate
13  classification report to you?
14      A   Indirectly, yes. They would report to me
15  through other subordinate supervisors or managers.
16      Q   What other subordinate supervisors or
17  managers would they be?
18      A   The treatment administrator.
19  Classification -- the classification personnel report
20  to the treatment administrator; the treatment
21  administrator reports to me.
22      Q   And how --
23      A   It's akin, Mr. Sensor, to being -- it's
24  analogous to being the Secretary of Department of

**Page 8**

1  Defense for the federal government. You have a whole
2  bunch of folks through various layers and various
3  functional areas. But they are the administrative,
4  responsible entity.
5      Q   I understand.
6          How about inmate records?
7      A   Inmate records at my institution reports
8  to me. They report through a deputy warden. Records
9  reports through a deputy warden, and then ultimately
10  to me.
11      Q   Which deputy warden would they report
12  through?
13      A   I believe they are under Deputy Warden
14  Burris.
15      Q   That is Elizabeth or Betty Burris?
16      A   Yes, yes.
17      Q   All right. Are you familiar with the
18  facts surrounding the death of Jermaine Wilson?
19      A   I have an understanding of those facts,
20  yes.
21      Q   What's your understanding of the facts?
22      A   It's that, unfortunately, Jermaine Wilson
23  committed suicide on a Friday night in February of
24  2005.

**Page 9**

1      Q   Do you have an understanding of what day
2  he was scheduled to be released?
3      A   I understand, from the action that has
4  been filed against me, that that reports that he was
5  due to be released on February 18th or 19th of
6  2005. I don't know the exact day.
7      Q   Other than reviewing the pleadings in the
8  matter that was filed, did you have an independent
9  understanding of what day he was scheduled to be
10  released?
11      A   I have -- other than the pleadings? I do
12  not recollect a specific understanding of his
13  scheduled release date, no.
14          I was out of the state. I was out
15  of -- perhaps out of the country when this happened.
16  I was on leave and was on a cruise in the western
17  Carribean. I returned to Florida the Saturday after
18  Jermaine expired.
19      Q   I see. And how did you first learn of
20  the incident?
21      A   I received a briefing by one of my
22  subordinate staff when I checked in by telephone
23  either upon returning to the state that day, that
24  Saturday or Sunday.

Warden Thomas Carroll

4 (Pages 10 to 13)

Page 10

1    I don't — I don't have a specific
2  recollection that I got notified by this person on
3  this date or this time. It would have been most
4  likely that's how it would have happened.
5      Q  Okay. Other than that notification, did
6  you — were you questioned or otherwise participate
7  in any investigations concerning his death?
8      A  I — whenever we have a serious incident
9  of this type, an investigation would routinely occur,
10  and it did in this case. The results of that
11  investigation were forwarded to me, and I then became
12  aware of the facts as delineated in that
13  investigation by reviewing material produced during
14  that investigation.
15      Q  Was that the investigation conducted by
16  Mr. Drake?
17      A  Yes.
18      Q  Did you review anything generated by the
19  Delaware State Police in connection with their
20  investigation?
21      A  Yes.
22      Q  And did you review the report or did you
23  discuss it with the detective who conducted the
24  investigation?

Page 11

1      A  I reviewed the report. I've had no
2  personal contact with the detective.
3      Q  Did you have any personal contact with
4  Investigator Drake after he finished his report?
5      A  Yes. Investigator Drake worked for me.
6      Q  Okay. And what did — what was the
7  nature of that contact with Investigator Drake?
8      A  I would have contact with Investigator
9  Drake on a daily basis over a whole series of issues.
10  He was one of two institutional investigators
11  employed at my site.
12      Q  Sure. Did you discuss this specific
13  incident with Mr. Drake?
14      A  I'm sure that, in reviewing the report, I
15  had some conversation with him. That would just be
16  natural. This is a very serious circumstance.
17      Q  Do you have a specific recollection of
18  any conversations with Mr. Drake concerning this
19  incident?
20      A  No.
21      Q  Okay. Did you discuss this incident with
22  Director Taylor at all?
23      A  My immediate supervisor was Bureau Chief
24  Howard. I would have had contact with Bureau Chief

Page 12

1  Howard as a result of that.
2      Q  All right. Commissioner Taylor is what I
3  should have said.
4      A  Yes.
5      Q  So Chief Howard you had discussions with
6  concerning this incident?
7      A  I had — yes. I mean, we would have had
8  conversations about the investigation occurring, and
9  he would have been apprised of what the findings
10  were.
11      Q  And do you have any recollection of what
12  the nature of your discussion with Chief Howard was?
13      A  No specific recollection.
14      Q  Okay. In February of 2005, do you know
15  what policies were in place at —
16      If you need to get that, go ahead.
17  Off the record.
18      (Telephonic interruption.)
19  BY MR. SENSOR:
20      Q  Let me try again.
21      I'm going to ask you questions
22  regarding the time frame of February '05 --
23      A  Okay.
24      Q  -- just to make it easier. I'm not going

Page 13

1  to have to repeat it every time.
2      Were any policies in place that you
3  know of at DCC to determine when inmates were ordered
4  to be released by the court?
5      A  Specific policies are related to the
6  computation of information by the inmate records
7  section and related to the receipt of correspondence
8  by records from the courts; which then records
9  personnel handle and do that.
10      There are records -- the records
11  section would have -- I believe would have policies
12  in regard to how sentences are computed and things of
13  that nature.
14      Q  Are those policies in writing?
15      A  I do not know.
16      Q  Is that something the records department,
17  or whoever is in charge of records at DCC, might be
18  better equipped to answer?
19      A  I would assume so.
20      Q  Did you have any responsibility for
21  reviewing or approving policies?
22      A  Department -- Bureau of Prisons policies
23  or Delaware Correctional Center policies, yes. In
24  some of the specialized areas, such as certain highly

Warden Thomas Carroll

Page 14

1  technical things, I'm not the approving authority.
2      Q   Sure. But in terms of these release
3  policies that we've just discussed, would that be
4  something that you would review and/or approve?
5      A   No.
6      Q   Who would be ultimately responsible for
7  reviewing and/or approving them?
8      A   I'm not sure.
9      Q   Who would be a better person to ask to
10  get that answer?
11      A   There is a -- I don't know exactly when
12  this occurred.
13          There's a central records function
14  within the department, and there are some folks in
15  that area. They -- if there would be anyone, it
16  would be them.
17      Q   So that's a central records function
18  within the entire DOC?
19      A   Yes.
20      Q   Is that something that's under the Bureau
21  of Administrative Services?
22      A   Management services.
23      Q   Management services?
24      A   Yes.

Page 15

1      Q   So perhaps Joyce Talley might be someone
2  to talk to about that?
3      A   Joyce Talley is the bureau chief. I
4  believe -- while it falls under her area of purview,
5  I do not believe that she would have the technical
6  knowledge in regard to the policies. But I believe
7  she would probably know who would.
8      Q   Okay. So when we had discussed earlier
9  areas within DCC that would not report to you, would
10  central records functions also be one of them?
11      A   Records would report -- the records staff
12  and the records personnel would report to me.
13  They -- if they're going to call off sick, they would
14  call off to my institution.
15          The development of policy -- I
16  don't have the expertise to develop policy related to
17  records. That's kind of a hybrid. I would describe
18  it as being a hybrid.
19      Q   Okay. So those policies are generally --
20  would generally be developed within management
21  services?
22      A   Yes. Yeah.
23      Q   Okay.
24      A   And the folks in the central records area

Page 16

1  would do training and would -- you know, things like
2  that.
3      Q   Are you aware of what procedures were in
4  place at DCC to respond to an inmate's inquiry
5  regarding his release date?
6      A   I'm not sure what you mean by
7  "procedures."
8      Q   Okay. Let's say an inmate approaches a
9  CO and says, Could you find out when I'm supposed to
10  be out of here, because I think I may be beyond my
11  date.
12          Do you know what, if any, policies
13  or procedures were in effect to carry out that
14  request?
15      A   I would not be able to quote a specific
16  policy or procedure. The practice would be that they
17  would inquire. And the inmate would have an
18  opportunity to send a note to the records area, to
19  send a note to their counselor, to send a note to the
20  area lieutenant, to send a note to the deputy
21  warden's office or the records supervisor.
22          I'm not sure that you can quantify
23  that and say that there's a policy that says, A
24  correctional officer shall do this. It's -- it's a

Page 17

1  normal operational practice.
2      Q   Inmate classification, that was something
3  within your realm of oversight?
4      A   Yes.
5      Q   What, if any, policies were in effect to
6  determine whether an inmate or detentioner would be
7  placed in the SHU?
8      A   The placement of a detentioner would be
9  based on their -- at that time, there's no formal
10  written policy. It would be based on their
11  behavioral history.
12      Q   Would it -- strike that.
13          Was there anything unusual about a
14  detentioner being placed in SHU?
15      A   No. There is a unit in SHU that is used
16  for housing detentioners.
17      Q   So there are actually subunits within the
18  whole SHU?
19      A   Yes.
20      Q   So there is a detentioner unit. And what
21  other units are there within SHU?
22      A   Inmates sentenced to death, protective
23  custody, isolation, detentioner, and SHU housing.
24      Q   So SHU housing would be SHU housing for

Warden Thomas Carroll

6 (Pages 18 to 21)

| Page 18 | Page 20 |
|---|---|

**Page 18**

1   an inmate assigned to DCC who, for whatever reason,
2   needed to be in that housing unit?
3       A   Yes.
4       Q   Do you know which one of those subunits
5   Jermaine Wilson was in at the time of his death?
6       A   I believe he was in 18D.
7       Q   What's 18D?
8       A   That is the unit for detentioners in
9   building 18. Building 18 is one of the security
10  housing unit buildings.
11      Q   Are you aware of what factors were
12  analyzed in determining the placement of Jermaine
13  Wilson into 18D?
14      A   Specifically, no.
15      Q   Do you have any general understanding?
16      A   I could venture a guess. I'm not sure
17  that you want me to venture a guess in a deposition.
18      Q   Well, based upon your professional
19  judgment and experience, do you have an idea of why
20  he might have been in there?
21      A   An individual who has been disorderly,
22  disruptive, threatening, who has exhibited disorderly
23  behavior would be placed or could likely be placed in
24  that unit.

**Page 20**

1       Q   I'm sorry. By a sentencing court.
2       A   Paperwork would come, whether that would
3   be through the mail, through being dropped off by
4   court and transportation personnel or through being
5   faxed. They would be the three -- to the best of my
6   knowledge, they would be the three general ways
7   through which paperwork would be transferred or
8   provided to the institution.
9       Q   Do you know if the records people -- or
10  the records department, I should say -- had any
11  electronic link with the courts through their docket
12  system or DELJIS?
13      A   I do not -- we can -- I believe we have
14  access to DELJIS. The specificity in regard to where
15  that goes and what that is -- has access to, I do not
16  know.
17      Q   Okay. Let's say a number of inmates or
18  detentioners come back from court and they were all,
19  say, coming up from New Castle, or down from
20  New Castle County. Who is responsible for making
21  sure that the court's orders or determinations
22  regarding sentencing is communicated to DCC?
23      A   The court.
24      Q   Who is responsible, within DOC, for

| Page 19 | Page 21 |
|---|---|

**Page 19**

1       Q   Okay. And it's your testimony that, at
2   the time of his death, there was no formal written
3   policy concerning classification of detentioners into
4   SHU?
5       A   Detentioners are not classified.
6   Classification is a function of sentenced defenders.
7       Q   Okay. Well, let me rephrase.
8           There is no formal written policy
9   regarding determining whether or not a detentioner
10  was to be placed in SHU?
11      A   Correct.
12      Q   Can you tell me what people or units were
13  responsible for making those placement decisions.
14      A   The initial decision would be made by the
15  shift commander in consultation with other staff upon
16  the receipt of the offender; or if an offender had
17  been -- was in the institution and behaves
18  inappropriately, they would be transferred for the
19  safe, secure operation of the institution.
20      Q   Are you able to tell me what procedures
21  or methods were in place in February 2005 for
22  information concerning release dates to be
23  transferred or communicated to DCC?
24      A   To be communicated by whom?

**Page 21**

1   bringing documents back to DCC?
2       A   I just described to you three methods by
3   which they get there: One is by mail, one is by
4   court transportation staff, and the third is by fax.
5       Q   Do the transportation staff actively seek
6   that information from the court?
7       A   I do not know that.
8       Q   Who would know that?
9       A   I would assume someone in the
10  transportation unit. There are literally dozens and
11  dozens of offenders, hundreds of offenders who are
12  transported back and forth to courts each day.
13      Q   Sure. And the transportation unit is
14  directly under the Bureau of Prisons?
15      A   Yes.
16      Q   Other than the deposition that you're
17  giving today and the discussions you've mentioned
18  earlier with Investigator Drake, have you discussed
19  the facts of this case with anybody else?
20      A   I've had a discussion with my attorneys.
21      Q   Sure. I don't want to know about that.
22  Anyone else?
23      A   An incident of this significance would
24  have -- I'm sure I've had discussions with Deputy

A000119

Warden Thomas Carroll

Page 22

1  Warden Pierce or Deputy Warden Burris as far as an
2  operational concern, obviously. But in regard to the
3  specifics of this case, no.
4          MR. SENSOR: Okay, sir. I don't
5  have any other questions. I thank you for your time.
6          THE WITNESS: Thank you very much.
7          MR. DURSTEIN: We'll read this one
8  as well.
9          (Deposition concluded at 12:12 p.m.)
10         C E R T I F I C A T I O N
11
12
13         I hereby certify that I have read
14  the foregoing transcript of my deposition testimony,
15  and that my answers to the questions propounded, with
16  the attached corrections or changes, if any, are true
17  and correct.
18
         ----------------------------
19         THOMAS CARROLL
20
21         I N D E X
22  WITNESS:                    PAGE
23  THOMAS CARROLL
24     Mr. Sensor              2

Page 23

1   CERTIFICATE OF SHORTHAND REPORTER
2
3          I, Gail Inghram Verbano, CSR, RMR,
4   CLR, the officer before whom the foregoing
5   proceedings were taken, do hereby certify that the
6   foregoing transcript is a true and correct record of
7   the proceedings; that said proceedings were taken by
8   me stenographically and thereafter reduced to
9   typewriting under my supervision; and that I am
10  neither counsel for, related to, nor employed by any
11  of the parties to this case and have no interest,
12  financial or otherwise, in its outcome.
13
14
15
16         ----------------------------
           Gail Inghram Verbano, CSR, RMR, CLR
17         CSR No. 8635
           Certification No.: 220
18         (Expires 1-31-2008)
19
20
21
22
23
24

**A000120**

Elizabeth Burris

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SUSIE A. WILSON, individually :
and in her capacity as
administratrix of the Estate :
of JERMAINE LAMAR WILSON,
                              :
          Plaintiff,
                              :
     vs.                         Civil Action No.
                              :     05-821 SLR
STANLEY W. TAYLOR, JR.,
individually; PAUL HOWARD,    :
individually; NOREEN RENARD,
individually; THOMAS L. CARROLL,:
individually; BETTY BURRIS,
individually; DAVID PIERCE,   :
individually; MICHAEL RECORDS,
individually; DAVID McDONALD, :
individually; and SERGEANT
BOOM, individually,           :

          Defendants.    :
                        -  -  -
          Deposition of ELIZABETH BURRIS, taken

pursuant to notice in the offices of the Delaware

Department of Justice, Civil Division, Sixth Floor,

Carvel State Office Building, 820 North French Street,

Wilmington, Delaware, on Wednesday, January 24, 2007,

at 11:00 a.m., before Lorraine B. Marino, Registered

Diplomate Reporter and Notary Public.


                CORBETT & WILCOX
             230 North Market Street
            Wilmington, Delaware 19801
                 (302) 571-0510
          Corbett & Wilcox is not affiliated with
             Wilcox & Fetzer, Court Reporters

www.corbettreporting.com

Elizabeth Burris

2  (Pages 2 to 5)

Page 2

1  APPEARANCES:
2       MICHAEL L. SENSOR, ESQ.
     Perry & Sensor
3     One Customs House Square - Suite 560
     Wilmington, DE 19801
4        for Plaintiff
5     RALPH K. DURSTEIN, ESQ.
     ERICA Y. TROSS, ESQ.
6     Deputy Attorneys General
     Delaware Department of Justice
7     820 North French Street - Sixth Floor
     Wilmington, DE 19801
8        for Defendants
9            - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1        ELIZABETH BURRIS, having been first
2  duly sworn, was examined and testified as follows:
3  BY MR. SENSOR:
4     Q.    Good morning --
5     A.    Good morning.
6     Q.    – Deputy Warden Burris. My name is
7  Michael Sensor, and I represent Susie Wilson, who is
8  the administrator and mother of the estate of Jermaine
9  Wilson, who is the gentleman who died at the Delaware
10  Correctional Center back in 2005. And this is the
11  time that we have set for your deposition.
12        I just want to go over some basic
13  ground rules with you. First, have you ever been
14  deposed before?
15     A.    Yes.
16     Q.    Okay. I don't want to belabor
17  anything that you have been told before or that
18  Mr. Durstein may have told you, but I am going to ask
19  you a series of questions about not only the facts of
20  the incident but also some questions regarding
21  policies and procedures in place at DCC. If at any
22  time you don't understand one of my questions, please
23  tell me. It is not unusual for lawyers to ask
24  confusing questions that make no sense, so please tell

Page 4

1  me if you don't understand. If you don't know or you
2  don't remember an answer, just tell me that, and that
3  is a perfectly valid answer.
4        If you can't hear me, certainly
5  signify by saying so.
6        It is also important that you stop
7  talking -- you don't talk over me, and I won't talk
8  over you, so the court reporter can take everything
9  down.
10        And I think if we follow those rules,
11  we will be in pretty good shape. Do you have any
12  questions?
13     A.    No.
14     Q.    Okay. And I will be respectful of
15  your time. I understand you are busy, and I will
16  attempt to make this as streamlined as possible. Fair
17  enough?
18     A.    Thank you.
19     Q.    All right. Could you just give me a
20  brief background of your history in the Delaware
21  Deparment of Correction?
22     A.    I began working at the Delaware
23  Correctional Center December 1983 as an administrative
24  officer I, was promoted to administrator officer II

Page 5

1  March 1986. That position was later reclassified to
2  support services manager.
3        I was promoted to deputy warden II
4  January 1999 and am still in that position today.
5     Q.    You mentioned a number after the term
6  deputy warden. Are there different degrees of deputy
7  warden?
8     A.    Yes. At our institution there is a
9  deputy warden II, which I am, and then a deputy warden
10  I, which is under me. And then I am not sure what are
11  the other designations. That is at DCC.
12     Q.    Sure. So basically you are the chief
13  deputy warden?
14     A.    Yes.
15     Q.    Okay. In the hierarchy of the
16  Department of Correction, who is your immediate
17  superior?
18     A.    The warden.
19     Q.    Okay. And that is Mr. --
20     A.    Warden Carroll.
21     Q.    Mr. Carroll, Warden Carroll. And then
22  Warden Carroll would report to?
23     A.    The bureau chief.
24     Q.    Right. Mr. Howard?

Elizabeth Burris

Page 6

1    A.    Yes.
2    Q.    And then Mr. Howard would then report
3  to Commissioner Taylor; correct?
4    A.    That's correct.
5    Q.    What is your educational background?
6    A.    I have a bachelor's degree in business
7  education from the University of Delaware, 1975.
8    Q.    Okay.  Have you attended any
9  post-college seminars, training sessions, anything
10  like that, in corrections?
11    A.    Yes, I have.
12    Q.    And what have you attended?
13    A.    Based totally on memory, I have
14  attended several National Institute of Corrections
15  courses in Colorado and in other satellite locations,
16  training offered through state personnel for the State
17  of Delaware, as well as training within the Department
18  of Correction.
19    Q.    Okay.  About how many seminars or
20  training sessions do you normally attend per year
21  outside the Department of Correction?
22    A.    Currently not hardly any at all.  More
23  so when I was coming up through my career.
24    Q.    Sure.

Page 7

1    A.    I am nearing retirement next year,
2  so --
3    Q.    Oh, congratulations.
4    A.    Thank you.
5    Q.    Hopefully you will go somewhere a
6  little warmer than it is today.
7            How many training sessions a year do
8  you estimate you attend within the Department of
9  Correction?
10    A.    Currently, I attend training at our
11  facility.  We do on-site, on-shift training for our
12  employees four hours per month, and I try to attend
13  those when I can.
14    Q.    Sure.  I would like to ask you the
15  same questions but confined to the timeframe of the
16  calendar year 2005.
17    A.    Okay.
18    Q.    Again, what training programs did you
19  attend either within or without the Department of
20  Correction as of 2005?
21    A.    I don't recall.
22    Q.    All right.  Fair enough.  Have you
23  ever been deposed in the past concerning anything
24  relating to the incident involving Jermaine Wilson?

Page 8

1    A.    No.
2    Q.    Have you been deposed in the past
3  concerning the United States Department of Justice
4  investigation of the Deparment of Correction?
5    A.    No.
6    Q.    Did you give any statements, whether
7  written or oral, in connection with the U.S. DOJ
8  investigation?
9    A.    Can you explain "statement"?
10    Q.    Sure.  A statement -- let me rephrase
11  that.  That was kind of a poor question.
12            At any time were you interviewed by
13  any person -- and I don't want to ask you any
14  questions about conversations with your attorneys,
15  either Mr. Durstein, Ms. Tross, or anyone else working
16  for the state.  But were you ever interviewed by a
17  person acting on behalf of the Department of Justice
18  in connection with the U.S. DOJ investigation?
19    A.    No.
20    Q.    Was there any time when somebody would
21  have sat down and asked you questions with a court
22  reporter present but no other attorney on the other
23  side?
24    A.    Oh, no.

Page 9

1    Q.    Okay.  Let's talk about the incident
2  involving Jermaine Wilson.  I assume you are familiar
3  with the facts of his death?
4    A.    That's correct.
5    Q.    All right.  How did you first become
6  aware that there was an incident involving Jermaine
7  Wilson's death?
8    A.    I was the on-call person for the
9  Delaware Correctional Center on the night of the
10  incident, so I received a phone call shortly after he
11  was discovered.
12    Q.    And who did you receive that phone
13  call from?
14    A.    The shift commander.
15    Q.    Who was the shift commander at that
16  time?
17    A.    Major Scarborough.
18    Q.    All right.  And what did Major
19  Scarborough tell you?
20    A.    To the best of my recollection --
21    Q.    Sure.
22    A.    -- that there was an incident in
23  Building 18 in which an inmate -- he probably named
24  the inmate.  He would have had very preliminary

Elizabeth Burris

4  (Pages 10 to 13)

Page 10

1  information. Inmate was discovered attempting to hang
2  himself.
3        I would have told him, you know, get
4  me more information. And during the course of the
5  next few minutes rather he would have put me on hold,
6  and I don't recall exactly how I got the information,
7  but when it was all said and done, he would have told
8  me the inmate's name. At that point staff did not
9  feel a pulse, were performing CPR.
10       At one point I had him put me --
11  transfer my call to the housing unit so that I could
12  get on-the-scene information from the staff as to, you
13  know, the time of discovery, those types of things,
14  because not only was I on call; I was the acting
15  warden. The warden was out of the state.
16       Q.   I see.
17       A.   So I knew that I had to brief --
18  number one, I had to figure out if I needed to
19  respond, who I wanted to respond, and then I needed to
20  brief my superiors.
21       Q.   I see. Let me just back up a tiny
22  bit. You mentioned that the call came from
23  Building 18; correct?
24       A.   No. The call came -- well, I am not

Page 11

1  sure where Major Scarborough was, but it came from the
2  shift commander.
3        Q.   Okay. That was a poorly phrased
4  question.
5        The incident apparently occurred in
6  Building 18; correct?
7        A.   That's correct.
8        Q.   What sort of inmates were housed in
9  Building 18 at the time of the incident?
10       A.   One tier of inmates is death penalty
11  inmates. One tier are protective custody inmates.
12  One tier is administrative segregation, isolation,
13  acting-out behavior, inmates who present an immediate
14  threat to the safe and secure operation of the
15  facility and/or themselves and others.
16       And the other tier are detentioners,
17  of which Mr. Wilson was one, whose behavior is such
18  that it is not felt that they will be successful and
19  that they would be disruptive to the safe and secure
20  operation of general-population detentioners.
21       Q.   Now, when you mention tiers -- and I
22  am coming into this with very little knowledge of how
23  a prison is physically laid out. I have certainly
24  been in prisons before to visit clients. Tell me what

Page 12

1  a tier is. Is that a floor or a wing? What is it?
2        A.   A tier is a housing area. That
3  building has four tiers, upper and lower floors. So
4  in this particular tier housing component there is two
5  floors, but it is all in the same tier. It is a wing
6  of the building.
7        Q.   I understand. So, for instance, on
8  the wing where Mr. Wilson was housed, one floor would
9  have contained, for instance, pretrial detentioners or
10  VOP detentioners such as him, who were considered a
11  slightly higher security risk; correct?
12       A.   Not the floor. The whole tier.
13       Q.   Okay. Well, I am trying to understand
14  the difference between a floor and a tier. Are a
15  floor and a tier the same thing?
16       A.   Okay. The tier is, in essence, the
17  wing, and there are four wings --
18       Q.   Okay.
19       A.   -- A, B, C, D. He was on D tier.
20  Each wing has two floors, stairs that go from the
21  lower to the upper.
22       Q.   I see.
23       A.   And the cells are designated, for
24  example, 18D Lower 1. You know, whatever his

Page 13

1  designation was, I would have known or could have told
2  that it was upper or lower.
3        Q.   I understand. So this would have been
4  your classic kind of X-shaped prison building. Is
5  that how it was laid out?
6        A.   That's correct.
7        Q.   All right. And then in the center
8  would have been, say, the control, the control pod?
9  What would have been in the center of the X-shaped
10  building?
11       A.   The control pod.
12       Q.   Okay, good. Do you know how many
13  people were housed in the tier where Mr. Wilson was at
14  the time of his death?
15       A.   No, I don't.
16       Q.   All right. Do you think it would have
17  been more than ten or less than ten?
18       A.   It would have been more than ten, but
19  there are only 50 cells, so it would have been less
20  than 50.
21       Q.   Is there one inmate per cell?
22       A.   Yes.
23       Q.   So it is sort of an isolation-type
24  situation?

**A000124**

Elizabeth Burris

Page 14

1      A.     It is not -- well, they are isolated
2  in their cell, yes. There is no one in the cell with
3  them.
4      Q.     All right. Can you tell me what the
5  furnishings of a typical cell in the D unit where
6  Mr. Wilson was housed would be?
7      A.     The bunk, a locker, stool and desk
8  mounted to the wall. Everything is mounted to the
9  wall.
10     Q.     Sure.
11     A.     Commode with sink.
12     Q.     And in terms of, for lack of a better
13  word, fabric items, there is obviously a sheet there,
14  because that is what he was hanging on; correct?
15     A.     Correct. There is the bed linens:
16  sheet, blanket, pillow, pillowcase, towel, washcloth.
17  Then their socks -- you know, their clothing.
18     Q.     What was it about Mr. Wilson that led
19  to the determination that he should be placed in that
20  tier?
21     A.     I was not directly involved with the
22  placement of him, but I can tell you from what I have
23  read about it and what I know about the situation now
24  that he was transferred to the institution from an

Page 15

1  incident that occurred at the Central Violation
2  Center. The incident involved disorderly, threatening
3  behavior. In those cases when inmates are transferred
4  to the facility, DCC, they are placed on that tier
5  because it is thought that they would be disruptive to
6  the operation of the general-population detentioners.
7      Q.     I see. Who is it who made the
8  determination to put Jermaine into that wing?
9      A.     I don't know.
10     Q.     Or into the tier. I am sorry.
11     A.     I don't know.
12     Q.     Who typically would be responsible for
13  that classification decision at the time of this
14  incident?
15     A.     It could -- typically, it would be the
16  shift commander that was on duty at the time. It
17  could be the person who arranged the transfer. It
18  could be anyone above the shift commander. If a
19  deputy warden got the call, we may call the shift
20  commander and tell them. And in this case I don't
21  know who did.
22     Q.     Sure. I understand. And realizing
23  you don't know about the specifics of this transfer,
24  do you know what documents, if any, would normally be

Page 16

1  reviewed in making that determination or such a
2  determination, I should say?
3      A.     The institution sending the inmate
4  would verbally relay what had occurred. In the case
5  of Central Violation Center, they would inform the
6  shift commander, whoever they were calling, that they
7  were processing administrative warrant. Other than
8  that, I am not sure.
9      Q.     Okay. Fair enough. Now, turning back
10  to the incident at hand, after you received
11  notification of a possible inmate suicide, what
12  happened next?
13     A.     For me?
14     Q.     Yes.
15     A.     When I was notified that the inmate
16  had been pronounced dead, while I was talking to the
17  shift commander, I told him who to call back. And in
18  this case it was Deputy Warden Pierce, Major
19  Cunningham, who was the security superintendent at the
20  time, and Institutional Investigator Drake. Of
21  course, institute the notification list, including
22  Delaware State Police; make sure they were called
23  right away. I gave instructions for Mr. Drake to
24  arrive as soon as he could so that he could be the

Page 17

1  liaison and assist state police and the medical
2  examiner and anyone else that needed assistance.
3      I then gathered the information that I
4  had gathered. I called the bureau chief, the media,
5  the public information chief.
6      Q.     Ms. Welch?
7      A.     Yes.
8      Q.     Right.
9      A.     That's correct. And Joseph Dudlek,
10  who was the prison inspector for the state.
11     Q.     Let me stop you there. His name is
12  Joseph Dudlek?
13     A.     Yes.
14     Q.     D-U-D-L-I-K?
15     A.     E-K.
16     Q.     And he is the state prison inspector?
17     A.     Yes.
18     Q.     Is he an employee of the Deparment of
19  Correction?
20     A.     Yes.
21     Q.     What are his duties?
22     A.     I don't know what his exact duties
23  are. I was notifying him because when there is a
24  critical incident, we are to notify him.

Elizabeth Burris

6 (Pages 18 to 21)

| Page 18 | Page 20 |

**Page 18**

1  Q.  Who does he report to in the
2  hierarchy; do you know?
3  A.  No, I don't know.
4  Q.  Then Mr. Drake, Ron Drake, is
5  essentially with internal affairs.  That's what the
6  institutional investigator is?
7  A.  He is the institution internal
8  affairs.  He does not work directly for the internal
9  affairs division that works for the commissioner.  He
10  works directly for the warden.
11  Q.  What is the difference between what
12  Mr. Drake would do versus -- strike that.
13  What are the differences between what
14  Mr. Drake's duties would have been in connection with
15  this incident versus an internal affairs investigator
16  under the warden?
17  A.  He is under the warden.
18  Q.  Okay.
19  A.  He was at that time directly under the
20  warden, and he was the warden's internal affairs
21  person.
22  Q.  Okay.  I must have misunderstood you.
23  I apologize.
24  Other than Mr. Drake and Mr. Dudlek

**Page 19**

1  and the Delaware State Police, are you aware of any
2  other investigations which were performed in
3  connection with this incident?
4  A.  No.  And I want to correct you that
5  Mr. Dudlek, to my knowledge, didn't perform an
6  investigation.
7  Q.  Oh, okay.
8  A.  I simply notified him, the bureau
9  chief, and the public information officer.
10  Q.  I see.  All right.  Did you ever
11  personally examine the scene of the hanging?
12  A.  No.
13  Q.  At some point after the body was
14  removed and it was cleaned up, so to speak, did you
15  ever go to that cell?
16  A.  No.
17  Q.  Okay.  After you made the telephone
18  calls that you have just described, what further
19  involvement, if any, did you have in this incident?
20  A.  None.
21  Q.  Did you eventually review the report
22  that Mr. Drake issued to Warden Carroll?
23  A.  Yes.
24  Q.  And what is your understanding of what

**Page 20**

1  was contained in that report?
2  A.  His conclusion was that it was a
3  suicide.  No foul play.  He, he being Mr. Wilson, gave
4  no indication that he was -- had suicidal thoughts.
5  He had asked about being released.  Staff had checked
6  into it as far as they could on that shift and that
7  they would continue to look into it for him.  And
8  staff had done everything that they should have done
9  during that shift leading up to the suicide.
10  Q.  Okay.  I just want to hand you a
11  document that was produced in discovery.  If you could
12  just take a look at that.
13  A.  (Pause)  Okay.
14  Q.  Do you recognize that document?
15  A.  Yes.
16  Q.  And what is that document?
17  A.  This is Investigator Drake's report on
18  the death of Inmate Jermaine Wilson.
19  Q.  And that is the report that you
20  reviewed that we just discussed a moment ago?
21  A.  Yes.
22  MR. SENSOR:  I ask the court reporter
23  to mark that, please.
24  (Burris Deposition Exhibit No. 1 was

**Page 21**

1  marked for identification.)
2  BY MR. SENSOR:
3  Q.  I just want to ask you a few questions
4  about terms that are contained in here.  There is a
5  term mentioned several times called a phone punch.
6  And there is on the last two pages of this document,
7  Bates 303 and 304, look like there is some notations
8  referring to phone punches.  Can you tell me what a
9  phone punch is?
10  A.  During the course of the shift, staff
11  are required to be on the tiers, the housing unit
12  areas of all buildings, of all housing units, doing an
13  area check, just having their presence there to ensure
14  the safe and secure operation of the facility.  During
15  count times, they count the inmates during that time,
16  checking for security, safety, sanitation violations.
17  And at the end of the tier, of every
18  tier, is a telephone.  And they pick the phone up,
19  enter a code, enter a number, and it records to a
20  computer system.  And that's called a phone punch.
21  And it proves the person's presence.
22  We have in the past experienced
23  overloads of the system by adding the new buildings,
24  had issues to where it was -- we made it mandatory

Elizabeth Burris

Page 22

1 that the staff document their phone punches in the
2 logbook, which is what the last two pages are, are
3 logbook pages. PP stands for phone punch.
4     Q.    Okay. So if I am understanding you
5 correctly, a phone punch is basically the way that the
6 staff member assigned to that wing lets the world know
7 that he is there or he or she is there, as they are
8 supposed to be; correct?
9     A.    Absolutely.
10    Q.    Okay. Now, I note on the last page,
11 page 304, there is two notations, one at 2119 hours
12 and one at 2200 hours, and it looks like it says, "P/P
13 C/D completed, phones continuously rang." Do you see
14 that?
15    A.    Yes.
16    Q.    What does that mean?
17    A.    It means that when they called the
18 phone punch in, the phone rang constantly and was --
19 there was not a tape recording that came on that said,
20 you know, your phone punch has been completed or
21 whatever the recording says.
22          In the normal course of the day and in
23 the normal course of a phone punch there is a person's
24 voice that comes on that indicates that their phone

Page 23

1 punch is accepted. Sometimes the phone is ringing
2 busy because several people are calling in at one
3 time. So they document if they didn't get the voice.
4     Q.    I see. So that doesn't mean that the
5 phone punch didn't take place. It is just that for
6 whatever reason, it wasn't recorded?
7     A.    Well, they are covering their butts --
8     Q.    I understand.
9     A.    -- by making sure that it is recorded.
10 And if the computer didn't pick it up, they are making
11 sure the person in the control pod wrote it down that
12 they did it.
13    Q.    Okay. Fair enough. What is the next
14 entry? It says, "P/" -- I can't even -- I am not
15 going to attempt to decipher it. Perhaps you can.
16 The one at 2240 hours.
17    A.    I am not positive, and I don't want to
18 guess.
19    Q.    Fair enough. What does the next entry
20 mean, 2230? Looks like "C/O," which I assume is
21 Correction Officer, "Naples to 12 for wand."
22    A.    It means that the shift commander
23 notified the unit that they were to send C/O Naples to
24 Building 12, which is our gate house, for wand duties,

Page 24

1 which means that person would screen for security
2 reasons staff coming into work at that time.
3     Q.    I see. And the next entry we have at
4 2242, what is that?
5     A.    "Notified by Staff Sergeant Newman D
6 Upper 6 Jermaine Wilson 456612 hanging, notified
7 Lieutenant Welcome immediately."
8     Q.    I assume the 456612 is his SBI number.
9     A.    That's correct.
10    Q.    And then 2245 is describing the
11 arrival of the backup and the various other people
12 involved in this?
13    A.    Yes.
14    Q.    Can you tell from this document, the
15 two pages of this document, who would have prepared
16 this log?
17    A.    I would say that C/O Michelle Phillips
18 did. She is listed on the previous page, near the top
19 of the previous page, as staff C/O Michelle Phillips
20 on duty control pod.
21    Q.    I see. And the entry immediately
22 above that says Friday, February 18, 2005, which I
23 guess was the date this obviously was prepared.
24    A.    That's correct.

Page 25

1     Q.    What does the 4x12 mean?
2     A.    It was the 4:00 to 12:00 shift.
3     Q.    So this is essentially documenting
4 everything that C/O Phillips, who was in the pod in
5 that building, either observed or happened during the
6 course of that shift; correct?
7     A.    Either observed or was told.
8     Q.    And then the remainder of the entries
9 we have that day, I guess 2303, the paramedics
10 arrived; correct?
11    A.    That's correct.
12    Q.    And 2308, the EMS arrived with the
13 stretcher; correct?
14    A.    That's correct.
15    Q.    Now, then 2314, it says, "Captain
16 Scarborough arrives." I may have asked you this a
17 moment ago, and if I did, I apologize. Who is Captain
18 Scarborough?
19    A.    The shift commander.
20    Q.    Okay. And the next entry under
21 that, what does that mean, that entry? Can you
22 translate it for me?
23    A.    "2314 notified Building 20 of" the
24 headcount, "H/C 68."

Elizabeth Burris

8   (Pages 26 to 29)

Page 26

1        Q.      Okay.  And that is the routine
2   headcount that is done several times a day to ensure
3   that nobody has slipped out?
4        A.      That's correct.
5        Q.      And then 2310, what does that mean?
6   It says L -
7        A.      "Phone punch completed C/W H/C 17."
8        Q.      Okay.  And I see there is a little L-E
9   before the time there.  Does that have any
10  significance?
11       A.      No.  And to tell you the truth, I
12  thought it was rolled over from the previous page.
13       Q.      Okay.  Perhaps it did.  And then 2326
14  apparently notes that two Delaware State Police
15  officers arrived?
16       A.      Yes.
17       Q.      Now, then I see at the bottom of that
18  document it is in a different hand.  That is after 12
19  midnight, so would that be the next shift, I guess the
20  12:00 to 7:00 shift, say, or the 11:00 to 7:00 shift?
21       A.      12:00 to 8:00.
22       Q.      12:00 to 8:00.  Okay.  Is there an
23  hour overlay between each shift?  In other words,
24  there is a 4:00 to 11:00 shift --

Page 27

1        A.      No.  There is a 4:00 to 12:00 --
2        Q.      I am sorry.  4:00 to 12:00 shift.
3        A.      -- 12:00 to 8:00, 8:00 to 4:00.
4                Can I make a correction of something I
5   said earlier?
6        Q.      Yes, please.
7        A.      I should have thought of it when I
8   said it.  When you asked me the population on that
9   tier and you said less than ten, and I said it would
10  have been more than ten, less than 50, actually, it
11  would have been less than 25.  Those buildings are 25
12  cells per tier.  There is 11 upper, 12 lower, because
13  one of them is a handicap and they are single bunk.
14               When you get to Buildings 22, 21, 22
15  and 23, that's when there is two per cell.
16       Q.      I understand.
17       A.      So I apologize.
18       Q.      Thank you.  That is fine.  That is
19  helpful.
20               Did you have any discussions with
21  Investigator Drake in connection with what he did, his
22  investigation relating to this death?
23       A.      No, I don't believe I did.
24       Q.      All right.  So after you were notified

Page 28

1   of the incident and gave orders to the people who
2   responded, is it a fair statement that your next
3   involvement was to read Investigator Drake's report?
4        A.      I would have briefed the warden when
5   he returned, obviously.  I probably -- knowing me, I
6   would have during, like, the next day if I saw Drake
7   said, you know, how are things going, you know.  But I
8   wouldn't -- there was no cause for alarm.  It appeared
9   to be a suicide.  I didn't have any reason to believe
10  otherwise, and still believe the same.  So no, I had
11  no involvement.
12       Q.      Okay.  You indicated to me that you
13  had become aware through reading this report that
14  Jermaine was making inquiries about whether he was
15  supposed to be released.
16       A.      I found that out later, yes.
17       Q.      All right.  Did you also learn that
18  there was a note left somewhere in his room which
19  said, "Would you please check on when I am supposed to
20  be getting out?"
21       A.      I don't recall what the note said, but
22  I have learned that there was a note in the cell.
23       Q.      Okay.  In the course of reading
24  Investigator Drake's report, did you become aware that

Page 29

1   other inmates who were interviewed had said that
2   Jermaine was inquiring with them how he could get out?
3        A.      No, I don't recall that.
4        Q.      All right.  Do you know as you sit
5   here today what day Jermaine was scheduled to be
6   released from DCC?
7        A.      No.
8        Q.      Do you know as you sit here that his
9   violation of probation was withdrawn when he went to
10  court on February 10?
11       A.      No.
12       Q.      Do you know that there was a violation
13  of probation which ended him up in DCC?
14       A.      I didn't see it.  I know because I
15  have read Mr. Drake's report and, of course, asked,
16  you know, how did he get here and why was he on the
17  tier, and I have learned that.
18       Q.      Sure.  I want to change focus a little
19  bit and talk about generally what the procedures are
20  that are in place at DCC for determining inmate
21  release dates.  I noted when going through several
22  logs, for instance, the daily activity reports, that
23  inmates are released fairly frequently.  Is that a
24  fair statement?

Elizabeth Burris

Page 30

1    A.    That's correct.
2    Q.    When somebody comes to DCC as an
3  inmate, what steps are taken to determine and
4  record -- what steps are taken to determine what date
5  that inmate is to be released?
6    A.    There is a records section at the
7  facility which has records clerks in it, correctional
8  records clerk and a records supervisor. They receive
9  paperwork from the court. They do whatever their
10  processes are for going into the computer, checking
11  the court paperwork. They calculate the sentence.
12  And then as the inmate works or participates in
13  programs, they may apply meritorious good time to the
14  inmate's sentence during his period of incarceration.
15  So they have a sequence of steps to follow in
16  calculating his sentence.
17    Q.    And how is that -- is that information
18  kept in a central computer system or is it a manual
19  ledger? What is it?
20    A.    No. It is kept in the computer
21  system. Additionally, he has a hard-copy record that
22  is kept in the records section.
23    Q.    Okay. If I -- say I am an inmate and
24  I have a belief that it is time for me to be released.

Page 31

1  What steps would I take to determine what my release
2  date is?
3    A.    If you are simply write -- if you are
4  simply inquiring as to your upcoming release date, you
5  could write to the records section yourself. On a day
6  where you think you should be out that day, you are
7  going to -- the inmate's first contact is his tier
8  officer, his correctional officer, line staff person,
9  who is going to mention it to the sergeant. They will
10  go through whatever they can to find out the answer
11  for the inmate.
12    Q.    Do you know who -- the term you used
13  was tier officer?
14    A.    Yes.
15    Q.    Do you know who the tier officer on
16  Jermaine's tier was at the time of his death?
17    A.    No.
18    Q.    Do you know who would know that
19  information?
20    A.    Well, no, I don't. According to the
21  logbook entries on Mr. Drake's report, C/O Naples and
22  Staff Sergeant Newman were the C and D floor officers.
23    Q.    Okay. Are there any procedures in
24  place so that -- you may have answered this already in

Page 32

1  a different way. Are there any procedures where an
2  inmate can be taken to the records department to
3  research his or her record, his record himself?
4    A.    No.
5    Q.    So that is all done by relaying
6  information to and from the records department?
7    A.    That's correct.
8    Q.    How long does it generally take to get
9  an answer on a release date or on a query about a
10  release date?
11    A.    Well, if the inmate is writing the
12  letter, records is open Monday through Friday, 7:00
13  a.m. to 5:00 p.m.
14    Q.    Okay.
15    A.    They answer their mail regularly. If
16  the inmate were inquiring verbally to staff, they
17  would check that during the shift. Obviously, if he
18  asks them while they are feeding chow, they are not
19  going to stop chow and make the phone call.
20    Q.    Sure.
21    A.    But they are going to tell him they
22  are going to check and get back with him.
23          And then our receiving room staff have
24  access to the computer to check to see if the guy's

Page 33

1  release date is in it and what his sentence is, if he
2  has an open detainer, whatever the case may be.
3          So even when records is closed, staff
4  can do a cursory check. The shift commander can go to
5  the inmate's record. He has access to the record to
6  check to see if there is anything in there that would
7  say that the inmate should be released.
8    Q.    I see. Do you know if Jermaine's
9  question was ever answered, what day he was supposed
10  to get out?
11    A.    No. I only know what was in
12  Mr. Drake's report.
13    Q.    I understand. Let's say assuming -- I
14  want to give a hypothetical based upon your knowledge
15  of the procedures. Let's say an inmate goes to court,
16  and as a result of whatever happens in court say a
17  violation of probation is discharged or there is a
18  finding of no violation. How long would it take for
19  that information to be recorded in DOC's computer
20  system?
21    A.    Well, first we have to receive it, and
22  that is totally upon the court. Sometimes the court
23  sends paperwork back with the court and transportation
24  officers if the inmate was taken directly to court.

Elizabeth Burris

10 (Pages 34 to 37)

Page 34

1    If it doesn't come back with them, it is faxed by the
2    court to the records section.
3            And sometimes, quite honestly, it is
4    faxed to the wrong institution or the records section,
5    the inmate when he asks and records researches finds
6    out that it didn't come to us at all, and at that
7    point they pull it and get it.
8        Q.    So am I correct in my understanding
9    that it is basically a paper system where the
10   institution has to physically receive a copy of the
11   order?
12       A.    That's absolutely correct.
13       Q.    All right. So, for instance, if it is
14   entered into the ASOP sentence, the sentencing system,
15   is that something that DOC has access to?
16       A.    I don't know.
17       Q.    So the general procedure is an order
18   of some type, an order of release will be faxed from
19   the court, hopefully to the right institution.
20   Correct?
21       A.    Correct. A signed --
22       Q.    Right.
23       A.    A signed order from the court, yes.
24       Q.    Right. Now, once that order is

Page 35

1    received in the institution, how long does it take for
2    the institution to process that order and actually
3    release the inmate?
4        A.    I am going to say immediately, meaning
5    that if they see that the guy is to be released today,
6    they handle that right then. If the guy has got a
7    five-year sentence and he is not going to go anywhere
8    for another four years, it might not get done until
9    tomorrow or the next day. But if he is -- they are
10   prioritized based on when the guy is going to be
11   released.
12       Q.    Sure. Would a lag of eight days be
13   unusual?
14       A.    A lag of eight days for an immediate
15   release?
16       Q.    Yes.
17       A.    Absolutely. That's unusual.
18       Q.    Would a lag of four days be unusual?
19       A.    A lag of one day would be unusual.
20       Q.    So it is usually processed fairly
21   immediately?
22       A.    Yes. If it is an immediate release,
23   he is going immediately.
24       Q.    Just bear with me a second. I have

Page 36

1    got so many papers here. I am trying to find the
2    right one.
3            Are the papers normally faxed from the
4    court the same day as the inmate's court appearance?
5        A.    I believe so.
6        Q.    In your experience, has there ever
7    been a delay in the papers being faxed from the court
8    to the institution?
9        A.    Absolutely.
10       Q.    How long -- has that delay ever lasted
11   more than a day?
12       A.    Yes.
13       Q.    Has that delay ever lasted eight days?
14       A.    I don't want to say an exact time
15   period. I do know that the records section staff have
16   to contact the court sometimes to get the paperwork
17   because the inmate and/or his family is calling and
18   saying, you know, he should be out or we can post
19   bail, whatever the case may be. And they will follow
20   up with the court to see if the family and/or the
21   inmate is telling the truth and get the paperwork and
22   get it processed as soon as they get it.
23       Q.    If there is a situation where an
24   inmate comes back from court and says, "Hey, I have

Page 37

1    been released," but no paperwork has been received
2    from the court, what is the procedure in the records
3    department to follow up on the inmate's belief that he
4    or she is supposed to be released?
5        A.    When they are notified, the records
6    section calls the court.
7        Q.    Do you know if that was done in this
8    case?
9        A.    No, I don't know.
10       Q.    Do I understand that your knowledge of
11   Jermaine's belief that he was to be released and
12   whatever was done to follow up is limited to the
13   internal affairs report?
14       A.    That's correct.
15       Q.    Okay. I want to show you another
16   document that was produced to me. This is noted
17   Delaware Correctional Center shift commander's report.
18   Take a look at that, please.
19       A.    (Pause) Looking at it, they don't go
20   together.
21       Q.    Let me -- if I may take a look at
22   that. Perhaps it got mixed up. Okay. Well, I have
23   got three -- let me try this. I am going to hand you
24   three documents that are sequentially Bates-marked

Elizabeth Burris

Page 38

1   392, 393 and 394. Maybe this will make a little more
2   sense.
3       A.      Yes.
4       Q.      Okay.
5       A.      (Pause) Yes.
6       Q.      Okay. Are those actually two separate
7   documents?
8       A.      Yes, sir.
9       Q.      Okay. What is the first document that
10  starts with 392?
11      A.      This is the shift commander's report
12  authored by Captain Scarborough, who was the shift
13  commander for February 18, '05, from 1500 hours till
14  11:00 p.m., which is the 4:00 to 12:00 shift.
15      Q.      Okay.
16      A.      The second document is a shift
17  commander's report authored by Captain Burton, who was
18  the 12:00 to 8:00 shift commander, and his time of
19  assignment is 11:00 p.m. until 7:00 a.m.
20      Q.      Okay. And those are prepared in the
21  standard course of business by the shift commanders?
22      A.      That's correct.
23              MR. SENSOR: Could you mark those,
24  please.

Page 39

1               (Burris Deposition Exhibit Nos. 2
2   through 4 were marked for identification.)
3   BY MR. SENSOR:
4       Q.      Ma'am, have you ever seen those
5   documents before today?
6       A.      Yes.
7       Q.      Okay. And when did you see them?
8       A.      I reviewed them in preparation for
9   today.
10      Q.      All right. Do you normally see shift
11  commanders' reports on a regular basis?
12      A.      No.
13      Q.      All right. While we are on that
14  subject, what documents did you review before your
15  deposition today?
16      A.      The shift commanders' reports,
17  Mr. Drake's investigation results. My goodness. The
18  interrogatories that were answered to you guys --
19      Q.      Okay.
20      A.      -- the amended complaint. I think
21  that's it.
22      Q.      All right. Did you bring any
23  documents with you in response to our notice of
24  deposition?

Page 40

1       A.      No, sir.
2       Q.      Other than the documents which --
3   strike that. Did you review documents at DCC in
4   response to the request for production and produce
5   them to your attorneys?
6       A.      Actually, I met with the -- the warden
7   and I met. He was producing the documents. I had
8   nothing else to produce and didn't need to get
9   involved.
10      Q.      I see. Other than the documents which
11  you reviewed with the warden, are there any other
12  documents in your possession or DCC's possession which
13  pertain to this incident?
14      A.      Absolutely not.
15      Q.      Okay. I want to show you a few other
16  documents and just ask you some general questions
17  about them. If you could take a look at this, please.
18      A.      (Pause) Okay.
19      Q.      That is a sentencing worksheet?
20      A.      I don't know. I don't -- I have not
21  touched this. I don't know.
22      Q.      Okay. Are you familiar with the type
23  of documents that would come from the court to the
24  facility advising of the release status of an inmate?

Page 41

1       A.      No. Unless there was a question with
2   a guy's sentence that I was particularly looking into,
3   I would not touch those documents at all.
4       Q.      Have you ever seen one of those
5   documents before?
6       A.      I don't recall looking through a
7   record. If there was one in there, I wouldn't have
8   needed to look at it. I would have just kept going.
9       Q.      Sure. Generally speaking, not
10  discussing that specific document, but have you seen
11  sentencing worksheet forms in that format in the past?
12      A.      No.
13              MR. SENSOR: Here is another -- could
14  you mark that, please.
15              (Burris Deposition Exhibit No. 5 was
16  marked for identification.)
17  BY MR. SENSOR:
18      Q.      So it is a fair statement that you
19  have never seen the document that is marked as
20  Burris 5; correct?
21      A.      That's correct.
22      Q.      Okay. Let me show you another
23  document. Perhaps you have seen something in this
24  format in the past.

Elizabeth Burris

12 (Pages 42 to 45)

Page 42

1    A.    This appears to be our standard
2  sentencing order.
3    Q.    Okay. Have you in the past ever
4  reviewed documents in that form, a violation of
5  probation sentence order?
6    A.    No. I don't review them as a course
7  of business. If they were in a record when I was
8  looking through a record, I may have looked at the
9  order, made sure that it was indicated it was part of
10  the sentence, and that would have been it.
11    Q.    Have you ever seen the document that
12  is in front of you that is marked "Violation of
13  Probation Sentence Order"?
14    A.    Absolutely not.
15    MR. SENSOR: Okay. Could we mark that
16  as an exhibit as well, please.
17    (Burris Deposition Exhibit No. 6 was
18  marked for identification.)
19  BY MR. SENSOR:
20    Q.    Ma'am, have there been times in the
21  past during your tenure as deputy warden of DCC when
22  you have needed to review an inmate's record to
23  determine the inmate's release date?
24    A.    No.

Page 43

1    Q.    Never?
2    A.    No. I don't do sentences. I have not
3  been trained to do them, so no, I don't. I review an
4  inmate's record if a legislator calls, wants to know
5  something about an inmate, in that someone is alleging
6  the inmate should be out or whatever. I may get the
7  records supervisor to come down, go through it with
8  me. But I don't calculate sentences.
9    Q.    At the time of Mr. Wilson's death who
10  was the records supervisor? You may have told me
11  earlier, but I apologize.
12    A.    No, I didn't. And I believe Rebecca
13  McBride was at the time.
14    Q.    Rebecca McBride?
15    A.    Yes.
16    Q.    Is Ms. McBride a civilian or is she
17  actually a corrections officer?
18    A.    A civilian employee.
19    Q.    Okay. So basically what you are
20  telling me is that your involvement in reviewing an
21  inmate's release information would be limited to if
22  there was a call from on high, say from a legislator;
23  is that a fair statement?
24    A.    An inquiry from someone.

Page 44

1    Q.    And normally, that would be handled by
2  the records supervisor?
3    A.    I am sorry.
4    Q.    I am sorry. That was a bad question.
5  Normally inquiries regarding release dates would be
6  handled by the records supervisor?
7    A.    Yes.
8    Q.    Are there any other persons in
9  supervisory or administrative capacities at DCC who
10  would be involved in reviewing inmate release dates?
11    A.    No.
12    Q.    So Ms. McBride is it?
13    A.    Yes. The shift commander would check
14  into an inquiry if there was an inquiry on his shift
15  and there was no one present from records. Otherwise,
16  he would refer it to the records section.
17    If the supervisor was not there and
18  there was an inquiry about an immediate release, the
19  records staff are trained to do the sentences and
20  would check into it.
21    Q.    Okay. Now, turning to the tier where
22  Mr. Wilson was housed at the time of his death, if I
23  were an inmate in one of those cells, how would I get
24  the attention of a C/O to let him or her know that I

Page 45

1  needed some information about my release date?
2    A.    The C/Os are walking down the tier at
3  least twice an hour. They would yell to them, you
4  know, "Hey, C/O." And they are checking in the cells
5  as they are walking down the tier. There is visual
6  contact.
7    Additionally, medical is on the tier
8  different times during the day with staff. So there
9  would be several opportunities during the course of an
10  hour for the inmate to approach staff.
11    Q.    Are you personally aware of any
12  incidents where inmates attempted to contact C/Os for
13  that information but were unsuccessful in doing so?
14    A.    No.
15    Q.    I want to show you a handwritten
16  document that was produced, and I would like you to
17  take a look at it and tell me if you recognize it.
18    MR. SENSOR: And maybe we could go off
19  the record.
20    (Discussion off the record.)
21  BY MR. SENSOR:
22    Q.    You had a chance to review the most
23  recent document I handed you?
24    A.    Yes.

Elizabeth Burris

Page 46

1    Q.    Do you recognize that document?
2    A.    No, I don't.
3    Q.    All right. So you have never seen it
4  before today?
5    A.    No, no, I have not.
6    Q.    All right. Did you note on that
7  document that apparently a few inmates were
8  interviewed by somebody in connection with this
9  incident and they reported that Jermaine had been
10 banging on his door all day trying to get somebody to
11 listen to him?
12   A.    (Pause) Okay. I am sorry. What was
13 your question?
14   Q.    Sure. You note on that document that
15 apparently a few inmates reported that Jermaine had
16 been banging on his door throughout the course of the
17 day to try to get somebody to talk to him about when
18 he was going to be released?
19   A.    That's what is indicated on the paper.
20   Q.    Okay. Is that unusual in your
21 estimation and your experience as deputy warden at
22 DCC?
23   A.    Yes.
24   Q.    So it would be unusual for somebody to

Page 47

1  be trying to get the attention of a C/O all day
2  without success?
3    A.    Absolutely.
4    Q.    I also note that that document
5  indicates that Jermaine was told that if he covered up
6  the window on his cell, that he might get, for lack of
7  a better term, faster attention. Do you see that?
8    A.    No, I didn't.
9    Q.    I think, believe it is halfway down
10 the first page.
11   A.    Yes. He was advised by someone named
12 Holland.
13   Q.    In your knowledge during your tenure
14 as deputy warden, have there been incidents in the
15 past where inmates have covered up the window on their
16 cell?
17   A.    Yes.
18   Q.    What happens when that occurs? Well,
19 strike that.
20         What is DOC's policy in responding to
21 inmates who cover up the window on their cell?
22   A.    No windows can be covered.
23   Q.    All right. So what is the response if
24 that occurs?

Page 48

1    A.    Tell the inmate to take down whatever
2  is covering it. If he refuses, staff take it down,
3  give him a disciplinary referral.
4    Q.    Would it be a situation where --
5  strike that.
6         Does the prison have a QRT, or quick
7  response team?
8    A.    That's correct.
9    Q.    Would that be a situation where the
10 QRT would go in to basically extract the inmate?
11   A.    Well, only if the inmate was
12 noncompliant to the point of being a threat to staff
13 opening the door.
14   Q.    Okay. And that document also
15 indicates, does it not, that Jermaine also was told or
16 decided that he might also get attention from a C/O if
17 he attempted -- pretended like he was attempting
18 suicide?
19   A.    Okay. Can you repeat the question?
20   Q.    Sure. That was a poorly phrased
21 question.
22         Does that document indicate that
23 Jermaine apparently came to the decision that he might
24 get faster attention if he feigned or pretended he was

Page 49

1  committing suicide?
2    A.    According to this document, which is
3  not signed by anyone, so I am not sure who authored
4  it, it does state that Wilson indicated -- Wilson told
5  inmates that he was going to act like he was going to
6  hang himself to get officers' attention.
7    Q.    What is DCC's policy -- what was DCC's
8  policy at the time of this incident for responding to
9  an an inmate who was apparently attempting suicide?
10   A.    If an inmate verbalizes or displays
11 behavior that appears to be suicidal in any way
12 whatsoever, security responds. Mental health/medical
13 are notified to intervene immediately.
14   Q.    If a C/O happens to walk by on his or
15 her rounds and sees something actively in process,
16 what happens?
17   A.    They immediately call for backup,
18 respond to prevent the inmate from harming himself.
19   Q.    And what is done to prevent the inmate
20 from harming him or herself?
21   A.    Well, if the inmate is attempting to
22 hang himself, staff physically prevent that. If they
23 are cutting themselves, staff -- no matter what, staff
24 physically prevent, try to intervene to keep the

Elizabeth Burris

14 (Pages 50 to 53)

Page 50

1  inmate from harming himself in any way.
2      Q.    Would that be also a situation where
3  the QRT might respond?
4      A.    I doubt that they are going -- unless
5  it is a threat of just two people or four, if they can
6  muster four quickly, being hurt by the inmate, the
7  staff are going to act right then. They are not going
8  to wait for QRT to be assembled.
9      Q.    Fair enough. In your tenure as deputy
10 warden of DCC, have there been incidents in the past
11 where inmates have pretended or feigned suicide but
12 were not actually committing suicide?
13     A.    Yes.
14     Q.    Do you know how many times during your
15 tenure that has occurred?
16     A.    No, I don't.
17     Q.    Is it more than ten or less than ten?
18     A.    Oh, during my tenure, more than ten.
19     Q.    Do you think it is more than a hundred
20 or less than a hundred?
21     A.    I don't know. I don't even want to
22 guess.
23     Q.    Okay. So it is somewhere more than
24 ten. Beyond that you are not really sure?

Page 51

1      A.    That's correct.
2      Q.    Okay. In the universe of inmates who
3  attempt suicide but aren't really doing it, to your
4  knowledge, did any of those inmates commit that act in
5  an attempt to gain information concerning their
6  release date?
7      A.    Oh, I don't know that either.
8      Q.    Do you know who would know that
9  information?
10     A.    I don't even know if that information
11 is available, because regardless of the reason, if an
12 inmate indicates verbally or in his behavior that
13 suicide is something he is contemplating, it is not
14 important the reason. It is important the act.
15     Q.    I understand. During your time as
16 deputy warden, do you know how many inmates attempted
17 suicide?
18     A.    No.
19     Q.    Do you have a guess?
20     A.    No.
21     Q.    Do you know who would know that
22 information?
23     A.    No, I don't. I am trying to think if
24 it is a statistic that we keep. Yes, I believe it is

Page 52

1  a statistic that we keep with security numbers.
2      Q.    Okay. Would that be something that
3  the warden might know?
4      A.    I am not sure.
5      Q.    Do you think the commissioner might
6  know that?
7      A.    No. I doubt it. It would be
8  internally, I believe.
9      Q.    Somewhere inside DCC?
10     A.    Yes. And I am -- I am pretty sure
11 that I have those reports that come into my office for
12 monthly reports that I could pull that.
13     Q.    Okay. So if I asked you to assemble
14 that information and provide it to your attorneys,
15 would you be willing to do that?
16     A.    I would confer with my attorneys.
17     Q.    That is fine. Okay.
18            After an inmate is, for lack of a
19 better word, extracted from his or her cell if there
20 is a suicide attempt, where is that inmate taken?
21     A.    To the infirmary.
22     Q.    And what happens at the infirmary?
23     A.    I am not sure, because medical
24 intervenes at that point. If medical puts them on a

Page 53

1  suicide level I watch, we assign security staff
2  visually on them at all times. The other levels, when
3  they remain in the infirmary, watches are held, that
4  type of thing.
5      Q.    In your tenure as deputy warden, has
6  the infirmary process been abused by inmates?
7      A.    Can you explain?
8      Q.    Sure. Do inmates at any time try to
9  get a trip to the infirmary for reasons other than
10 genuine medical complaints?
11     A.    Absolutely.
12     Q.    What sorts of reasons in your time as
13 deputy warden have inmates used the medical process
14 for that are not medical?
15     A.    I can't give you factuals.
16     Q.    Sure.
17     A.    I can give you my experience --
18     Q.    Please.
19     A.    -- and/or observations.
20     Q.    Please.
21     A.    To be around the nurses, around more
22 people, to avoid being on disciplinary sanction. If
23 they were disciplined by the hearing office staff for
24 a certain number of days in isolation, some inmates

Elizabeth Burris

15 (Pages 54 to 57)

| Page 54 | Page 56 |
|---|---|
| 1 would manipulate their way to the infirmary to avoid<br>2 being in isolation.<br>3     Q.    Do you have a sense of how many<br>4 inmates abuse that process as you have described<br>5 during your tenure as deputy warden?<br>6     A.    No.<br>7     Q.    Is it in the hundreds?<br>8     A.    Oh, I wouldn't say the hundreds.<br>9 Frequently it is the same inmates over and over. But<br>10 I want to say that every -- no matter it is<br>11 manipulation or it is an actual suicide thought of the<br>12 inmate, every verbalization or acting out is treated<br>13 as if it were serious.<br>14     Q.    Sure. I understand. In your<br>15 knowledge during your time as deputy warden, have<br>16 there been any incidents where an inmate has committed<br>17 suicide with no prior verbalizations of suicidal plans<br>18 or thoughts?<br>19     A.    I don't know enough to be sure to<br>20 answer you.<br>21     Q.    All right. Do you know who inside DCC<br>22 would have that information?<br>23     A.    No, because I am not sure if that<br>24 wouldn't be part of medical. | 1 medications.<br>2     Q.    Are you personally aware of any inmate<br>3 who has feigned or attempted suicide in an attempt to<br>4 have better access to the records department or<br>5 records information?<br>6     A.    In my tenure as deputy warden, I have<br>7 never heard of that.<br>8     Q.    Generally when inmates will do that,<br>9 it is an attempt to get in a different situation than<br>10 what they are in; correct?<br>11     A.    That's correct.<br>12     MR. SENSOR: Okay. I just want to go<br>13 over two more documents with you, and I think we will<br>14 be done. I have one document that is Bates-marked --<br>15 strike that for a second.<br>16     Could you mark that written statement,<br>17 please.<br>18     (Burris Deposition Exhibit No. 7 was<br>19 marked for identification.)<br>20 BY MR. SENSOR:<br>21     Q.    The first document I am going to show<br>22 you is Bates-marked 204 and 205. Just take a moment<br>23 to review that, if you will.<br>24     A.    (Pause) Okay. |

| Page 55 | Page 57 |
|---|---|
| 1     Q.    Okay. Of those shall we say false<br>2 suicide attempts, do you have a sense of whether<br>3 hanging or an attempted hanging is frequently used by<br>4 inmates?<br>5     A.    Yes. I think that's the preferred<br>6 method.<br>7     Q.    Preferred method? Do you have a sense<br>8 percentage-wise what percentage of inmates who abuse<br>9 the medical process would attempt a hanging?<br>10     A.    Oh, no. I don't want to guess at a<br>11 number or a percentage.<br>12     Q.    Sure, sure. But it is frequently<br>13 used?<br>14     A.    I want to be careful of the word<br>15 "frequently."<br>16     Q.    Sure.<br>17     A.    If an inmate is manipulating the<br>18 system, more often than not he will use -- that is the<br>19 method that he would say is that he is going to string<br>20 up. And I have heard that more than anything else.<br>21     I have never heard that someone said,<br>22 "I am going to take an overdose." For one thing,<br>23 that's harder for inmates to be able to do in that<br>24 environment because they don't have keep-on-person | 1     Q.    Ma'am, do you recognize that document?<br>2     A.    I have never seen these two pieces of<br>3 paper.<br>4     Q.    Okay. Can you tell me generally what<br>5 those forms are, if you have any knowledge?<br>6     A.    It is a detainer/pending charge log,<br>7 DC-99.<br>8     Q.    Okay. And the other document?<br>9     A.    Detainer/pending charge log, DC-99<br>10 also.<br>11     Q.    What is a detainer/pending charge log,<br>12 DC-99?<br>13     A.    These are, if I am not mistaken, the<br>14 sheets that would be put in the inmate's hard record<br>15 that would show the charges that the inmate was being<br>16 held under, and then the record staff would indicate<br>17 disposition as they were disposed of.<br>18     Q.    All right. The first page on there<br>19 does indicate apparently a hold without bail for a<br>20 violation of probation; correct?<br>21     A.    That's correct.<br>22     Q.    Now, if an inmate were to be ordered<br>23 released or otherwise moved from DCC, would that first<br>24 document reflect that change or is that simply a |

Elizabeth Burris

16 (Pages 58 to 61)

Page 58

1    detainer form?
2        A.    Yes. This is a detainer form. Are
3    you saying that if the inmate went from one
4    institution to another, would that be on here?
5        Q.    Yes.
6        A.    No, that would not be on here.
7        Q.    If the inmate went from Level V to
8    freedom, would that be on there?
9        A.    Well, he could only go to freedom by
10   having the charge disposed of, so yes, there would be
11   some indication, but it wouldn't say that he went to
12   freedom. It would say what the disposition of the
13   charge was.
14       Q.    Okay, sure. But the point is that it
15   would reflect that something had happened to the
16   charge to justify release?
17       A.    That's correct.
18       MR. SENSOR: Okay. Can we mark that
19   one, please?
20       (Burris Deposition Exhibit No. 8 was
21   marked for identification.)
22   BY MR. SENSOR:
23       Q.    The final document I would like to
24   show you was Bates-marked 94, 95 and 96 by the state

Page 59

1        A.    Okay.
2        Q.    Do you recognize that document that I
3    have just put in front of you?
4        A.    Well, it appears to be a summary of
5    his history, "he" being Jermaine Wilson.
6        Q.    Yes.
7        A.    But it is not signed, so I am not sure
8    where it came from.
9        Q.    Okay. You have never seen that before
10   today?
11       A.    No.
12       Q.    What are the second and third pages,
13   if you recognize them?
14       A.    It appears to be Jermaine Wilson's
15   criminal history, client location history.
16       Q.    Is this a document that is normally
17   maintained in the records department of DCC?
18       A.    It is printed from the computer. I
19   guess anyone could print it that had access to the
20   information.
21       Q.    Okay. But is this information that
22   the DCC records department would have access to, at
23   least pages 2 and 3 of that document?
24       A.    Yes.

Page 60

1        MR. SENSOR: All right. Could we just
2    mark that, please.
3        (Burris Deposition Exhibit No. 9 was
4    marked for identification.)
5    BY MR. SENSOR:
6        Q.    I have one final question for you. I
7    just want to turn back to No. 8 momentarily. There
8    was a term there that I didn't understand on the first
9    page. On that detainer it says the agency is SCNC.
10   Do you see that?
11       A.    Superior Court New Castle County.
12       MR. SENSOR: That answers my question.
13   Okay.
14       Ma'am, those are my questions. Thank
15   you for your time.
16       A.    Thank you, sir.
17       MR. DURSTEIN: Reserve reading and
18   signing.
19       - - -
20       (Deposition concluded at 12:26 p.m.)
21       - - -
22
23
24

Page 61

1              INDEX
2    BURRIS DEPOSITION EXHIBITS              Marked
3    1 Memo dated 3/21/05, from Mr. Drake to
          Warden Carroll, with attachment------- 20
4
5    2 Shift Commander Scarborough's report,
          dated 2/18/05---------------------- 39
6    3 4:00 to 12:00 shift commander's report
          page 2, dated 2/18/05----------------- 39
7
8    4 Shift Commander Burton's report,
          dated 2/18/05---------------------- 39
9    5 Sentencing worksheet dated 2/10/05----- 41
10   6 VOP sentence order dated 2/11/05------- 42
11   7 Handwritten document entitled "Inmate
          Interviews," dated 2/20/05------------- 56
12
13   8 Detainer/pending charge log------------ 58
14   9 Jermaine Wilson history, with
          attachments------------------------ 60
15           - - -
16   (Exhibits attached to original transcript and copies.)
17
18
19
20
21
22
23
24

Elizabeth Burris

Page 62

1           CERTIFICATE
2           I, LORRAINE B. MARINO, Registered
3    Diplomate Reporter and Notary Public, do hereby
4    certify that the witness, ELIZABETH BURRIS, after
5    being duly sworn by me, was examined by counsel for
6    the respective parties and the questions of said
7    witness and her answers were taken down by me in
8    stenotype notes and thereafter transcribed into
9    typewriting at my direction.
10          I certify that the foregoing is a true
11   and correct transcript of the testimony given at said
12   examination of said witness.
13          I further certify that the deposition
14   was made available to the witness for reading and
15   signing.
16          I further certify that I am not
17   counsel, attorney, or relative of either party, or
18   otherwise interested in the event of this suit.
19
20
21
     Registered Diplomate Reporter and Notary Public
22      Certificate No. 181PS/Exp.: Permanent
23
     Date: 2/2/07
24

David Pierce

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SUSIE A. WILSON, individually :
and in her capacity as        :
administratrix of the Estate  :
of JERMAINE LAMAR WILSON,     :
deceased, and in her capacity :
as next friend of Z.W., a     :
minor,                        :
                              : Civil Action
        Plaintiffs,           : No. 05-821 SLR
                              :
        vs.                   :
                              :
STANLEY W. TAYLOR, JR.,       :
individually; PAUL HOWARD,    :
individually; NOREEN RENNARD, :
individually; THOMAS L.       :
CARROLL, individually; BETTY  :
BURRIS, individually; DAVID   :
PIERCE, individually; MICHAEL :
RECORDS, individually; DAVID  :
McDONALD, individually; and   :
SERGEANT BOOM, individually,  :
                              :
        Defendants.           :
                        —   —   —

          Deposition of DAVID PIERCE, taken
pursuant to notice before Gail Inghram Verbano, CLR,
CSR, RMR, in the law offices of Delaware Department
of Justice, Carvel State Office Building, 6th Floor,
820 North French Street, Wilmington, Delaware 19801,
on Thursday, March 1, 2007, beginning at
approximately 11:15 a.m.


              CORBETT & WILCOX
   230 N. Market Street - Wilmington, Delaware 19801
                (302) 571-0510


       Corbett & Wilcox is not affiliated with
          Wilcox & Fetzer, Court Reporters

David Pierce

2 (Pages 2 to 5)

Page 2

1  APPEARANCES:
2      MICHAEL L. SENSOR, ESQ.
     PERRY & SENSOR
3      Suite 560, One Customs House
     Wilmington, Delaware 19899
4      Attorney for Plaintiffs
5      RALPH K. DURSTEIN, ESQ.
     STATE OF DELAWARE
6      DEPARTMENT OF JUSTICE
     Carvel State Office Building
7      6th Floor, 820 North French Street
     Wilmington, Delaware 19801
8      Attorney for Defendants
9  ALSO PRESENT:
10      Jennifer Mitchell
11
12
13
14      DAVID PIERCE, having first been
15  duly sworn according to law, was examined and
16  testified as follows:
17              - - -
18      EXAMINATION
19  BY MR. SENSOR:
20      Q   Mr. Pierce, my name is Michael Sensor. I
21  represent the plaintiffs in the case of the Estate of
22  Jermaine Wilson versus various State defendants.
23          The first question I need to ask
24  you is, have you ever had your deposition taken

Page 3

1  before?
2      A   No; I'm not familiar with the deposition
3  process.
4      Q   I'm sure Mr. Durstein may have explained
5  it to you. Just to be very brief, I'm going to ask
6  you a series of questions about your knowledge
7  regarding the death of Jermaine Wilson, and I'd just
8  like to ask you to answer those questions to the best
9  of your knowledge and belief.
10          If you don't remember the answer to
11  a question or you don't know the answer, just tell me
12  that. That's a perfectly valid answer. If you don't
13  understand a question I've asked — which wouldn't be
14  unusual, because sometimes lawyers don't know what
15  they're saying — just tell me that, and I'll try to
16  rephrase it.
17          We'll try to make this as
18  streamlined as possible. I'm respectful of your
19  time, and we'll try to get you out of here. Make
20  sense?
21      A   Yes, sir.
22      Q   If you don't tell me you didn't
23  understand or don't know the answer to a question,
24  I'll assume that you did understand it and proceed

Page 4

1  therefrom. Fair enough?
2      A   I think I understand.
3      Q   So I'm correct you've never been deposed
4  in the past?
5      A   That is correct.
6      Q   Okay. You're currently the deputy warden
7  of the Delaware Correctional Center?
8      A   I'm one of two deputy wardens of the
9  Delaware Correctional Center.
10      Q   Who is the other deputy warden?
11      A   Elizabeth Burris.
12      Q   How long have you been one of the two
13  deputy wardens there?
14      A   I have been a deputy warden at Delaware
15  Correctional Center since October of 2004.
16      Q   Okay. Let's just go over your training,
17  education, experience.
18          Did you graduate from high school?
19      A   Yes.
20      Q   Where did you graduate?
21      A   James H. Groves.
22      Q   Okay. And what's your educational
23  background?
24      A   In addition to high school education,

Page 5

1  I've taken some college courses in criminal justice.
2  I do not have a degree.
3      Q   Where did you take those courses?
4      A   Delaware Technical and Community College.
5      Q   Have you taken any continuing education
6  courses regarding corrections or the correctional
7  field?
8      A   Yes. Not in the collegiate level;
9  National Institute of Corrections. I've taken
10  courses internally with the State personnel office.
11      Q   I'm sorry. I didn't mean to interrupt
12  you.
13          Is that usually done on a yearly
14  basis?
15      A   It's not an annual — it's
16  subject-matter-based. It's one time.
17      Q   What sorts of things were taught in that
18  class?
19      A   The NIC course that I took was
20  Effectively — was entitled Effectively Managing the
21  Multigenerational Workforce.
22      Q   Fair enough.
23          Do you have any military
24  background?

David Pierce

Page 6

1     A   I want to go back. And I also took
2   another NIC course. In addition to the Effectively
3   Managing the Multigenerational Workforce, I took a
4   National Institute of Corrections course on field
5   training officer on-the-job training.
6     Q   Okay. Approximately when were those
7   classes taken?
8     A   The -- using the abbreviation FTO OJT
9   class was taken, I believe, in the summer of 2004.
10  Effectively Managing the Multigenerational Workforce
11  was taken, I believe, in early '05.
12    Q   Okay. And then a return to my prior
13  question: Do you have any military service?
14    A   Negative.
15    Q   How long have you been employed by the
16  Department of Corrections overall?
17    A   Since January the 29th of 1996.
18    Q   All right. And just give me a brief
19  outline of your history with DOC.
20    A   I went -- after graduating the initial
21  academy, I was assigned to Delaware Correctional
22  Center in Smyrna, Delaware, as a correctional
23  officer.
24        I worked there in various

Page 7

1   capacities as a correctional officer for a period of
2   approximately two years; at which time I was promoted
3   to correctional corporal at Sussex Correctional
4   Institution, and that was February of '98, where I
5   served in various functions as a correctional
6   corporal.
7         I was promoted to correctional
8   sergeant at the Sussex Community Correctional Center
9   in September of 1999.
10        I was promoted to correctional
11  lieutenant at the Central Violation of Probation
12  Center when it opened in 2001. I believe it was
13  about September.
14    Q   Okay.
15    A   I was then promoted to correctional staff
16  lieutenant in November of 2003 at Delaware
17  Correctional Center, where I served in various
18  capacities, mostly shift commander, for a period of
19  time until October of '04, where I was promoted to
20  deputy warden.
21    Q   Okay. At the time of Jermaine Wilson's
22  death, which was approximately February 18th/19th
23  of '05, what were your duties as deputy warden of
24  DCC?

Page 8

1     A   Very difficult question to answer in that
2   there are a lot of responsibilities for someone in an
3   administrative role. I will try to summarize them in
4   general terms.
5     Q   Sure.
6     A   I can be more specific in any area that
7   you're interested.
8     Q   Sure.
9     A   In general, my responsibilities were to
10  supervise the security superintendents.
11    Q   Okay.
12    A   The scheduling office, the electronic
13  technicians, the inmate transfer office.
14        There's a lot of functions that go
15  along with a lot of those jobs, which I'm not going
16  to -- I could take an hour of your time going into
17  the minutiae of that.
18    Q   Let's talk about the inmate transfer
19  office. What does the inmate transfer office do?
20    A   The inmate transfer office controls
21  internal movement within the institution as directed.
22  The inmate transfer office takes input from the
23  classification process as to where inmates are
24  classified to be housed.

Page 9

1     Q   Within DCC?
2     A   Within DCC -- and manages that bed space,
3   making the internal movements as inmates change
4   classifications, whether it be to higher from lower
5   security, from sentence to detention or -- those
6   sorts of movements occur through that office.
7     Q   Does that office have any involvement
8   with determining release dates of inmates?
9     A   Negative.
10    Q   What office within -- or department or
11  suboffice within DCC does that? Is that the records
12  department?
13    A   The records department maintains the
14  inmate's institutional file, and they calculate
15  inmate sentences that are put forth by the courts.
16  But the courts ultimately are the ones that determine
17  the release date.
18    Q   Right. Well, let me ask you this. Let's
19  say that there's a DCC inmate who is scheduled to be
20  released on March 1st. What department -- does any
21  of the departments or offices under your supervision
22  deal with calculating that release date and getting
23  word to the necessary people that the person is
24  supposed to be released?

David Pierce

4 (Pages 10 to 13)

| Page 10 | Page 12 |
|---|---|
| 1  A  No. | 1  Q  What factors go into determining whether |
| 2  Q  Do you know what department takes care of | 2  an inmate is to be placed in the SHU? |
| 3  those things? | 3  A  There are multiple factors which could |
| 4  A  The records department. | 4  make that determination. It's a very open-ended |
| 5  Q  Is the records department under the | 5  question. I would ask you to help me understand what |
| 6  supervision of another person within DCC? | 6  it is you're -- |
| 7  A  There is a records office supervisor. | 7  Q  Well, let's say you have an inmate coming |
| 8  That person reports directly to the warden of the | 8  in to DCC for the first time. Are there certain |
| 9  institution. | 9  behavior or personality factors that are examined in |
| 10  Q  Okay. That would be Warden Carroll; | 10  determining whether or not that person is appropriate |
| 11  correct? | 11  for SHU? |
| 12  A  Correct. | 12  A  If an inmate is coming to our institution |
| 13  Q  Okay. What about inmate transportation? | 13  who is a known inmate to the system from another |
| 14  Is that something within your purview? | 14  institution, or has recently been discharged and is |
| 15  A  In some respects, there are -- there is a | 15  coming back in who is known to the institution |
| 16  separate division known as court and transportation, | 16  through their behavioral history, certainly that |
| 17  which deals with some inmate movement, I believe -- | 17  would be a factor in potentially their placement in |
| 18  let me ask you to correct -- | 18  that area. |
| 19      You're talking about inmate | 19      Additionally, the initial charges |
| 20  transportation outside the facility; correct? | 20  against the inmate and the behavior of the inmate |
| 21  Q  Yes, sir. | 21  for, let's say, a detentioner from the arresting |
| 22  A  Yes; court and transportation deals with | 22  police agency -- if they had information regarding |
| 23  inmate movement to the courts and institutional | 23  the lead-up to the incarceration that gave concern, |
| 24  transfers that are prearranged throughout the State. | 24  that would be a factor to look at as well. |

| Page 11 | Page 13 |
|---|---|
| 1      There is some movement that I have | 1      Outside of the internal transfer or |
| 2  some involvement with, and that deals with | 2  a new commitment, there are no other -- now, |
| 3  supervising, indirectly, through the chain of | 3  internally, you're talking about a new inmate. |
| 4  command, those people who perform inmate | 4  There's other things that can happen inside the |
| 5  transportation to outside security appointments; also | 5  prison. But as far as somebody coming into the |
| 6  staff that supervise inmates that are in an outside | 6  institution new, that is what I think you're asking. |
| 7  hospital. | 7  Q  In this case, Jermaine Wilson -- I |
| 8      But other than that, we don't | 8  believe there's no quarrel with the fact that he was |
| 9  have -- we occasionally will have other inmate | 9  in CVOP, and there was an administrative warrant |
| 10  transportation, such as funeral runs or deathbed | 10  filed and then he was brought into SHU. |
| 11  visits in the community, and those staff I indirectly | 11      Are you familiar with the factors |
| 12  supervise. | 12  that went into determining why he was placed in SHU? |
| 13  Q  It sounds like, to the extent there's | 13  A  I'm familiar with the administrative |
| 14  transportation, it's really specialty transportation, | 14  warrant and the behavior indicated in that. |
| 15  not routine movement to and from a courthouse? | 15      As far as the factors determining |
| 16  A  Correct. | 16  placement, I think I could be more specific to that |
| 17  Q  Okay. Let's talk about classification | 17  part of your question. I don't know who made the |
| 18  for a minute. | 18  decision or evaluated those factors to make the |
| 19      What is the SHU? | 19  placement issue. |
| 20  A  Security housing unit, is what the SHU | 20  Q  Is there a classifications bureau or |
| 21  stands for. That building, I believe, was part of | 21  classifications department within DCC that makes |
| 22  the late '90s expansion project under Commissioner | 22  those decisions? |
| 23  Taylor. That unit is currently being used as a | 23  A  We have classification within DCC. We |
| 24  maximum security environment. | 24  have a system throughout the State of Delaware for |

David Pierce

Page 14

1  inmate classification. One level is the
2  institutional level. So yes, that's part of the
3  entire statewide classification process.
4       However, we do not classify inmates
5  that are detentioners. So classification does not
6  get involved necessarily with that part of the
7  process.
8       Q  Was Mr. Wilson considered, at the point
9  he was brought to the SHU, an inmate or a
10  detentioner?
11      A  He was considered a detentioner.
12      Q  Is there a difference, from DCC's
13  perspective, between an inmate and a detentioner?
14      A  Yes.
15      Q  What's that difference?
16      A  The difference is an inmate is sentenced
17  to serve a period of time as a court sentence for --
18  the determination has been made as to the charge,
19  whatever the particular charge he was committed
20  under.
21       A detentioner has an open charge
22  which is not yet determined.
23      Q  Okay. And in this case, the open charge
24  was the administrative warrant?

Page 15

1      A  Which, in turn, is the violation of
2  probation issued by the Court. The administrative
3  warrant is the first part of the process.
4      Q  Okay. In February of 2005, was it
5  unusual to have detentioners in SHU?
6      A  No.
7      Q  Do you know, around February 18th of
8  2005, how many detentioners were in SHU?
9      A  No.
10      Q  How many people can SHU hold, total?
11      A  How many people total?
12      Q  Yeah.
13      A  It's approximately 300.
14      Q  So it's a fairly large part of the DCC
15  then?
16      A  Our current population is 25,000.
17      Q  In February 2005, how were the SHU cells
18  set up? How many did each cell hold?
19      A  One inmate per cell.
20      Q  Do you know what equipment was in each
21  cell, generally speaking?
22      A  What fixtures were part of the room?
23      Q  Yes, sir.
24      A  Yes.

Page 16

1      Q  What was in there?
2      A  You have -- there's a bed. There is a
3  locker. There is an inmate toilet and sink, and a
4  little stool and table for them to do writing on.
5  There is also a small flap, if you will, a small
6  access port in addition to the door where food trays
7  and medicines can be distributed without having to
8  open the door.
9      Q  Right. Did the beds, in February 2005,
10  normally have sheets on them?
11      A  Yes.
12      Q  And at this point, just assume my
13  questions deal with February 2005 unless I signify
14  otherwise, because I don't want to confuse the record
15  of then versus now.
16      A  I understand.
17      Q  Were there windows on the doors of the
18  cells?
19      A  Yes.
20      Q  Were they wide enough to see all the way
21  inside the cell or only part of the cell?
22       Well, that was a bad question. How
23  wide were the windows; do you know?
24      A  I couldn't give you a specific

Page 17

1  measurement.
2      Q  Did they cover the entire length of the
3  door or just part of the door?
4      A  They certainly were not the entire length
5  of the door. The windows are not proportionally --
6  not even 50 percent of the door.
7      Q  Right. Was there a procedure in place to
8  check the inmates in the cells on a routine basis?
9      A  Yes.
10      Q  And how many times a day or hour, or what
11  have you, did the check take place?
12      A  The procedure indicates the checks were
13  to be made at irregular intervals, no less than
14  30 minutes apart.
15      Q  And what is done in connection with the
16  check or --
17      A  Staff, when performing -- security check
18  is what we term it as.
19       They do multiple functions, one of
20  which is account for living, breathing flesh; one of
21  which is monitor inmates as far as the mood or the
22  tension. It's more appropriate in areas where
23  there's more inmate interaction. Certainly it's a
24  factor in that area as well.

David Pierce

6 (Pages 18 to 21)

Page 18

1    They look for cleanliness issues,
2  any contraband which is apparent. Look for any
3  maintenance issues. Physical plant -- for example,
4  any damage to any property that needs to be attended
5  to.
6    They -- also part of that process
7  is an electronic record of them making that security
8  check.
9    Q  Is that the phone punch that we've heard
10  about?
11    A  It is. That is commonly termed the phone
12  punch.
13    There is -- there are phones
14  secured in a small box on the wall that the officers,
15  at the far end of the unit when they're in there
16  making their security check, they open the box and
17  go -- press a number on the phone. It gets recorded
18  that they were there at the specific date and time.
19  It's also logged in institutional logbooks as well.
20    Q  Right. Now, when these checks are done,
21  does somebody physically enter the cell, or what's
22  done? How is the cell and the inmate checked upon?
23    A  Security checks in the SHU did not
24  routinely involve entering any cells unless there is

Page 19

1  some situation warranting that. Inmates in that
2  housing area do not interact with staff until such
3  time as they have full restraints on them. So our
4  staff can't go into every cell without having first
5  followed the procedure necessary for having an inmate
6  depart the cell.
7    Q  Does somebody look through the window to
8  see if the inmate -- you mentioned living, breathing
9  flesh earlier. Does somebody look in the window to
10  make sure the inmate is there and moving around or
11  sleeping?
12    A  Yes.
13    Q  How long does that look through the
14  window normally take? Or does it depend on each
15  inmate?
16    A  It depends on what the inmate is doing.
17  Certainly if the inmate is sitting at his table
18  actively writing a letter, or if you happen to see
19  the inmate in movement, there is not -- and there's
20  nothing out of the ordinary going on in that
21  movement, then certainly you don't -- there's not a
22  prolonged observation period.
23    Q  What if the inmate has covered up his or
24  her -- well, I guess his window with paper or some

Page 20

1  other object? What happens?
2    A  Well, that inmate should be instructed to
3  remove the object.
4    Q  And if that doesn't happen, what occurs
5  next?
6    A  It would depend on the circumstances,
7  sir.
8    Q  Okay. Would that be a situation where
9  the inmate might be extracted or --
10    A  Yes, very possible.
11    Q  Okay. What if the inmate is observed to
12  be attempting to harm himself?
13    A  If -- well, then emergency response would
14  be initiated at that point. We would have an
15  emergency response code system, and the staff would
16  respond and attempt to prevent injury to the inmate.
17  Prevent him from harming himself and respond
18  appropriately to any further needs that are there,
19  whether it be medical -- or decisions for movement to
20  a more appropriate area.
21    Q  Thinking back to the year or so before
22  the death of Jermaine Wilson, are you able to state
23  on how many occasions inmates in the SHU were
24  observed attempting to harm themselves?

Page 21

1    A  I couldn't -- I couldn't tell you that.
2    Q  Do you know, generally speaking, whether
3  it happens a lot or happens not at all?
4    A  I think it's a matter of opinion as far
5  as perspective on what frequency is a lot or isn't.
6    My personal recollection is it
7  didn't happen daily, but it wasn't an unusual
8  occurrence, in my experience in corrections.
9    Dealing with the population that we
10  deal with, we have those circumstances arise from
11  time to time. That's why we have the -- it's part of
12  our training to respond to those types of incidents,
13  because it does occur.
14    Q  If an inmate is observed, let's say,
15  attempting to commit suicide, after the inmate is --
16  after the emergency response team arrives, is the
17  inmate taken anywhere?
18    A  I think that would be extremely dependent
19  upon the circumstances of the individual case.
20    Q  Right. I mean, generally speaking, would
21  the inmate be allowed to remain in his cell?
22    A  Generally speaking, no.
23    Q  So they might be either taken to the
24  infirmary or somewhere else within DCC?

David Pierce

Page 22

1    A   It is well within the realm of
2  possibility that the inmate would be relocated to the
3  infirmary at the direction of mental health staff for
4  observation, at their direction. It's also quite
5  possible that they may go to an outside hospital if
6  their injuries require such.
7    Q   Right. In the year before Jermaine
8  Wilson's death, are you able to state how many
9  inmates successfully attempted suicide in DCC?
10   A   Meaning they successfully killed
11 themselves?
12   Q   Yes.
13   A   I'm not aware of any, but I can't say
14 specifically.
15   Q   Okay. Are you aware of any incidents, in
16 the year before Jermaine Wilson's death, where
17 inmates would fake suicide attempts for whatever
18 reason?
19   A   It's not possible to determine whether an
20 attempt -- a suicide attempt was faked. We can
21 theorize based upon -- but you take every case
22 seriously, as though it was an actual attempt.
23   Q   Were there ever any incidents you were
24 aware of, during your time as deputy warden before

Page 23

1  this incident, where an inmate might attempt suicide
2  for the purpose of bringing attention to his or
3  herself, as opposed to wanting to harm themselves?
4    A   My professional opinion and experience in
5  working with inmates is that inmates, at times, are
6  manipulative, including taking actions such as
7  superficial cuts -- one example may be holding toilet
8  paper -- one roll of toilet paper sheet around their
9  neck right at the time staff approach the window to
10 make their check.
11       And certainly -- I can't say for a
12 fact what their intention was. But my professional
13 experience is, yes, that is not uncommon for inmates
14 to do things such as that to -- what I would think is
15 probably an attention-seeking action.
16   Q   Right.
17   A   But again, we take that seriously.
18   Q   Sure. So every incident, whether, say,
19 it's toilet paper, like you described, or something
20 involving physical harm, like a cut, is responded to
21 the same way?
22   A   Yes.
23   Q   Okay. Let's talk about this incident
24 itself.

Page 24

1       Are you familiar with the facts
2  surrounding the death of Jermaine Wilson?
3    A   I think so, yes.
4    Q   Can you tell me what you know about the
5  incident.
6    A   On the date in question, that evening,
7  the inmate had -- was found in his cell unresponsive.
8  Staff responded. Took the inmate -- this is -- took
9  the inmate and tried to provide lifesaving measures.
10 And emergency support was called from outside the
11 institution: 911 was called.
12       Emergency personnel from the
13 outside -- specifically, I don't know if it was EMS,
14 paramedics or who it was -- arrived and also
15 attempted to resuscitate Inmate Wilson, without
16 success.
17   Q   Did you observe his body before it was
18 taken from DCC?
19   A   Yes.
20   Q   At the time you observed his body, what
21 did you see?
22   A   I was there at the exact time that a
23 photograph was taken with the State police.
24       He was lying in the cell, feet

Page 25

1  towards the cell door. He was lying face up. At the
2  time, he had the remains of what the paramedics had
3  left in the room from where they had tried to
4  resuscitate him. Exactly what it was, I'm not sure.
5  I couldn't recall exactly what was on him.
6       His shirt was open at the time, and
7  there was a sheet hanging from the locker, and there
8  was a small amount of blood on the floor right
9  underneath where the sheet was.
10   Q   Did you notice blood anywhere else within
11 the room?
12   A   No, I didn't.
13   Q   I want to show you some copies of
14 photographs. And I'm sorry they look poor, but this
15 is all that I was given.
16       Tell me if you recognize anything
17 that's shown in those photographs.
18       And while he's doing that, Dirk,
19 you were going to get me color copies of those
20 photos.
21   A   Yes, this is a very poor photo. It's a
22 very poor photo.
23       This appears to be the scene that I
24 happened to be there when the photograph was taken

David Pierce

8 (Pages 26 to 29)

<table>
<tr><td>

Page 26

1 and how Inmate Wilson was positioned at the time, on
2 his back in the cell.
3        There is a photo, a closer-up photo
4 of the locker within the cell with the remnants of --
5 a piece of sheet hanging from it with a small amount
6 of blood on the floor.
7        You also have another photograph
8 here that -- I'm not sure what it is. It appears
9 that there's staff in there, in the cell -- I really
10 can't theorize -- I assume that's Inmate Wilson. I
11 don't know.
12        And I don't recognize this
13 photograph, so I couldn't really speak as to what it
14 is.
15        And then you have multiple other
16 photographs of the sheet. This appears to be a photo
17 of somebody performing CPR.
18        MR. SENSOR: Okay. I'll just ask
19 the court reporter to mark these photographs, which
20 were Bates marked D310 through 315, as Pierce 1.
21        (Pierce Exhibit 1 was marked for
22        identification.)
23 BY MR. SENSOR:
24    Q   Sir, did the photographs that you just

</td><td>

Page 28

1    A   Yes. I want to clarify what you stated
2 there, though.
3    Q   Sure.
4    A   I believe you stipulated after I observed
5 the incident. I didn't observe the incident and
6 wasn't involved in it whatsoever. I simply responded
7 to the institution after --
8    Q   I'm sorry. That was a poor question.
9    A   I just wanted to make sure I stipulated,
10 you know, I wasn't involved in the incident or
11 observed it. I just happened to respond to evaluate
12 my staff's response to the situation.
13    Q   Sure. I'll clarify that. I didn't mean
14 to imply that you had actually seen it. After you
15 responded to the scene, is what I should say.
16    A   Understood.
17    Q   Just to clarify, other than your
18 observation of the scene, today is the first time
19 that you've given any statements or testimony
20 involving Mr. Wilson's death?
21    A   That is accurate.
22    Q   Okay. Did you have any conversations
23 with any correction officers at SHU to determine what
24 had happened?

</td></tr>
<tr><td>

Page 27

1 reviewed, at least the ones that you were able to
2 recognize, are those a fair and accurate
3 representation of what you observed in the SHU cell
4 at the time you responded to the scene?
5    A   Yes.
6    Q   Okay. Now, were you on duty at that
7 time, or did you have to be called in?
8    A   I was contacted at home and asked to
9 respond. So I was not on duty.
10    Q   Subsequent to his death, did you provide
11 any statements or interviews in connection with any
12 investigations?
13    A   No.
14    Q   I understand there was an internal
15 affairs or an institutional investigator report done
16 by -- Mr. Drake, I believe? Ronny Drake?
17    A   Yes, sir.
18    Q   And were you questioned by Mr. Drake in
19 connection therewith?
20    A   No.
21    Q   So after that incident and after you
22 observed it, is today the first time that you've
23 given any statements or testimony regarding this
24 incident?

</td><td>

Page 29

1    A   No, I did not.
2    Q   So your involvement was you were called
3 in, you went to the scene, and that was it?
4    A   I was called in, I went to the scene, and
5 I ensured that the appropriate people were doing --
6 ensured that Mr. Drake had all the resources and was
7 getting the cooperation that he needed from the
8 staff.
9    Q   Right.
10    A   I ensured that the supervisor was, in
11 fact, collecting the necessary reports from the staff
12 involved on the date before they departed. I ensured
13 that the shift commander on duty followed our
14 procedure regarding turning over the deceased's body
15 to the medical examiner's office and got a receipt
16 for the body.
17        So I guess the process oversight
18 was my only function on that date.
19    Q   And as I understand the procedure that
20 was in effect at that time, when there is a death
21 inside the institution, it's the job of the State
22 police and/or the institutional investigator to
23 actually conduct the investigation; is that correct?
24    A   That's accurate.

</td></tr>
</table>

David Pierce

9 (Pages 30 to 32)

Page 30

1    Q   Okay.  Very good.
2         Sir, do you have any knowledge of
3    whether or not Mr. Wilson was scheduled to be
4    released from DCC at any time?
5    A   No knowledge at all.
6    Q   Have you since learned anything regarding
7    when he was supposed to have been released?
8    A   No, I haven't.
9         MR. SENSOR:  Okay, sir.  I don't
10   think I have any other questions.  I thank you for
11   your time.
12        MR. DURSTEIN:  No questions.  I
13   think we'll read.
14        (Deposition concluded at 11:45 a.m.)
15        C E R T I F I C A T I O N
16
17
18        I hereby certify that I have read
19   the foregoing transcript of my deposition testimony,
20   and that my answers to the questions propounded, with
21   the attached corrections or changes, if any, are true
22   and correct.
23
24        ----------------------------
          DAVID PIERCE

Page 31

1         I N D E X
2    WITNESS:                  PAGE
3    DAVID PIERCE
4    Mr. Sensor                 2
5
6
7
8         E X H I B I T S
9    PIERCE       DESCRIPTION      PAGE
10   1     Photocopies of photographs    26
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 32

1    CERTIFICATE OF SHORTHAND REPORTER
2
3         I, Gail Inghram Verbano, CSR, RMR,
4    CLR, the officer before whom the foregoing
5    proceedings were taken, do hereby certify that the
6    foregoing transcript is a true and correct record of
7    the proceedings; that said proceedings were taken by
8    me stenographically and thereafter reduced to
9    typewriting under my supervision; and that I am
10   neither counsel for, related to, nor employed by any
11   of the parties to this case and have no interest,
12   financial or otherwise, in its outcome.
13
14
15
16
17        ----------------------------
          Gail Inghram Verbano, CSR, RMR, CLR
          CSR No. 8635
          Certification No.: 220
          (Expires 1-31-2008)