IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SUSIE A. WILSON, individually and in her capacity as administratrix of the Estate of JERMAINE LAMAR WILSON, deceased, and in her capacity as next friend of Z.W., a minor, ) ) ) ) ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Civ. No. 05-821-SLR |
| STANLEY W. TAYLOR, JR., individually; PAUL HOWARD, individually; NOREEN RENNARD, individually; THOMAS L. CARROLL, individually; BETTY BURRIS, individually; DAVID PIERCE, individually; MICHAEL RECORDS, individually; and DAVID McDONALD, ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

Michael L. Sensor, Esquire, of Perry & Sensor, Wilmington, Delaware. Counsel for Plaintiff.

Ralph K. Durstein, Deputy Attorney General, and Erika Y. Tross, Deputy Attorney General, State of Delaware, Wilmington, Delaware. Counsel for Defendants.

**MEMORANDUM OPINION**

Dated: 2/13/09
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Susie A. Wilson, mother of the decedent Jermaine Lamar Wilson, filed this action on December 1, 2005 against[1] Stanley W. Taylor, Jr. ("Taylor"), then Commissioner of the Department of Correction of the State of Delaware; Paul Howard ("Howard"), then Chief of the Bureau of Prisons of the Department of Correction of the State of Delaware; Noreen Rennard, Chief of the Bureau of Community Corrections of the Department of Correction of the State of Delaware; Thomas L. Carroll ("Carroll"), then Warden of the Delaware Correctional Center ("DCC")[2]; Betty Burris ("Burris"), then Deputy Warden of the DCC; David Pierce ("Pierce"), Deputy Warden of the DCC; Michael Records ("Records"), then Probation and Parole Officer employed by the State of Delaware; and David McDonald ("McDonald"), then a Correctional Officer ("C/O") employed by the State of Delaware assigned to the DCC. (D.I. 1)

An 11-count amended complaint was filed on February 7, 2006. (D.I. 23) Plaintiff alleges[3] violations of the decedent's constitutional rights under 42 U.S.C. §§ 1981 and 1983 pursuant to: (1) the state-created danger doctrine; (2) deliberate indifference; (3) maintenance of customs, policies, practices or procedures; and (4)

---

[1]Defendant Johnny Boone, a Correctional Officer employed by the State of Delaware assigned to the Delaware Correctional Center, was voluntarily dismissed as a party by the plaintiff on February 27, 2006. (D.I. 28)

[2]The DCC has since been renamed the James T. Vaughn Correctional Center but, for purposes of this case and record, the court will continue to refer to DCC.

[3]Plaintiff concedes that the allegations of a conspiracy to violate the decedent's constitutional rights under 42 U.S.C. § 1985, contained in counts VI, VII, and VIII of the amended complaint, representing paragraphs 187 through 196, were not borne out by the facts during discovery. (D.I. 72 at 28 n.8) Accordingly, they shall be dismissed.

failure to train. Plaintiff also asserts the torts of assault and battery and wrongful death. (*Id.* at ¶¶ 168-86, 197-203) Plaintiff seeks punitive damages. (*Id.* at ¶¶ 204-6)

On January 18, 2008, defendants filed a motion for summary judgment on all counts. (D.I. 58) The court issued an order on February 13, 2008, requesting a statement from defendants detailing material facts as to which there is no genuine issue to be tried and the legal issues upon which judgment is sought, with a responsive statement to be submitted by plaintiff. (D.I. 62) Defendants filed their statement on February 25, 2008, and plaintiff filed her responsive statement on March 20, 2008. (D.I. 64; D.I. 65) Plaintiff filed her answering brief in opposition to summary judgment on September 28, 2008 and defendants replied on October, 14, 2008. (D.I. 72; D.I. 74) Currently before the court is defendants' motion for summary judgment on all counts. (D.I. 58) The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the following reasons, the court will deny defendants' motion for summary judgment.

## II. BACKGROUND

Jermaine Lamar Wilson ("Wilson") died in his solitary cell at DCC on February 18, 2005, as a result of asphyxia due to hanging after an apparent attempt to feign suicide. (D.I. 23 ¶ 123; D.I. 59 at 8; D.I. 72 at 1-2, 25) He had been arrested on December 4, 2002, for robbery first degree, aggravated menacing, and conspiracy. (D.I. 23 ¶ 51) He was 17 years old at the time and was detained at the New Castle County Juvenile Detention Center. (*Id.*; D.I. 59 at 4) By the time of his indictment on one count of robbery first degree, two counts of attempted robbery first degree, and three counts of conspiracy second degree on January 27, 2003, Wilson had turned 18

years old. (D.I. 23 ¶ 52; D.I. 59 at 4) His custody was remanded to the Department of Correction at Gander Hill Prison in April 2003. (D.I. 23 ¶¶ 53-54; D.I. 59 at 4) On March 10, 2004, Wilson pled guilty to one count of robbery first degree and two counts of attempted robbery first degree.[4] (D.I. 23 ¶ 55; D.I. 59 at 4) He was sentenced to the minimum mandatory term of two years incarceration ("Level V"), followed by one year of work release ("Level IV"), suspended after six months for six months of probation ("Level III"). (D.I. 23 ¶ 56; D.I. 61 at A155-56) Wilson was ordered to spend his Level IV time at a Level V facility, until space was available at Level IV. (D.I. 61 at A156) After serving approximately 15 months of his Level V sentence at Gander Hill Prison, Wilson was transferred to the Central Violation of Probation Center ("CVOP") on September 23, 2004.[5] (D.I. 23 ¶¶ 58, 63; *Id.* at A165-66) The CVOP is a Level IV facility. (D.I. 59 at 5)

---

[4]In exchange for Wilson's guilty plea on these charges, the state entered a *nolle prosequi* on the remaining three counts of conspiracy second degree. (D.I. 23 ¶ 55; D.I. 72 at 6)

[5] Wilson spent two days, September 21, 2004 through September 23, 2004, at the Webb Correctional Facility ("WCF") during his transfer from Gander Hill Prison to the CVOP. (D.I. 59 at A-163-65) Wilson had been told by a prison counselor that he was being transferred to WCF because his Level IV time was beginning. (D.I. 23 ¶ 60) There was no explanation given to Wilson or his family regarding his transfer from WCF to the CVOP. (D.I. 23 ¶ 64)

### A. The January 25, 2005 Incident

On January 25, 2005, Wilson violated a CVOP rule[6] prohibiting talking in the hallways to and from meal time. (D.I. 23 ¶ 68; Id.) After being reprimanded by defendant McDonald, Wilson refused to stop talking and was ordered to a holding cell. (D.I. 23 ¶ 68; D.I. 59 at 5) Upon entering the cell, defendant McDonald allegedly[7] "closed the door violently, causing the door to strike [Wilson] on the back." (D.I. 23 ¶ 74) Wilson responded by calling defendant McDonald either a "sucker"or a "f–king sucker." (Id. at ¶ 75; D.I. 61 at A178; D.I. 73 at B14) At this point, defendant McDonald grabbed Wilson by the throat with his left hand while holding up his right hand in a punching position. (D.I. 23 ¶ 75) Wilson told defendant McDonald that if the officer struck him, he would file a grievance against him. (Id. at ¶ 76) Defendant McDonald then threw Wilson against a bench in the cell while still holding Wilson's throat and threatened him verbally.[8] (Id.) Defendant McDonald slammed Wilson's head against the wall cutting the back of his head. (Id. at ¶ 77) Defendant McDonald then left the holding cell. (D.I. 73 at B15)

---

[6]Wilson had also been reprimanded for two previous, minor incidents when he refused to work outside in the cold weather in January 2005. (D.I. 73 at B7-8, 16-17)

[7]When deciding a motion for summary judgment, the court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995); for purposes of this motion, therefore, the court must accept this and other disputed assertions as true.

[8]Defendant McDonald allegedly said to Wilson: "Listen, you stupid motherf–ker. If you ever call me a sucker again I'll f–k your little black a-s up." (D.I. 23 ¶ 76)

After defendant McDonald left the holding cell, Wilson saw C/O Ayars in the vicinity of the cell and told her that he wanted to file a grievance against defendant McDonald and speak to the supervisor on duty. (D.I. 23 ¶ 79; Id.) C/O Ayars "acted as if she could not understand what [Wilson] was saying and would not grant [his] request [to file a grievance]." (D.I. 73 at B15) Wilson then began to kick the door of the cell. (D.I. 23 ¶ 80; D.I. 59 at 5) In response to Wilson's kicking, C/O Ayars called defendant McDonald back to the holding cell, who returned with C/O Boone. (D.I. 23 ¶¶ 80-81; D.I. 61 at A181; D.I. 73 at B15)

Defendant McDonald ordered Wilson to stop kicking the cell door. (D.I. 23 ¶ 81; D.I. 59 at 5; D.I. 73 at B15) Wilson refused to do so. (D.I. 59 at 5) While defendant McDonald was unlocking the door of the cell, C/O Boone asked Wilson why he was banging on the door. (D.I. 23 ¶ 81; D.I. 73 at B15) Wilson responded that he had just been assaulted and wanted to file a grievance. (D.I. 23 ¶ 82; D.I. 72 at B15) Once inside the cell, defendant McDonald ordered Wilson to sit down. (D.I. 23 ¶ 83; D.I. 73 at B16) Wilson refused to sit, asking defendant McDonald why he had attacked him. (D.I. 23 ¶ 83; D.I. 73 at B16) Defendant McDonald again ordered Wilson to sit, who again refused and insisted that he speak with the supervisor on duty. (D.I. 73 at B16) At this point, defendant McDonald asked C/O Boone if he was "ready," counted to two, and capstunned[9] Wilson in the face. (D.I. 23 ¶ 84; D.I. 59 at 5; D.I. 61 at A178-82) Wilson was ordered to sit down again. (D.I. 23 ¶ 86; D.I. 73 at B16) Approximately two

---

[9]Capstun is a spray containing liquid capsaicin pepper oil. (D.I. 23 ¶ 85) It is more commonly known as mace or pepper spray.

and one-half hours later, Wilson was transferred to DCC in Smyrna, Delaware, and placed in "a solitary-confinement unit commonly known as 'The Hole.'" (D.I. 23 ¶ 97; D.I. 59 at 5-6; D.I. 73 at B16)  Wilson was told that he would only have to stay in The Hole for one night.  (D.I. 73 at B16)  In fact, he remained there for weeks, until his death on February 18, 2005.  (D.I. 61 at A202-10, 248)

In a letter written to Judge Richard R. Cooch of the Superior Court by Wilson and filed with the Prothonotary on February 11, 2005, Wilson described the incident between C/O McDonald and himself as well as the fact that he remained on "24 hour lockedown [sic]" since being transferred to DCC.  (D.I. 73 at B14-17)  He also wrote that he had been told by a counselor that he would be put in "flow down"[10] on November 23, 2004, and that the flow down process would take three to four weeks, but that he had not heard from the counselor since.  (*Id.*)  Wilson also wrote about the two minor incidents when he refused to work outside in January 2005, and for which he was issued violations.  (*Id.* at B16-17)

### B. Administrative Warrant and VOP Hearing

As a result of the incident with defendant McDonald, defendant Records issued an administrative warrant against Wilson alleging that Wilson was in violation of his sentence.  (D.I. 23 ¶ 87; D.I. 59 at 5; D.I. 61 at A183)  This warrant triggered Violation of Probation ("VOP") proceedings.  (D.I. 23 ¶ 88)  In the administrative warrant,

---

[10] "'[F]low down'" is a procedure in place at DCC wherein certain inmates on Level IV supervision are placed on progressively less strict supervision, with the ultimate goal being home confinement or partial work release." (D.I. 23 ¶ 62)

defendant Records requested that Wilson be held without bail until the VOP hearing. (D.I. 61 at A183) Wilson was ordered held without bail on January 26, 2005, which was continued via video hearing on February 1, 2005. (D.I. 23 ¶ 95; D.I. 59 at 6; *Id.* at A187)

On February 9, 2005, defendant Records issued a VOP report to Judge Cooch. (D.I. 61 at 188-89) The VOP hearing to decide the merits of the administrative warrant was held on February 10, 2005, before Judge Cooch. (D.I. 23 ¶ 103) At this hearing Wilson denied the violation and a contested VOP hearing was scheduled for February 15, 2005. (D.I. 72 at B22-23; D.I. 73 at B21) Wilson was returned to his solitary cell at DCC. (D.I. 23 ¶ 106)

Later during the day of February 10, 2005, for reasons unknown, defendant Records requested that the VOP be withdrawn. (*Id.* at ¶¶ 110-11; D.I. 61 at A109; D.I. 72 at 8) Judge Cooch approved this request and the violation was withdrawn the same day. (D.I. 61 at A193-94) A post-hearing sentencing worksheet dated February 10, 2005, indicates that Wilson was to be released as a result of the withdrawn VOP.[11] (D.I. 23 ¶ 112, ex. A; D.I. 73 at B25) Judge Cooch's order withdrawing the VOP and releasing Wilson was filed with the Prothonotary on February 14, 2005. (D.I. 61 at A193-94) It appears that this order was not received by DCC. (D.I. 59 at 7)

---

[11]There is a second sentencing worksheet for Wilson that does not indicate that he is to be released. (D.I. 73 at B26) However, in light of defendants' admission that Wilson was to be released, this discrepancy is moot.

### C. Wilson's Release Scheduled for February 18, 2005

The record indicates that Wilson was told by someone at DCC that he was to be released on February 18, 2005. (D.I. 23 ¶ 108; D.I. 72 at 8-9) Wilson wrote a letter to his mother, the plaintiff, dated February 10, 2005, asking her to come pick him up on February 18.[12] (D.I. 73 at B27) In the letter he wrote: "I have to stay at level 5 . . . untill [sic] my level 3 time starts and thats [sic] next . . . Friday 18." (*Id.*) Furthermore, in his letter to Judge Cooch, Wilson wrote that his "Level 4 time is up on the 18 [sic] of this month." (*Id.* at B17) In the DCC's investigative interviews following Wilson's death on February 18, 2005, C/O Carpenter stated that Wilson had been asking her when he was going to be released beginning on February 16th. (D.I. 61 at A245, 247) During discovery it was confirmed that Wilson was due to be released on February 18, 2005. (*Id.* at A108)

### D. Wilson's Death on February 18, 2005

The events leading up to Wilson's death at approximately 10:45 p.m. on February 18, 2005, revolve around Wilson's failed attempts to get the attention of the guards on duty by "banging on [the] door [of his cell]" saying that he was going home. (D.I. 72 at 9; D.I. 73 at B30) Since this tactic did not work, Wilson told at least two other

---

[12]Plaintiff did in fact go to DCC on February 18, 2005, to pick up her son. (D.I. 23 ¶¶ 118-20) When she first arrived at approximately 5:30 p.m., she was told that Wilson was not at the facility and that they had no release information for him and that she should come back in a few hours. (D.I. 61 at A81) When she returned she was again told that DCC had no release papers for Wilson. (*Id.*) Hoping that "something different would happen," she waited until approximately 9:00 p.m. before going home. (D.I. 23 ¶ 120; *Id.*)

inmates that he was going to pretend to hang himself in an effort to get the attention of the guards. (D.I. 73 at B30-31) Wilson also may have told correctional officers that "he was going to be taken [out] in a body bag." (D.I. 72 at 9; *Id.* at B35)

Sometime between 5:30 p.m. and 6:00 p.m. on the evening of February 18, Wilson told C/O Newman, as Newman was patrolling the tier, that he was supposed to be released that day. (D.I. 59 at 7; D.I. 61 at A244) C/O Newman relayed this information to C/O Carpenter, who first checked the DOC's computer system and then phoned C/O Daggy in the receiving room at approximately 8:00 p.m. (D.I. 61 at A204, 244-45) Neither the computer system nor C/O Daggy had any information regarding Wilson's release. (*Id.* at A204, 245) C/O Daggy stated that Wilson could still be released that day, but that currently they did not have any such information. (*Id.* at A204) C/O Carpenter relayed this to C/O Newman, telling C/O Newman that they would let Wilson know as soon as they knew anything else. (*Id.*) The record is unclear as to whether C/O Newman relayed this information to Wilson. (*Id.* at A244)

C/O Newman's last interaction with Wilson, prior to Wilson's death, was at approximately 10:15 p.m. during his rounds. (D.I. 59 at 7; *Id.* at A233) At that time, Wilson held a handwritten note against the glass of his cell stating that he "was supposed to be released that day and that he wanted someone to 'check the computer' to find out why he had not been released." (D.I. 72 at 10; D.I. 61 at A233)

At approximately 10:40 p.m., while conducting his next patrol, C/O Newman looked into Wilson's cell and saw Wilson hanging by his neck from a sheet tied to a pole bar in his foot locker, which was fastened to the wall of his cell. (D.I. 59 at 8; D.I.

9

61 at A202; D.I. 72 at 10) Correctional officers on duty responded immediately and medical personnel were summoned to the scene. (D.I. 61 at A202-204, 208, 210-211, 244) Efforts to revive Wilson failed and he was pronounced dead by paramedics at 11:16 p.m. (*Id.* at A204, 208, 210-211, 213, 242, 248) The handwritten note which Wilson had held against the glass in front of C/O Newman was found on the shelf of the foot locker. (*Id.* at A233, 246, 248)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a

genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (*quoting* Fed. R. Civ. P. 56(e)). However, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Indeed, to survive a motion for summary judgment, plaintiff cannot rely merely on the unsupported allegations of the complaint, and must present more than the "mere existence of a scintilla of evidence" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Plaintiff's Constitutional Claims

Plaintiff alleges that Wilson's constitutional rights were violated under the state-created danger doctrine when, due to the unlawful assault on January 25, 2005, and after failing to be released from prison as so ordered by the Superior Court, he was deprived of due process, equal protection under the laws, and the right to be free from cruel and unusual punishment. (D.I. 23 ¶ 164.a-.f) In their brief for summary judgment, defendants argue that all constitutional claims under 42 U.S.C. § 1983 are barred because: 1) the plaintiff has failed to meet the "favorable termination rule" of *Heck v. Humphrey*, 512 U.S. 477 (1994); and 2) there was no "state-created danger" resulting

from a failure to train claim per *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989), after he was ordered released by the Superior Court but remained in custody at DCC.

### 1. Favorable Termination Rule under *Heck*

In order for a plaintiff to have a valid § 1983 claim based on the duration of his detention, he must meet the "favorable termination rule" established in *Heck*: the conviction or sentence must have "been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 487. In their motion for summary judgment, defendants argue that plaintiff's constitutional claims must fail because Judge Cooch never adjudicated the merits of Wilson's VOP. (D.I. 59 at 12)

Viewing the facts in the light most favorable to plaintiff, a genuine issue of material fact exists as to whether or not Wilson's detention was valid at the time of his death and whether or not DOC was aware that Wilson was scheduled to be released on February 18, 2005. While it is true that the merits of Wilson's VOP were not adjudicated, the withdrawal of the VOP was approved by Judge Cooch at the request of defendant Records and DOC. (D.I. 23 ¶¶ 110-11; *Id.*; D.I. 61 at A109; D.I. 72 at 8) The record clearly indicates that Wilson was ordered to be released by Judge Cooch and that his release date was determined to be February 18, 2005. (D.I. 61 at A108, 193-94) The record also indicates that Wilson was told by someone at DCC that he was to be released on February 18: he cites that date in the letter to his mother asking for her to come pick him up; he cites that date in the letter to Judge Cooch describing the

12

altercation between defendant McDonald and himself. (D.I. 73 at B17, 27) A reasonable jury could infer that his inquiries to C/O Carpenter about his release date around the 16th of February indicate that he expected to soon be released. (D.I. 61 at A245, 247)

### 2. Maintenance of Customs, Policies, Practices, or Procedures and Failure to Train

Plaintiff claims that Wilson's constitutional rights were violated under 42 U.S.C. § 1983 because of defendants' failure to train and to maintain customs, policies, practices or procedures. (D.I. 23 ¶¶ 184-86) "To establish a Section 1983 claim for failure to train and supervise employees, a plaintiff must (1) identify with particularity what the supervisory officials failed to do that demonstrates deliberate indifference and (2) demonstrate a close causal link between the alleged failure and the alleged injury." *Daniels v. Delaware*, 120 F. Supp. 2d 411, 423 (D. Del. 2000) (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)).

Viewing the facts in the light most favorable to plaintiff, a genuine issue of material fact exists as to whether or not defendants failed to train and/or to maintain customs, policies, practices or procedures. At the time of Wilson's death, the accepted practice at DCC for an inmate to obtain information regarding his release date was to either ask the records department or his tier officer. (D.I. 59 at 14) DCC tier officers were apparently trained to "go through whatever they can to find out the answer for the inmate." (*Id.*) The record shows that Wilson, following proper procedure, began asking his tier officer, C/O Carpenter, on approximately February 16th for information about his

release. (D.I. 61 at A245, 247) However, it appears that no affirmative steps were taken by C/O Carpenter or any other DCC personnel to assist Wilson until approximately 8:00 p.m. the evening of Friday, February 18, after the Superior Court had closed for the weekend and after Wilson had been "banging on [the] door [of his cell]" throughout the day and apparently becoming more and more agitated and desperate. (D.I. 72 at 9, 31; D.I. 73 at B30) A jury could find, on this record, that the failure of DCC personnel to adequately respond to Wilson's inquiry caused him to resort to feigning a suicide attempt in order to garner attention which resulted in his death. (D.I. 73 at B30-31) For these reasons, summary judgment as to all constitutional claims is denied.

### B. Deliberate Indifference

Plaintiff claims that defendants were deliberately indifferent to the risk that Wilson might attempt to hurt himself. (D.I. 23 ¶¶ 180-83) The fact that an inmate committed suicide in and of itself is not enough to substantiate a claim of deliberate indifference. *Freedman v. City of Allentown*, 853 F.2d 1111, 1115 (3d Cir. 1988). Rather, a "plaintiff in a prison suicide case has the burden of establishing three elements: (1) the detainee had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted with reckless indifference' to the detainee's particular vulnerability." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) (quoting *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 669 (3d Cir. 1988)).

Viewing the facts in the light most favorable to plaintiff, a genuine issue of material fact exists as to whether or not defendants acted with deliberate indifference to Wilson's risk of hurting himself. The record supports plaintiff's assertion that Wilson was told by a prison official that he was scheduled to be released on February 18, 2005. (D.I. 23 ¶ 108; D.I. 72 at 8-9) Furthermore, as noted above, the record shows that Wilson's repeated inquiries into his release both before and on the 18th were largely ignored, that he may have told fellow inmates that he was going to pretend to hang himself to get the attention of the guards, that he grew increasingly agitated throughout the day of the 18th, and that he may have even told correctional officers that "he was going to be taken [out] in a body bag." (D.I. 72 at 9; D.I. 73 at B35) For these reasons, summary judgment on the claim of deliberate indifference is denied.

### C. Assault and Battery & Qualified Immunity under State Law

Plaintiff claims that defendant McDonald committed assault and battery upon Wilson in the January 25, 2005 incident. (D.I. 23 ¶¶ 197-99) Defendants argue that all defendants are entitled to qualified immunity under the State Tort Claims Act. (D.I. 59 at 25) The State Tort Claims Act protects state defendants from civil liability where their actions: 1) "arose out of and in connection with the performance of an official duty;" 2) were "done in good faith and in the belief that the public interest would best be served thereby;" and 3) were not done with "gross or wanton negligence." 10 Del. C. § 4001.

Viewing the facts in the light most favorable to plaintiff, a genuine issue of material fact exists as to whether defendant McDonald acted in good faith and without gross or wanton negligence. The details of the January 25, 2005 incident, as described

15

by Wilson in his contemporaneous letter to Judge Cooch, contradict the descriptions provided by the correctional officers of CVOP in their incident reports and in the administrative warrant authored by defendant Records. (D.I. 61 at A178-82; D.I. 61 at A183; D.I. 73 at B14-17) At the VOP hearing on February 10, 2005, Wilson denied the violation and a contested VOP hearing was scheduled. (D.I. 72 at B22-23; D.I. 73 at B21) Later that same day, for reasons unknown, defendant Records requested that the VOP be withdrawn. (D.I. 23 ¶¶ 110-11; D.I. 61 at A109; D.I. 72 at 8) A jury could reasonably infer from this unexplained withdrawal, after Wilson had protested the merits of the violation against him, that an unprovoked altercation between himself and defendant McDonald did occur. For these reasons, summary judgment as to the assault and battery claim against defendant McDonald and as to qualified immunity under state law as to all defendants is denied.

### D. Wrongful Death

Plaintiff brings a wrongful death claim under 10 Del. C. § 3724 against defendants. (D.I. 23 ¶¶ 200-03) In order to sustain a wrongful death claim, it must be shown that the defendant's "wrongful act caus[ed] the death of another." 10 Del. C. § 3722.

Viewing the facts in the light most favorable to plaintiff, a genuine issue of material fact exists as to whether or not defendants' conduct was a proximate cause of Wilson's death. The conduct in question is the defendants' lack of response to Wilson's inquiries into his release and if they knew, or had reason to know, that Wilson was going to harm himself. As noted above, the record shows that Wilson's repeated

inquiries into his release both before and on the 18th were largely ignored, that he may have told fellow inmates that he was going to pretend to hang himself to get the attention of the guards, that he grew increasingly agitated throughout the day of the 18th, and that he may have even told correctional officers that "he was going to be taken [out] in a body bag." (D.I. 72 at 9; D.I. 73 at B35) For these reasons, summary judgment on the claim of wrongful death is denied.

### E. Qualified Immunity under Federal and State Law

In their motion for summary judgment, defendants claim that the doctrine of qualified immunity applies to all defendants in their individual capacities and that, therefore, this court should grant their motion for summary judgment against all claims. (D.I. 59 at 28-30) "[D]etermining whether qualified immunity applies involves: 1) taken in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a constitutional right; and (2) the right was clearly established in the light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001). Qualified immunity will be defeated if a defendant "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982).

Viewed in the light most favorable to plaintiff, a genuine issue of material fact exists as to whether or not defendants knew, or should have known, that their official actions would violate Wilson's constitutional rights. The record indicates that the VOP was withdrawn and Wilson was ordered to be released. (D.I. 61 at A193-94) The

record also indicates that Wilson was told that he was scheduled to be released on February 18, 2005. (D.I. 23 ¶ 108; D.I. 72 at 8-9) Wilson was not timely released and his persistent inquiries to on-duty correctional officers for information about his release were largely ignored. (D.I. 61 at A108, 204, 244, 247; D.I. 72 at 9; D.I. 73 at B30-31, 35) Defendants acknowledge that it is known that inmates feign suicide attempts in order to get attention. (D.I. 61 at A134-35) The record indicates that Wilson did just that and died as a result. (*Id.* at A204; D.I. 73 at B30-31) For these reasons, summary judgment under the doctrine of qualified immunity is denied.

### F. Punitive Damages

Plaintiff claims that she is entitled to punitive damages from all defendants. (D.I. 23 ¶¶ 204-06) Under a § 1983 claim, punitive damages are appropriate where "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Under Delaware state law, punitive damages are appropriate where defendants' conduct is "outrageous" and committed through "reckless indifference to the rights of others." *Jardel Corp. V. Hughes*, 523 A.2d 518, 528 (Del. 1987).

Viewing the facts in the light most favorable to plaintiff, a genuine issue of material fact exists as to whether or not defendants acted outrageously and with "reckless indifference to the rights of others." *Id.* As noted above, with respect to the alleged assault and battery of Wilson by defendant McDonald, a significant discrepancy exists between DCC personnel's version of the events of January 25th and Wilson's own

version. (D.I. 61 at A178-83; D.I. 73 at B14-17) Furthermore, as noted above, with respect to the events surrounding Wilson's death, the record affirmatively shows that Wilson's pleas for information regarding his release date were largely ignored despite his increasing agitation. (D.I. 72 at 9; D.I. 73 at B35) For these reasons, summary judgment on the claim for punitive damages is denied.

## V. CONCLUSION

For the reasons stated above, the court will deny defendants' motion for summary judgment on all counts. A jury, if viewing the totality of the circumstances of record in a light most favorable to plaintiff, could reasonably find for plaintiff on all claims.

An appropriate order will issue.